# EXHIBIT 3

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | |
|---|---|
| STATE OF SOUTH CAROLINA ) | IN THE COURT OF COMMON PLEAS |
| ) | |
| COUNTY OF LEXINGTON ) | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| ) | |
| Donald Black, Marcia Black, Larry ) | C/A NO. 2019-CP-32-_____ |
| Martin, Rebecca Martin, Barbara ) | |
| Thompson, and James Thompson, ) | |
| ) | |
| For themselves and a Class of Similarly ) | **NOTICE OF MOTION AND MOTION FOR** |
| Situated Plaintiffs, ) | **PROTECTIVE ORDER PURSUANT TO** |
| ) | **RULES 23(d)(2) and 26(c), SCRCP** |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| Mantei & Associates, Ltd., Ricky Alan ) | |
| Mantei, Cindy Chiellini, Centaurus ) | |
| Financial, Inc., and J.P. Turner & ) | |
| Company, L.L.C., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**TO:    DEFENDANTS MANTEI & ASSOCIATES, LTD, RICKY ALAN MANTEI, CINDY CHIELLINI, CENTAURUS FINANCIAL, INC., and J.P. TURNER & COMPANY, LLC**

**YOU WILL PLEASE TAKE NOTICE** that Plaintiffs, Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson, for themselves and on behalf of a class of similarly situated investors, will move this Court at the Lexington County Courthouse, Lexington, South Carolina, ten (10) days from the date of this motion or as soon thereafter as a hearing is scheduled by the Court for an Order pursuant to Rules 23(d)(2) and 26(c) of the South Carolina Rules of Civil Procedure restricting *pendente lite*, the above-named defendants, Centaurus Financial, Inc. ("Centaurus"), J.P. Turner & Company, LLC ("J.P. Turner"), Mantei & Associates, Ltd. ("Mantei & Associates"), Ricky Alan Mantei, and Cindy Chiellini

1

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

(collectively "Defendants"), and their counsel from communicating with any potential class members regarding this litigation,

Counsel for the Plaintiffs affirms, pursuant to Rule 11, SCRCP, that he believes consultation with the Defendants on the matters stated herein would serve no useful purpose.

In support of this motion, Plaintiffs would respectfully show as follows:

## INTRODUCTION

In this proposed class action, Plaintiffs believe Defendants and their counsel may attempt to communicate with potential members of the class ("Class Members")—for whom  Defendants act as financial advisors in a fiduciary relationship--about the subject matter of this lawsuit in order to shape the Class Members' beliefs and obtain an advantage in this litigation.  Any communication with the Class Members regarding this lawsuit instituted by the Defendants likely will misrepresent the status, purpose, and effect of the action and will create impressions tending to reflect adversely on the named Plaintiffs, their counsel, and Plaintiffs' causes of action.  This type of one-sided communication would interfere with Plaintiffs' right to bring their claims as a class action under Rule 23, SCRCP.  An order prohibiting Defendants and their counsel from communicating with potential class members about the subject matter of this lawsuit without prior court approval would be a narrowly-tailored limitation of commercial speech consistent with the rights of the parties under the circumstances.

## FACTUAL BACKGROUND

This lawsuit arises out of the Defendants' foisting of illiquid debt instruments upon the Plaintiffs and the Class Members via false promises and misleading information.  The current proposed definition of the Class Members is:

South Carolina citizens and the estates of deceased South Carolina citizens, who, at the age of 50 years or older, were sold by representatives affiliated with the

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Mantei Defendants[1] while registered with the Broker-Dealer Defendants a debt instrument (including, but not limited to structured certificates of deposit, principal protected notes, and corporate medium-term notes) with an interest rate that was subject to fluctuation prior to maturity, which could decrease to zero based on market variables, and which has or had a maturity period greater than 10 years.

Plaintiffs brought the following causes of action to vindicate their rights and the rights of the Class Members as a result of the Defendants' conduct: (1) breach of contract; (2) breach of fiduciary duty; (3) unjust enrichment; (4) breach of contract accompanied by a fraudulent act; and (5) violations of the Uniform Securities Act, S.C. Code Ann. §§ 35-1-101, *et seq.*

Plaintiffs and the Class Members placed the utmost trust, care, and confidence in the Defendants. Plaintiffs believe the Defendants may leverage and attempt to misuse their fiduciary relationship and communicate with the Class Members about this litigation in an attempt to either to solicit affidavit testimony in opposition to class certification, encourage class members to "opt out" of the class after it is certified, or otherwise obtain an advantage in this case to the detriment of Plaintiffs' and the other Class Members' rights. Indeed, Defendants have already attempted to use surreptitious techniques to alter clients' investment objectives after losses occurred in the accounts. Due to the very real nature of this potentially irreparable harm as a result of the confidential relationship between Defendants and the Class Members, Plaintiffs file this motion for an order preemptively prohibiting such communications and thereby prevent further injury and harm from occurring to Class Members at the hands of Defendants who have already misused their fiduciary relationship to enrich themselves at the expense of Named Plaintiffs and other Class Members.

---

[1] The "Mantei Defendants" are Defendants Mantei & Associates, Ricky Alan Mantei, and Cindy Chiellini. At all relevant times, Mantei and Chiellini were registered representatives of either Defendants J.P. Turner or Centaurus.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## LAW/ANALYSIS

Rule 23(d)(2), SCRCP gives this Court the broad power to "impose such terms as shall fairly and adequately protect the interest of the persons on whose behalf the action is brought or defended." Under certain circumstances, it may be necessary to limit communication between the parties and potential members of the class. *See Eldridge v. City of Greenwood*, 308 S.C. 125, 127-28, 417 S.E.2d 532, 534 (1992). One reason that courts enter such orders is to protect against "[u]napproved communications to class members that misrepresent the status or effect of the pending action [which] have an obvious potential for confusion and/or adversely affecting the administration of justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 n.12 (1981) (quoting *Waldo v. Lakeshore Estates, Inc.*, 433 F. Supp. 782, 790-91 (E.D. La. 1977)). Orders restricting these communications are permissible when they "reflect a weighing of the need for a limitation and the potential interference with the rights of the parties" and are carefully drawn to "limit[] speech as little as possible." *Id.* at 101-02; *see also Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985) (holding the four criteria for good cause to restrict communications between a class and class opponents are "the severity and the likelihood of the perceived harm; the precision with which the order is drawn; the availability of a less onerous alternative; and the duration of the order").

Case law is replete with examples where such orders are entered to protect the rights of the parties. Courts in particular recognize that where defendants have business relationships with the absent and unsophisticated class members, they are in a position to use their economic leverage to coercive effect. To prevent such harms and to avoid inherent potential for abuse, defendants in class-action lawsuits may be prohibited from unrestricted communications with potential class members.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

For example, such restrictions were placed upon the defendant in *Kleiner*.  In that case, the plaintiffs sought class-based relief against a bank for its failure to properly calculate interest rates charged to its customers. *Kleiner*, 751 F.2d at 1196.  Because many members of the class would be concerned about their credit rating and their ability to borrow from the bank in the future, the bank had economic leverage over these potential class members. *See id.* at 1202.  The Eleventh Circuit recognized that a "unilateral communications scheme" by a class action defendant is "rife with potential for coercion. '[I]f the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive.'" *Id.* (quoting Note, *Developments in the Law – Class Actions*, 89 Harv. L. Rev. 1318, 1600 (1976)). Unilateral "opt out" communications are particularly troublesome, as they "sabotage the goal of informed consent by urging exclusion on the basis of a one-side presentation of the facts, without opportunity for rebuttal.  The damage from misstatements could well be irreparable." *Id.* at 1203. The court therefore affirmed the district court's order imposing communication restrictions. *Id.*; *see also id.* at 1207 (finding the order was not an unconstitutional restriction of commercial speech).

Similarly, in *Rankin v. Board of Education of Wichita Public Schools*, 174 F.R.D. 695 (D. Kan. 1977), plaintiffs sought certification of a class of speech-language impaired students. Defendant school board wrote to parents of the student class members addressing the underlying issues raised by the litigation, without mentioning the litigation. *Id.* at 697.  Even though the letter was not itself abusive, it nonetheless raised real concerns about future communications.  As the court noted: "There is no legitimate purpose for defendant to communicate with prospective members of the class concerning the lawsuit; such communications could invite abuse." *Id*.  While the court allowed communications "made in the ordinary course of providing educational services

to the students, even though such communications may necessarily implicate the subject matter of the litigation," the court issued an order prohibiting defendants and their counsel from making any contact or communication with prospective class members which expressly referred to the litigation in order to avoid this blatant potential for abuse. *Id.* at 697-98.

Other courts have imposed contact bans on defendants after they demonstrated their inability to avoid potentially inappropriate contacts. In *Hampton Hardware, Inc. v. Cotter & Company, Inc.*, 156 F.R.D. 630 (N.D. Tex. 1994), a hardware retailer brought a class action against a wholesale cooperative. The defendant wholesaler sent three different letters to potential class members, urging them not to participate in the lawsuit. *Id.* at 631-32. Although the court found that little actual harm was caused by the letters, they nonetheless demonstrated the clear potential for abuse and accordingly justified the imposition of a bar on litigation-related contacts. In so holding, the court pointed to the on-going business relationship between class members and the defendant which "underscore[d] the potential for future coercion." *Id.* at 633. Because class members "must necessarily rely upon the defendant for dissemination of factual information about hardware goods and for lower prices in purchasing those goods," they were particularly susceptible to believing defendant's negative comments about the class action litigation. *Id.* In addition, defendant had a clear conflict of interest in advising class members about the merits of participating in the lawsuit "due to its direct pecuniary benefit in the outcome." *Id.* The court noted that "[a]ctual harm need not be proven to justify an order limiting class contacts. Rather, an order limiting contacts is justified upon a finding of 'a likelihood of serious abuses.'" *Id.* (quoting *In re School Asbestos Litigation*, 842 F.2d 671, 683 (3d Cir. 1988)).

Here, there is no legitimate reason for the Defendants to communicate with class members about the subject-matter of the lawsuit prior to certification. Many class members have an on-

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

going business relationship with the Defendants, with the Defendants acting in a fiduciary capacity as their financial advisors. All of the class members are elderly and many are very unsophisticated. These are relationships highly susceptible to misinformation and subtle coercion relating to their rights to pursue claims against the Defendants, just like the debtor-class in *Kleiner* and even more so than the parents in *Rankin* or the hardware retailers in *Hampton Hardware*. Any communication with potential class members about the subject-matter of this case creates a likelihood of serious abuse. Moreover, these Defendants have already attempted to alter the investment objectives of accounts of Class Members under the guise of "updating" account information. Plaintiffs therefore request that this Court prohibit Defendants from engaging in the following communications with the Class Members during the pendency of this litigation: (1) any express or implied reference to the instant lawsuit; (2) any express or implied request that Class Members "opt out" of the class if it is certified; and (3) any solicitation of support for Defendants' opposition to a motion to certify the class, opposition to this motion, or opposition to other issues in this case that may arise during the course of this litigation.

Class Members include both current and former clients of Defendants. Plaintiffs do not intend to restrict Defendants' communications with Class Members in the ordinary course of any still existing relationship. But those communications cannot pertain to the subject matter of this lawsuit. The Class Members' decision to participate or opt out of the class or support or oppose this motion or any other issue in this litigation under Rule 23 should be based on proper notice approved by the Court, and not on a one-sided presentation of the merits of the case by the Defendants or their counsel or other representatives.

**CONCLUSION**

For these reasons, Plaintiffs respectfully request that this Court enter an order prohibiting the Defendants and their counsel from communicating with potential class members about the subject-matter of this lawsuit prior to trial as described above, or in the alternative, to prohibit such communication without prior court approval, and for such other and further relief as may be just and proper.

Respectfully submitted,

s/Mitchell Willoughby
Mitchell Willoughby, Esquire, SC Bar No. 6161
Elizabeth Zeck, Esquire, SC Bar No. 9006
R. Walker Humphrey, II, Esquire, SC Bar No. 79426
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street (29201)
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com
whumphrey@willoughbyhoefer.com

*Attorneys for Named Plaintiffs*

June 28, 2019
Columbia, South Carolina

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF LEXINGTON | ) | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| | ) | |
| Donald Black, Marcia Black, Larry | ) | C/A NO. 2019-CP-32-_____ |
| Martin, Rebecca Martin, Barbara | ) | |
| Thompson, and James Thompson, | ) | |
| | ) | |
| For themselves and a Class of Similarly | ) | **SUMMONS** |
| Situated Plaintiffs, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Mantei & Associates, Ltd., Ricky Alan | ) | |
| Mantei, Cindy Chiellini, Centaurus | ) | |
| Financial, Inc., and J.P. Turner & | ) | |
| Company, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

TO THE DEFENDANTS ABOVE-NAMED:

**YOU ARE HEREBY SUMMONED** and required to answer the complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to this complaint upon the subscriber, at the address shown below, within thirty (30) days after service hereof, exclusive of the day of such service, and if you fail to answer the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

s/Mitchell Willoughby
Mitchell Willoughby, Esquire, SC Bar No. 6161
Elizabeth Zeck, Esquire, SC Bar No. 9006
R. Walker Humphrey, II, Esquire, SC Bar No. 79426
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street (29201)
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com
whumphrey@willoughbyhoefer.com

*Attorneys for Named Plaintiffs*

June 28, 2019
Columbia, South Carolina

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF LEXINGTON | ) | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| | ) | |
| Donald Black, Marcia Black, Larry | ) | C/A NO. 2019-CP-32-_____ |
| Martin, Rebecca Martin, Barbara | ) | |
| Thompson, and James Thompson, | ) | |
| | ) | |
| For themselves and a Class of Similarly | ) | **ORIGINAL COMPLAINT** |
| Situated Plaintiffs, | ) | **(Jury Trial Demanded)** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Mantei & Associates, Ltd., Ricky Alan | ) | |
| Mantei, Cindy Chiellini, Centaurus | ) | |
| Financial, Inc., and J.P. Turner & | ) | |
| Company, L.L.C, | ) | |
| | ) | |
| Defendants. | ) | |

Named Plaintiffs Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson, for themselves and, pursuant to Rule 23 of the South Carolina Rules of Civil Procedure, on behalf of a class of similarly situated Plaintiffs, complain of the above-named defendants, Mantei & Associates, Ltd. ("Mantei & Associates"), Ricky Alan Mantei, Cindy Chiellini, J.P. Turner & Company, LLC ("J.P. Turner"), and Centaurus Financial, Inc. ("Centaurus") (collectively "Defendants"), and respectfully allege as follows:

## INTRODUCTION

1.      This is a South Carolina class action brought to vindicate the rights of Named Plaintiffs Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson and James Thompson (collectively, "Named Plaintiffs"), and all similarly situated South Carolina investors (the "Class Members"), who were sold illiquid and ripoff products by Defendants.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

2.     Mantei and Chiellini at all relevant times were employed by and/or affiliated with Mantei & Associates, Ltd. All brokers associated with Defendant Mantei & Associates, Ltd. worked as a team.  Defendant Mantei was instrumental in managing and reviewing investments for each and every client with each and every individual broker employed by and/or affiliated with Mantei & Associates, Ltd., and in personally reviewing each client's monthly statements.  Because of her long tenure and experience with Mantei & Associates, Ltd., Defendant Chiellini was named as the "financial representative" on client account statements.  Defendants Mantei, Chiellini, and Mantei & Associates are collectively referred to as the "Mantei Defendants."  At all times relevant to this action, the Mantei Defendants operated out of offices in Lexington County, South Carolina.

3.     Between approximately March 2010 and approximately June 15, 2015, Mantei and Chiellini were registered representatives of J.P. Turner.  Since approximately May 19, 2015, Mantei and Chiellini have been registered representatives with Centaurus.  J.P. Turner and Centaurus are referred to collectively herein as the "Broker-Dealer Defendants."

4.     Defendants advertised and sold illiquid debt instruments to unsophisticated investors over the age of 50, including Named Plaintiffs and the other Class Members, with false promises of high returns and guaranteed return of their principal investment within a short time following initial purchases.  These products included structured certificates of deposit ("Structured CDs"), principal protected notes ("PPNs"), and "medium term" corporate bonds (collectively, the "Ripoff Products"), all of which shared the same characteristics that Defendants willfully misrepresented and/or concealed from Named Plaintiffs and other Class Members:

- that the publicly advertised high initial interest rate would be recalculated after an introductory period based on complex and obscure metrics which resulted in the reduction to zero or near zero of the interest rates payable for the remaining length of the investments,

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

which maturities were measured in decades and in many cases were longer than the Named

Plaintiffs' and other Class Members' life expectancies;

- that the Ripoff Products did not perform like traditional bank certificates of deposit;

- that the market value would decrease during the life of the investments; and

- that the Ripoff Products were illiquid.

These "features" meant that Named Plaintiffs and the other Class Members could not access their

funds in the interim without substantial losses, if a secondary market even existed for such

investments.

5.     All of the Ripoff Products were debt securities exempt from registration pursuant

to rules issued by the Securities and Exchange Commission under the Securities Act of 1933, were

not issued by investment companies registered under or which have filed registration statements

under the Investment Company Act of 1940, and/or otherwise did not qualify as "covered

securities" for purposes of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").

6.     Defendants advanced their own interests in the sale of the Ripoff Products without

regard and contrary to the interests of the investors, as these products paid high fees and

commissions to the detriment of the interests of Named Plaintiffs and other Class Members.

7.     Defendants sold the Ripoff Products as part of a willful and malicious scheme

designed to enrich themselves in reckless disregard of the rights and interests of, and any resulting

damage to, Named Plaintiffs and the other Class Members.

8.     Named Plaintiffs bring this action on behalf of a class consisting of all South

Carolina investors over the age of 50 years who were sold the Ripoff Products by Defendants, and

on behalf of themselves and other Class Members seek actual damages, punitive damages, court

costs, attorneys' fees, litigation expenses, prejudgment interest at the highest legal rate and/or

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

another factor compensating for the time value of money, and equitable relief as may be appropriate, including but not limited to rescission and the disgorgement of commissions or other fees by which Defendants have been unjustly enriched.

### PARTIES

9.     Named Plaintiffs Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson are each citizens and residents of the State of South Carolina.

10.     Defendant Mantei & Associates, Ltd. is a South Carolina corporation and has as its principal place of business 4580 Sunset Boulevard, Lexington, South Carolina 29072. Mantei & Associates is registered to do business in this State and is in good standing with the South Carolina Secretary of State. Defendants Ricky Alan Mantei and Cindy Chiellini each have their principal place of business at 4580 Sunset Boulevard, Lexington, South Carolina 29072.

11.     Defendants Ricky Alan Mantei and Cindy Chiellini are each citizens and residents of the State of South Carolina.  Defendant Cindy Chiellini is a resident of Lexington County, South Carolina. At all times relevant to this claim, Mantei and Chiellini were registered representatives, and Mantei was also a registered investment advisor, with either J.P. Turner or Centaurus.  All of the actions, inactions, omissions, and wrongdoing of both Mantei and Chiellini were performed for and on behalf of J.P. Turner and Centaurus in the course and scope of their employment. Therefore, Mantei and Chiellini are directly liable and Centaurus and J.P. Turner, and their control persons, are jointly, severally, and fully accountable and totally liable for the misconduct and fraudulent wrongdoing of Mantei and Chiellini under agency law, common law principles of *respondeat superior*, and state securities laws.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

12.     Defendant Centaurus Financial, Inc. is a California corporation and has as its principal place of business 2300 E Katella Avenue, Suite 200, Anaheim, California 92806. Centaurus is registered to do business in this State and is in good standing with the South Carolina Secretary of State.

13.     Defendant J.P. Turner & Company, LLC is a Georgia limited liability company and has as its principal place of business 200 North Pacific Coast Highway, Suite 1200, El Segundo, California 90245. J.P. Turner terminated its registration to do business in this State on or about May 16, 2016, but remains an active Georgia limited liability company.

## JURISDICTION AND VENUE

14.     The incidents giving rise to this Complaint took place in the State of South Carolina.

15.     Defendants at all relevant times conducted and performed business and acts that are the subject of this Complaint in Lexington County, South Carolina and have sufficient contacts and business within Lexington County, South Carolina so as to render them subject to the *in personam* jurisdiction and venue of this Court pursuant to the Code of Laws of South Carolina.

16.     All claims contained herein are governed by the laws of the State of South Carolina.

17.     Venue is proper before this Court under, *inter alia*, S.C. Code Ann. § 15-7-30.

## GENERAL ALLEGATIONS

18.     The Mantei Defendants have been financial advisors and brokers in the Lexington area of South Carolina since 1995, often associated with firms having a lengthy record of gross regulatory violations. From approximately 1995 to 2000, Mantei and Chiellini were registered representatives with D.E. Frey & Company ("D.E. Frey"). D.E. Frey's securities registration was terminated in early 2001 following repeated regulatory violations and sanctions. From approximately 2008 to 2010, Mantei and Chiellini were registered representatives of GunnAllen

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Financial, Inc. ("GunnAllen"). The Financial Industry Regulatory Authority ("FINRA") shut down GunnAllen in 2010 after repeated lawsuits, investigations, and fines for regulatory violations plagued the firm. Mantei and Chiellini then became registered representatives of J.P. Turner from approximately 2010 to 2015. J.P. Turner suffered a fate similar to that of D.E. Frey and GunnAllen when its parent company, Cetera Financial Group ("Cetera"), shuttered J.P. Turner's operations in 2015 due to J.P. Turner's own pervasive regulatory violations.

19.     In approximately May 2015, the Mantei brokers all registered with Centaurus, and Centaurus, despite an opportunity and obligation to conduct appropriate due diligence and with the knowledge and understanding of the illiquidity and other characteristics of the Ripoff Products, adopted the same faithless wrongful conduct and strategy used at J.P. Turner and sanctioned the Mantei Defendants to carry on just as they had when affiliated with J.P. Turner—with the same book of business, the same products, and the same practices.

20.     Centaurus was aware of Mantei and Chiellini's prior employment history, the products they sold their clients, the products they would continue to sell their clients, and their business practices. Centaurus, upon accepting the transfer of the Class Members' accounts, failed to advise or inform the Class Members of the illiquid and imprudent nature of the Ripoff Products held in those accounts. Instead, by accepting the investments without comment to their clients, the Class Members, Centaurus ratified the recommendations of the Mantei Defendants and their associates while associated with J.P. Turner. Upon information and belief, Centaurus imposed no restrictions on Mantei and Chiellini with respect to the products they could sell, including the Ripoff Products, or the manner in which they sold them. Indeed, upon information and belief, Centaurus expressly sanctioned, allowed, permitted, and encouraged Mantei and Chiellini to keep selling Ripoff Products just as they had been.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

21.     Since May 2015, the Mantei Defendants and other registered representatives associated with Mantei & Associates have been the sole/primary representatives of Centaurus in the Aiken/Lexington areas of South Carolina and on information and belief, other parts of South Carolina as well.

22.     This case seeks damages and equitable remedies for the actions of the Mantei Defendants both during their tenure with J.P. Turner and continuing unabated with Centaurus.

23.     The Mantei Defendants, for themselves and on behalf of the Broker-Dealer Defendants, used outdoor signage outside their offices on Highway 378 in Lexington County, among other means of messaging, to advertise the Ripoff Products to the public.  These advertisements claimed the Ripoff Products were "FDIC insured" and provided very attractive interest rates up to 10%, in contrast to low rates then available from depository banks for traditional certificates of deposit and other similar investments, as a ruse to lure in elderly investors.

24.     Defendants' outdoor signage did not provide any explanation of any of the following characteristics of the Ripoff Products:

   a.  that the advertised Ripoff Products were different from traditional certificates of deposit and other similar investments offered by depository banks;

   b.  that the advertised Ripoff Products had no guaranteed rate of return over the life of the investment;

   c.  that the high rate of return advertised was a "teaser" rate that would be paid for only a short period and that thereafter interest would be determined by a calculation based on obscure market metrics;

   d.  that, due to the calculations embedded in the Ripoff Products, the rate of return following the initial teaser period would drop as low as 0% well before maturity;

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

e.  that the advertised FDIC insurance did not protect their investments against fluctuations in value prior to maturity as a result of decreased interest rates based on various financial indices;

f.  that there were high commissions and fees to be paid to Defendants or otherwise charged and that the advertised FDIC insurance only protected the amount of investment net of Defendants' fees;

g.  that the value of the Ripoff Products at maturity would effectively be worth less in purchasing power than the amount invested originally;

h.  that the value of the advertised Ripoff Products could and in fact did decrease substantially prior to maturity;

i.  that the Ripoff Products had lengthy maturity periods, often as long as decades, that could equal or exceed the investors' life expectancy, and

j.  that the Ripoff Products were highly illiquid and that any early sale, if available at all, would result in substantial loss of principal.

25.     Once elderly Named Plaintiffs and Class Members were lured into Defendants' local offices by the misleading advertising of the Ripoff Products, Defendants represented and assured them that Defendants had the knowledge and experience necessary to safely and prudently handle their investments.  As a result of these affirmative representations, Named Plaintiffs and Class Members placed the utmost faith, trust, and confidence in Defendants to provide sound, prudent and honest financial advice in the management of their retirement assets entrusted to Defendants.

26.     Defendants assured Named Plaintiffs and other Class Members that the outdoor signage accurately described the Ripoff Products they were purchasing.  But the misleading and

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

incomplete outdoor signage was just one part of Defendants' scheme of misrepresentation and concealment about the Ripoff Products.

27.     Defendants recommended the Ripoff Products to Named Plaintiffs and other Class Members as safe, secure, and liquid investments.

28.     Defendants also told Named Plaintiffs and other Class Members that the Ripoff Products were FDIC insured for the full value of the investment.

29.     Defendants failed to provide Named Plaintiffs and other Class Members with prospectuses for the Ripoff Products prior to their sale in direct violation of, *inter alia*, S.C. Code Ann. Regs. 13-501(A)(10).

30.     Defendants failed to provide Named Plaintiffs and other Class Members with full, complete, and accurate disclosures regarding the nature and terms of the Ripoff Products, but instead deliberately concealed the material facts set forth in ¶ 24, *supra*.

31.     Defendants failed to inform Named Plaintiffs and other Class Members that the Ripoff Products had stated maturities of longer than ten years and that the principal of their investment in the Ripoff Products could be tied up until the stated maturity dates.

32.     Defendants knew or should have known that the interest calculations embedded in the Ripoff Products were based on metrics that made it extremely unlikely for the Ripoff Products to return the promised "good" rate of interest after the initial guaranteed period.

33.     Defendants failed to inform Named Plaintiffs and other Class Members that the embedded calculations made it extremely unlikely that the Ripoff Products would return the promised "good" rate of interest after the initial guaranteed period.

34.     The Ripoff Products sold to Named Plaintiffs and other Class Members had lengthy maturity periods.  Defendants knew or should have known these periods were longer than the

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

investment time horizons and even the life expectancies of many elderly Named Plaintiffs and other Class Members to whom the Defendants sold these products.

35.     Defendants failed to inform Named Plaintiffs and other Class Members that the maturity periods were longer than their investment time horizons and even the life expectancies of many elderly investors to whom the Defendants sold these products.

36.     The market value of the Ripoff Products prior to maturity fell dramatically below their cost bases as a result of the falling interest rates, which dropped to zero pursuant to the embedded calculations based on various financial metrics.

37.     Defendants knew or should have known that the market value of the Ripoff Products would drop well below their cost bases as a result of their lengthy terms and the decreased and/or zero interest rates resulting from the embedded rate calculations.

38.     Defendants failed to inform Named Plaintiffs and other Class Members that the market value of the Ripoff Products would drop well below their cost bases as a result of their lengthy terms and the decreased and/or zero interest rates resulting from the embedded rate calculations.

39.     Defendants knew or should have known that the issuers were unlikely to exercise their "call" options as a result of the decreased and/or zero interest rates resulting from the embedded interest rate calculations.

40.     Defendants knew or should have known that the Ripoff Products would effectively be worth less in purchasing power at maturity than the amount originally invested.

41.     Defendants failed to inform Named Plaintiffs and other Class Members that the Ripoff Products would effectively be worth less in purchasing power at maturity than the amount originally invested.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

42.     Defendants failed to inform Named Plaintiffs and other Class Members that their representations that the Ripoff Products would be called well before their maturity dates were untrue, deceitful, and wrongful.

43.     Because of the decreased value of the Ripoff Products prior to maturity and because the Ripoff Products did not generate the income stream promised by Defendants, Named Plaintiffs and other Class Members are unable to make withdrawals without invading principal and locking in substantial losses, in direct contradiction of Defendants' representations that the Named Plaintiffs and other Class Members' investments in the Ripoff Products were protected, insured, and liquid.

44.     The Ripoff Products are grossly illiquid, meaning that Named Plaintiffs and other Class Members cannot access the assets invested in the Ripoff Products without suffering substantial losses as the market value of the Ripoff Products are now far below their cost bases.

45.     Defendants engaged in a scheme of concealment, failing to reveal to Named Plaintiffs and other Class Members that the Ripoff Products generated large commissions and fees payable to Defendants, which amounts were deducted from the amount available for investment. Defendants further concealed that these commissions and fees were the primary motivating factor in their promotion and sale of these illiquid products to elderly Named Plaintiffs and other Class Members—not the needs of the investors themselves, but rather the bad faith and self-interests of Defendants.

46.     When Named Plaintiffs and other Class Members raised questions to Defendants about the diminished current values of the Ripoff Products, Defendants repeatedly told Named Plaintiffs and other Class Members that the Ripoff Products were and had been proper investments, that any reduction in the account balance was merely temporary and the result of factors beyond

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Defendants' control, that making changes in the investment strategy designed by Defendants would be foolish and wrong, and that the best course of action would be to continue to hold the Ripoff Products until they were called. Defendants supported their recommendation of Named Plaintiffs and other Class Members' continued holding of the Ripoff Products by repeating their assurances that the Ripoff Products would soon be called, well in advance of their maturity date. Defendants knew this to be false and made these representations only to convince Named Plaintiffs and other Class Members to continue holding the Ripoff Products and to take no other actions to protect their interests.

47.     Reassured by these continuing false and misleading promises and representations from financial "advisors" whom they believed were trustworthy and reputable and had their best interests in mind, the Named Plaintiffs and other Class Members followed Defendants' advice to leave their irreplaceable assets under Defendants' control and to continue to hold the Ripoff Products recommended and sold by Defendants. Defendants' false and misleading promises and representations concealed the true nature of the Ripoff Products and the harm they were causing, thereby keeping Named Plaintiffs and other Class Members misinformed, in the dark and waiting patiently as advised by Defendants.

48.     Unbeknownst to the Named Plaintiffs and other Class Members, the Ripoff Products were too risky and illiquid for elderly investors with a need for guaranteed income for living expenses, health care costs or to meet required minimum distributions in their IRAs and for flexibility and liquidity in their accounts. However, because of the faith, trust, and confidence that Defendants purposefully, deliberately and misleadingly engendered in these elderly Named Plaintiffs and other Class Members, they remained unaware that their trust was misplaced, that

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

they had been lied to and defrauded, and that their accounts continued to be exposed to enormous risk, imprudent investment, and general mismanagement.

49.     As a result of Defendants' continuing failures, the Named Plaintiffs and other Class Members have lost substantial value in their irreplaceable assets, have been denied immediate access to their funds, and have suffered enormous loss and damage.

## ALLEGATIONS OF NAMED PLAINTIFFS

### A.    Donald and Marcia Black

50.     Donald Black was born in 1943 and served for 27 years as a mess sergeant in the South Carolina Army National Guard.  He also owned and operated a lawn and garden store in South Carolina for over thirty years, until his retirement in 2013.

51.     Marcia Black was born in 1945 and was employed as hairdresser prior to her retirement in 2011.

52.     Mr. Black has served on the Board of Directors of the Nazareth United Methodist Church in Leesville, South Carolina since the mid-1980s.  In mid-2013, while he was also serving as Treasurer, a church member approached him about an investment she had just been sold by Defendants and which she believed (based on information received from Defendants) would also be a good investment opportunity for the church.  Mr. Black traveled to the Mantei Defendants' local office and observed a sign advertising "FDIC Insured" CDs at 10% interest for a minimum investment of $25,000.  He met with a representative of Defendants who described the advertised investments as FDIC insured and offering a 10% return during the first year, while the interest rate could decline thereafter, it would still be at a "good" rate, which amount would be readjusted to "not less than 3-4%" thereafter.  Defendants' representative explained that the investment would

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

be called by the issuer in 3-5 years and all principal would be returned to the investor at that time, in addition to the substantial interest that would be earned on the investment.

53.     After Mr. Black explained that the potential investor was the church, Defendants' representative agreed to come to a church board meeting to explain the recommended investments. At that meeting, which Mr. Black attended, Defendants' representative repeated the presentation made to Mr. Black in Defendants' local office.

54.     At no time either during Mr. Black's initial meeting in Defendants' office or during the church board meeting did Defendants' representative explain that the interest on the recommended investments could go to zero or that principal losses were likely to occur if the investment was not held until maturity.  Nor did Defendants' representative ever explain that the recommended investments would not mature until around 2030 and that the guaranteed return of principal would be available only if the investment was held until maturity.

55.     Thereafter, the church board voted to entrust two types of irreplaceable assets to Defendants for investment in the recommended products:  its cemetery fund, which represented monies held in trust and from which perpetual care expenses must be paid for the upkeep of burials in the church's graveyard, and a portion of its general fund.  Defendants comingled the two types of assets in the same account and sold the church two structured CDs for the aggregate amount.

56.     In fact and unbeknownst to Mr. Black and other church members, the stated maturities of the Ripoff Products sold to the church by Defendants were between 2028 and 2033.

57.     In his role as church Treasurer, Mr. Black observed the deposit of interest payments during the initial introductory period resulting from the investments recommended by Defendants into the church's bank account(s).  He and Mrs. Black decided to consult Defendants about whether they should make a similar investment with their own funds.  At the time, the Blacks were both

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

retired and in their late 60s. Defendants' representative recommended that the Blacks purchase similar products in their individual capacities and repeated the same representations about the expected income and liquidity of the recommended investments.

58.     In reliance on the representations of Defendants' representative, the Blacks decided to entrust Defendants with $60,000. These funds were the proceeds of the family's "change jar" savings. Over the years, the Blacks had saved their daily pocket change in a designated jar. Each time the jar filled up, they rolled the coins and took them to their bank. The Blacks did not deposit the money generated from their change jar in the bank or otherwise invest it. Instead, they converted the coins into cash in bills and kept those bills at their home.

59.     After Defendants recommended that they purchase one of the advertised products, the Blacks brought the cash representing their "change jar" savings to Defendants' local office. Defendants refused to accept cash and required that the Blacks obtain a cashier's check from their bank in order to purchase the products recommended by Defendants.

60.     Defendants sold Mr. and Mrs. Black a single structured CD product with a cost basis of $60,000, representing the entire amount of their years of "change jar" savings. They did not provide the Blacks with a prospectus on this product prior to its sale.

61.     Mrs. Black received an inheritance from her brother and sought Defendants' advice regarding the investment of a portion of it. Defendants' representative recommended the purchase of another structured CD, again assuring her that it would be a wise investment as it would provide income and repeating the same representations about the expected income and liquidity of the recommended investment.

62.     Defendants sold Mrs. Black another structured CD product with a cost basis of $50,000, representing the entire amount of the inheritance entrusted to Defendants for investment.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

63.     In fact and unbeknownst to Mr. and Mrs. Black, the stated maturity of the Ripoff Products sold to them by Defendants were between 2034 and 2035.  These maturities exceed the life expectancies of either of the Blacks.

64.     Several years later, Mr. Black noticed that the church was no longer receiving interest payments on the Ripoff Products that Defendants had sold and that the market value shown on Defendants' account statements for these assets was less than the amount the church had originally paid.  Mr. Black met with Defendants to ask for an explanation.

65.     Defendants gave a long, complicated, and confusing account of how the interest rates were calculated on such Ripoff Products, which Mr. Black did not understand.  They further provided reassurances that they would look into and rectify this situation.   Believing that Defendants were looking out for their best interests, Mr. Black was reassured that Defendants would look after and protect his interests.

66.     The Blacks had a similar communication with Defendants after they noticed similar problems in their personal accounts.  Again, Defendants' representatives reassured them that their money was safe that Defendants would "look into" other options for them to earn money from these investments.

67.     In 2018, the Blacks received by mail a written communication from Defendants purporting to list their investment objectives and other information about themselves and their account.  Much of this information was untrue.  The Blacks went to meet with Defendants who took back the erroneous customer information paperwork and promised to make corrections to accurately reflect the Blacks' objectives, risk tolerance and other information.  The Blacks have never received a corrected customer information printout from Defendants, despite Defendants' promises to share such paperwork.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

68.     As a result of Defendants' recommendations that much of their retirement savings and of Mrs. Black's inheritance be tied up in Ripoff Products, the Blacks have been forced to finance purchases they otherwise would have been able to buy outright.  Unless they accept a sizeable loss, their money will be tied up and unavailable for their use and enjoyment during their lifetimes.

**B.     Larry and Rebecca Martin**

69.     Larry Martin was born in 1949 and was employed as a machinist at Michelin for 33 years prior to his retirement in 2013.

70.     Rebecca Martin was born in 1952 and was employed as an administrative assistant for about 30 years, first for a local textile company and later for a law firm.

71.     In 2013, the Martins sought a meeting with the Mantei Defendants after seeing the sign outside their office advertising a 10% return on investments.  At that time, the Martins were both in their mid-60s.  Mr. Martin had recently retired from Michelin and Mrs. Martin planned to retire within a year.

72.     Mr. Martin required advice on the investment of his 401K and a lump sum retirement fund he had received from Michelin.   These funds, which totaled approximately $730,000, were held in a roll-over IRA.   Mrs. Martin would also be receiving retirement assets of approximately $130,000.  These funds represented a substantial portion of the Martins' retirement savings.

73.     Defendant Chiellini asked the Martins if they would like to earn the 10% return advertised on the office sign.  She also told them that the recommended investments were guaranteed to never lose their principal and that the investments would be called by their issuers within 3-5 years at which time the full principal would be returned.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

74.     The Martins were not told that the 10% interest rate was only for the first year of investment nor that thereafter the interest rate was variable and could drop to zero.  Nor did Defendants disclose that the recommended investments would not mature for twenty (20) years.

75.     Defendants sold Mr. Martin four structured CDs in the aggregate amount of $500,000, as well as a $100,000 "medium term" corporate bond.  These Ripoff Products were all purchased with assets in Mr. Martin's IRA.

76.     When Mrs. Martin retired in mid-2014, Defendants also sold her another two structured CDs in the aggregate amount of $80,000 and a $50,000 corporate note.   These Ripoff Products were all purchased with assets in Mrs. Martin's IRA.

77.     When discussing the investment strategy recommended for the Martins, Defendants did not distinguish between different types of investments they eventually sold to the Martins but treated them as having the same high return and likelihood of being called within a short period. Defendants knew or should have known these representations were false.

78.     Defendants did not provide the Martins with prospectuses on the recommended products prior to its sale.

79.     In fact and unbeknownst to Mr. and Mrs. Martin at the time of their purchases, the stated maturity of the Ripoff Products sold to them by Defendants were between 2033 and 2034. These maturities exceed the life expectancies of either of the Martins.

80.     Several years later, the Martins noticed that the monthly statements reported declining fair market values for their supposedly "guaranteed" investments.   Defendants' representatives initially provided reassurances that the Martins should not worry because they would actually receive all of their principal back.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

81.     The Martins made numerous attempts to discuss these investments with Defendant Chiellini, who failed to return calls or set up a meeting for about a year.  Several meetings finally occurred in March and April 2018, at which time Defendants admitted that the Ripoff Products had long maturities.  When the Martins complained that their money was tied up for twenty years, Defendant Chiellini, on behalf of all Defendants, continued to maintain that the issuers would call these investments within 6 years of their issuance and that the Martins should be patient and would soon have access to all their money.

82.     The Martins were not satisfied with the answers and explanations provided during the in-person meetings and raised additional questions in writing.  However, Defendants failed to respond to these inquiries.  Upset and disillusioned at their mistreatment by their trusted advisors, the Martins transferred their accounts away from Defendants' control in May 2018.

### C.     James and Barbara Thompson

83.     James Thompson was born in 1942 and was employed as a sheet metal fabricator and welder and in construction prior to his retirement.

84.     Barbara Thompson was born in 1941 and was employed as an auditor in the South Carolina Comptroller General's Office prior to her retirement.

85.     In late 2013 or early 2014, the Thompsons sought a meeting with the Mantei Defendants after seeing the sign outside their office advertising a 10% return on investments.

86.     The Thompsons sought advice on the investment of essentially all of their liquid assets, which were collectively worth approximately $126,000.  At this time, they were both over 70.5 years old and their IRAs were subject to the minimum distribution requirements imposed by law.   Prior to their engagement of Defendants as their financial advisors, the Thompsons' assets were held in bank accounts.   They told Defendants that they were "low risk" investors.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

87.     Defendants assured the Thompsons that the recommended investment products would not lose principal and that the issuers would call these products within 3-5 years, so that their funds would be readily available to them.

88.     Defendants also assured the Thompsons that although the interest rates on these products were subject to change, the return would remain "good."  The Thompsons were never told that the interest could go to zero.

89.     Defendants sold Mr. Thompson a $33,000 structured CD, tying up 100% of his IRA funds in a Ripoff Product.

90.     Defendants sold Mrs. Thompson a $26,000 principal protected note, tying up 100% of her IRA funds in a Ripoff Product.

91.     Defendants also sold the Thompsons another $33,000 structured CD and another $34,000 principal protected note in the couple's joint tenancy brokerage account.  These Ripoff Products were identical to those sold to the Thompsons in their IRAs.

92.     The Thompsons were not provided with a prospectus for any of the Ripoff Products prior to the Defendants selling such products to them.

93.     In fact, and unbeknownst to the Thompsons, the Ripoff Products sold to them by Defendants had maturities between 2033 and 2034.  These maturities exceed the life expectancies of either of the Thompsons.

94.     In late 2016, the Thompsons complained to Defendants that the Ripoff Products recommended by Defendants had lost value and were no longer paying any interest.   At Defendants' recommendation, the structured CD was sold at a loss from both Mr. Thompson's IRA and their joint brokerage account.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## CLASS ALLEGATIONS

95.     Named Plaintiffs bring this class action on behalf of themselves and all persons similarly situated under Rule 23, SCRCP.  Named Plaintiffs seek to represent the following class:

> South Carolina citizens and the estates of deceased South Carolina citizens, who, at the age of 50 years or older, were sold by representatives affiliated with the Mantei Defendants while registered with the Broker-Dealer Defendants a debt instrument (including, but not limited to structured certificates of deposit, principal protected notes, and corporate medium-term notes) with an interest rate that was subject to fluctuation prior to maturity, which could decrease to zero based on market variables, and which has or had a maturity period greater than 10 years.

96.     Named Plaintiffs' claims may be maintained under Rule 23(a), SCRCP on behalf of the Class Members because the class is so numerous that joinder of all members is impracticable, there are questions of law or fact in common to the class, the claims of the representative parties are typical of the claims of the class, the representative parties will fairly and adequately protect the interests of the class and the amount in controversy exceeds one hundred dollars ($100.00) for each class member.

97.     The number of Class Members is currently unknown but is expected to exceed the number beyond which joinder of all Class Members is impractical.  Upon information and belief, the size of the class does not exceed 100 members.

98.     The questions of law that are common to the claims of Named Plaintiffs and of each Class Member include, *inter alia*:

    a.  the liability of Defendants;

    b.  the method of calculation of damages;

    c.  the anticipated justifications and defenses raised by the Defendants;

    d.  the availability of equitable relief, such as disgorgement and/or rescission of the Ripoff Products; and

    e.  remedies available under South Carolina law.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

99.     The questions of fact that are common to the claims of Named Plaintiffs and of each Class Member include, *inter alia:*

    a.  the business practices and conduct of Defendants to promote the Ripoff Products to Named Plaintiffs and the Class Members to advance their own interests in collecting fees and commissions;

    b.  the true characteristics of the Ripoff Products;

    c.  the knowledge of the Defendants regarding the true characteristics of the Ripoff Products;

    d.  the lack of notice from Defendants to inform the Named Plaintiffs and Class Members of the true characteristics of the Ripoff Products;

    e.  the knowledge of the Defendants as to the illiquidity of the Ripoff Products for any Plaintiff in the class;

    f.  the lack of notice from Defendants to inform the Named Plaintiffs and Class Members of the illiquidity of the Ripoff Products;

    g.  the failure of Defendants to provide Named Plaintiffs and Class Members with prospectuses prior to confirmation of the purchase of the Ripoff Products;

    h.  the extent and source of the Defendants' unjust enrichment, including fees, commissions, incentives, and any other form of benefit or compensation received by Defendants;

    i.  the lack of notice from Defendants to inform the Named Plaintiffs and Class Members of the fees, commissions, incentives, and any other form of benefit or compensation to be received by Defendants for recommending and selling the Ripoff Products to the Named Plaintiffs and Class Members; and

    j.  all factual issues regarding equitable relief.

100.     The claims advanced by Named Plaintiffs are typical of those of each Class Member in that the nature of the claims is the same for each Class Member; the Named Plaintiffs were subjected to the same general course of business practices and conduct as each Class Member; the cause of damage for the class is a single course of conduct which is the same for each

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Class Member; each Class Member is an affected investor; the Ripoff Products sold are substantially the same in all relevant respects for this action; the types of damages incurred are essentially the same for each Class Member; and the anticipated defenses of Defendants are the same for each Class Member.

101.  Named Plaintiffs were sold Ripoff Products that were substantially similar in all material respects to the products sold to other Class Members. Named Plaintiffs possess sufficient knowledge and involvement in the matter to fairly and adequately protect the interests of each member of the class.

102.  Each Class Member has incurred damages and requires relief as set forth herein due to the Defendants' actions.

**FOR A FIRST CAUSE OF ACTION**
**(BREACH OF CONTRACT)**

103.  Each allegation of the foregoing paragraphs is incorporated herein by reference as fully as if set forth verbatim.

104.  Upon the opening of Named Plaintiffs' and the Class Members' accounts with Defendants, and then as Defendants began to manage and control the accounts, Defendants entered into both express agreements and implied agreements with the Named Plaintiffs and other Class Members. These agreements constituted contracts between the Named Plaintiffs and other Class Members and the Broker-Dealer Defendants (hereinafter "the Agreements").

105.  Defendants, via the Agreements, and pursuant to statutes and regulations, agreed to abide by the rules and regulations of the Securities and Exchange Commission ("SEC"), the Financial Industry Regulatory Authority ("FINRA"), and all other self-regulatory organizations ("SRO") of which they were members. Named Plaintiffs and the Class Members are third party

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

beneficiaries of these Agreements and have been damaged by Defendants' failure to abide by these Agreements and the SRO rules and regulations.[1]

106.    In addition, South Carolina law implies a duty of good faith and fair dealing into every contract, including the Agreements between Defendants and Named Plaintiffs and the Class Members.

107.    Defendants' (i) failure to fulfill their common law and statutory duties to handle and manage the investors' accounts with due care, diligence, and undivided faithfulness and loyalty; (ii) self-serving actions, inactions, and omissions; and (iii) bad faith and fraudulent wrongdoing as described herein, constitute a failure to abide by the terms of the Agreements and the third-party agreements referenced above, and constitute a breach of these contracts. Named Plaintiffs and the Class Members have been directly and proximately damaged as a result of Defendants' breaches.

108.    Named Plaintiffs and other Class Members are therefore informed and believe that they are entitled to (1) actual damages, including but not limited to loss opportunity costs and/or market damages; (2) consequential damages; (3) disgorgement of wrongfully obtained fees and commissions; (4) costs, (5) prejudgment interest, (6) attorneys' fees, and (7) and such other relief as is just, proper, and equitable.

---

[1] By citing to federal securities rules and regulations, Named Plaintiffs are not making any claims under federal law; instead, Named Plaintiffs simply are using the violation of federal standards as potential proof of liability on their state-law theories. Incorporating these standards into Plaintiffs' state law cause of action does not give rise to federal question jurisdiction. *See Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 817 (1986). Any removal on this basis will be met with an immediate motion for remand and for sanctions.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## FOR A SECOND CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY)

109.     Each allegation of the foregoing paragraphs is incorporated herein by reference as fully as if set forth verbatim.

110.     Defendants, as Named Plaintiffs' and the Class Members' registered securities brokers, acted as Named Plaintiffs' and the Class Members' agents and, under the common law of South Carolina, any agent by virtue of the relationship with the principal is considered a fiduciary with respect to all matters within the scope of the agency.

111.     By the nature of the transactions in question, the Named Plaintiffs' and the Class Members' relationship with Defendants, Defendants' employees, and Defendants' agents involved a relationship of the utmost trust and confidence. This relationship was, by its essential nature, intrinsically fiduciary, calling for Defendants, and their employees and agents, to act with perfect good faith, absolute faithfulness, and undivided loyalty to the interests of Named Plaintiffs and the Class Members.

112.     With this fiduciary relationship also came the duties and obligations to keep Named Plaintiffs and the Class Members fully informed of all information pertinent to all transactions in which Defendants were representing Named Plaintiffs and the Class Members, to make full disclosure of all information that materially affected the account, to disclose any actual or potential conflict of interest, to exercise reasonable care, diligence, and prudence in the performance of their duties and to place the interests of their principals above their own.

113.     At the urging of Defendants, Named Plaintiffs and the Class Members reposed a special confidence in Defendants by entrusting their assets to Defendants, who agreed to accept them and to act as Named Plaintiffs' and the Class Members' fiduciaries in providing expert guidance and investment advice.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

114.    Defendants breached their fiduciary duties in one or more of the following particulars:

    a.  Defendants placed their own interests ahead of Named Plaintiffs and the Class Members by recommending and purchasing the Ripoff Products;

    b.  Defendants placed their own interests ahead of Named Plaintiffs' and the Class Members' interests by treating them as a profit center instead of as their fiduciary principals;

    c.  Defendants sold Ripoff Products that were harmful and damaging to Plaintiffs and provided false, misleading, and incomplete information to Named Plaintiffs and the Class Members regarding the Ripoff Products in an effort to induce Named Plaintiffs and the Class Members to purchase them;

    d.  Despite knowing that the Ripoff Products were speculative and illiquid, Defendants nonetheless sold them to Named Plaintiffs and the Class Members;

    e.  Defendants knew of, but failed to disclose to Named Plaintiffs and the Class Members, their own financial interests in recommending Ripoff Products, including a complete advance disclosure of all fees and costs associated with the Ripoff Products; and

    f.  Defendants either knew of or failed to ascertain and understand the nature of the Ripoff Products purchased for Named Plaintiffs and the Class Members.

115.    Because of the imprudence, recklessness, willful and wanton misconduct, failures to disclose, bad faith, and fraudulent acts and misrepresentations, as set forth herein, Defendants, and their employees and agents, breached the fiduciary duties owed to Named Plaintiffs and the Class Members.  These breaches were a direct and proximate cause of damages to the Named Plaintiffs and the Class Members.

116.    Named Plaintiffs and the Class Members are therefore informed and believe that they are entitled to (1) actual damages, including but not limited to loss of opportunity costs and/or market damages, (2) consequential damages, (3) disgorgement of wrongfully obtained fees and

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

commissions, (4) punitive damages in an amount to be determined by the finder of fact, (5) costs, (6) prejudgment interest, and (7) and such other relief as is just, proper, and equitable.

**FOR A THIRD CAUSE OF ACTION**
**(UNJUST ENRICHMENT)**

117.     Each allegation of the other paragraphs set forth herein is incorporated by reference as fully as if set forth verbatim.

118.     As a result of the misconduct and omissions described above, Defendants received benefits in the form of commissions and fees on the sale of each Ripoff Product.  These commissions and fees were paid out of the gross amount Named Plaintiffs and other Class Member invested in the Ripoff Products, to the detriment of Named Plaintiffs and other Class Members and the benefit of Defendants.

119.     For the reasons set forth in this Complaint, Defendants received and retained those commissions under unequitable circumstances.  Defendants' foisting of the Ripoff Products upon Named Plaintiffs and other Class Members through their willful concealment of material information regarding the Ripoff Products' nature, structure, and characteristics unjustly conferred a benefit upon Defendants to the great detriment of Named Plaintiffs and the Class Members.

120.     Named Plaintiffs and the Class Members are therefore informed and believe that they are entitled to (1) disgorgement of wrongfully obtained fees and commissions, (2) prejudgment interest, (3) all losses or harms suffered as a result of and occasioned by the Defendants wrongfully obtaining fees and commissions from Plaintiffs, and (4) and such other relief as is just, proper, and equitable.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## FOR A FOURTH CAUSE OF ACTION
### (BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT)

121.    Each allegation of the other paragraphs set forth herein is incorporated by reference as fully as if set forth verbatim.

122.    Defendants' fraudulent misconduct, actions, and inactions, as described above in the Fifth Cause of Action, constitutes a failure to abide by the terms of the Agreements, and constitute a breach of the Agreements entered into with Named Plaintiffs and other Class Members.  Named Plaintiffs and the Class Members have been directly and proximately damaged as a result of these breaches by Defendants.

123.    Moreover, in breaching the Agreements with Named Plaintiffs and the Class Members, Defendants exhibited a fraudulent intent relating to those breaches as set forth above.

124.    Defendants' breaches of the Agreements were accompanied by fraudulent acts on the part of Defendants as set forth above.

125.    As a direct and proximate result of Defendants' breach of contract accompanied by fraudulent act, Named Plaintiffs and the Class Members have suffered injury all in direct violation of the laws of the state of South Carolina.

126.    Named Plaintiffs are therefore informed and believe that they are entitled to (1) actual damages including but not limited to loss of opportunity cost and/or market damages, (2) consequential damages, (3) punitive damages, (4) costs, (5) prejudgment interest, (6) attorneys' fees, and (7) and such other relief as is just, equitable, and proper.

## FOR A FIFTH CAUSE OF ACTION
### (STATE SECURITIES ACT VIOLATIONS, S.C. CODE ANN. §§ 35-1-101, *ET SEQ.*)

127.    Each allegation of the foregoing paragraphs is incorporated herein by reference as fully as if set forth verbatim.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

128.    The Ripoff Products, while not "covered securities" for purposes of SLUSA, are nonetheless "securities" as that term is defined in the South Carolina Uniform Securities Act of 2005.  S.C. Code Ann. § 35-1-102(29); *see also id.* § 35-1-102(7) (separately defining "Federal covered security" under the South Carolina Uniform Securities Act of 2005).

129.    In the course of their fiduciary duties to Named Plaintiffs and the Class Members, Defendants recommended and advised Named Plaintiffs and the Class Members to purchase the Ripoff Products, and in so doing, made untrue statements of material facts or omitted to state material facts necessary to make other statements not misleading, in light of the circumstances, thereby violating the South Carolina Securities Act, S.C. Code Ann. § 35-1-501, -502, & 509(b) and S.C. Code of Regulations 13-501(14)—(17) as set forth in this Complaint.

130.    The actions, inactions, untrue statements, and omissions of Defendants were made (or not omitted) to Named Plaintiffs and the Class Members, either directly or indirectly, in connection with the offer, sale, or purchase of securities under South Carolina law, namely the Ripoff Products.

131.    On information and belief Defendants were compensated, either directly or indirectly, for the sale of the Ripoff Products, which was accomplished by means of untrue statements and/or omissions that rewarded Defendants, but damaged Named Plaintiffs and the Class Members as alleged herein.

132.    On information and belief, Defendants failed to provide Named Plaintiffs and the Class Members with copies of the prospectuses for each Ripoff Product prior to sale, in violation of S.C. Code Ann. Regs 13-501(A)(10).

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

133.   Defendants' acts and/or omissions violated FINRA Rule 2111 and other applicable FINRA rules governing broker conduct relative to honesty, ethics, obligations to customers, and the like, in violation of S.C. Code Ann. Regs 13-501(A)(21).

134.   The actions of Defendants were wrongful, fraudulent, and in violation of S.C. Code Ann. §§ 35-1-501, -502, and -509 (Supp. 2010) and the regulations regulating broker conduct established thereunder.

135.   As a direct and proximate result of the fraud of Defendants, Named Plaintiffs and the Class Members suffered substantial damages.

136.   Named Plaintiffs and the Class Members are therefore informed and believe that they are entitled to (1) actual damages including but not limited to loss of opportunity cost and/or market damages and/or rescission, (2) disgorgement of fees and commissions paid to Defendants; (3) costs, (4) attorneys' fees, (5) statutory interest pursuant to S.C. Code Ann. § 35-1-509(b), and (6) such other relief as is just, proper and equitable.

## DEMAND FOR RELIEF

WHEREFORE, Named Plaintiffs pray for judgment against Defendants Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, jointly and severally, as follows:

a.   For actual damages suffered by Named Plaintiffs and the Class Members including but not limited to the market losses to their accounts that would not have occurred in the absence of the sale of the Ripoff Products;

b.   For consequential damages and/or market or lost opportunity damages and/or market damages suffered by Named Plaintiffs and the Class Members;

c.   For disgorgement of fees and commissions received by Defendants as a result of the sale of the Ripoff Products;

d.   For rescission of the Ripoff Products;

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

e.     For punitive damages in an amount to be determined by the trier of fact;

f.     For statutory and/or prejudgment interest at the highest legal rate;

g.     For the costs of this action;

h.     For reasonable attorneys' fees; and

i.     For such other and further relief as is just, equitable and proper.


Respectfully submitted,


s/Mitchell Willoughby
Mitchell Willoughby, Esquire, SC Bar No. 6161
Elizabeth Zeck, Esquire, SC Bar No. 9006
R. Walker Humphrey, II, Esquire, SC Bar No. 79426
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street (29201)
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com
whumphrey@willoughbyhoefer.com

*Attorneys for Named Plaintiffs*


June 28, 2019
Columbia, South Carolina

ELECTRONICALLY FILED - 2019 Jul 11 4:01 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF LEXINGTON | ) | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| | ) | |
| Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson, | ) ) ) | C/A NO. 2019-CP-32-02636 |
| | ) | |
| For themselves and a Class of Similarly Situated Plaintiffs, | ) ) | **NOTICE OF HEARING** |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| vs. | ) ) | |
| | ) | |
| Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, L.L.C, | ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

**TO:    THE DEFENDANTS ABOVE-NAMED:**

**YOU WILL PLEASE TAKE NOTICE** that Plaintiffs' Motion for Protective Order Pursuant to Rules 23(d)(2) and 26(c), SCRCP filed on June 28, 2019 in the above-captioned case is scheduled for a hearing before The Honorable William P. Keesley on Wednesday, July 31, 2019 at 11:30am at the Lexington County Courthouse located at 205 East Main Street in Lexington, South Carolina, 29072. A copy of the Court's electronic notice of hearing is attached hereto as Exhibit 1.

Respectfully submitted,

s/Mitchell Willoughby
Mitchell Willoughby, Esquire, SC Bar No. 6161
Elizabeth Zeck, Esquire, SC Bar No. 9006
R. Walker Humphrey, II, Esquire, SC Bar No. 79426
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street (29201)

Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com
whumphrey@willoughbyhoefer.com

*Attorneys for Plaintiffs*

July 11, 2019
Columbia, South Carolina

ELECTRONICALLY FILED - 2019 Jul 11 4:01 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

# EXHIBIT 1

ELECTRONICALLY FILED - 2019 Jul 11 4:01 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | |
|---|---|
| **From:** | Courtmail32_DoNotReply@sccourts.org |
| **To:** | Mitchell Willoughby |
| **Cc:** | jparker@lex-co.com |
| **Subject:** | Motion "MOFREE-Motion for Protective Order" for Case "2019CP3202636-Donald Black , plaintiff, et al VS Mantei & Associates Ltd , defendant, et al" was added to a Motions Roster for 7/31/2019 at 11:30 AM |
| **Date:** | Monday, July 1, 2019 2:45:08 PM |

The Common Pleas motion roster for the week of July 29th, 2019 has been published to the web.  All requests for continuances must be filed by Wednesday July 24th 2019 @ 5pm.

If this motion is resolved before the scheduled date and time, please notify the following:  Jenny Parker at jparker@lex-co.com.

~~~ CONFIDENTIALITY NOTICE ~~~ This message is intended only for the addressee and may contain information that is confidential. If you are not the intended recipient, do not read, copy, retain, or disseminate this message or any attachment. If you have received this message in error, please contact the sender immediately and delete all copies of the message and any attachments.

ELECTRONICALLY FILED - 2019 Jul 11 4:01 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636



STATE OF SOUTH CAROLINA )  IN THE COURT OF COMMON PLEAS
 )
COUNTY OF LEXINGTON )  FOR THE ELEVENTH JUDICIAL CIRCUIT
 )
Donald Black, Marcia Black, Larry Martin, )  C/A NO. 2019-CP-32-02636
Rebecca Martin, Barbara Thompson, and )
James Thompson, )
 )
For themselves and a Class of Similarly )
Situated Plaintiffs, )
 )
Plaintiffs, )
 )
vs. )  **AFFIDAVIT OF SERVICE**
 )
Mantei & Associates, Ltd., Ricky Alan )
Mantei, Cindy Chiellini, Centaurus )
Financial, Inc., and J.P. Turner & )
Company, L.L.C., )
 )
Defendants. )
 )

BEFORE ME PERSONALLY APPEARED Sheila Wright who, after being first duly sworn, deposes and states as follows:

1. I am over 18 years of age, and qualified and competent to make this affidavit.

2. I make this affidavit based upon my own personal knowledge.

3. I am currently employed with the law firm of Willoughby & Hoefer, P.A., in Columbia, South Carolina, as a Legal Assistant.

4. I am neither a lawyer in nor a party to the above-captioned action and have no interest in or connection with the above-captioned action.

5. On Monday, July 1, 2019, at or about 11:09am, I personally served copies (reflecting the Court's electronic file stamp) of the **Summons and Complaint** and **Notice of Motion and Motion for Protective Order Pursuant to Rules 23(d)(2) and 26(c), SCRCP** in the above-captioned action upon Lisa Culler, Assistant Secretary for

1

Cogency Global Inc., registered agent for Defendant Centaurus Financial, Inc., by

delivering to and leaving same with her at the address listed below:

2 Office Park Court, Suite 103
Columbia, SC 29223

**FURTHER AFFIANT SAYETH NOT.**

Sheila Wright

SWORN TO AND SUBSCRIBED BEFORE ME,
THIS ___18___ DAY OF ___July___, 2019

Notary Public for South Carolina

My Commission Expires: ___02/04/2029___

ELECTRONICALLY FILED - 2019 Jul 18 4:12 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jul 18 4:12 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

STATE OF SOUTH CAROLINA    )   IN THE COURT OF COMMON PLEAS

    )

COUNTY OF LEXINGTON    )   FOR THE ELEVENTH JUDICIAL CIRCUIT

    )

Donald Black, Marcia Black, Larry    )   C/A NO. 2019-CP-32-02636

Martin, Rebecca Martin, Barbara    )

Thompson, and James Thompson,    )

    )

For themselves and a Class of Similarly    )   **AFFIDAVIT OF SERVICE**

Situated Plaintiffs,    )

    )

    Plaintiffs,    )

    )

    vs.    )

    )

Mantei & Associates, Ltd., Ricky Alan    )

Mantei, Cindy Chiellini, Centaurus    )

Financial, Inc., and J.P. Turner &    )

Company, L.L.C,    )

    )

    Defendants.    )

_____    )

BEFORE ME PERSONALLY APPEARED, the undersigned, who, after being first duly sworn, deposes and states as follows:

1.  I am over 18 years of age and qualified and competent to make this affidavit.

2.  I make this affidavit based upon my own personal knowledge.

3.  I am neither a lawyer in nor a party to the above-captioned action and have no interest in or connection with the above-captioned action.

4.  On Friday, June 28, 2019 at or about 6:07pm, I personally served copies (reflecting the Court's electronic file stamp) of the **Summons and Complaint** and the **Notice of Motion and Motion for Protective Order Pursuant to Rules 23(d)(2) and 26(c), SCRCP** in the

ELECTRONICALLY FILED - 2019 Jul 18 4:12 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

above-captioned action upon Defendant Ricky Alan Mantei by delivering same to him at

his residence located in Richland County at the address listed below:

<div style="text-align:center">

209 Oak Brook Drive
Columbia, SC 29223

</div>

SWORN TO AND SUBSCRIBED BEFORE ME,
This 18th day of July_____, 2019.

_____
Henrietta Seyue, Process Server

_____
Notary Public for South Carolina

My Commission Expires: May 17, 2022

Served for:     Willoughby & Hoefer, PA
                *Attorneys for Plaintiffs*
                930 Richland Street
                Columbia, SC 29201

ELECTRONICALLY FILED - 2019 Jul 18 4:12 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636



| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
|---|---|---|
| COUNTY OF LEXINGTON | ) | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson, | ) | C/A NO. 2019-CP-32-02636 |
| For themselves and a Class of Similarly Situated Plaintiffs, | ) | **AFFIDAVIT OF SERVICE** |
| Plaintiffs, | ) | |
| vs. | ) | |
| Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, L.L.C, | ) | |
| Defendants. | ) | |

BEFORE ME PERSONALLY APPEARED, the undersigned, who, after being first duly sworn, deposes and states as follows:

1. I am over 18 years of age and qualified and competent to make this affidavit.

2. I make this affidavit based upon my own personal knowledge.

3. I am neither a lawyer in nor a party to the above-captioned action and have no interest in or connection with the above-captioned action.

4. On Friday, June 28, 2019 at or about 6:07pm, I personally served copies (reflecting the Court's electronic file stamp) of the **Summons and Complaint** and the **Notice of Motion and Motion for Protective Order Pursuant to Rules 23(d)(2) and 26(c), SCRCP** in the

above-captioned action upon Defendant Mantei & Associates, Ltd. by delivering same to

Rick Mantei, registered agent for Mantei & Associates, Ltd. at the address listed below:

<div align="center">
209 Oak Brook Drive<br>
Columbia, SC 29223
</div>

SWORN TO AND SUBSCRIBED BEFORE ME,
This 18th day of July, 2019

_____
Notary Public for South Carolina

My Commission Expires: May 17, 2022

Henrietta Seyue, Process Server

Served for:      Willoughby & Hoefer, PA
                 *Attorneys for Plaintiff*
                 930 Richland Street
                 Columbia, SC 29201

ELECTRONICALLY FILED - 2019 Jul 18 4:12 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jul 18 4:12 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF LEXINGTON | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson, | C/A NO. 2019-CP-32-02636 |
| For themselves and a Class of Similarly Situated Plaintiffs, | **AFFIDAVIT OF SERVICE** |
| Plaintiffs, | |
| vs. | |
| Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, L.L.C, | |
| Defendants. | |

BEFORE ME PERSONALLY APPEARED, the undersigned, who after being first duly sworn, deposes and states as follows:

1. I am over 18 years of age and qualified and competent to make this affidavit.

2. I make this affidavit based upon my own personal knowledge.

3. I am neither a lawyer in nor a party to the above-captioned action and have no interest in or connection with the above-captioned action.

4. On Monday, July 1, 2019 at or about 4:51pm, I personally served copies (reflecting the Court's electronic file stamp) of the **Summons and Complaint** and the **Notice of Motion and Motion for Protective Order Pursuant to Rules 23(d)(2) and 26(c), SCRCP** in the

above-captioned action upon Defendant Cindy Chiellini by delivering same to her at her

place of business in Lexington County, South Carolina at the address listed below:

4580 Sunset Boulevard
Lexington, SC 29072

SWORN TO AND SUBSCRIBED BEFORE ME,

This 18th day of July_____, 2019

_____
Henrietta Seyue, Process Server

_____
Notary Public for South Carolina

My Commission Expires: May 17, 2022

Served for:     Willoughby & Hoefer, PA
                *Attorneys for Plaintiff*
                930 Richland Street
                Columbia, SC 29201

2

ELECTRONICALLY FILED - 2019 Jul 18 4:16 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

STATE OF SOUTH CAROLINA          )     IN THE COURT OF COMMON PLEAS
                                 )
COUNTY OF LEXINGTON              )     FOR THE ELEVENTH JUDICIAL CIRCUIT
                                 )
Donald Black, Marcia Black, Larry Martin, )   C/A NO. 2019-CP-32-02636
Rebecca Martin, Barbara Thompson, and )
James Thompson,                  )
                                 )
For themselves and a Class of Similarly )
Situated Plaintiffs,             )
                                 )
                    Plaintiffs,  )
                                 )
          vs.                    )     **AFFIDAVIT OF SERVICE**
                                 )
Mantei & Associates, Ltd., Ricky Alan )
Mantei, Cindy Chiellini, Centaurus )
Financial, Inc., and J.P. Turner & )
Company, L.L.C.,                 )
                                 )
                    Defendants.  )
_____)

BEFORE ME PERSONALLY APPEARED Sheila Wright who, after being first duly sworn, deposes and states as follows:

1.  I am over 18 years of age, and qualified and competent to make this affidavit.

2.  I make this affidavit based upon my own personal knowledge.

3.  I am currently employed with the law firm of Willoughby & Hoefer, P.A., in Columbia, South Carolina, as a Legal Assistant.

4.  I am neither a lawyer in nor a party to the above-captioned action and have no interest in or connection with the above-captioned action.

5.  On Thursday, July 11, 2019, I personally caused to be served, via the commercial delivery services of FedEx, standard overnight delivery with signature required, copies (reflecting the Court's electronic file stamp) of the **Summons and Complaint, Notice of Motion and Motion for Protective Order Pursuant to Rules 23(d)(2) and 26(c),**

1

**SCRCP,** and **Notice of Hearing** in the above-captioned matter upon Defendant J.P. Turner & Company, LLC. Service of these documents was made on B. Burkin, mailroom, on July 12, 2019 at 12:03pm PDT at the below address:

J.P. Turner & Company, LLC
200 N. Sepulveda Blvd., Ste 1200
El Segundo, CA 90245

6.   A copy of the proof of delivery is attached hereto and incorporated herein as Exhibit 1.

**FURTHER AFFIANT SAYETH NOT.**

Sheila Wright

SWORN TO AND SUBSCRIBED BEFORE ME,
THIS  18  DAY OF  July , 2019.

Notary Public for South Carolina

My Commission Expires:  02/04/2020

ELECTRONICALLY FILED - 2019 Jul 18 4:16 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jul 18 4:16 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

# EXHIBIT 1



ELECTRONICALLY FILED - 2019 Jul 18 4:16 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

July 16,2019

Dear Customer:

The following is the proof-of-delivery for tracking number **775692904082**.

## Delivery Information:

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered to: | Mailroom |
| Signed for by: | B.BURKIN | Delivery location: | 200 N  SEPULVEDA BLVD |
| | | | EL SEGUNDO, CA 90245 |
| Service type: | FedEx Standard Overnight | Delivery date: | Jul 12, 2019 14:03 |
| Special Handling: | Deliver Weekday | | |
| | Adult Signature Required | | |



## Shipping Information:

| | | | |
|---|---|---|---|
| Tracking number: | 775692904082 | Ship date: | Jul 11, 2019 |
| | | Weight: | 1.0 lbs/0.5 kg |

| Recipient: | | Shipper: | |
|---|---|---|---|
| J.P. Turner & Company, LLC | | Sheila Wright | |
| 200 N Sepulveda Blvd, Ste 1200 | | 930 Richland Street | |
| EL SEGUNDO, CA 90245 US | | COLUMBIA, SC 29201 US | |

| Reference | | 123 | |

Thank you for choosing FedEx.

ELECTRONICALLY FILED - 2019 Jul 18 4:18 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

STATE OF SOUTH CAROLINA    )   IN THE COURT OF COMMON PLEAS

                         )

COUNTY OF LEXINGTON       )   FOR THE ELEVENTH JUDICIAL CIRCUIT

                         )

Donald Black, Marcia Black, Larry   )   C/A NO. 2019-CP-32-02636

Martin, Rebecca Martin, Barbara    )

Thompson, and James Thompson,   )

                         )

For themselves and a Class of Similarly )        **AFFIDAVIT OF SERVICE**

Situated Plaintiffs,             )

                         )

         Plaintiffs,        )

                         )

    vs.                  )

                         )

Mantei & Associates, Ltd., Ricky Alan  )

Mantei, Cindy Chiellini, Centaurus   )

Financial, Inc., and J.P. Turner &    )

Company, L.L.C,            )

                         )

         Defendants.    )

                         )

       BEFORE ME PERSONALLY APPEARED, the undersigned, who, after being first duly

sworn, deposes and states as follows:

1. I am over 18 years of age and qualified and competent to make this affidavit.

2. I make this affidavit based upon my own personal knowledge.

3. I am neither a lawyer in nor a party to the above-captioned action and have no interest in
   or connection with the above-captioned action.

4. On Friday, June 28, 2019 at or about 5:36pm, I personally served copies (reflecting the
   Court's electronic file stamp) of the **Summons and Complaint** and the **Notice of Motion
   and Motion for Protective Order Pursuant to Rules 23(d)(2) and 26(c), SCRCP** in the
   above-captioned action upon Defendant Mantei & Associates, Ltd. by leaving a copy of

the same with Jennifer Richardson, an employee of the place of business of Mantei &

Associates, Ltd. in Lexington County, South Carolina at the address listed below:

4580 Sunset Boulevard
Lexington, SC 29072

SWORN TO AND SUBSCRIBED BEFORE ME,
This 18th day of July _____, 2019

_____
Notary Public for South Carolina
My Commission Expires: May 17, 2022

_____
Henrietta Seyue, Process Server

Served for:     Willoughby & Hoefer, PA
                *Attorneys for Plaintiffs*
                930 Richland Street
                Columbia, SC 29201

ELECTRONICALLY FILED - 2019 Jul 18 4:18 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jul 18 4:18 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636



STATE OF SOUTH CAROLINA          )     IN THE COURT OF COMMON PLEAS
                                 )
COUNTY OF LEXINGTON              )     FOR THE ELEVENTH JUDICIAL CIRCUIT
                                 )
Donald Black, Marcia Black, Larry )    C/A NO. 2019-CP-32-02636
Martin, Rebecca Martin, Barbara  )
Thompson, and James Thompson,    )
                                 )
For themselves and a Class of Similarly )
Situated Plaintiffs,             )
                                 )          **AFFIDAVIT OF SERVICE**
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )
                                 )
Mantei & Associates, Ltd., Ricky Alan )
Mantei, Cindy Chiellini, Centaurus )
Financial, Inc., and J.P. Turner & )
Company, L.L.C,                  )
                                 )
          Defendants.            )
_____ )

BEFORE ME PERSONALLY APPEARED, the undersigned, who, after being first duly

sworn, deposes and states as follows:

1.  I am over 18 years of age and qualified and competent to make this affidavit.

2.  I make this affidavit based upon my own personal knowledge.

3.  I am neither a lawyer in nor a party to the above-captioned action and have no interest in

    or connection with the above-captioned action.

4.  On Friday, June 28, 2019 at or about 5:36pm, I personally served copies (reflecting the

    Court's electronic file stamp) of the **Summons and Complaint** and the **Notice of Motion**

    **and Motion for Protective Order Pursuant to Rules 23(d)(2) and 26(c), SCRCP** in the

    above-captioned action upon Defendant Mantei & Associates, Ltd. by leaving a copy of

1

the same with Jennifer Richardson, an employee of the place of business of Mantei &

Associates, Ltd. in Lexington County, South Carolina at the address listed below:

4580 Sunset Boulevard
Lexington, SC 29072

SWORN TO AND SUBSCRIBED BEFORE ME,
This 18th day of July , 2019

_____
Notary Public for South Carolina
My Commission Expires: May 17, 2022

_____
Henrietta Seyue, Process Server

Served for:     Willoughby & Hoefer, PA
                *Attorneys for Plaintiffs*
                930 Richland Street
                Columbia, SC 29201

ELECTRONICALLY FILED - 2019 Jul 18 4:18 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jul 18 4:18 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636



| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
|---|---|---|
| COUNTY OF LEXINGTON | ) | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson, | ) | C/A NO. 2019-CP-32-02636 |
| For themselves and a Class of Similarly Situated Plaintiffs, | ) | **AFFIDAVIT OF SERVICE** |
| Plaintiffs, | ) | |
| vs. | ) | |
| Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, L.L.C, | ) | |
| Defendants. | ) | |

BEFORE ME PERSONALLY APPEARED, the undersigned, who, after being first duly sworn, deposes and states as follows:

1.  I am over 18 years of age and qualified and competent to make this affidavit.

2.  I make this affidavit based upon my own personal knowledge.

3.  I am neither a lawyer in nor a party to the above-captioned action and have no interest in or connection with the above-captioned action.

4.  On Friday, June 28, 2019 at or about 5:36pm, I personally served copies (reflecting the Court's electronic file stamp) of the **Summons and Complaint** and the **Notice of Motion and Motion for Protective Order Pursuant to Rules 23(d)(2) and 26(c), SCRCP** in the above-captioned action upon Defendant Cindy Chiellini by leaving a copy of the same with

1

Jennifer Richardson, an employee of the place of business of Cindy Chiellini in Lexington

County, South Carolina at the address listed below:

4580 Sunset Boulevard
Lexington, SC 29072

SWORN TO AND SUBSCRIBED BEFORE ME,
This 19th day of July             , 2019

_____
Notary Public for South Carolina

My Commission Expires: May 17, 2022

_____
Henrietta Seyue, Process Server

Served for:     Willoughby & Hoefer, PA
                *Attorneys for Plaintiffs*
                930 Richland Street
                Columbia, SC 29201

ELECTRONICALLY FILED - 2019 Jul 18 4:18 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | **FOR THE ELEVENTH JUDICIAL CIRCUIT** |
| **COUNTY OF LEXINGTON** | ) | |
| | ) | |
| Donald Black, Marcia Black, Larry Martin, | ) | |
| Rebecca Martin, Barbara Thompson, and | ) | Civil Action No.: 2019-CP-32-02636 |
| James Thompson. | ) | |
| | ) | |
| For themselves and a Class of Similarly | ) | |
| Situated Plaintiffs, | ) | |
| | ) | **CERTIFICATE OF SERVICE** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Mantei & Associates, Ltd., Ricky Alan | ) | |
| Mantei, Cindy Chiellini, Centaurus | ) | |
| Financial, Inc., and J.P. Turner & | ) | |
| Company, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

This is to certify that a copy of the foregoing NOTICE OF FILING NOTICE OF
REMOVAL and accompanying exhibits has been served upon all counsel of record via the South
Carolina Courts E-Filing Portal, on the 29th of July, 2019.


*s/ Joel H. Smith*
Joel H. Smith, S.C. Bar No. 3190
Kevin J. Malloy, S.C. Bar No. 100170
Bowman and Brooke LLP
1441 Main Street, Suite 1200
Columbia, SC  29201-2897
(803) 726-7422
Joel.Smith@bowmanandbrooke.com
Kevin.Malloy@bowmanandbrooke.com

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636



| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | **FOR THE ELEVENTH JUDICIAL CIRCUIT** |
| **COUNTY OF LEXINGTON** | ) | |
| | ) | |
| Donald Black, Marcia Black, Larry Martin, | ) | |
| Rebecca Martin, Barbara Thompson, and | ) | Civil Action No.: 2019CP3202636 |
| James Thompson. | ) | |
| | ) | |
| For themselves and a Class of Similarly | ) | |
| Situated Plaintiffs, | ) | |
| | ) | |
| Plaintiffs, | ) | **NOTICE OF FILING** |
| | ) | **NOTICE OF REMOVAL** |
| v. | ) | |
| | ) | |
| Mantei & Associates, Ltd., Ricky Alan | ) | |
| Mantei, Cindy Chiellini, Centaurus | ) | |
| Financial, Inc., and J.P. Turner & | ) | |
| Company, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

**PLEASE TAKE NOTICE** that on the July 26, 2019, pursuant to 15 U.S.C. § 78bb and 28

U.S.C. § 1446, Defendants Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini,

Centaurus Financial, Inc., and J.P. Turner & Company, L.L.C. (collectively, "Defendants") filed

a Notice of Removal of this action with the Clerk of the United States District Court for the District

of South Carolina, Columbia Division (*see* Exhibit A). By filing this Notice, Defendants have

removed this action to the United States District Court for the District of South Carolina, Columbia

Division.

Pursuant to 28 U.S.C. § 1446(d), this Court shall proceed no further unless and until this

action is remanded.

To preserve its rights and so as not to have a default judgment entered against it, Defendants

hereby notify this Court that Defendants will not file responsive pleading(s) to Plaintiffs'

Complaint with this Court. Defendants' responsive pleading(s) will be timely filed with the United

States District Court.

Dated: July 29, 2019                              Respectfully submitted,

_s/ Michael H. Montgomery_                        _s/ Joel H. Smith_
Michael H. Montgomery                             Joel H. Smith
Montgomery Willard, LLC                           Kevin J. Malloy
1002 Calhoun Street (29201)                       Bowman and Brooke LLP
Post Office Box 11886                             1441 Main Street, Suite 1200
Columbia, South Carolina 29211                    Columbia, SC  29201-2897
(803) 779-3500                                    (803) 726-7422
mhm@montgomerywillard.com                         Joel.Smith@bowmanandbrooke.com
                                                  Kevin.Malloy@bowmanandbrooke.com

_Attorney for Mantei & Associates, Ltd.,_
_Ricky Alan Mantei, and Cindy Chiellini_          _Attorneys for Centaurus Financial, Inc._


                    _s/ Cory Manning_
                    Cory Manning
                    Nelson Mullins Riley & Scarborough LLP
                    1320 Main Street, 17th Floor
                    Columbia, SC 29201
                    (803) 255-5524
                    Cory.Manning@nelsonmullins.com

                    _Attorney for J.P. Turner & Company,L.L.C._

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

# EXHIBIT A

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson. | ) ) ) ) |
| | ) |
| For themselves and a Class of Similarly Situated Plaintiffs, | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) ) |
| | ) |
| Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, L.L.C., | ) ) ) ) ) |
| | ) |
| Defendants. | ) ) ) |

Civil Action No.: 3:19-cv-02097-MGL

**DEFENDANTS' NOTICE OF REMOVAL**

Defendants Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, L.L.C. (collectively, "Defendants"),[1] by and through their undersigned attorneys, provide notice pursuant to 28 U.S.C. § 1446 of the removal of the action styled *Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson, for themselves and a class of similarly situated plaintiffs v. Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, L.L.C.*, pending in the Lexington County, South Carolina Court of Common Pleas for the Eleventh Judicial Circuit, as Case No. 2019-CP-32-02636 (the "State Court Action") to the United States District Court for the District of South Carolina. Removal is based on 15 U.S.C.

---

[1] All Defendants named in this matter consent to the removal of the above-styled action.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

§ 78bb(f)(2) (Removal of Covered Class Action). As grounds for removal, Defendants state the following:

## I.    Plaintiffs' Putative Class Action Complaint

1.    On June 28, 2019, Plaintiffs Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson ("Plaintiffs") filed a putative class action complaint ("Complaint") in the State Court Action.

2.    In the Complaint, Plaintiffs invoke statutory, contractual, and tort-based claims in connection with securities transactions executed in their brokerage accounts. *See generally* Compl.

3.    In the Complaint, Plaintiffs also seek to represent a class that is limited to South Carolina citizens and the estates of deceased South Carolina citizens that are 50 years old or older. Compl. ¶ 95.

4.    On June 28, 2019, Plaintiff served a copy of the Summons and Complaint on Defendants Mantei & Associates, Ltd., Ricky Alan Mantei, and Cindy Chiellini.[2] On June 28, 2019, Plaintiffs served a copy of the Summons and Complaint on Defendant J.P. Turner & Company, L.L.C. On July 1, 2019, Plaintiffs served a copy of the Summons and Complaint on Defendant Centaurus Financial, Inc.

5.    The State Court Action may be removed to this Court pursuant to the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78, *et seq.*, which permits removal of state court class actions that allege misrepresentations or omissions of material fact in connection with the purchase or sale of covered securities.

---

[2] Defendants Mantei & Associates, Ltd., Ricky Alan Mantei, and Cindy Chiellini were the first-served defendants in this matter.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## II.    Removal and Preemption Based on the Securities Litigation Uniform Standards Act

6.    This action may be removed to this Court because it is a "covered class action" within the meaning of SLUSA.

7.    Congress enacted SLUSA to preempt class actions that assert claims based on state law involving the purchase and sale of covered securities.

8.    SLUSA's preemption provision states:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—
>
> > (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
> >
> > (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1).

9.    Congress also expressly provided for the removal of any state law class action that falls within SLUSA's ambit. SLUSA's removal provision states:

> Any covered class action brought in any State court involving a covered security, as set forth in paragraph (1), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to paragraph (1).

15 U.S.C. § 78bb(f)(2).

10.    Thus, with limited exceptions not relevant here, SLUSA provides federal courts with both removal jurisdiction and an obligation to dismiss any state law class action that: (1) is a "covered class action"; (2) asserts a claim based on state law; (3) involves a "covered security"; and (4) alleges that the defendant misrepresented or omitted a material fact or employed any deceptive

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

or manipulative device or contrivance "in connection with the purchase or sale of any security." *See Cyan, Inc. v. Beaver Cty. Emples. Ret. Fund*, 138 S. Ct. 1061, 1067-68 (2018).

11.    The State Court Action satisfies each of the criteria necessary for removal and preemption under SLUSA.

12.    First*,* the Complaint alleges a "covered class action," which SLUSA defines as "any single lawsuit in which . . . one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members." 15 U.S.C. § 78bb(f)(5)(B)(i)(II). The instant Complaint refers to the action as a "class action" and makes numerous allegations on behalf of the putative class. *See* Compl. ¶ 1; *see generally* Compl. The Complaint further alleges that there are common questions of law and fact which predominate over the questions affecting only individual members of the putative class. Compl. ¶ 95; 98-101. The Complaint, therefore, asserts a "covered class action" under SLUSA.[3]

13.    Second*,* Plaintiffs' Complaint pleads class action claims that are based upon state law, as required by 15 U.S.C. § 78bb(f)(1). *See* Compl. ¶ 16; ¶¶ 103-136 (Counts I-V)).

14.    Third*,* Plaintiffs' Complaint pleads class action claims that involve "covered securities" within the meaning of SLUSA. Under SLUSA, covered securities include the following:

> (A) a security designated as qualified for trading in the national market system pursuant to section 11A(a)(2) of the Securities Exchange Act of 1934 (15 U.S.C. 78k-1(a)(2)) that is listed, or

---

[3] Defendants do not concede that any of the allegations in the Complaint are true or that class certification is appropriate; the relevant inquiry is whether the Complaint alleges a prospective class action.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

authorized for listing, on a national securities exchange (or tier or segment thereof); or

(B) a security of the same issuer that is equal in seniority or that is a senior security to a security described in subparagraph (A).

15 U.S.C.S. § 77r(b)(1).

15.    Plaintiffs seek to represent a class of individuals who were sold securities that meet the following criteria: (1) "debt instrument[s]"; (2) "with an interest rate that was subject to fluctuation prior to maturity"; (3) "which could decrease to zero based on market variables"; and (4) "which [have] or had a maturity period greater than 10 years." *See* Compl. ¶ 95.

16.    As set forth in the Declaration of Michael Leahy, a number of class member Plaintiffs purchased securities in their Centaurus Financial accounts that (a) meet the class criteria as set forth by Plaintiffs in the Complaint, and (b) are "covered securities" within the meaning of SLUSA pursuant to 15 U.S.C. § 77r(b)(1)(B).[4] *See* Declaration of Michael Leahy, attached hereto as **Exhibit A**; *see also* Selected Relevant Offering Documents, attached as Exhibits 1-4 of the same.

17.    For instance, a simple review of just the securities purchased by the named class representatives reveal a number of investments at issue that are "covered securities" within the meaning of SLUSA because they are debt instruments issued by Barclays and Morgan Stanley that are senior to a security of the same issuer that is traded on a national exchange (*i.e.*, common stock issued by Barclays and Morgan Stanley).  *See* Exhibit A, at ¶¶ 3-6.  For example, named class

---

[4] Due to the limited information provided in the Complaint on the securities at issue, Defendants have not examined every transaction for every class member. However, based on the information provided, it is clear that some of the securities at issue in the Complaint are "covered securities" pursuant to SLUSA.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Plaintiffs Larry and Rebecca Martin made the following purchases in April 2017, May 2017, and January 2018, respectively:

    a.    Barclays Capped Callable CMS Steepener Global Medium-Term Notes, Series A (due July 28, 2034) (CUSIP number 06741UFK5);

    b.    Barclays Callable Leveraged Steepener Global Medium-Term Notes (due July 31, 2034) (CUSIP number 06741UFM1); and

    c.    Morgan Stanley Leveraged CMS Curve and S&P 500 Index Linked Securities (due 2034) (CUSIP number 61760QDZ4).

*See* Exhibit A, at ¶¶ 3a, 3b, 3c.

18.    By way of another example, named class Plaintiff Rebecca Martin also made the following purchase in January 2018:

    a.    Morgan Stanley Leveraged CMS Curve and Russell 2000® Index Linked Notes (due 2034) (CUSIP number 61760QEC4).

*See* Exhibit A, at ¶ 3d.

19.    All four of the examples set forth above are not only "covered securities" for purposes of SLUSA but also meet the class criteria as set forth by Plaintiffs in the Complaint in that they are (1) "debt instrument[s]"; (2) "with an interest rate that was subject to fluctuation prior to maturity"; (3) "which could decrease to zero based on market variables;" and (4) "which [have] or had a maturity period greater than 10 years." *See* Exhibit A, at ¶ 5; *see also* Exhibits 1-4 to same.

20.    Fourth, the Complaint alleges that Defendants misrepresented or omitted a material fact and employed a deceptive or manipulative device or contrivance in connection with the purchase or sale of covered securities. The Complaint alleges that Defendants advertised and sold

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

"illiquid" products "with false promises of high returns and guaranteed return[s] of [] principal" and that Defendants "willfully misrepresented and/or concealed" material facts regarding these investments to Plaintiffs. Compl. at ¶ 4. Beyond the foregoing, the Complaint revolves around allegations of "misrepresentation[s] or omission[s] of [] material fact." *See* Compl. at ¶¶ 1, 4, 6, 7, 19, 23-48.

21.    Nothing more is required to demonstrate that the State Court Action is removable to federal court and, ultimately, subject to dismissal under SLUSA.

### III.    Procedural Requirements and Local Rules

22.    <u>Removal to this Court is proper.</u> Pursuant to 28 U.S.C. § 1446(a), this Notice of Removal is being filed in the United States District Court for the District of South Carolina, which is the federal district court embracing the Court of Common Pleas for the Eleventh Judicial Circuit in Lexington County, South Carolina, where the State Court Action was initially filed.

23.    <u>Removal is timely.</u> This Notice of Removal is being filed with the United States District Court for the District of South Carolina on July 26, 2019, within thirty days after receipt by Defendants of the Summons and Complaint. *See* 28 U.S.C. § 1446(b).

24.    <u>Pleadings and Process.</u> Attached to this Notice of Removal is a copy of all process, pleadings and orders, which have been served upon Defendants in this action, including the Complaint and the summons served on Defendants (true and correct copies are attached hereto as **Exhibit B**). *See* 28 U.S.C. § 1446(a).

25.    <u>Signature</u>: As required by 28 U.S.C. § 1446(a), this Notice of Removal is signed pursuant to Fed. R. Civ. P. 11.

26.    <u>Notice.</u> Pursuant to 28 U.S.C. § 1446(d), promptly after filing this Notice of Removal, Defendants will provide a Notice of Filing of Notice of Removal to all parties and will

file the same with the Clerk of the Court of Common Pleas for the Eleventh Judicial Circuit in Lexington County, South Carolina. A copy of the Notice of Filing of Notice of Removal is attached hereto as **Exhibit C.**

27.    Having satisfied all of the requirements for removal, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1446 and 15 U.S.C. § 78bb, and removal is proper.

**WHEREFORE**, having satisfied all the requirements for removal under 28 U.S.C. § 1446 and 15 U.S.C. § 78bb, Defendants Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, L.L.C. respectfully serve notice that the above-referenced civil action, now pending in the Court of Common Pleas for the Eleventh Judicial Circuit in Lexington County, South Carolina, is removed therefrom to the United States District Court for the District of South Carolina.

Dated: July 26, 2019                                Respectfully submitted,

_s/ Michael H. Montgomery_                _s/ Joel H. Smith_
Michael H. Montgomery                     Joel H. Smith
Montgomery Willard, LLC                   Kevin J. Malloy
1002 Calhoun Street (29201)               Bowman and Brooke LLP
Post Office Box 11886                     1441 Main Street, Suite 1200
Columbia, South Carolina 29211            Columbia, SC  29201-2897
(803) 779-3500                            (803) 726-7422
mhm@montgomerywillard.com                 Joel.Smith@bowmanandbrooke.com
                                          Kevin.Malloy@bowmanandbrooke.com
_Attorney for Mantei & Associates, Ltd.,_
_Ricky Alan Mantei, and Cindy Chiellini_  _Attorneys for Centaurus Financial, Inc._

                           _s/ Cory Manning_
                           Cory Manning
                           Nelson Mullins Riley & Scarborough LLP
                           1320 Main Street, 17th Floor
                           Columbia, SC 29201
                           (803) 255-5524
                           Cory.Manning@nelsonmullins.com

                           _Attorney for J.P. Turner & Company,_
                           _L.L.C._

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 26th of July 2019, the foregoing **NOTICE OF REMOVAL** was served on all counsel of record via electronic and first class mail addressed as follows:

*s/ Joel H. Smith*
Joel H. Smith
Bowman and Brooke LLP

# Exhibit A

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

Donald Black, Marcia Black, Larry Martin,
Rebecca Martin, Barbara Thompson, and
James Thompson,

For Themselves and a Class of Similarly
Situated Plaintiffs,

     Plaintiffs,

v.

Mantei & Associates, Ltd., Ricky Alan
Mantei, Cindy Chiellini, Centaurus Financial,
Inc., and J.P. Turner & Company, L.L.C.,

     Defendants.

Civil Action No. _____

---

**DECLARATION OF MICHAEL LEAHY**

---

I, Michael Leahy, being competent and over the age of twenty-one, do hereby voluntarily and knowingly swear, declare, and affirm the following from my own personal knowledge:

1.     I am the Associate Counsel for Centaurus Financial, Inc. ("Centaurus"). In this role, I am aware of certain investments offered by Centaurus, and I have knowledge of and access to information regarding investments purchased by Plaintiffs in their Centaurus accounts.

2.     Plaintiffs' Complaint alleges that the named Plaintiffs seek to represent a putative class consisting of residents of the State of South Carolina, aged 50 years and older, who purchased securities from Centaurus that meet the following criteria: (1) "debt instrument[s]"; (2) "with an interest rate that was subject to fluctuation prior to maturity"; (3) "which could decrease to zero

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

based on market variables"; and (4) "which [have] or had a maturity period greater than 10 years." *See* Compl. ¶ 95.

3.    I am aware of four such securities purchased by a named Plaintiff. Specifically, Plaintiffs Larry D. Martin and/or Rebecca W. Martin purchased the following securities in their Centaurus accounts:

    a.    Barclays Capped Callable CMS Steepener Global Medium-Term Notes, Series A (due July 28, 2034) (CUSIP number 06741UFK5) (purchased in April 2017 by Larry and Rebecca Martin);

    b.    Barclays Callable Leveraged Steepener Global Medium-Term Notes (due July 31, 2034) (CUSIP number 06741UFM1) (purchased in May 2017 by Larry and Rebecca Martin);

    c.    Morgan Stanley Leveraged CMS Curve and S&P 500 Index Linked Securities (due 2034) (CUSIP number 61760QDZ4) (purchased in January 2018 by Larry and Rebecca Martin); and

    d.    Morgan Stanley Leveraged CMS Curve and Russell 2000® Index Linked Notes (due 2034) (CUSIP number 61760QEC4) (purchased in January 2018 by Rebecca Martin).

4.    Plaintiffs allege in the Complaint that Larry D. Martin and Rebecca W. Martin are South Carolina residents aged fifty or older. The paperwork for their Centaurus accounts is consistent with these allegations.

5.    The above securities meet each of the class criteria set out in Paragraph 2 above. Attached hereto as Exhibits 1-4 are the offering documents for each of these securities.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

6.     The issuers of these securities, Barclays and Morgan Stanley, both have common stock traded on the New York Stock Exchange under the symbols BCS and MS, respectively. Furthermore, as debt securities, these securities are equal or greater in seniority than the common stock of Barclays and Morgan Stanley.

Further, the Declarant sayeth naught.

Respectfully submitted, July 26, 2019.

Michael Leahy
Associate Counsel for Centaurus Financial, Inc.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

# EXHIBIT 1

7/5/2019 https://www.sec.gov/Archives/edgar/data/312070/000110465914053347/a14-16357_23424b2.htm

3:19-cv-02097-MGL Date Filed 07/26/19 Entry Number 1-1 Page 6 of 93
3:23-cv-04149-MGL Date Filed 08/18/23 Entry Number 3-3 Page 82 of 281

424B2 1 a14-16357_23424b2.htm PS - 20140728 - 20Y STEEPENER

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities Offered | Maximum Aggregate Offering Price | Amount of Registration Fee(1) |
|---|---|---|
| Global Medium-Term Notes, Series A | $4,000,000 | $515.20 |

(1)    Calculated in accordance with Rule 457(r) of the Securities Act of 1933

Pricing Supplement dated July 23, 2014
(To Prospectus dated July 19, 2013 and
the Prospectus Supplement dated July 19, 2013)

Filed Pursuant to Rule 424(b)(2)
Registration No. 333-190038



### US$4,000,000
### CAPPED CALLABLE CMS STEEPENER NOTES DUE JULY 28, 2034

| | | | |
|---|---|---|---|
| **Principal Amount:** | US$4,000,000 | **Issuer:** | Barclays Bank PLC |
| **Issue Price:** | Variable Price Re-Offer | **Series:** | Global Medium-Term Notes, Series A |
| **Payment at Maturity:** | If you hold the Notes to maturity, you will receive 100% of your principal, subject to the creditworthiness of Barclays Bank PLC.  The Notes are not, either directly or indirectly, an obligation of any third party, and any payment to be made on the Notes, including any repayment of principal provided at maturity, depends on the ability of Barclays Bank PLC to satisfy its obligations as they come due.  For a description of risks with respect to the ability of Barclays Bank PLC to satisfy its obligations as they come due, see "Selected Risk Factors—Issuer Credit Risk" in this pricing supplement. | **Original Issue Date:** | July 28, 2014 |
| **Original Trade Date:** | July 23 , 2014 | **Maturity Date:** | July 28, 2034, subject to Redemption at the Option of the Company (as set forth below). |
| **CUSIP:** | 06741UFK5 | **Denominations:** | Minimum denominations of US$20,000 and in integral multiples of US$1,000 thereafter. |
| **ISIN:** | US06741UFK51 | | |
| **Reference Asset/Reference Rate:**  The CMS Spread *minus* the Fixed Percentage Amount | | **Maximum Interest Rate:** | 10.00% per annum. |
| **CMS Spread:** An amount determined by the Calculation Agent, which is the CMS Rate with a maturity of 30 years ("30CMS") *minus* the CMS Rate with a maturity of 2 years ("2CMS" and together with 30CMS, the "CMS Rates"). (See "The CMS Rates" on page PS-7 for additional information on how the CMS Rates are calculated).  In certain circumstances, the CMS Rates will be based on the alternate calculation of the CMS Rate as described in "Reference Assets—Floating Interest Rate—CMS Rate" in the accompanying prospectus supplement. | | **Minimum Interest Rate:** | 0.00% per annum. |

*[Terms of Notes continue on next page]*

| | Price to Public(1) | Agent's Commission(1)(2) | Proceeds to Barclays Bank PLC(1)(2) |
|---|---|---|---|
| **Per Note** | At Variable Prices | 5.00% | 95.00% |
| **Total** | At Variable Prices | $200,000 | $3,800,000 |

**(1)** Barclays Capital Inc. has agreed to purchase the Notes from us at 100% of the principal amount minus a maximum commission equal to $50.00 per $1,000 principal amount, or 5.00%, resulting in a minimum aggregate proceeds to Barclays Bank PLC of $3,800,000.  Barclays Capital Inc. proposes to offer the Notes from time to time for sale in negotiated transactions, or otherwise, at varying prices to be determined at the time of each sale; provided that, such prices are not expected to be less than $950.00 or greater than $1,000 per $1,000 principal amount. Barclays Capital Inc. may also use all or a portion of its commissions on the Notes to pay selling concessions or fees to other dealers.  See "Selected Risk Factors—The Price You Paid for the Notes May Be Higher than the Prices Paid by Other Investors" below for additional detail. **(2)** The total Agent's Commission and Proceeds to Barclays Bank PLC, will be based on the aggregate dollar amount of notes sold by Barclays Bank PLC to Barclays Capital Inc. as determined on the Original Trade Date.

Our estimated value of the Notes on the Original Trade Date, based on our internal pricing models, is $908.00 per Note. The estimated value is

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

less than the initial issue price of the Notes. See "Additional Information Regarding Our Estimated Value of the Notes" below. We may decide to sell additional Notes after the date of this pricing supplement, at issue prices and with commissions and aggregate proceeds that differ from the amounts set forth above. In addition, the estimated value of the Notes on the date any additional Notes are priced for sale to be traded will take into account a number of variables, including prevailing market conditions and our subjective assumptions, which may or may not materialize, on the date that such additional Notes are traded. As a result of changes in these variables, our estimated value of the Notes on any subsequent trade date may be lower or higher than our estimated value of the Notes on the Original Trade Date, but in no case will be less than $870.00 per Note.

*Any payment on the Notes is subject to the creditworthiness of the Issuer and is not guaranteed by any third party. For a description of risks with respect to the ability of Barclays Bank PLC to satisfy its obligations as they come due, see "Selected Risk Factors—Issuer Credit Risk" in this pricing supplement.*

Investing in the Notes involves a number of risks. See "Risk Factors" beginning on page S-6 of the prospectus supplement and "Selected Risk Factors" on page PS-2 below.

The Notes will not be listed on any U.S. securities exchange or quotation system. Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the Notes or determined that this pricing supplement is truthful or complete. Any representation to the contrary is a criminal offense.

The Notes constitute our direct, unconditional, unsecured and unsubordinated obligations and are not deposit liabilities of Barclays Bank PLC and are not insured by the U.S. Federal Deposit Insurance Corporation or any other governmental agency of the United States, the United Kingdom or any other jurisdiction.

We may use this pricing supplement in the initial sale of Notes. Barclays Capital Inc. or another of our affiliates may use this pricing supplement in market resale transactions in any Notes after their initial sale. Unless we or our agent informs you otherwise in the confirmation of sale, this pricing supplement is being used in a market resale transaction.

| | |
|---|---|
| **Fixed Percentage Amount:** | 0.50% |
| **Initial Interest Rate:** | 10.00% per annum |

| | |
|---|---|
| **Interest Rate Formula:** | For each Interest Period commencing on or after the Original Issue Date to but excluding January 28, 2016 (the "Initial Interest Payment Period"): the Initial Interest Rate |
| | For each Interest Period commencing on or after January 28, 2016 (the "Floating Interest Payment Period"), the interest rate per annum will be equal to the *product of* (1) the Multiplier *times* (2) the Reference Rate, subject to the Minimum Interest Rate and the Maximum Interest Rate. |
| **Business Day:** | A Monday, Tuesday, Wednesday, Thursday or Friday that is neither a day on which banking institutions in London or New York City generally are authorized or obligated by law, regulation, or executive order to close. |
| **Business Day Convention/Day Count Fraction:** | Following, unadjusted; 30/360 |
| **Interest Period:** | The initial Interest Period will begin on, and include, the Original Issue Date and end on, but exclude, the first Interest Payment Date. Each subsequent Interest Period will begin on, and include, the Interest Payment Date for the preceding Interest Period and end on, but exclude, the next Interest Payment Date. The final Interest Period will end on, but exclude, the Maturity Date (or the Early Redemption Date, if applicable). |
| **Reference Rate Reset Dates:** | For each Interest Period commencing on or after January 28, 2016, the first day of such Interest Period |
| **Interest Payment Dates:** | Payable quarterly in arrears on the 28th day of each January, April, July and October, commencing on October 28, 2014 and ending on the Maturity Date or the Early Redemption Date, if applicable. |
| **Reference Rate Determination Dates:** | Two New York Business Days prior to the relevant Reference Rate Reset Date |
| **Multiplier:** | 4.00 |
| **Redemption at the Option of the Company:** | We may redeem your Notes, in whole or in part, at the Redemption Price set forth below, on any Interest Payment Date commencing on January 28, 2016, provided we give at least five business days' prior written notice to the trustee. If we exercise our redemption option, the Interest Payment Date on which we so exercise will be referred to as the "Early Redemption Date". |
| **Redemption Price:** | If we exercise our redemption option, you will receive on the Early Redemption Date 100% of the principal amount, together with any accrued and unpaid interest to but excluding the Early Redemption Date. |
| **Settlement:** | DTC; Book-entry; Transferable. |
| **Listing:** | The Notes will not be listed on any U.S. securities exchange or quotation system. |
| **Calculation Agent:** | Barclays Bank PLC |



We urge you to consult your investment, legal, tax, accounting and other advisers and to invest in the Notes only after you and your advisors have carefully considered the suitability of an investment in the Notes in light of your particular circumstances.

Barclays Bank PLC has filed a registration statement (including a prospectus) with the SEC for the offering to which this pricing supplement relates. Before you invest, you should read the prospectus dated July 19, 2013 and the prospectus supplement dated July 19, 2013 and other documents Barclays Bank PLC has filed with the SEC

for more complete information about Barclays Bank PLC and this offering. Buyers should rely upon this pricing supplement, the prospectus, the prospectus supplement and any relevant preliminary pricing supplement for complete details. You may get these documents and other documents Barclays Bank PLC has filed for free by visiting EDGAR on the SEC website at www.sec.gov, and you may also access the prospectus and prospectus supplement through the links below:

- **Prospectus dated July 19, 2013:**

  http://www.sec.gov/Archives/edgar/data/312070/000119312513295636/d570220df3asr.htm

- **Prospectus Supplement dated July 19, 2013:**

  http://www.sec.gov/Archives/edgar/data/312070/000119312513295715/d570220d424b3.htm

**Our SEC file number is 1-10257 and our Central Index Key, or CIK, on the SEC website is 0000312070.**

**Alternatively, Barclays Capital Inc. or any agent or dealer participating in this offering will arrange to send you this pricing supplement, the prospectus, the prospectus supplement and any relevant preliminary pricing supplement if you request it by calling your Barclays Capital Inc. sales representative, such dealer or 1-888-227-2275 (Extension 2-3430). A copy of the prospectus may be obtained from Barclays Capital Inc., 745 Seventh Avenue— Attn: US InvSol Support, New York, NY 10019.**

We reserve the right to change the terms of, or reject any offer to purchase the Notes prior to their issuance. In the event of any changes to the terms of the Notes, we will notify you and you will be asked to accept such changes in connection with your purchase. You may also choose to reject such changes in which case we may reject your offer to purchase.

As used in this term sheet, the "Company," "we," "us," or "our" refers to Barclays Bank PLC.

---

### Additional Information Regarding Our Estimated Value of the Notes

Our internal pricing models take into account a number of variables and are based on a number of subjective assumptions, which may or may not materialize, typically including volatility, interest rates, and our internal funding rates. Our internal funding rates (which are our internally published borrowing rates based on variables such as market benchmarks, our appetite for borrowing, and our existing obligations coming to maturity) may vary from the levels at which our benchmark debt securities trade in the secondary market. Our estimated value on the pricing date is based on our internal funding rates. Our estimated value of the Notes may be lower if such valuation were based on the levels at which our benchmark debt securities trade in the secondary market.

Our estimated value of the Notes on the pricing date is less than the initial issue price of the Notes. The difference between the initial issue price of the Notes and our estimated value of the Notes results from several factors, including any sales commissions to be paid to Barclays Capital Inc. or another affiliate of ours, any selling concessions, discounts, commissions or fees to be allowed or paid to non-affiliated intermediaries, the estimated profit that we or any of our affiliates expect to earn in connection with structuring the Notes, the estimated cost which we may incur in hedging our obligations under the Notes, and estimated development and other costs which we may incur in connection with the Notes.

Our estimated value on the pricing date is not a prediction of the price at which the Notes may trade in the secondary market, nor will it be the price at which Barclays Capital Inc. may buy or sell the Notes in the secondary market. Subject to normal market and funding conditions, Barclays Capital Inc. or another affiliate of ours intends to offer to purchase the Notes in the secondary market but it is not obligated to do so.

Assuming that all relevant factors remain constant after the pricing date, the price at which Barclays Capital Inc. may initially buy or sell the Notes in the secondary market, if any, and the value that we may initially use for customer account statements, if we provide any customer account statements at all, may exceed our estimated value on the pricing date for a temporary period expected to be approximately twelve months after the initial issue date of the Notes because, in our discretion, we may elect to effectively reimburse to investors a portion of the estimated cost of hedging our obligations under the Notes and other costs in connection with the Notes which we will no longer expect to incur over the term of the Notes. We made such discretionary election and determined this temporary reimbursement period on the basis of a number of factors, including the tenor of the Notes and any agreement we may have with the distributors of the Notes. The amount of our estimated costs which we effectively reimburse to investors in this way may not be allocated ratably throughout the reimbursement period, and we may discontinue such reimbursement at any time or revise the duration of the reimbursement period after the initial issue date of the Notes based on changes in market conditions and other factors that cannot be predicted.

Barclays Capital Inc., or another affiliate of ours, or a third party distributor may purchase and hold some of the Notes for subsequent resale at variable prices after the initial issue date of the Notes. There may be circumstances where investors may be offered to purchase those Notes from one distributor (including Barclays Capital Inc. or an affiliate) at a more

favorable price than from other distributors. Furthermore, from time to time, Barclays Capital Inc. or an affiliate may offer and sell the Notes to purchasers of a large number of the Notes at a more favorable price than a purchaser acquiring a lesser number of the Notes.

At our sole option, we may decide to offer additional Notes after the Original Trade Date. Our estimated value of the Notes on any subsequent trade date may reflect issue prices, commissions and aggregate proceeds that differ from the amounts set forth in this pricing supplement and will take into account a number of variables, including prevailing market conditions and our subjective assumptions, which may or may not materialize, on the date that such additional Notes are traded. As a result of changes in these variables, our estimated value of the Notes on any subsequent trade date may differ significantly from our estimated value of the Notes on the original trade date, but in no case will be less than $870.00.

**We urge you to read the "Selected Risk Factors" beginning on page PS-2 of this pricing supplement.**

---

## SELECTED RISK FACTORS

**An investment in the Notes involves significant risks not associated with an investment in conventional floating rate or fixed rate medium term notes. You should read the risks summarized below in connection with, and the risks summarized below are qualified by reference to, the risks described in more detail in the "Risk Factors" section beginning on page S-6 of the prospectus supplement. We urge you to consult your investment, legal, tax, accounting and other advisers and to invest in the Notes only after you and your advisors have carefully considered the suitability of an investment in the Notes in light of your particular circumstances.**

- **Reference Rate / Interest Payment Risk**— Investing in the Notes is not equivalent to investing in securities directly linked to the CMS Rates. Instead, after the initial Interest Periods for which the Initial Interest Rate applies, the amount of interest payable on the Notes is determined by *multiplying* the (a) Multiplier *by* (b) the *difference between* the CMS Rates of the two maturities identified on the cover page hereof (the "CMS Spread") *minus* the Fixed Percentage Amount (the "Reference Rate"), as determined on the Reference Rate Determination Date applicable to the relevant Interest Period, subject to the Minimum Interest Rate and the Maximum Interest Rate. Accordingly, the amount of interest payable on the Notes is dependent on whether, and the extent to which, the CMS Spread is greater than the Fixed Percentage Amount on each Reference Rate Determination Date. If the CMS Spread on any Reference Rate Determination Date is equal to or less than the Fixed Percentage Amount (i.e., the difference between the CMS Rates of the two maturities identified on the cover page hereof is equal to or less than the Fixed Percentage Amount), you would receive no interest payment on the related Interest Payment Date (i.e., the interest rate for that Interest Payment Date would be equal to the Minimum Interest Rate of 0.00%). If the CMS Spread is equal to or less than the Fixed Percentage Amount on every Reference Rate Determination Date throughout the term of the Notes, you would receive no interest payments on your Notes throughout their term after the initial Interest Periods for which the Initial Interest Rate applies. Given these various scenarios, it is possible that the interest payment related to each Interest Period, after the initial Interest Periods for which the Initial Interest Rate applies, during the term of the Notes will be less than the amount that would be paid on an ordinary debt security of comparable maturity and may be zero in many instances.

- **The Amount of Interest Payable on the Notes Related to Any Interest Period is Capped** — The interest rate on the Notes for each quarterly Interest Period, after the Initial Interest Payment Period when the Initial Interest Rate applies, is capped for that quarter at the maximum interest rate of 10.00% per annum. Furthermore, due to the leverage factor or multiplier, you will not get the benefit of any increase in the Reference Rate (as determined on the relevant Reference Rate Determination Date) above a level of 2.50%.

- **Issuer Credit Risk**— The Notes are our unsecured debt obligations, and are not, either directly or indirectly, an obligation of any third party. Any payment to be made on the Notes, including any repayment of principal provided at maturity, depends on our ability to satisfy our obligations as they come due. As a result, the actual and perceived creditworthiness of Barclays Bank PLC may affect the market value of the Notes and, in the event we were to default on our obligations, you may not receive any repayment of principal or any other amounts owed to you under the terms of the Notes.

- **The Price You Paid for the Notes May Be Higher than the Prices Paid by Other Investors**— Barclays Capital Inc. proposes to offer the Notes from time to time for sale to investors in one or more negotiated transactions, or otherwise, at prevailing market prices at the time of sale, at prices related to then-prevailing prices, at negotiated prices, or otherwise. Accordingly, there is a risk that the price you paid for your Notes will be higher than the prices paid by other investors based on the date and time you made your purchase, from whom you purchased the Notes, any related transaction costs, whether you hold your Notes in a brokerage account, a fiduciary or fee-based account or another type of account and other market factors.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

7/5/2019

- **Early Redemption**—We may redeem the Notes prior to the Maturity Date on any Interest Payment Date, beginning on the date specified on the cover page hereof. If you intend to purchase the Notes, you must be willing to have your Notes redeemed early. We are generally more likely to redeem the Notes during periods when we expect that interest will accrue on the Notes at a rate that is greater than that which we would pay on our traditional interest-bearing deposits or debt securities having a maturity equal to the remaining term of the Notes. In contrast, we are generally less likely to redeem the Notes during periods when we expect interest to accrue on the Notes at a rate that is less than that which we would pay on those instruments. If we redeem the Notes prior to the Maturity Date, accrued interest will be paid on the Notes until such early redemption, but you will not receive any future interest payments from the Notes redeemed and you may be unable to reinvest your

PS-2

proceeds from the redemption in an investment with a return that is as high as the return on the Notes would have been if they had not been redeemed.

- **Lack of Liquidity**—The Notes will not be listed on any securities exchange. Barclays Capital Inc. and other affiliates of Barclays Bank PLC intend to make a secondary market for the Notes but are not required to do so, and may discontinue any such secondary market making at any time, without notice. Barclays Capital Inc. may at any time hold unsold inventory, which may inhibit the development of a secondary market for the Notes. Even if there is a secondary market, it may not provide enough liquidity to allow you to trade or sell the Notes easily. Because other dealers are not likely to make a secondary market for the Notes, the price at which you may be able to trade your Notes is likely to depend on the price, if any, at which Barclays Capital Inc. and other affiliates of Barclays Bank PLC are willing to buy the Notes. The Notes are not designed to be short-term trading instruments. Accordingly, you should be able and willing to hold your Notes to maturity.

- **The Historical Performance of the Reference Rate is Not an Indication of Its Future Performance**—The historical performance of the CMS Rates should not be taken as an indication of their future performance during the term of the Notes. Changes in the levels of the CMS Rates will affect the value of the Notes, but it is impossible to predict whether such levels will rise or fall. During the Floating Interest Payment Period, there can be no assurance that the CMS Spread will be greater than the Fixed Percentage Amount during the relevant Interest Periods. Furthermore, the historical performance of the CMS Spread does not reflect the return the Notes would have had because it does not take into account the Multiplier, the Fixed Percentage Amount or the Maximum Interest Rate.

- **Exposure to the CMS Rates**—Payments on the Notes are determined with reference to the CMS Rates. The CMS Rates or the 30 Year CMS Rate and the 2 Year CMS Rate are the "constant maturity swap rates" that measure the fixed rate of interest payable on a hypothetical fixed-for-floating U.S. dollar interest rate swap transaction with a maturity of thirty years and two years, respectively. In such a hypothetical swap transaction, the fixed rate of interest, payable semi-annually on the basis of a 360-day year consisting of twelve 30-day months, is exchangeable for a floating 3-month LIBOR-based payment stream that is payable quarterly on the basis of the actual number of days elapsed during a quarterly period in a 360-day year. "LIBOR" is the London Interbank Offered Rate, and is the rate of interest at which banks borrow funds from each other in the London interbank market. 3-Month LIBOR is the rate of interest which banks in London charge each other for loans for a period of three months.

For additional information about CMS Rates, and more specifically, how the CMS Spread is calculated, see "The CMS Rates" below.

- **The Estimated Value of Your Notes Might be Lower if Such Estimated Value Were Based on the Levels at Which Our Debt Securities Trade in the Secondary Market**—The estimated value of your Notes on the pricing date is based on a number of variables, including our internal funding rates. Our internal funding rates may vary from the levels at which our benchmark debt securities trade in the secondary market. As a result of this difference, the estimated value referenced above may be lower if such estimated value was based on the levels at which our benchmark debt securities trade in the secondary market.

- **The Estimated Value of Your Notes is Lower Than the Initial Issue Price of Your Notes**—The estimated value of your Notes on the pricing date is lower than the initial issue price of your Notes. The difference between the initial issue price of your Notes and the estimated value of the Notes is a result of certain factors, such as any sales commissions to be paid to Barclays Capital Inc. or another affiliate of ours, any selling concessions, discounts, commissions or fees to be allowed or paid to non-affiliated intermediaries, the estimated profit that we or any of our affiliates expect to earn in connection with structuring the Notes, the estimated cost which we may incur in hedging our obligations under the Notes, and estimated development and other costs which we may incur in connection with the Notes.

- **The Estimated Value of the Notes is Based on Our Internal Pricing Models, Which May Prove to be Inaccurate and May be Different from the Pricing Models of Other Financial Institutions**—The estimated

7/5/2019    https://www.sec.gov/Archives/edgar/data/312070/000110465914053347/a14-16357_23424b2.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 11 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 3-3    Page 88 of 281

value of your Notes on the pricing date is based on our internal pricing models, which take into account a number of variables and are based on a number of subjective assumptions, which may or may not materialize. These variables and assumptions are not evaluated or verified on an independent basis. Further, our pricing models may be different from other financial institutions' pricing models and the methodologies used by us to estimate the value of the Notes may not be consistent with those of other financial institutions which may be purchasers or sellers of Notes in the secondary market. As a result, the secondary market price of your Notes may be materially different from the estimated value of the Notes determined by reference to our internal pricing models. Moreover, at our sole option, we may decide to sell additional Notes after the Original Trade Date. Our estimated value of the Notes on any subsequent trade date may reflect issue prices, commissions and aggregate proceeds that

PS-3

differ from the amounts set forth in this pricing supplement and will take into account a number of variables, including prevailing market conditions and our subjective assumptions, which may or may not materialize, on the date that such additional Notes are traded. As a result of changes in these variables, our estimated value of the Notes on any subsequent trade may differ significantly from our estimated value of the Notes on the Original Trade Date.

- **The Estimated Value of Your Notes Is Not a Prediction of the Prices at Which You May Sell Your Notes in the Secondary Market, if any, and Such Secondary Market Prices, If Any, Will Likely be Lower Than the Initial Issue Price of Your Notes and Maybe Lower Than the Estimated Value of Your Notes**—The estimated value of the Notes will not be a prediction of the prices at which Barclays Capital Inc., other affiliates of ours or third parties may be willing to purchase the Notes from you in secondary market transactions (if they are willing to purchase, which they are not obligated to do). The price at which you may be able to sell your Notes in the secondary market at any time will be influenced by many factors that cannot be predicted, such as market conditions, and any bid and ask spread for similar sized trades, and may be substantially less than our estimated value of the Notes. Further, as secondary market prices of your Notes take into account the levels at which our debt securities trade in the secondary market, and do not take into account our various costs related to the Notes, such as fees, commissions, discounts, and the costs of hedging our obligations under the Notes, secondary market prices of your Notes will likely be lower than the initial issue price of your Notes. As a result, the price, at which Barclays Capital Inc., other affiliates of ours or third parties may be willing to purchase the Notes from you in secondary market transactions, if any, will likely be lower than the price you paid for your Notes, and any sale prior to the maturity date could result in a substantial loss to you.

- **The Temporary Price at Which We May Initially Buy The Notes in the Secondary Market And the Value We May Initially Use for Customer Account Statements, If We Provide Any Customer Account Statements At All, May Not Be Indicative of Future Prices of Your Notes**—Assuming that all relevant factors remain constant after the pricing date, the price at which Barclays Capital Inc. may initially buy or sell the Notes in the secondary market (if Barclays Capital Inc. makes a market in the Notes, which it is not obligated to do) and the value that we may initially use for customer account statements, if we provide any customer account statements at all, may exceed our estimated value of the Notes on the Original Trade Date, as well as the secondary market value of the Notes, for a temporary period after the initial issue date of the Notes. The price at which Barclays Capital Inc. may initially buy or sell the Notes in the secondary market and the value that we may initially use for customer account statements may not be indicative of future prices of your Notes.

- **We and Our Affiliates May Engage in Various Activities or Make Determinations That Could Materially Affect Your Notes in Various Ways and Create Conflicts of Interest**—We and our affiliates establish the offering price of the Notes for initial sale to the public, and the offering price is not based upon an independent verification or valuation. Additionally, the role played by Barclays Capital Inc., as a dealer in the Notes, could present it with significant conflicts of interest with the role of Barclays Bank PLC, as issuer of the Notes. For example, Barclays Capital Inc. or its representatives may derive compensation or financial benefit from the distribution of the Notes and such compensation or financial benefit may serve as an incentive to sell these Notes instead of other investments. We may pay dealer compensation to any of our affiliates acting as agents or dealers in connection with the distribution of the Notes. Furthermore, we and our affiliates make markets in and trade various financial instruments or products for their own accounts and for the account of their clients and otherwise provide investment banking and other financial services with respect to these financial instruments and products. These financial instruments and products may include securities, futures, options or other derivative instruments with returns linked or related to changes in the levels of the CMS Rates. Such market making activities, trading activities and other investment banking and financial services may negatively impact the value of the Notes. Furthermore, in any such market making, trading activities, and other services, we or our affiliates may take positions or take actions that are inconsistent with, or adverse to, the investment objectives of the holders of the Notes. We and our affiliates have no obligation to take the needs of any buyer, seller or holder of the Notes into account in conducting these activities.

- **Additional Potential Conflicts**—As described above, we and our affiliates play a variety of roles in connection with the issuance of the Notes, including acting as Calculation Agent and hedging our obligations under the Notes. In performing these duties, the economic interests of the Calculation Agent and other affiliates of ours are potentially adverse to your interests as an investor in the Notes.

In addition, Barclays Wealth and Investment Management, the wealth management division of Barclays Capital Inc., may arrange for the sale of the Notes to certain of its clients. In doing so, Barclays Wealth and Investment Management will be acting as agent for Barclays Bank PLC and may receive compensation from Barclays Bank PLC in the form of discounts and commissions. The role of Barclays Wealth and Investment Management as a provider of certain services to such customers and as agent for Barclays Bank PLC in connection with the

<div align="center">PS-4</div>

distribution of the Notes to investors may create a potential conflict of interest, which may be adverse to such clients. Barclays Wealth and Investment Management is not acting as your agent or investment adviser, and is not representing you in any capacity with respect to any purchase of Notes by you. Barclays Wealth and Investment Management is acting solely as agent for Barclays Bank PLC. If you are considering whether to invest in the Notes through Barclays Wealth and Investment Management, we strongly urge you to seek independent financial and investment advice to assess the merits of such investment.

- **Many Economic and Market Factors Will Impact the Value of the Notes**—In addition to the Reference Rate on any day, the value of the Notes will be affected by a number of economic and market factors that may either offset or magnify each other, including:

  o   the expected volatility of the Reference Rate;
  o   the time to maturity of the Notes;
  o   interest and yield rates in the market generally;
  o   a variety of economic, financial, political, regulatory or judicial events; and
  o   our creditworthiness, whether actual or perceived, including actual or anticipated downgrades in our credit ratings.

<div align="center">**HYPOTHETICAL INTEREST RATE AND INTEREST PAYMENT CALCULATIONS**</div>

*The examples below illustrate the various payments you may receive on the Notes in a number of different hypothetical scenarios. These examples are only hypothetical and do not indicate the actual payments or returns you will receive on the Notes. The examples below assume that the Notes are held until maturity and do not take into account the tax consequences of an investment in the Notes.*

As described above, after the initial Interest Periods for which the Initial Interest Rate is payable, the Notes will pay interest on each Interest Payment Date at an effective per annum interest rate calculated in accordance with the Interest Rate Formula. The following illustrates the process by which the interest rate and interest payment amount are determined for each Interest Period during the term of the Notes.

For purposes of these examples, we assume that the Notes are not being redeemed on the applicable Interest Payment Date pursuant to the Redemption at the Option of the Company provisions above. If we exercise our redemption option, you will receive on the Early Redemption Date the Redemption Price applicable to that Early Redemption Date, calculated as described above. The examples below are based on the Fixed Percentage Amount of 0.50% per annum, and reflect the Minimum Interest Rate of 0.00% per annum and the Maximum Interest Rate of 10.00% per annum.

**Interest Rate Calculation**

*Step 1: Calculate the Reference Rate.*

For each Interest Period commencing on or after January 28, 2016, a value for the Reference Rate is determined by calculating the CMS Spread (the 30 Year CMS Rate *minus* the 2 Year CMS Rate) *minus* the Fixed Percentage Amount. If the value of the first CMS Rate is not sufficiently greater than the second CMS Rate, the subtraction of the second CMS Rate from the first CMS Rate will be less than or equal to the Fixed Percentage Amount which will result in a negative Reference Rate or a Reference Rate of zero.

*Step 2: Calculate the per annum interest rate for each Interest Payment Date.*

For each Interest Period commencing on or after January 28, 2016 ("Floating Interest Payment Period"), the interest rate per annum will be equal to the *product* of (i) the Multiplier and (2) the Reference Rate, subject to the Minimum Interest Rate and the Maximum Interest Rate.

For each Interest Period commencing on or after the Original Issue Date to but excluding January 28, 2016, the interest rate per annum will be equal to the Initial Interest Rate.

As both the Initial Interest Rate and the Maximum Interest Rate are set at 10.00%, the maximum possible per annum interest rate for any Interest Period is 10.00%.  The minimum interest rate applicable to any Interest Period during the Floating Interest Payment Period could be 0.00%.  As such, the per annum interest rate for any Interest Period during the Floating Interest Payment Period could potentially be between 0.00% per annum and 10.00%.  See "Selected Risk Factors —Reference Rate/Interest Payment Risk".

PS-5

**Example Interest Rate and Interest Payment Calculations**

The table below presents examples of hypothetical interest that would accrue on the Notes during various Interest Periods during the term of the Notes.  For the Initial Interest Payment Period, interest will accrue at a rate of 10.00% per annum.  For the Floating Interest Payment Period, interest will accrue on the Notes at an effective per annum interest rate calculated in accordance with the Interest Rate Formula.

The examples below assume the Notes are held until the Maturity Date.  These examples do not take into account any tax consequences from investing in the Notes.

Also, as stated above, the below is merely a sampling of Interest Periods during the Floating Interest Payment Period and does not reflect the total number of Interest Periods that occur during the term of the Notes.

| Reference Rate[4] | Multiplier *times* Reference Rate | Interest Rate[1][2] | Interest Payment Amount (per $1,000 note) [3] |
|---|---|---|---|
| -4.000% | -16.00% | 0.00% | $0.00 |
| -2.500% | -10.00% | 0.00% | $0.00 |
| -1.000% | -4.00% | 0.00% | $0.00 |
| 0.000% | 0.00% | 0.00% | $0.00 |
| 0.500% | 2.00% | 2.00% | $5.00 |
| 1.00% | 4.00% | 4.00% | $10.00 |
| 1.50% | 6.00% | 6.00% | $15.00 |
| 2.000% | 8.00% | 8.00% | $20.00 |
| 2.50% | 10.00% | 10.00% | $25.00 |
| 3.00% | 12.00% | 10.00% | $25.00 |
| 3.50% | 14.00% | 10.00% | $25.00 |
| 4.00% | 16.00% | 10.00% | $25.00 |

1. For each Interest Period occurring within the Initial Interest Payment Period, the interest rate is equal to the Initial Interest Rate of 10.00%.
2. For each Interest Period occurring during the Floating Interest Payment Period, the interest rate per annum is equal to the product of (1) the Multiplier of 4.00 and (2) the Reference Rate, subject to the Minimum Interest Rate of 0.00% and the Maximum Interest Rate of 10.00%, if applicable.
3. The interest payment amount for an Interest Payment Date equals the principal amount times the effective interest rate for the related Interest Period.
4. For each Interest Period, the value of the Reference Rate is equal to the CMS Spread (the 30 Year CMS Rate *minus* the 2 Year CMS Rate) *minus* the Fixed Percentage Amount, as determined on the related Reference Rate Determination Date.

***Example 1:*** If on the Reference Rate Determination Date for the relevant Interest Period the value of the 30 Year CMS Rate is 6.00% and the 2 Year CMS Rate is 5.00%, the Reference Rate for the Interest Period would be 0.50% (equal to the 30 Year CMS Rate minus the 2 Year CMS Rate minus the Fixed Percentage Amount of 0.50%).  In this case, the per annum interest rate for that Interest Period would be 2.00% (equal to the Reference Rate times the Multiplier of 4.00), and you would receive an interest payment of $5.00 per $1,000 principal amount of Notes on the related quarterly Interest Payment Date, calculated as follows:

*Effective Interest Rate = 2.00% x (90/360) = 0.50%*

*Interest Payment = $1,000 x 0.50% = $5.00*

***Example 2:*** If on the Reference Rate Determination Date for the relevant Interest Period the value of the 30 Year CMS Rate is 4.00% and the 2 Year CMS Rate is 4.60%, the Reference Rate for the Interest Period would be -1.10% (equal to the 30 Year CMS Rate minus the 2 Year CMS Rate minus the Fixed Percentage Amount of 0.50%). Because the value of the Reference Rate times the Multiplier of 4.00 results in a per annum interest rate of -4.40%, which is less than the Minimum Interest Rate of 0.00%, the per annum interest rate for that Interest Period would be 0.00% (the Minimum Interest Rate), and you would receive no interest payment on the related quarterly Interest Payment Date (the interest payment would be $0).

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

**Example 3:** If on the Reference Rate Determination Date for the relevant Interest Period the value of the 30 Year CMS Rate is 9.25% and the 2 Year CMS Rate is 5.95%, the Reference Rate for the Interest Period would be 2.80% (equal to the 30 Year CMS Rate minus the 2 Year CMS Rate minus the Fixed Percentage Amount of 0.50%). Because the value of the Reference Rate times the Multiplier of 4.00 results in a per annum interest rate of 11.20%, which is greater than the

PS-6

Maximum Interest Rate of 10.00%, the per annum interest rate for that Interest Period would be equal to the Maximum Interest Rate of 10.00%, and you would receive an interest payment of $25.00 per $1,000 principal amount of Notes on the related quarterly Interest Payment Date, calculated as follows:

*Effective Interest Rate = 10.00% x (90/360) = 2.50%*
*Interest Payment = $1,000 x 2.50% = $25.00*

PS-7

### THE CMS RATES

The CMS Rate with a maturity of 30 years ("30 Year CMS Rate") and the CMS Rate with a maturity of 2 years ("2 Year CMS Rate"), will be determined by the Calculation Agent by reference to the 30 Year CMS Rate and the 2 Year CMS Rate that appear on Reuters ISDAFIX1 page (the "ISDAFIX1 Page") as of 11:00 a.m., New York City time, on the relevant Reference Rate Determination Date. Please see the information contained in "Reference Assets—Floating Interest Rate—CMS Rate" starting on page S-72 of the Prospectus Supplement for additional detail, including information on procedures that will be applied by the Calculation Agent when the Reference Rate cannot be determined in the manner described above on any Reference Rate Determination Date.

*Historical Information for the CMS Rates*

We have provided the following historical information to help you evaluate the behavior of the CMS Rates in various periods. The historical difference between the CMS Rates should not be taken as an indication of the future difference between the CMS Rates or the performance of the Notes. Fluctuations in the CMS Rates make the interest rate on the Notes difficult to predict and can result in an interest rate to investors that is lower than anticipated. Fluctuations in the CMS Rates and interest rate trends that have occurred in the past are not necessarily indicative of fluctuations that may occur in the future, which may be wider or narrower than those that have occurred historically.

We cannot guarantee that the difference between the CMS Rates will be maintained or will increase or that the 30 Year CMS Rate will be greater than the sum of the 2 Year CMS Rate and the Fixed Percentage Amount over the term of the Notes so that you will receive a rate of interest greater than the Minimum Interest Rate for any Interest Period over the term of the Notes. The actual interest rate on the Notes for any Interest Period commencing on or after January 28, 2016 will depend on the actual CMS Rates on the applicable Reference Rate Determination Dates.

The following table and graph show historical month-end differences between the CMS Rates minus the Fixed Percentage Amount from January 2008 through July 24, 2014 based on the CMS Rates as published by Bloomberg L.P. We have not independently verified the accuracy or completeness of the historical data in the table and graph below. The Calculation Agent will determine the actual interest rate on the Notes for any Interest Periods commencing on or after January 28, 2016 by reference to the CMS Rates as published on the ISDAFIX1 Page.

**Historical Difference between 30 Year CMS Rate and 2 Year CMS Rate minus the Fixed Percentage Amount[1]**

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| January | 1.467% | 1.267% | 2.795% | 3.003% | 1.665% | 2.090% | 2.633% |
| February | 1.808% | 1.262% | 2.852% | 2.906% | 1.719% | 2.051% | 2.640% |
| March | 1.678% | 1.372% | 2.821% | 2.850% | 1.894% | 2.067% | 2.496% |
| April | 1.176% | 1.603% | 2.630% | 2.884% | 1.756% | 1.953% | 2.422% |
| May | 1.150% | 2.338% | 2.315% | 2.809% | 1.239% | 2.269% | 2.290% |
| June | 0.893% | 2.134% | 2.250% | 2.892% | 1.431% | 2.448% | 2.249% |
| July | 1.062% | 2.244% | 2.490% | 2.742% | 1.412% | 2.715% | 2.080%[2] |
| August | 0.952% | 2.267% | 2.016% | 2.186% | 1.603% | 2.649% |  |

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

7/5/2019  https://www.sec.gov/Archives/edgar/data/312070/000110465914053347/a14-16357_23424b2.htm

3:19-cv-02097-MGL   Date Filed 07/26/19   Entry Number 1-1   Page 15 of 93
3:23-cv-04149-MGL   Date Filed 08/18/23   Entry Number 1-3   Page 92 of 281

| | | | | | |
|---|---|---|---|---|---|
| September | 0.733% | 2.119% | 2.242% | 1.639% | 1.685% | 2.694% |
| October | 1.162% | 2.423% | 2.650% | 1.936% | 1.729% | 2.679% |
| November | 0.428% | 2.537% | 2.534% | 1.596% | 1.675% | 2.885% |
| December | 0.733% | 2.604% | 2.841% | 1.371% | 1.856% | 2.923% |

(1)   The Reference Rate will be an amount determined by the Calculation Agent equal to the CMS Spread, which is 30 Year CMS Rate minus 2 Year CMS Rate minus the Fixed Percentage Amount.

(2)   As measured on July 24, 2014.

PS-8

## MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS

The material tax consequences of your investment in the Notes are summarized below.  The discussion below supplements the discussion under "Certain U.S. Federal Income Tax Considerations" in the accompanying prospectus supplement.  Except as noted under "Non-U.S. Holders" below, this section applies to you only if you are a U.S. holder (as defined in the accompanying prospectus supplement) and you hold your Notes as capital assets for tax purposes and does not apply to you if you are a member of a class of holders subject to special rules or are otherwise excluded from the discussion in the prospectus supplement.  In addition, this discussion applies to you only if you are an initial purchaser of the Notes; if you are a secondary purchaser of the Notes, the tax consequences to you may be different.

The following section is the opinion of our special tax counsel, Sullivan & Cromwell LLP, and it assumes that the description of the terms of the Notes in this pricing supplement is materially correct.  The Notes will be treated as debt instruments subject to special rules governing contingent payment debt instruments for U.S. federal income tax purposes.  Under these rules, if you are a U.S. individual or taxable entity, you generally will be required to accrue interest on a current basis in respect of the Notes over their term based on the comparable yield and projected payment schedule for the Notes and pay tax accordingly, even though the comparable yield may exceed the interest payments made with respect to the Notes.  This comparable yield and projected payment schedule are determined solely to calculate the amount on which you will be taxed prior to redemption or maturity and are neither a prediction nor a guarantee of what the actual yield will be.  You would also be required to make adjustments to your accruals if the actual amounts that you receive in any taxable year differ from the amounts shown on the projected payment schedule. You will not be required to separately include in income the interest payments you receive on the Notes, except to the extent of any positive or negative adjustments discussed below.

In addition, any gain you may recognize on the sale, redemption or maturity of the Notes will be taxed as ordinary interest income and any loss you may recognize on the sale, redemption or maturity of the Notes would generally be ordinary loss to the extent of the interest you previously included as income in respect of the Notes and thereafter would be capital loss. If you are a noncorporate holder, you would generally be able to use such ordinary loss to offset your income only in the taxable year in which you recognize the ordinary loss and would generally not be able to carry such ordinary loss forward or back to offset income in other taxable years.

It is not entirely clear how, under the rules governing contingent payment obligations, the maturity date for debt instruments (such as your Notes) that provide for an early redemption right should be determined for purposes of computing the comparable yield and projected payment schedule. It would be reasonable, however, to compute the comparable yield and projected payment schedule for your Notes (and we intend to make the computation in such a manner) based on the assumption that your Notes will remain outstanding until the stated maturity date.

If, during any taxable year, the interest payments made on the Notes exceed the projected payments for that taxable year, you will incur a "net positive adjustment" under the contingent payment debt instrument regulations equal to the amount of such excess.  You will treat a net positive adjustment as additional interest income in that taxable year.

If, during any taxable year, the interest payments made on the Notes are less than the amount of projected payment for that taxable year, you will incur a "net negative adjustment" under the contingent payment debt instrument regulations equal to the amount of such deficit. This net negative adjustment will (a) reduce your interest income on the Notes for that taxable year, and (b) to the extent of any excess after the application of (a), give rise to an ordinary loss to the extent of your interest income on the Notes during prior taxable years, reduced to the extent such interest was offset by prior net negative adjustments. Any net negative adjustment in excess of the amounts described in (a) and (b) will be carried forward as a negative adjustment to offset future interest income with respect to the Notes or to reduce the amount realized on a sale, redemption or maturity of the Notes.  In the case of taxpayers who are individuals, a net negative adjustment is not subject to the two percent floor limitation on miscellaneous itemized deductions.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

One consequence of the application of the contingent payment debt instrument rules to your Notes is that you will likely be required to include an amount of interest in income in certain periods that is less than the interest payments to be made on your Notes in such periods. Conversely, you will likely be required to include an amount of interest in income in certain other periods that exceeds the interest payments that are due on your Notes for such periods. We generally expect holders to include an amount of interest in income that is less than the interest payments to be made on the Notes during the early periods of the Notes, and to include an amount of interest in income that exceeds the interest payments to be made on the Notes during later periods. In the aggregate, if you hold your Notes to maturity, the total amount of income you include should equal the total amount of interest you received.

<div align="center">PS-9</div>

If you purchase your Notes for an amount that differs from the issue price of the Notes, you may be subject to special tax rules as described in "Certain U.S. Federal Income Tax Considerations—U.S. Federal Income Tax Treatment of the Notes as Indebtedness for U.S. Federal Income Tax Purposes—Contingent Payment Debt Instruments" in the accompanying prospectus supplement (in particular, the rules that apply when a U.S. holder purchases a contingent payment debt instrument for an amount that differs from the adjusted issue price of that contingent payment debt instrument at the time of the purchase). These rules are complex and therefore holders are urged to consult their tax advisors regarding these rules.

For a further discussion of the tax treatment of your Notes, including information regarding obtaining the comparable yield, projected payment schedule and issue price for your Notes and the tax consequences to secondary purchasers of the Notes, please see the discussion under the heading "Certain U.S. Federal Income Tax Considerations—U.S. Federal Income Tax Treatment of the Notes as Indebtedness for U.S. Federal Income Tax Purposes—Contingent Payment Debt Instruments" in the accompanying prospectus supplement.

*Non-U.S. Holders.* Barclays currently does not withhold on payments treated as interest to non-U.S. holders in respect of instruments such as the Notes. However, if Barclays determines that there is a material risk that it will be required to withhold on any such payments, Barclays may withhold on any payments at a 30% rate, unless you have provided to Barclays an appropriate and valid Internal Revenue Service Form W-8. Non-U.S. holders will also be subject to the general rules regarding information reporting and backup withholding as described under the heading "Certain U.S. Federal Income Tax Considerations—Information Reporting and Backup Withholding" in the accompanying prospectus supplement.

### CERTAIN EMPLOYEE RETIREMENT INCOME SECURITY ACT CONSIDERATIONS

Your purchase of a Note in an Individual Retirement Account (an "IRA"), will be deemed to be a representation and warranty by you, as a fiduciary of the IRA and also on behalf of the IRA, that (i) neither the Issuer, the placement agent nor any of their respective affiliates has or exercises any discretionary authority or control or acts in a fiduciary capacity with respect to the IRA assets used to purchase the Note or renders investment advice (within the meaning of Section 3(21)(A) (ii) of the Employee Retirement Income Security Act ("ERISA")) with respect to any such IRA assets and (ii) in connection with the purchase of the Note, the IRA will pay no more than "adequate consideration" (within the meaning of Section 408(b)(17) of ERISA) and in connection with any redemption of the Note pursuant to its terms will receive at least adequate consideration, and, in making the foregoing representations and warranties, you have (x) applied sound business principles in determining whether fair market value will be paid, and (y) made such determination acting in good faith.

For additional ERISA considerations, see "Employee Retirement Income Security Act" in the prospectus supplement.

### SUPPLEMENTAL TERMS OF THE NOTES

Notwithstanding anything to the contrary contained herein, (1) each reference to "BBA" on page S-79 of the prospectus supplement will be deemed to refer to "IntercontinentalExchange Group".

Notwithstanding anything to the contrary in "Plan of Distribution—Initial Offering and Issue of Securities" in the accompanying prospectus, the agent's commission may be up to 5.00% of the proceeds from the offering.

### SUPPLEMENTAL PLAN OF DISTRIBUTION

We have agreed to sell to Barclays Capital Inc. (the "**Agent**"), and the Agent has agreed to purchase from us, the principal amount of the Notes, and at the price, specified on the cover of this pricing supplement. The Agent is committed to take and pay for all of the Notes, if any are taken.

PS-10



# US$4,000,000
# BARCLAYS BANK PLC

### CAPPED CALLABLE CMS STEEPENER NOTES DUE JULY 28, 2034

GLOBAL MEDIUM-TERM NOTES, SERIES A

(TO PROSPECTUS DATED JULY 19, 2013, AND THE
PROSPECTUS SUPPLEMENT DATED JULY 19, 2013)

_____



ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

# EXHIBIT 2



July 2014
Preliminary Terms No. 179
Registration Statement No. 333-190038
Dated July 1, 2014
Filed pursuant to Rule 433

# INTEREST RATE STRUCTURED INVESTMENTS

## Callable Leveraged Steepener Notes due July 31, 2034

### Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate

For the first year of the term of the notes, the notes will pay quarterly interest payments at a fixed rate of 10.00% per annum. After the first year, subject to early redemption as further described below, the notes will pay quarterly interest payments at a variable rate per annum equal to (i) the multiplier of 8.00 *times* (ii) the reference rate, which is equal to (a) the CMS spread, which is the 30-year constant maturity swap rate *minus* the 5-year constant maturity swap rate, *minus* (b) the fixed percentage amount of 0.250%, subject to the maximum interest rate of 10.00% per annum and the minimum interest rate of 0.00% per annum. We may redeem the notes, in whole or in part, at our option on any quarterly interest payment date beginning on July 31, 2015 at the redemption price set forth below. These long-dated notes are for investors who seek an opportunity to earn interest at a potentially above-market rate in exchange for the risk of receiving little interest over the term of the notes and the risk of the notes being called by the issuer prior to the maturity date. **All payments on the notes, including the repayment of principal, are subject to the creditworthiness of Barclays Bank PLC. The notes are not, either directly or indirectly, an obligation of any third party, and any payment to be made on the notes, including the repayment of principal at maturity, depends on the ability of Barclays Bank PLC to satisfy its obligations as they come due.**

### SUMMARY TERMS

| | |
|---|---|
| **Issuer:** | Barclays Bank PLC |
| **Aggregate principal amount:** | $ |
| **Stated principal amount:** | $1,000 per note |
| **Initial issue price:** | Variable price re-offer (see "Commissions and initial issue price" below) |
| **Original trade date†:** | July 2, 2014 |
| **Original issue date†:** | July 31, 2014 |
| **Maturity date†:** | July 31, 2034, subject to redemption at the option of the company (as set forth below) |
| **Payment at maturity:** | The payment at maturity per note will be the stated principal amount *plus* accrued and unpaid interest, if any (subject to the creditworthiness of the issuer). |
| **Redemption at the option of the company:** | The issuer may redeem the notes, in whole or in part, at the redemption price set forth below, on any interest payment date beginning on July 31, 2015; *provided* that the issuer gives at least ten business days' prior written notice to the trustee. If the issuer exercises its redemption option, the interest payment date on which it is exercised will be referred to as the "early redemption date." |
| **Redemption price:** | If the issuer exercises its redemption option, the payment on the early redemption date per note will be the stated principal amount *plus* accrued and unpaid interest, if any (subject to the creditworthiness of the issuer). |
| **Reference rate:** | The CMS spread *minus* the fixed percentage amount |
| **CMS spread:** | The CMS spread will be an amount determined by the calculation agent equal to the 30-year CMS rate *minus* the 5-year CMS rate, expressed as a percentage. See "The CMS Rates" below for additional information on how the CMS rates are calculated. In certain circumstances, the CMS rate will be based on the alternate calculation of the CMS rate as described in "Reference Assets—Floating Interest Rate—CMS Rate" on page S-72 of the accompanying prospectus supplement. |
| **Fixed percentage amount:** | 0.250% |
| **Interest rate:** | For each interest period commencing on or after the original issue date to but excluding July 31, 2015 (the "fixed rate payment period"), the interest rate per annum will be equal to the initial interest rate. For each interest period commencing on or after July 31, 2015 to but excluding the maturity date (the "floating rate payment period"), the interest rate per annum will be equal to (1) the multiplier *times* (2) the reference rate; *provided* that the interest rate will not be lower than the minimum interest rate or higher than the maximum interest rate. The reference rate applicable to an interest period will be determined as of the related reference rate determination date. **During the floating rate payment period, it is possible that you could receive little or no interest on the notes. If, on the related reference rate determination date, the reference rate is less than or equal to 0.00%, no interest will accrue for that interest period and the notes will not pay any interest on the related interest payment date.** |

*(terms continued on the next page)*

### Commissions and initial issue price:

| | Initial issue price[1] | Price to public[1][2] | Agent's commissions[2] | Proceeds to issuer[1] |
|---|---|---|---|---|
| **Per note:** | At variable prices | At variable prices | $35.00 | $965.00 |
| **Total:** | At variable prices | At variable prices | $ | $ |

(1) **Our estimated value of the notes on the original trade date, based on our internal pricing models, is expected to be between $900.00 and $950.00 per note. The estimated value is expected to be less than the initial issue price of the notes. See "Additional Information Regarding Our Estimated Value of the Notes" on page 3 of this document. We may decide to sell additional notes after the date of this document, at issue prices and with commissions and aggregate proceeds that differ from the amounts set forth above. In addition, the estimated value of the notes on the date any additional notes are priced for sale to be traded will take into account a number of variables, including prevailing market conditions and our subjective assumptions, which may or may not materialize, on the date that such additional notes are traded. As a result of changes in these variables, our estimated value of the notes on any subsequent trade date may be lower or higher than our estimated value of the notes on the original trade date, but in no case will be less than $900.00 per note.**

(2) **Barclays Capital Inc. will receive commissions from the issuer of up to 3.50% of the principal amount of the notes, or up to $35.00 per $1,000 principal amount, and may retain all or a portion of these commissions or use all or a portion of these commissions to pay selling concessions or fees to other dealers including Morgan Stanley & Co. LLC. Barclays Capital Inc. proposes to offer the notes from time to time for sale in negotiated transactions, or otherwise, at varying prices to be determined at the time of each sale; *provided* that such prices are not**

**expected to be less than $965.00 or greater than $1,000.00 per $1,000 stated principal amount. See "Risk Factors—The price you paid for the notes may be higher than the prices paid by other investors" below for additional detail.**

<span style="color:red">**Investing in the notes involves risks not associated with an investment in conventional debt securities. See "Risk Factors" beginning on page 6 of this document and on page S-6 of the prospectus supplement. You should read this document together with the related prospectus and prospectus supplement, each of which can be accessed via the hyperlinks below before you make an investment decision.**</span>

**Any payment on the notes, including any repayment of principal, is subject to the creditworthiness of the issuer and is not guaranteed by any third party. For a description of risks with respect to the ability of Barclays Bank PLC to satisfy its obligations as they come due, see "Risk Factors—Credit of Issuer" in this document.**

<u>Prospectus dated July 19, 2013</u>                    <u>Prospectus Supplement dated July 19, 2013</u>

Barclays Bank PLC has filed a registration statement (including a prospectus) with the U.S. Securities and Exchange Commission ("SEC") for the offering to which this document relates. Before you invest, you should read the prospectus dated July 19, 2013, the prospectus supplement dated July 19, 2013 and other documents Barclays Bank PLC has filed with the SEC for more complete information about Barclays Bank PLC and this offering. Buyers should rely upon the prospectus, prospectus supplement and any relevant free writing prospectus or pricing supplement for complete details. You may get these documents and other documents Barclays Bank PLC has filed for free by visiting EDGAR on the SEC website at www.sec.gov. Alternatively, Barclays Bank PLC or any agent or dealer participating in this offering will arrange to send you the prospectus, prospectus supplement, preliminary pricing supplement, if any, and final pricing supplement (when completed) and this document if you request it by calling your Barclays Bank PLC sales representative, such dealer or 1-888-227-2275 (Extension 2-3430). A copy of each of these documents may be obtained from Barclays Capital Inc., 745 Seventh Avenue—Attn: US InvSol Support, New York, NY 10019.

**Neither the Securities and Exchange Commission ("SEC") nor any state securities commission has approved or disapproved of the notes or determined that this document is truthful or complete. Any representation to the contrary is a criminal offense.**

ELECTRONICALLY FILED - 2019 Jul 26 4:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

7/5/2019                    https://www.sec.gov/Archives/edgar/data/312070/000095010314004604/dp47560_fwp-194ms.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 21 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 1-3    Page 98 of 281

**BARCLAYS**

## Callable Leveraged Steepener Notes due July 31, 2034
### Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate

*Terms continued from previous page:*

| | |
|---|---|
| **Initial interest rate:** | 10.00% per annum |
| **Minimum interest rate:** | 0.00% per annum |
| **Maximum interest rate:** | 10.00% per annum |
| **Multiplier:** | 8.00 |
| **Interest payment dates†:** | Quarterly on each January 31, April 30, July 31 and October 31, commencing on October 31, 2014, and ending on the maturity date or the early redemption date, if applicable. |
| **Interest period:** | The initial interest period will begin on, and include, the original issue date and end on, and include, the calendar day immediately preceding the first interest payment date.  Each subsequent interest period will begin on, and include, the interest payment date for the immediately preceding interest period and end on, and include, the calendar day immediately preceding the next following interest payment date.  The final interest period will end on, and include, the calendar day immediately preceding the maturity date (or the early redemption date, if applicable). |
| **Reference rate determination date:** | For each interest period, two U.S. government securities business days prior to the reference rate reset date for such interest period |
| **Reference rate reset date:** | For each interest period, the first day of such interest period |
| **Business day convention:** | Following, Unadjusted |
| **Day count fraction:** | 30/360 |
| **Business day:** | Any day that is a Monday, Tuesday, Wednesday, Thursday or Friday and that is not a day on which banking institutions in New York City or in London generally are authorized or obligated by law or executive order to be closed |
| **U.S. government securities business day:** | Any day that is a Monday, Tuesday, Wednesday, Thursday or Friday on which The Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. government securities |
| **Denominations:** | Minimum denominations of US$20,000 and integral multiples of US$1,000 thereafter |
| **Settlement:** | DTC; Book-entry; Transferable. |
| **CUSIP/ISIN:** | 06741UFM1 / US06741UFM18 |
| **Listing:** | We do not intend to list the notes on any U.S. securities exchange or quotation system. |
| **Selected dealer:** | Morgan Stanley & Co. LLC ("MS & Co.") |

† Expected. In the event that we make any change to the original trade date or the original issue date, the interest payment dates and/or the maturity date may be changed so that the stated term of the notes remains the same.

## Barclays Capital Inc.

July 2014                                                                                                         Page 2

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

3:19-cv-02097-MGL      Date Filed 07/26/19      Entry Number 1-1      Page 22 of 93
3:23-cv-04149-MGL      Date Filed 08/18/23      Entry Number 1-3      Page 99 of 281

# BARCLAYS

**Callable Leveraged Steepener Notes due July 31, 2034**
Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate

## Additional Terms of the Notes

You should read this document together with the prospectus dated July 19, 2013, as supplemented by the prospectus supplement dated July 19, 2013 relating to our Global Medium-Term notes, Series A, of which the notes are a part.  This document, together with the documents listed below, contains the terms of the notes and supersedes all prior or contemporaneous oral statements as well as any other written materials including preliminary or indicative pricing terms, correspondence, trade ideas, structures for implementation, sample structures, brochures or other educational materials of ours.  You should carefully consider, among other things, the matters set forth in "Risk Factors" in the prospectus supplement, as the notes involve risks not associated with conventional debt securities.  We urge you to consult your investment, legal, tax, accounting and other advisors before you invest in the notes.

You may access these documents on the SEC website at www.sec.gov as follows (or if such address has changed, by reviewing our filings for the relevant date on the SEC website):

- Prospectus dated July 19, 2013:

  http://www.sec.gov/Archives/edgar/data/312070/000119312513295636/d570220df3asr.htm

- Prospectus supplement dated July 19, 2013:

  http://www.sec.gov/Archives/edgar/data/312070/000119312513295715/d570220d424b3.htm

Our SEC file number is 1-10257 and our Central Index Key, or CIK, on the SEC website is 0000312070.  As used in this document, the "Company," "we," "us," or "our" refers to Barclays Bank PLC.

*The notes constitute Barclays Bank PLC's direct, unconditional, unsecured and unsubordinated obligations and are not deposit liabilities and are not insured by the U.S. Federal Deposit Insurance Corporation or any other governmental agency of the United States, the United Kingdom or any other jurisdiction.*

In connection with this offering, Morgan Stanley & Co. LLC is acting in its capacity as a selected dealer.

For the purposes of the notes offered by this document, each reference to "BBA" on page S-79 of the prospectus supplement will be deemed to refer to "IntercontinentalExchange Group."

**Additional Information Regarding Our Estimated Value of the Notes**

Our internal pricing models take into account a number of variables and are based on a number of subjective assumptions, which may or may not materialize, typically including volatility, interest rates**,** and our internal funding rates.  Our internal funding rates (which are our internally published borrowing rates based on variables such as market benchmarks, our appetite for borrowing, and our existing obligations coming to maturity) may vary from the levels at which our benchmark debt securities trade in the secondary market.  Our estimated value on the original trade date is based on our internal funding rates.  Our estimated value of the notes may be lower if such valuation were based on the levels at which our benchmark debt securities trade in the secondary market.

Our estimated value of the notes on the original trade date is expected to be less than the initial issue price of the notes.  The difference between the initial issue price of the notes and our estimated value of the notes is expected to result from several factors, including any sales commissions expected to be paid to Barclays Capital Inc. or another affiliate of ours, any selling concessions, discounts, commissions or fees expected to be allowed or paid to non-affiliated intermediaries, the estimated profit that we or any of our affiliates expect to earn in connection with structuring the notes, the estimated cost that we may incur in hedging our obligations under the notes, and estimated development and other costs that we may incur in connection with the notes.

Our estimated value on the original trade date is not a prediction of the price at which the notes may trade in the secondary market, nor will it be the price at which Barclays Capital Inc. may buy or sell the notes in the secondary market. Subject to normal market and funding conditions, Barclays Capital Inc. or another affiliate of ours intends to offer to purchase the notes in the secondary market but it is not obligated to do so.

Assuming that all relevant factors remain constant after the original trade date, the price at which Barclays Capital Inc. may initially buy or sell the notes in the secondary market, if any, and the value that we may initially use for customer account statements, if we provide any customer account statements at all, may exceed our estimated value on the original trade date for a temporary period expected to be approximately twelve months after the original issue date of the notes because, in our discretion, we may elect to effectively reimburse to investors a portion of the estimated cost of hedging our obligations under the notes and other costs in connection with the notes that we will no longer expect to incur over the term of the notes. We made such discretionary election and determined this temporary reimbursement period on the basis of a number of factors, including the tenor of the notes and any

July 2014                                                                                                              Page 9

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636



**Callable Leveraged Steepener Notes due July 31, 2034**
**Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate**

agreement we may have with the distributors of the notes. The amount of our estimated costs that we effectively reimburse to investors in this way may not be allocated ratably throughout the reimbursement period, and we may discontinue such reimbursement at any time or revise the duration of the reimbursement period after the initial issue date of the notes based on changes in market conditions and other factors that cannot be predicted.

Barclays Capital Inc., or another affiliate of ours, or a third party distributor may purchase and hold some of the notes for subsequent resale at variable prices after the initial issue date of the notes. There may be circumstances where investors may be offered to purchase those notes from one distributor (including Barclays Capital Inc. or an affiliate) at a more favorable price than from other distributors. Furthermore, from time to time, Barclays Capital Inc. or an affiliate may offer and sell the notes to purchasers of a large number of the notes at a more favorable price than a purchaser acquiring a lesser number of the notes.

At our sole option, we may decide to offer additional notes after the original trade date. Our estimated value of the notes on any subsequent trade date may reflect issue prices, commissions and aggregate proceeds that differ from the amounts set forth in this document and will take into account a number of variables, including prevailing market conditions and our subjective assumptions, which may or may not materialize, on the date that such additional notes are traded. As a result of changes in these variables, our estimated value of the notes on any subsequent trade date may differ significantly from our estimated value of the notes on the original trade date, but in no case will be less than $900.00.

**We urge you to read "Risk Factors" beginning on page 6 of this document.**

**You may revoke your offer to purchase the notes at any time prior to the original trade date. We reserve the right to change the terms of, or reject any offer to purchase, the notes prior to their original trade date. In the event of any changes to the terms of the notes, we will notify you and you will be asked to accept such changes in connection with your purchase. You may also choose to reject such changes in which case we may reject your offer to purchase.**

July 2014                                                                                                                 Page

7/5/2019 https://www.sec.gov/Archives/edgar/data/312070/000095010314004604/dp47560_fwp-194ms.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 25 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 1-1    Page 102 of 281

**BARCLAYS**

---

**Callable Leveraged Steepener Notes due July 31, 2034**
**Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate**

---

## Investment Summary

During the fixed rate payment period, the notes pay interest at a rate of 10.00% per annum.  During the floating rate payment period, the notes pay interest at a variable rate per annum equal to (i) the multiplier of 8.00 *times* (ii) the reference rate, which is equal to (a) the CMS spread, which is the 30-year constant maturity swap rate *minus* the 5-year constant maturity swap rate, *minus* (b) the fixed percentage amount of 0.250%; *provided* that the interest rate will not be lower than the minimum interest rate of 0.00% per annum or higher than the maximum interest rate of 10.00% per annum.  The interest rate with respect to each quarterly interest period during the floating rate payment period is reset on the applicable reference rate reset date based on the reference rate determined on the relevant reference rate determination date.  If the 30-year CMS rate is not greater than the 5-year CMS rate by more than the fixed percentage amount of 0.250% on the applicable reference rate determination date, the interest rate will be 0.00% and no interest will accrue on the notes for the related interest period.

| | |
|---|---|
| **Maturity:** | 20 years, unless the notes are redeemed early |
| **Initial interest rate:** | 10.00% per annum |
| **Reference rate:** | The CMS spread *minus* the fixed percentage amount |
| **CMS spread:** | The 30-year CMS rate *minus* the 5-year CMS rate |
| **Fixed percentage amount:** | 0.250% |
| **Maximum interest rate:** | 10.00% per annum |
| **Minimum interest rate:** | 0.00% per annum |
| **Interest rate:** | For each interest period commencing on or after the original issue date to but excluding July 31, 2015 (the "fixed rate payment period"), the interest rate per annum will be equal to the initial interest rate. |
| | For each interest period commencing on or after July 31, 2015 to but excluding the maturity date (the "floating rate payment period"), the interest rate per annum will be equal to (1) the multiplier *times* (2) the reference rate; *provided* that the interest rate will not be lower than the minimum interest rate or higher than the maximum interest rate. |
| | The reference rate applicable to an interest period will be determined as of the related reference rate determination date. |
| | **During the floating rate payment period, it is possible that you could receive little or no interest on the notes.  If, on the related reference rate determination date, the reference rate is less than or equal to 0.00%, no interest will accrue for that interest period and the notes will not pay any interest on the related interest payment date.** |
| **Multiplier:** | 8.00 |
| **Redemption at the option of the company:** | The issuer may redeem the notes, in whole or in part, at the redemption price set forth on the cover page, on any interest payment date beginning on July 31, 2015; *provided* that the issuer gives at least ten business days' prior written notice to the trustee |

## Key Investment Rationale

The notes offer investors an opportunity to earn interest at a potentially above-market rate in exchange for the risk of receiving little interest on the notes and the risk of the notes being called by the issuer prior to the maturity date.  We may redeem the notes, in whole or in part, on any interest payment date commencing on or after July 31, 2015.

ELECTRONICALLY FILED - 2019 Jun 06 4:06 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

7/5/2019 https://www.sec.gov/Archives/edgar/data/312070/000095010314004604/dp47560_fwp-194ms.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 26 of 93
3:23-cv-04149-MGL    Date Filed 09/18/23    Entry Number 1-1    Page 103 of 281

July 2014

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Page

7/5/2019     https://www.sec.gov/Archives/edgar/data/312070/000095010314004604/dp47560_fwp-194ms.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 27 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 61-4    Page 104 of 281

ELECTRONICALLY FILED - 2019 Jul 26 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

**BARCLAYS**

**Callable Leveraged Steepener Notes due July 31, 2034**
**Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate**

## Risk Factors

*An investment in the notes involves significant risks not associated with an investment in conventional floating rate or fixed rate medium term notes. You should read the risks summarized below in connection with, and the risks summarized below are qualified by reference to, the risks described in more detail in the "Risk Factors" section beginning on page S-6 of the prospectus supplement. We urge you to consult your investment, legal, tax, accounting and other advisors before you invest in the notes. The following is a non-exhaustive list of certain key risk factors for investors in the notes. For further discussion of these and other risks, you should read the sections entitled "Risk Factors" in the prospectus supplement, including the risk factors discussed under the following headings:*

- "Risk Factors—Risks Relating to All Securities";
- "Risk Factors—Additional Risks Relating to Notes Which Pay No Interest or Pay Interest at a Low Rate";
- "Risk Factors—Additional Risks Relating to Securities with a Maximum Return, Maximum Rate, Ceiling or Cap";
- "Risk Factors—Additional Risks Relating to Notes Which are Characterized as Benefitting from Full Principal Protection";
- "Risk Factors—Additional Risks Relating to Securities Which We May Call or Redeem (Automatically or Otherwise)";
- "Risk Factors—Additional Risks Relating to Securities Which Contain a Multiplier"; and
- "Risk Factors—Additional Risks Relating to Notes with a Reference Asset That Is a Floating Interest Rate, an Index Containing Floating Interest Rates or Based in Part on a Floating Interest Rate."

- **Reference rate / interest payment risk** — Investing in the notes is not equivalent to investing in securities directly linked to the CMS rates. Instead, after the fixed rate payment period, the amount of interest payable on the notes is determined by *multiplying* (a) the multiplier *by* (b) the reference rate, which is equal to (i) the CMS spread, which is the 30-year CMS rate *minus* the 5-year CMS rate, *minus* (ii) the fixed percentage amount of 0.250%, as determined on the reference rate determination date applicable to the relevant interest period, subject to the minimum interest rate and the maximum interest rate. Accordingly, the amount of interest payable on the notes for any interest period is dependent on whether, and the extent to which, the reference rate is greater than zero on any reference rate determination date. If the CMS spread on any reference rate determination date is less than or equal to the fixed percentage amount (*i.e.*, the 30-year CMS rate is not greater than the 5-year CMS rate by more than the fixed percentage amount of 0.250%), you will receive no interest payment on the related interest payment date (*i.e.*, the interest rate for that interest payment date would be equal to the minimum interest rate of 0.00%). If the CMS spread is less than or equal to the fixed percentage amount on every reference rate determination date throughout the floating rate payment period, you would receive no interest payments on your notes during the floating rate payment period. Given these various scenarios, it is possible that the interest rate related to each interest period during the floating rate payment period will be less than that of an ordinary debt security of comparable maturity and may be zero in many instances.

  Because the amount of interest payable on the notes during the floating rate payment period is based on the CMS spread (and is thus a floating rate), you will be exposed to risks not associated with a conventional fixed-rate debt instrument. These risks include fluctuation of the CMS rates and the possibility that, for any given interest period, you may receive a lesser amount of interest than for one or more prior interest periods.

- **The amount of interest payable on the notes related to any interest period is capped** — The interest rate on the notes for each quarterly interest period during the floating rate payment period is capped for that quarter at the maximum interest rate of 10.00% per annum. Furthermore, due to the multiplier of 8.00 and the fixed percentage amount of 0.250%, you will not receive the benefit of any excess of the CMS spread (as determined on the relevant reference rate determination date) over 1.500%.

- **The reference rate will reflect the deduction of the fixed percentage amount from the CMS spread** — The interest rate on the notes for each quarterly interest period during the floating rate payment period will reflect the deduction of the fixed percentage amount from the CMS spread. Accordingly, the effective yield on the notes will likely be less than that the effective yield on a security paying interest directly linked to the CMS spread without any deduction.

- **The reference rate as of any reference rate determination date may be less than the reference rate as of any other day during the term of the notes** — The reference rate for any interest period will be determined solely on the reference rate determination date applicable to the relevant interest period. Therefore, even if the reference rate as of any day that is not the reference rate determination date applicable to the relevant interest period is higher than the reference rate as of such reference rate determination date, the amount of interest payable on the corresponding interest payment date will not take into account that higher level.

- **The historical performances of the CMS rates are not an indication of their future performances** — The historical performance of the CMS rates should not be taken as an indication of their future performance during the term of the notes. Changes in the levels of the CMS rates will affect the value of the notes, but it is impossible to predict whether such levels will

July 2014                                                                                                          Page

ELECTRONICALLY FILED - 2019 Jun 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

BARCLAYS

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

**Callable Leveraged Steepener Notes due July 31, 2034**
Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate

rise or fall.  During the floating rate payment period, there can be no assurance that the reference rate will be positive during the relevant interest periods.  Furthermore, the historical performance of the CMS spread does not reflect the return the notes would have had because it does not take into account the fixed percentage amount, the multiplier or the maximum interest rate.

- **Credit of Issuer** — The notes are senior unsecured debt obligations of the issuer, Barclays Bank PLC, and are not, either directly or indirectly, an obligation of any third party. Any payment to be made on the notes depends on the ability of Barclays Bank PLC to satisfy its obligations as they come due and are not guaranteed by a third party. As a result, the actual and perceived creditworthiness of Barclays Bank PLC may affect the market value of the notes and, in the event Barclays Bank PLC were to default on its obligations, you may not receive the amounts owed to you under the terms of the notes.

- **The price you paid for the notes may be higher than the prices paid by other investors** — Barclays Capital Inc. proposes to offer the notes from time to time for sale to investors in one or more negotiated transactions, or otherwise, at prevailing market prices at the time of sale, at prices related to then-prevailing prices, at negotiated prices, or otherwise.  Accordingly, there is a risk that the price you paid for your notes will be higher than the prices paid by other investors based on the date and time you made your purchase, from whom you purchased the notes, any related transaction costs, whether you hold your notes in a brokerage account, a fiduciary or fee-based account or another type of account and other market factors.

- **Early redemption risk** — We may redeem the notes, in whole or in part, on any interest payment date beginning on the date specified on the cover page hereof.  It is more likely that we will redeem the notes in whole prior to their stated maturity date to the extent that the interest payable on the notes is greater than the interest that would be payable on other instruments issued by us of comparable maturity, terms and credit rating trading in the market.  If the notes are redeemed, in whole or in part, prior to their stated maturity date, you will receive no further interest payments on the notes redeemed and may have to re-invest the proceeds in a lower rate environment.

- **Additional potential conflicts** — As described above, we and our affiliates play a variety of roles in connection with the issuance of the notes, including acting as calculation agent and hedging our obligations under the notes.  In performing these duties, the economic interests of the calculation agent and other affiliates of ours are potentially adverse to your interests as an investor in the notes.

    In addition, Barclays Wealth, the wealth management division of Barclays Capital Inc., may arrange for the sale of the notes to certain of its clients.  In doing so, Barclays Wealth will be acting as agent for Barclays Bank PLC and may receive compensation from Barclays Bank PLC in the form of discounts and commissions.  The role of Barclays Wealth as a provider of certain services to such customers and as agent for Barclays Bank PLC in connection with the distribution of the notes to investors may create a potential conflict of interest, which may be adverse to such clients.  Barclays Wealth is not acting as your agent or investment advisor, and is not representing you in any capacity with respect to any purchase of notes by you.  Barclays Wealth is acting solely as agent for Barclays Bank PLC.  If you are considering whether to invest in the notes through Barclays Wealth, we strongly urge you to seek independent financial and investment advice to assess the merits of such investment.

- **Lack of liquidity** — The notes will not be listed on any securities exchange.  Barclays Capital Inc. and other affiliates of Barclays Bank PLC intend to make a secondary market for the notes but are not required to do so, and may discontinue any such secondary market making at any time, without notice.  Even if there is a secondary market, it may not provide enough liquidity to allow you to trade or sell the notes easily.  Because other dealers are not likely to make a secondary market for the notes, the price at which you may be able to trade your notes is likely to depend on the price, if any, at which Barclays Capital Inc. and other affiliates of Barclays Bank PLC are willing to buy the notes.  The notes are not designed to be short-term trading instruments.  Accordingly, you should be able and willing to hold your notes to maturity.

- **Many economic and market factors will affect the value of the notes** — In addition to the level of the reference rate on any day, the value of the notes will be affected by a number of economic and market factors that may either offset or magnify each other, including:

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 30 of 93
3:23-cv-04149-MGL    Date Filed 09/18/23    Entry Number 1-1    Page 107 of 281

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

- o   the expected volatility of the reference rate;

- o   the time to maturity of the notes;

- o   interest and yield rates in the market generally;

- o   a variety of economic, financial, political, regulatory or judicial events;

- o   supply and demand for the notes; and

- o   our creditworthiness, whether actual or perceived, including actual or anticipated downgrades in our credit ratings.

Generally, the longer the time remaining to maturity, the more the market price of the notes will be affected by the other factors described above.

- ▪   **The estimated value of your notes might be lower if such estimated value were based on the levels at which our debt securities trade in the secondary market** — The estimated value of your notes on the original trade date is based on a

July 2014                                                                                                    Page



## Callable Leveraged Steepener Notes due July 31, 2034
**Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate**

number of variables, including our internal funding rates. Our internal funding rates may vary from the levels at which our benchmark debt securities trade in the secondary market. As a result of this difference, the estimated values referenced above may be lower if such estimated values were based on the levels at which our benchmark debt securities trade in the secondary market.

- **The estimated value of your notes Is expected to be lower than the initial issue price of your notes** — The estimated value of your notes on the original trade date is expected to be lower, and may be significantly lower, than the initial issue price of your notes. The difference between the initial issue price of your notes and the estimated value of the notes is expected as a result of certain factors, such as any sales commissions expected to be paid to Barclays Capital Inc. or another affiliate of ours, any selling concessions, discounts, commissions or fees expected to be allowed or paid to non-affiliated intermediaries, the estimated profit that we or any of our affiliates expect to earn in connection with structuring the notes, the estimated cost that we may incur in hedging our obligations under the notes, and estimated development and other costs that we may incur in connection with the notes.

- **The estimated value of the notes is based on our internal pricing models, which may prove to be inaccurate and may be different from the pricing models of other financial institutions** — The estimated value of your notes on the original trade date is based on our internal pricing models, which take into account a number of variables and are based on a number of subjective assumptions, which may or may not materialize. These variables and assumptions are not evaluated or verified on an independent basis. Further, our pricing models may be different from other financial institutions' pricing models and the methodologies used by us to estimate the value of the notes may not be consistent with those of other financial institutions that may be purchasers or sellers of the notes in the secondary market. As a result, the secondary market price of your notes may be materially different from the estimated value of the notes determined by reference to our internal pricing models. Moreover, at our sole option, we may decide to sell additional notes after the original trade date. Our estimated value of the notes on any subsequent trade date may reflect issue prices, commissions and aggregate proceeds that differ from the amounts set forth in this document and will take into account a number of variables, including prevailing market conditions and our subjective assumptions, which may or may not materialize, on the date that such additional notes are traded. As a result of changes in these variables, our estimated value of the notes on any subsequent trade date may differ significantly from our estimated value of the notes on the original trade date.

- **The estimated value of your notes is not a prediction of the prices at which you may sell your notes in the secondary market, if any, and such secondary market prices, if any, will likely be lower than the initial issue price of your notes and may be lower than the estimated value of your notes** — The estimated value of the notes will not be a prediction of the prices at which Barclays Capital Inc., other affiliates of ours or third parties may be willing to purchase the notes from you in secondary market transactions (if they are willing to purchase, which they are not obligated to do). The price at which you may be able to sell your notes in the secondary market at any time will be influenced by many factors that cannot be predicted, such as market conditions, and any bid and ask spread for similar sized trades, and may be substantially less than our estimated value of the notes. Further, as secondary market prices of your notes take into account the levels at which our debt securities trade in the secondary market, and do not take into account our various costs related to the notes such as fees, commissions, discounts, and the costs of hedging our obligations under the notes, secondary market prices of your notes will likely be lower than the initial issue price of your notes. As a result, the price, at which Barclays Capital Inc., other affiliates of ours or third parties may be willing to purchase the notes from you in secondary market transactions, if any, will likely be lower than the price you paid for your notes, and any sale prior to the maturity date could result in a substantial loss to you.

- **The temporary price at which we may initially buy the notes in the secondary market and the value we may initially use for customer account statements, if we provide any customer account statements at all, may not be indicative of future prices of your notes** — Assuming that all relevant factors remain constant after the original trade date, the price at which Barclays Capital Inc. may initially buy or sell the notes in the secondary market (if Barclays Capital Inc. makes a market in the notes, which it is not obligated to do) and the value that we may initially use for customer account statements, if we provide any customer account statements at all, may exceed our estimated value of the notes on the original trade date, as well as the secondary market value of the notes, for a temporary period after the original issue date of the notes. The price at which Barclays Capital Inc. may initially buy or sell the notes in the

7/5/2019                                   https://www.sec.gov/Archives/edgar/data/312070/000095010314004604/dp47560_fwp-194ms.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 32 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 1-1    Page 109 of 281

secondary market and the value that we may initially use for customer account statements may not be indicative of future prices of your notes.

- **We and our affiliates may engage in various activities or make determinations that could materially affect your notes in various ways and create conflicts of interest** — We and our affiliates establish the offering price of the notes for initial sale to the public, and the offering price is not based upon any independent verification or valuation.  Additionally, the role played by Barclays Capital Inc., as a dealer in the notes, could present it with significant conflicts of interest with the role of Barclays Bank PLC, as issuer of the notes.  For example, Barclays Capital Inc. or its representatives may derive compensation or financial benefit from the distribution of the notes and such compensation or financial benefit may serve as an incentive to sell these notes instead of other investments.  We may pay dealer compensation to any of our affiliates acting as agents or dealers in connection with the distribution of the notes.  Furthermore, we and our affiliates make markets in and trade various financial instruments or products for their own accounts and for the account of their clients and otherwise provide investment banking and other financial services with respect to these financial instruments and products.  These financial instruments and

July 2014                                                                                                    Page 4

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

7/5/2019    https://www.sec.gov/Archives/edgar/data/312070/000095010314004604/dp47560_fwp-194ms.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 33 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 1-1    Page 110 of 281

**BARCLAYS**

**Callable Leveraged Steepener Notes due July 31, 2034**

**Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate**

products may include securities, futures, options or other derivative instruments with returns linked or related to changes in the levels of the reference rates.  Such market making activities, trading activities and other investment banking and financial services may negatively impact the value of the notes.  Furthermore, in any such market making, trading activities, and other services, we or our affiliates may take positions or take actions that are inconsistent with, or adverse to, the investment objectives of the holders of the notes.  We and our affiliates have no obligation to take the needs of any buyer, seller or holder of the notes into account in conducting these activities.

July 2014    Page

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

**BARCLAYS**

**Callable Leveraged Steepener Notes due July 31, 2034**
Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate

## Hypothetical Interest Rate and Interest Payment Calculations

*The examples below illustrate the various payments you may receive on the notes in a number of different hypothetical scenarios. These examples are only hypothetical and do not indicate the actual payments or return you will receive on the notes. The examples below do not take into account the tax consequences of an investment in the notes.*

As described above, after the fixed rate payment period, the notes will pay interest, if any, on each interest payment date at an effective per annum interest rate calculated in accordance with the formula for determining the interest rate. The following illustrates the process by which the interest rate and interest payment amount are determined for each interest period during the term of the notes.

For purposes of these examples, we assume that the notes are not redeemed on any interest payment date pursuant to the redemption at the option of the company provisions above and are held to maturity. If we exercise our redemption option, you will receive on the early redemption date the redemption price applicable to that early redemption date, calculated as described above.

**Interest Rate Calculation**

> *Step 1: Calculate the reference rate.*

For each interest period occurring during the floating rate payment period, the reference rate is determined by calculating the CMS spread (the 30-year CMS rate *minus* the 5-year CMS rate) and subtracting the fixed percentage amount of 0.250%. If the 30-year CMS rate is not greater than the 5-year CMS rate by more than the fixed percentage amount of 0.250%, the interest rate will be 0.00% and no interest will accrue on the notes for the related interest period.

> *Step 2: Calculate the per annum interest rate for each interest payment date.*

For each interest period occurring during the fixed rate payment period, the interest rate per annum will be equal to the initial interest rate.

For each interest period occurring during the floating rate payment period, the interest rate per annum will be equal to (1) the multiplier of 8.00 *times* (2) the reference rate; *provided* that the interest rate will not be lower than the minimum interest rate of 0.00% per annum or higher than the maximum interest rate of 10.00% per annum. **If the reference rate is zero or negative on any reference rate determination date during the floating rate payment period, you will not receive any interest for the related interest period.**

As both the initial interest rate and the maximum interest rate are set at 10.00%, the maximum possible per annum interest rate for any interest period is 10.00%. The minimum interest rate applicable to any interest period during the floating rate payment period is 0.00%. As such, the per annum interest rate for any interest period during the floating rate payment period could potentially be between 0.00% and 10.00% per annum. See "Risk Factors—Reference rate / interest payment risk" above.

**Example Interest Rate and Interest Payment Calculations**

The table below presents examples of hypothetical interest that would accrue on the notes during various interest periods during the floating rate payment period. During the fixed rate payment period (Year 1), interest will accrue at a rate of 10.00% per annum. For the floating rate payment period (Years 2-20), interest will accrue on the notes based on the CMS spread *minus* the fixed percentage amount.

The table below is merely a sampling of interest periods during the term of the notes and does not reflect the total number of interest periods that occur during the term of the notes.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202296

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636



**Callable Leveraged Steepener Notes due July 31, 2034**
Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate

| CMS Spread[1] | Reference Rate[1] | Multiplier *times* Reference Rate | Interest Rate[2][3] | Quarterly Interest Payment Amount (per $1,000 stated principal amount note)[4] |
|---|---|---|---|---|
| -3.750% | -4.000% | -32.000% | 0.000% | $0.00 |
| -2.250% | -2.500% | -20.000% | 0.000% | $0.00 |
| -0.750% | -1.000% | -8.000% | 0.000% | $0.00 |
| 0.000% | -0.250% | -2.000% | 0.000% | $0.00 |
| 0.250% | 0.000% | 0.000% | 0.000% | $0.00 |
| 0.500% | 0.250% | 2.000% | 2.000% | $5.00 |
| 0.750% | 0.500% | 4.000% | 4.000% | $10.00 |
| 1.250% | 1.000% | 8.000% | 8.000% | $20.00 |
| 1.500% | 1.250% | 10.000% | 10.000% | $25.00 |
| 1.750% | 1.500% | 12.000% | 10.000% | $25.00 |
| 2.250% | 2.000% | 16.000% | 10.000% | $25.00 |
| 3.250% | 3.000% | 24.000% | 10.000% | $25.00 |
| 3.750% | 3.500% | 28.000% | 10.000% | $25.00 |
| 4.250% | 4.000% | 32.000% | 10.000% | $25.00 |

1. For each interest period, the value of the reference rate is equal to (1) the CMS spread (the 30-year CMS rate *minus* the 5-year CMS rate) *minus* (2) the fixed percentage amount of 0.250%, as determined as of the related reference rate determination date.

2. For each interest period occurring within the fixed rate payment period, the interest rate per annum is equal to the initial interest rate of 10.00%.

3. For each interest period occurring during the floating rate payment period, the interest rate per annum is equal to (1) the multiplier of 8.00 *times* (2) the reference rate; *provided* that the interest rate will not be lower than the minimum interest rate of 0.00% per annum or higher than the maximum interest rate of 10.00% per annum.

4. The interest payment amount for an interest payment date equals the principal amount times the effective interest rate for the related interest period.

**Example 1:** If, on the reference rate determination date for the relevant interest period, the value of the 30-year CMS rate is 6.000% and the 5-year CMS rate is 5.500%, the reference rate for the interest period would be 0.250% (equal to (i) the 30-year CMS rate *minus* the 5-year CMS rate *minus* (ii) the fixed percentage amount of 0.250%). In this case, the per annum interest rate for that interest period would be 2.000% (equal to the reference rate of 0.250% times the multiplier of 8.00), and you would receive an interest payment of $5.00 per $1,000 principal amount of notes on the related quarterly interest payment date, calculated as follows:

*Effective Interest Rate = Interest Rate per Annum × Day Count Fraction = 2.000% × (90/360) = 0.500%*

*Interest Payment = $1,000 × 0.500% = $5.00*

**Example 2:** If, on the reference rate determination date for the relevant interest period, the value of the 30-year CMS rate is 4.250% and the 5-year CMS rate is 5.000%, the reference rate for the interest period would be -1.000% (equal to (i) the 30-year CMS rate *minus* the 5-year CMS rate *minus* (ii) the fixed percentage amount of 0.250%). Because the value of the reference rate of -1.000% times the multiplier of 8.00 results in a per annum interest rate of -8.000%, which is less than the minimum interest rate of 0.00% per annum, the per annum interest rate for that interest period would be 0.00% (the minimum interest rate), and you would receive no interest payment on the related quarterly interest payment date (the interest payment would be $0).

**Example 3:** If, on the reference rate determination date for the relevant interest period, the value of the 30-year CMS rate is 9.250% and the 5-year CMS rate is 6.000%, the reference rate for the interest period would be 3.000% (equal to (i) the 30-

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

7/5/2019

https://www.sec.gov/Archives/edgar/data/312070/000095010314004604/dp47560_fwp-194ms.htm

3:19-cv-02097-MGL   Date Filed 07/26/19   Entry Number 1-1   Page 37 of 93
3:23-cv-04149-MGL   Date Filed 08/18/23   Entry Number 1-1   Page 114 of 281

year CMS rate *minus* the 5-year CMS rate *minus* (ii) the fixed percentage amount of 0.250%).  Because the value of the reference rate of 3.000% times the multiplier of 8.00 would result in a per annum interest rate of 24.000%, which is greater than the maximum interest rate of 10.00%, the per annum interest rate for that interest period would be equal to the maximum interest rate of 10.00%, and you would receive an interest payment of $25.00 per $1,000 stated principal amount of notes on the related quarterly interest payment date, calculated as follows:

*Effective Interest Rate = Interest Rate per Annum × Day Count Fraction = 10.000% × (90/360) = 2.500%*

July 2014                                                                                              Page 1

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

7/5/2019 https://www.sec.gov/Archives/edgar/data/312070/000095010314004604/dp47560_fwp-194ms.htm

3:19-cv-02097-MGL   Date Filed 07/26/19   Entry Number 1-1   Page 38 of 93
3:23-cv-04149-MGL   Date Filed 09/18/23   Entry Number 1-1   Page 115 of 281

**BARCLAYS**

**Callable Leveraged Steepener Notes due July 31, 2034**
**Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate**

*Interest Payment = $1,000 × 2.500% = $25.00*

July 2014                                                                 Page

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

**BARCLAYS**

**Callable Leveraged Steepener Notes due July 31, 2034**
**Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate**

## The CMS Rates

The CMS rate is the "constant maturity swap rate" that measures the fixed rate of interest payable on a hypothetical fixed-for-floating U.S. dollar interest rate swap transaction of a specified maturity.  In such a hypothetical swap transaction, the fixed rate of interest, payable quarterly on the basis of a 360-day year consisting of twelve 30-day months, is exchangeable for a floating 3-month LIBOR-based payment stream that is payable quarterly on the basis of the actual number of days elapsed during a quarterly period in a 360-day year. "LIBOR" is the London Interbank Offered Rate, and is a representation of the rate of interest at which banks borrow funds from each other in the London interbank market.  3-Month LIBOR is the rate of interest which banks in London charge each other for loans for a period of three months.

The CMS rate with a maturity of 30 years ("30-year CMS rate") and the CMS rate with a maturity of 5 years ("5-year CMS rate") will be determined by the calculation agent by reference to the 30-year CMS rate and 5-year CMS rate that appear on Reuters ISDAFIX1 page (the "ISDAFIX1 Page") as of 11:00 a.m., New York City time, on the relevant reference rate determination date.  Please see the information contained in "Reference Assets—Floating Interest Rate—CMS Rate" on page S-72 of the prospectus supplement for additional detail, including information on procedures that will be applied by the calculation agent when the reference rate cannot be determined in the manner described above on any reference rate determination date.

### CMS Rate Historical Information

*Historical Information for the CMS Rates*

We have provided the following historical information to help you evaluate the behavior of the CMS rates in various periods.  The historical difference between the CMS rates should not be taken as an indication of the future difference between the CMS rates or the performance of the notes.  Fluctuations in the CMS rates make the interest rate on the notes difficult to predict and can result in an interest rate to investors that is lower than anticipated.  Fluctuations in the CMS rates and interest rate trends that have occurred in the past are not necessarily indicative of fluctuations that may occur in the future, which may be wider or narrower than those that have occurred historically.

We cannot guarantee that the difference between the CMS rates will be maintained or will increase or that the 30-year CMS rate will be sufficiently greater than 5-year CMS rate over the term of the notes so that you will receive a rate of interest greater than the minimum interest rate for any interest period during the floating rate payment period.  The actual interest rate on the notes for any interest period occurring during the floating rate payment period will depend on the actual CMS rates on the applicable reference rate determination dates.

July 2014                                                                                      Page 13

7/5/2019  https://www.sec.gov/Archives/edgar/data/312070/000095010314004604/dp47560_fwp-194ms.htm

3:19-cv-02097-MGL   Date Filed 07/26/19   Entry Number 1-1   Page 40 of 93
3:23-cv-04149-MGL   Date Filed 08/18/23   Entry Number 1-1   Page 117 of 281

**BARCLAYS**

**Callable Leveraged Steepener Notes due July 31, 2034**
**Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate**

The following table shows historical month-end differences between the CMS rates from January 31, 2008 through June 27, 2014 based on the CMS rates as published by Bloomberg L.P.  We have not independently verified the accuracy or completeness of the historical data in the table below.  The calculation agent will determine the actual interest rate on the notes for each interest period occurring during the floating rate payment period by reference to the CMS rates as published on the ISDAFIX1 Page.

### Historical Difference between 30-Year CMS Rate and 5-Year CMS Rate[1]

|           | 2008   | 2009   | 2010   | 2011   | 2012   | 2013   | 2014      |
|-----------|--------|--------|--------|--------|--------|--------|-----------|
| **January**   | 1.277% | 0.903% | 1.741% | 2.136% | 1.679% | 1.990% | 1.978%    |
| **February**  | 1.466% | 0.749% | 1.822% | 1.947% | 1.655% | 2.007% | 1.965%    |
| **March**     | 1.331% | 1.036% | 1.798% | 1.887% | 1.733% | 2.035% | 1.730%    |
| **April**     | 1.004% | 1.014% | 1.684% | 2.000% | 1.705% | 1.981% | 1.684%    |
| **May**       | 0.892% | 1.333% | 1.608% | 2.032% | 1.358% | 1.996% | 1.687%    |
| **June**      | 0.697% | 1.210% | 1.664% | 2.068% | 1.515% | 1.880% | 1.623%[2] |
| **July**      | 0.828% | 1.308% | 1.927% | 2.179% | 1.550% | 2.079% |           |
| **August**    | 0.766% | 1.328% | 1.593% | 1.935% | 1.701% | 1.952% |           |
| **September** | 0.618% | 1.271% | 1.820% | 1.459% | 1.800% | 2.098% |           |
| **October**   | 0.577% | 1.482% | 2.216% | 1.678% | 1.789% | 2.132% |           |
| **November**  | 0.229% | 1.689% | 2.068% | 1.423% | 1.797% | 2.283% |           |
| **December**  | 0.593% | 1.548% | 1.952% | 1.358% | 1.907% | 2.135% |           |

---

(1)   The reference rate will be an amount determined by the calculation agent equal to the (1) CMS spread, which is 30-year CMS rate *minus* 5-year CMS rate, *minus* (2) the fixed percentage amount of 0.250%.

(2)   As measured on June 27, 2014.

July 2014

Page 2

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

**BARCLAYS**

**Callable Leveraged Steepener Notes due July 31, 2034**
Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate

## Additional Information about the Notes

**Additional provisions:**

**Minimum ticketing size:** $20,000 / 20 notes

**Tax considerations:** You should review carefully the sections entitled "Certain U.S. Federal Income Tax Considerations—U.S. Federal Income Tax Treatment of the Notes as Indebtedness for U.S. Federal Income Tax Purposes" and, if you are a non-U.S. holder, "—Tax Treatment of Non-U.S. Holders," in the accompanying prospectus supplement. We intend to treat the Notes as "contingent payment debt instruments" for U.S. federal income tax purposes, as described under "—*Contingent Payment Debt Instruments*" in the accompanying prospectus supplement. Because the Notes will be offered to initial purchasers at varying prices, it is expected that the "issue price" of the Notes for U.S. federal income tax purposes will be uncertain. We currently intend to treat the issue price as $1,000 for each $1,000 principal amount Note, and the remainder of this discussion so assumes, unless otherwise indicated. Our intended treatment will affect the amounts you will be required to include in income for U.S. federal income tax purposes. You should consult your tax advisor regarding the uncertainty with respect to the Notes' issue price, including the tax consequences to you if the actual issue price of the Notes for U.S. federal income tax purposes is not $1,000 per Note.

Assuming that our treatment of the Notes as contingent payment debt instruments is correct, regardless of your method of accounting for U.S. federal income tax purposes, you generally will be required to accrue taxable interest income in each year on a constant yield to maturity basis at the "comparable yield," as determined by us, with certain adjustments in each year to reflect the difference, if any, between the actual and the projected amounts of the interest payments on the Notes in that year according to the "projected payment schedule" determined by us. Any income recognized upon a sale or exchange of a Note (including early redemption or redemption at maturity) will be treated as interest income for U.S. federal income tax purposes.

After the Issue Date, you may obtain the comparable yield and the projected payment schedule by requesting them from the Director of Structuring, Investor Solutions Americas, at (212) 528-7198. **Neither the comparable yield nor the projected payment schedule constitutes a representation by us regarding the actual contingent interest payments, if any, that we will make on the Notes.**

If you purchase Notes at their original issuance for an amount that is different from their issue price, you will be required to account for this difference, generally by allocating it reasonably among projected payments on the Notes and treating these allocations as adjustments to your income when the payment is made. You should consult your tax advisor regarding the treatment of the difference between your basis in your Notes and their issue price.

It is possible that the Internal Revenue Service could determine that the Notes are "variable rate debt instruments" for U.S. federal income tax purposes, which could have adverse U.S. federal income tax consequences for you. For example, if the Notes were properly treated as variable rate debt instruments, you would be required to include payments of stated interest in income when they are received or accrued, in accordance with your method of accounting for U.S. federal income tax purposes. You should consult your tax advisor regarding the U.S. federal income tax consequences to you if the Notes are properly treated as variable rate debt instruments.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

You should consult your tax advisor regarding the U.S. federal tax consequences of an investment in the Notes, as well as tax consequences arising under the laws of any state, local or non-U.S. taxing jurisdiction.

**Non-U.S. Holders**

We do not believe that non-U.S. holders should be required to provide a Form W-8 in order to avoid 30% U.S. withholding tax with respect to interest on the Notes, although the Internal Revenue Service could challenge this position.  However, non-U.S. holders should in any event expect to be required to provide appropriate Forms W-8 or other documentation in order to establish an exemption from backup withholding, as described under the heading "Information Reporting and Backup Withholding" in the accompanying prospectus supplement.  If any withholding is required, we will not be required to pay any additional amounts with respect to amounts withheld.

July 2014                                                                                    Page

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

**BARCLAYS**

---

### Callable Leveraged Steepener Notes due July 31, 2034
**Based on the Spread between the 30-Year CMS Rate and the 5-Year CMS Rate**

---

| | |
|---|---|
| **Trustee:** | The Bank of New York Mellon |
| **Calculation agent:** | Barclays Bank PLC |
| **Use of proceeds and hedging:** | The net proceeds we receive from the sale of the notes will be used for various corporate purposes as set forth in the prospectus and prospectus supplement and, in part, in connection with hedging our obligations under the notes through one or more of our subsidiaries. |
| | We, through our subsidiaries or others, hedge our anticipated exposure in connection with the notes by taking positions in futures and options contracts on the reference rate and any other securities or instruments we may wish to use in connection with such hedging.  Trading and other transactions by us or our affiliates could affect the level, value or price of reference assets and their components, the market value of the notes or any amounts payable on your notes. For further information on our use of proceeds and hedging, see "Use of Proceeds and Hedging" in the prospectus supplement. |
| **ERISA:** | See "Employee Retirement Income Security Act" starting on page S-120 in the accompanying prospectus supplement. |
| **Contact:** | Morgan Stanley clients may contact their local Morgan Stanley branch office or Morgan Stanley's principal executive offices at 1585 Broadway, New York, New York 10036 (telephone number (866) 477-4776).  All other clients may contact their local brokerage representative.  Third-party distributors may contact Morgan Stanley Structured Investment Sales at (800) 233-1087. |

*This document represents a summary of the terms and conditions of the notes.  We encourage you to read the accompanying prospectus and prospectus supplement for this offering, which can be accessed via the hyperlinks on the cover page of this document.*

### Supplemental Plan of Distribution

We will agree to sell to Barclays Capital Inc. (the "agent"), and the agent will agree to purchase from us, the principal amount of the notes, and at the price, specified on the cover of the related pricing supplement, the document that will be filed pursuant to Rule 424(b) containing the final pricing terms of the notes.  The agent will commit to take and pay for all of the notes, if any are taken.

We expect that delivery of the notes will be made against payment for the notes on or about the original issue date indicated on the cover of this document, which will be the twentieth business day following the original trade date (this settlement cycle being referred to as "T+20"). Under Rule 15c6-1 of the Securities Exchange Act of 1934, trades in the secondary market generally are required to settle in three business days, unless the parties to any such trade expressly agree otherwise. Accordingly, purchasers who wish to trade the notes on any date prior to three business days before delivery will be required, by virtue of the fact that the notes will initially settle in 20 business days (T+20), to specify alternative settlement arrangements to prevent a failed settlement. See "Plan of Distribution" in the prospectus supplement.

Notwithstanding anything to the contrary in "Plan of Distribution—Initial Offering and Issue of Securities" in the accompanying prospectus, the agent will receive commissions from the issuer equal to 3.50% of the principal amount of the notes, or $35.00 per $1,000 stated principal amount, and may retain all or a portion of these commissions or use all or a portion of these commissions to pay selling concessions or fees to other dealers including Morgan Stanley & Co. LLC ("MS & Co.").

Barclays Capital Inc. proposes to offer the notes from time to time for sale in negotiated transactions, or otherwise, at varying prices to be determined at the time of each sale; *provided* that such prices are not expected to be less than $965.00 or greater than $1,000.00 per $1,000 stated principal amount.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3203636

7/5/2019    https://www.sec.gov/Archives/edgar/data/312070/000095010314004604/dp47560_fwp-194ms.htm

July 2014    Page

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

# EXHIBIT 3

FWP 1 dp44016_fwp-ps1285.htm FORM FWP

# Morgan Stanley

**February 2014**
Preliminary Terms No. 1,285
Registration Statement No. 333-178081
Dated February 13, 2014
Filed pursuant to Rule 433

## INTEREST RATE STRUCTURED PRODUCTS
### Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**

**Principal at Risk Securities**

As further described below, interest will accrue on the securities (i) in Years 1 to 4: at a rate of 10.00% per annum and (ii) in Years 5 to maturity: for each day that the closing value of the S&P 500® Index is greater than or equal to 50% of the initial index value (which we refer to as the index reference level), at a variable rate per annum equal to 4 times the difference, if any, between the 30-Year Constant Maturity Swap Rate ("30CMS") and the 2-Year Constant Maturity Swap Rate ("2CMS"), as determined on the CMS reference determination date at the start of the related monthly interest payment period; subject to the maximum interest rate of 10.00% per annum for each interest payment period during the floating interest rate period and the minimum interest rate of 0.00% per annum. The securities provide an above-market interest rate in Years 1 to 4; however, for each interest payment period in Years 5 to maturity, the securities will not pay any interest with respect to the interest payment period if the CMS reference index level is equal to or less than 0.00% on the related monthly CMS reference determination date. In addition, if, on any calendar day, the index closing value is less than the index reference level, interest will accrue at a rate of 0.00% per annum for that day. At maturity, if the final index value is greater than or equal to the barrier level of 50% of the initial index value, investors will receive the stated principal amount of the securities plus any accrued and unpaid interest. However, if the final index value is less than the barrier level, investors will be fully exposed to the decline in the value of the S&P 500® Index over the term of the securities, and the payment at maturity will be less than 50% of the stated principal amount of the securities and could be zero. **There is no minimum payment at maturity on the securities. Accordingly, investors may lose up to their entire initial investment in the securities.** Investors will not participate in any appreciation of the S&P 500® Index. These long-dated securities are for investors who seek an opportunity to earn interest at a potentially above-market rate in exchange for the risk of losing their principal and the risk of receiving little or no interest on the securities during the floating interest rate period.

**All payments are subject to the credit risk of Morgan Stanley. If Morgan Stanley defaults on its obligations, you could lose some or all of your investment. These securities are not secured obligations and you will not have any security interest in, or otherwise have any access to, any underlying reference asset or assets.**

SUMMARY TERMS

| | |
|---|---|
| **Issuer:** | Morgan Stanley |
| **Aggregate principal amount:** | $            . May be increased prior to the original issue date but we are not required to do so. |
| **Issue price:** | At variable prices |
| **Stated principal amount:** | $1,000 per security |
| **Pricing date:** | February   , 2014 |
| **Original issue date:** | February 28, 2014 (      business days after the pricing date) |
| **Maturity date:** | February 28, 2034 |
| **Interest accrual date:** | February 28, 2014 |
| **Payment at maturity:** | • If the final index value is **greater than or equal to the barrier level:** the stated principal amount *plus* any accrued and unpaid interest<br>• If the final index value is **less than the barrier level:** (a) the stated principal amount *times* the index performance factor *plus* (b) any accrued and unpaid interest. *This amount will be less than 50% of the stated principal amount of the securities and could be zero.* |
| **Interest:** | From and including the original issue date to but excluding February 28, 2018 (the "fixed interest rate period"): 10.00% per annum<br>From and including February 28, 2018 to but excluding the maturity date (the "floating interest rate period"):<br>For each interest payment period, a variable rate per annum equal to the product of:<br>**(a) leverage factor** *times* **the CMS reference index;** *subject to the minimum interest rate and the maximum interest rate;* **and**<br>**(b) N/ACT;** *where,*<br>"N" = the total number of calendar days in the applicable interest payment period on which the index closing value is greater than or equal to the index reference level (each such day, an "accrual day"); and<br>"ACT" = the total number of calendar days in the applicable interest payment period.<br>The CMS reference index level applicable to an interest payment period will be determined on the related CMS reference determination date.<br>*Beginning February 28, 2018, it is possible that you could receive little or no interest on the securities. If, on the related CMS reference determination date, the CMS reference index level is equal to or less than the CMS reference index strike, interest will accrue at a rate of 0.00% for that interest payment period. In addition, if on any day, the index closing value is determined to be less than the index reference level, interest will accrue at a rate of 0.00% per annum for that day. The determination of the index closing value will be subject to certain market disruption events. Please see Annex A—The S&P 500® Index—Market Disruption Event" below.* |
| **Leverage factor:** | 4 |
| **Interest payment period:** | Monthly |
| **Interest payment period end dates:** | Unadjusted |
| **Interest payment dates:** | The last calendar day of each month, beginning March 31, 2014; *provided* that if any such day is not a business day, that interest payment will be made on the next succeeding business day and no adjustment will be made to any interest payment made on that succeeding business day. |
| **Interest reset dates:** | The last calendar day of each month, beginning February 28, 2018 |
| **Maximum interest rate:** | 10.00% per annum in any monthly interest payment period during the floating interest rate period |
| **Minimum interest rate:** | 0.00% per annum |
| **Index:** | The S&P 500® Index |
| **Underlying index publisher:** | Standard & Poor's Financial Services LLC |

ELECTRONICALLY FILED - 2018 ... CHARLESTON - COMMON PLEAS - CASE#2019CP3202636

**Agent:** Morgan Stanley & Co. LLC ("MS & Co."), a wholly owned subsidiary of Morgan Stanley. See "Supplemental Information Concerning Plan of Distribution; Conflicts of Interest."

*Terms continued on the following page*

**Estimated value on the pricing date:** Approximately $862.60 per security, or within $12.50 of that estimate. See "The Securities" on page 3.

**Commissions and issue price:**

| | Price to Public[(1)(2)] | Agent's Commissions[(2)] | Proceeds to Issuer[(3)] |
|---|---|---|---|
| Per security | At variable prices | $ | $ |
| Total | At variable prices | $ | $ |

(1) *The securities will be offered from time to time in one or more negotiated transactions at varying prices to be determined at the time of each sale, which may be at market prices prevailing, at prices related to such prevailing prices or at negotiated prices; provided, however, that such price will not be less than $970 per security and will not be more than $1,000 per security. See "Risk Factors—The Price You Pay For The Securities May Be Higher Than The Prices Paid By Other Investors."*

(2) *Morgan Stanley or one of our affiliates will pay varying discounts and commissions to dealers, including Morgan Stanley Wealth Management (an affiliate of the agent) and their financial advisors, of up to $ per security depending on market conditions. See "Supplemental Information Concerning Plan of Distribution; Conflicts of Interest." For additional information, see "Plan of Distribution (Conflicts of Interest)" in the accompanying prospectus supplement.*

(3) *See "Use of Proceeds and Hedging" on page 18.*

**You should read this document together with the related prospectus supplement, index supplement and prospectus, each of which can be accessed via the hyperlinks below, before you decide to invest.**

Prospectus Supplement dated November 21, 2011

Index Supplement dated November 21, 2011  Prospectus dated November 21, 2011

**The securities are not bank deposits and are not insured by the Federal Deposit Insurance Corporation or any other governmental agency, nor are they obligations of, or guaranteed by, a bank.**

The issuer has filed a registration statement (including a prospectus) with the SEC for the offering to which this communication relates. Before you invest, you should read the prospectus in that registration statement and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering. You may get these documents for free by visiting EDGAR on the SEC Web site at www.sec.gov. Alternatively, the issuer, any underwriter or any dealer participating in this offering will arrange to send you the prospectus if you request it by calling toll-free 1-800-584-6837.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

## Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**

Principal at Risk Securities

*Terms continued from previous page:*

| | |
|---|---|
| CMS reference determination dates: | Two (2) U.S. government securities business days prior to the related interest reset date at the start of the applicable interest payment period. |
| CMS reference index: | 30-Year Constant Maturity Swap Rate minus 2-Year Constant Maturity Swap Rate, expressed as a percentage. *Please see "Additional Provisions—CMS Reference Index" below.* |
| CMS reference index strike: | 0.00% |
| Index reference level: | , which is 50% of the initial index value |
| Initial index value: | , which is the index closing value on February 25, 2014 |
| Barrier level: | , which is 50% of the initial index value |
| Final index value: | The index closing value of the index on the final determination date |
| Index closing value: | The closing value of the index. *Please see "Additional Provisions—The S&P 500® Index" below.* |
| Final determination date: | The third scheduled business day prior to the maturity date, subject to adjustment due to non-index business days or certain market disruption events. |
| Index cutoff: | The index closing value for any day from and including the third index business day prior to the related interest payment date for any interest payment period shall be the index closing value on such third index business day prior to such interest payment date. |
| Index performance factor: | The final index value *divided by* the initial index value |
| Redemption: | None |
| Day-count convention: | Actual/Actual |
| Specified currency: | U.S. dollars |
| CUSIP / ISIN: | 61760QDZ4 / US61760QDZ46 |
| Book-entry or certificated security: | Book-entry |
| Business day: | New York |
| Calculation agent: | Morgan Stanley Capital Services LLC. |
| | All determinations made by the calculation agent will be at the sole discretion of the calculation agent and will, in the absence of manifest error, be conclusive for all purposes and binding on you, the trustee and us. |
| | All values used in the interest rate formula for the securities and all percentages resulting from any calculation of interest will be rounded to the nearest one hundred-thousandth of a percentage point, with .000005% rounded up to .00001%. All dollar amounts used in or resulting from such calculation on the securities will be rounded to the nearest cent, with one-half cent rounded upward. |
| | Because the calculation agent is our affiliate, the economic interests of the calculation agent and its affiliates may be adverse to your interests as an investor in the securities, including with respect to certain determinations and judgments that the calculation agent must make in determining the payment that you will receive on each interest payment date and at maturity or whether a market disruption event has occurred. Please see Annex A—The S&P 500® Index—Market Disruption Event" and "—Discontinuance of the S&P 500® Index; Alteration of Method of Calculation" below. The calculation agent is obligated to carry out its duties and functions as calculation agent in good faith and using its reasonable judgment. |
| Trustee: | The Bank of New York Mellon |
| Contact information: | Morgan Stanley Wealth Management clients may contact their local Morgan Stanley branch office or our principal executive offices at 1585 Broadway, New York, New York 10036 (telephone number (866) 477-4776). All other clients may contact their local brokerage representative. Third-party distributors may contact Morgan Stanley Structured Investment Sales at (800) 233-1087. |

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**

Principal at Risk Securities

# The Securities

## Principal at Risk Securities

The securities offered are debt securities of Morgan Stanley.  In years 1 to 4, the securities pay interest at a rate of 10.00% per annum. Beginning February 28, 2018, interest will accrue on the securities for each day that the closing value of the S&P 500® Index is greater than or equal to 50% of the initial index value (which we refer to as the index reference level), at a variable rate per annum equal to 4 times the CMS reference index for the related monthly interest payment period; subject to the maximum interest rate of 10.00% per annum per interest payment period and the minimum interest rate of 0.00% per annum. The floating interest rate is based on the CMS reference index **and** the level of the S&P 500® Index. If 30CMS is less than or equal to 2CMS on the applicable CMS reference determination date, the floating interest rate will be 0.00% and no interest will accrue on the securities for the related interest period. In addition, if, on any calendar day during the interest payment period, the index closing value is less than the index reference level, interest will accrue at a rate of 0.00% per annum for that day.

At maturity, if the final index value is greater than or equal to the barrier level, investors will receive the stated principal amount of the securities plus any accrued and unpaid interest. However, if the final index value is less than the barrier level, investors will be fully exposed to the decline in the value of the S&P 500® Index over the term of the securities, and the payment at maturity will be less than 50% of the stated principal amount of the securities and could be zero. **There is no minimum payment at maturity on the securities. Accordingly, investors may lose up to their entire initial investment in the securities.**  Investors will not participate in any appreciation of the S&P 500® Index.

We describe the basic features of these securities in the sections of the accompanying prospectus called "Description of Debt Securities— Floating Rate Debt Securities" and prospectus supplement called "Description of Securities," subject to and as modified by the provisions described below. All payments on the securities are subject to the credit risk of Morgan Stanley.

The stated principal amount of each security is $1,000, and the issue price is variable. This price includes costs associated with issuing, selling, structuring and hedging the securities, which are borne by you, and, consequently, the estimated value of the securities on the pricing date will be less than the issue price. We estimate that the value of each security on the pricing date will be approximately $862.60, or within $12.50 of that estimate. Our estimate of the value of the securities as determined on the pricing date will be set forth in the final pricing supplement.

*What goes into the estimated value on the pricing date?*

In valuing the securities on the pricing date, we take into account that the securities comprise both a debt component and a performance-based component linked to the CMS reference index and the S&P 500® Index (the "index"). The estimated value of the securities is determined using our own pricing and valuation models, market inputs and assumptions relating to the CMS reference index and the index, instruments based on the CMS reference index and the index, volatility and other factors including current and expected interest rates, as well as an interest rate related to our secondary market credit spread, which is the implied interest rate at which our conventional fixed rate debt trades in the secondary market.

*What determines the economic terms of the securities?*

In determining the economic terms of the securities, including the interest rate, the leverage factor, the maximum interest rate, the CMS reference index strike, the index reference level and the barrier level, we use an internal funding rate, which is likely to be lower than our secondary market credit spreads and therefore advantageous to us. If the issuing, selling, structuring and hedging costs borne by you were lower or if the internal funding rate were higher, one or more of the economic terms of the securities would be more favorable to you.

*What is the relationship between the estimated value on the pricing date and the secondary market price of the securities?*

The price at which MS & Co. purchases the securities in the secondary market, absent changes in market conditions, including those related to interest rates and the CMS reference index and the index, may vary from, and be lower than, the estimated value on the pricing date, because the secondary market price takes into account our secondary market credit spread as well as the bid-offer spread that MS & Co. would charge in a secondary market transaction of this type, the costs of unwinding the related hedging transactions and other factors.

MS & Co. may, but is not obligated to, make a market in the securities and, if it once chooses to make a market, may cease doing so at any time.

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 50 of 93

3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 1-1    Page 127 of 281

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

7/5/2019    https://www.sec.gov/Archives/edgar/data/895421/000095010314001094/dp44016_fwp-ps1285.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 51 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 1-1    Page 128 of 281

Morgan Stanley

Fixed to Floating Rate Securities due 2034
**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature**
**Linked to the S&P 500® Index**
Principal at Risk Securities

# Additional Provisions

## CMS Reference Index

### What are the 30-Year and 2-Year Constant Maturity Swap Rates?

The 30-Year Constant Maturity Swap Rate (which we refer to as "30CMS") is, on any U.S. government securities business day, the fixed rate of interest payable on an interest rate swap with a 30-year maturity as reported on Reuters Page ISDAFIX1 or any successor page thereto at 11:00 a.m. New York City time on that day. This rate is one of the market-accepted indicators of longer-term interest rates.

The 2-Year Constant Maturity Swap Rate (which we refer to as "2CMS") is, on any U.S. government securities business day, the fixed rate of interest payable on an interest rate swap with a 2-year maturity as reported on Reuters Page ISDAFIX1 or any successor page thereto at 11:00 a.m. New York City time on that day.

An interest rate swap rate, at any given time, generally indicates the fixed rate of interest (paid semi-annually) that a counterparty in the swaps market would have to pay for a given maturity, in order to receive a floating rate (paid quarterly) equal to 3-month LIBOR for that same maturity.

### U.S. Government Securities Business Day

U.S. government securities business day means any day except for a Saturday, Sunday or a day on which The Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. government securities.

### CMS Rate Fallback Provisions

If 30CMS or 2CMS is not displayed by 11:00 a.m. New York City time on the Reuters Screen ISDAFIX1 Page on any day on which the level of the CMS reference index must be determined, such affected rate for such day will be determined on the basis of the mid-market semi-annual swap rate quotations to the calculation agent provided by five leading swap dealers in the New York City interbank market (the "Reference Banks") at approximately 11:00 a.m., New York City time, on such day, and, for this purpose, the mid-market semi-annual swap rate means the mean of the bid and offered rates for the semi-annual fixed leg, calculated on a 30/360 day count basis, of a fixed-for-floating U.S. Dollar interest rate swap transaction with a term equal to the applicable 30 year or 2 year maturity commencing on such day and in a representative amount with an acknowledged dealer of good credit in the swap market, where the floating leg, calculated on an actual/360 day count basis, is equivalent to USD-LIBOR-BBA with a designated maturity of three months. The calculation agent will request the principal New York City office of each of the Reference Banks to provide a quotation of its rate. If at least three quotations are provided, the rate for that day will be the arithmetic mean of the quotations, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest). If fewer than three quotations are provided as requested, the rate will be determined by the calculation agent in good faith and in a commercially reasonable manner.

February 2014                                                                                                          Page 4

ELECTRONICALLY FILED - 2019 Jul 26 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

7/5/2019 https://www.sec.gov/Archives/edgar/data/895421/000095010314001094/dp44016_fwp-ps1285.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 52 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 10-4    Page 129 of 281

Morgan Stanley

Fixed to Floating Rate Securities due 2034
Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index
Principal at Risk Securities

## The S&P 500® Index

The S&P 500® Index, which is calculated, maintained and published by Standard & Poor's Financial Services LLC ("S&P"), consists of 500 component stocks selected to provide a performance benchmark for the U.S. equity markets. The calculation of the S&P 500® Index is based on the relative value of the float adjusted aggregate market capitalization of the 500 component companies as of a particular time as compared to the aggregate average market capitalization of 500 similar companies during the base period of the years 1941 through 1943. For additional information about the S&P 500® Index, see the information set forth under "Annex A—The S&P 500® Index" in this document and "S&P 500® Index" in the accompanying index supplement.

### Index Closing Value Fallback Provisions

The index closing value on any calendar day during the term of the securities on which the index level is to be determined (each, an "index determination date") will equal the official closing value of the index as published by the underlying index publisher or its successor, or in the case of any successor index, the official closing value for such successor index as published by the publisher of such successor index or its successor, at the regular weekday close of trading on that calendar day, as determined by the calculation agent; provided that the index closing value for any day from and including the third index business day prior to the related interest payment date for any interest payment period shall be the index closing value in effect on such third index business day prior to such interest payment date; provided further that if a market disruption event with respect to the index occurs on any index determination date or if any such index determination date is not an index business day, the index closing value for such index determination date will be the closing value of the index on the immediately preceding index business day on which no market disruption event has occurred. In certain circumstances, the index closing value shall be based on the alternate calculation of the index described under "Annex A—The S&P 500® Index—Discontinuance of the S&P 500® Index; Alteration of Method of Calculation."

"Index business day" means a day, as determined by the calculation agent, on which trading is generally conducted on each of the relevant exchange(s) for the index, other than a day on which trading on such exchange(s) is scheduled to close prior to the time of the posting of its regular final weekday closing price.

"Relevant exchange" means the primary exchange(s) or market(s) of trading for (i) any security then included in the index, or any successor index, and (ii) any futures or options contracts related to the index or to any security then included in the index.

For more information regarding market disruption events with respect to the index, discontinuance of the index and alteration of the method of calculation, see "Annex A—The S&P 500® Index—Market Disruption Event" and "—Discontinuance of the S&P 500® Index; Alteration of Method of Calculation" herein.

February 2014                                                                                                                 Page 9

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

## Fixed to Floating Rate Securities due 2034
Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature
Linked to the S&P 500® Index
Principal at Risk Securities

# How the Securities Work

### How to calculate the interest payments:

The table below presents examples of hypothetical interest that would accrue on the securities during any month in the floating interest rate period. The examples below are for purposes of illustration only. The examples of the hypothetical floating interest rate that would accrue on the securities are based on both the level of the CMS reference index level on the applicable CMS reference determination date and the total number of calendar days in a monthly interest payment period on which the index closing value is greater than or equal to the index reference level.

The actual interest payment amounts during the floating interest rate period will depend on the actual level of the CMS reference index on each CMS reference determination date and the index closing value of the S&P 500® Index on each day during the floating interest rate period. The applicable interest rate for each monthly interest payment period will be determined on a per-annum basis but will apply only to that interest payment period. The table assumes that the interest payment period contains 30 calendar days. The examples below are for purposes of illustration only and would provide different results if different assumptions were made.

| CMS Reference Index | 4 times CMS Reference Index* | Annualized Rate of Interest Paid | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Number of days on which the index closing value is greater than or equal to the index reference level | | | | | | |
| | | 0 | 5 | 10 | 15 | 20 | 25 | 30 |
| -3.250% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -3.000% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -2.750% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -2.500% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -2.250% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -2.000% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -1.750% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -1.500% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -1.250% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -1.000% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -0.750% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -0.500% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -0.250% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| 0.000% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| 0.250% | 1.00% | 0.00% | 0.1667% | 0.3333% | 0.5000% | 0.6667% | 0.8333% | 1.0000% |
| 0.500% | 2.00% | 0.00% | 0.3333% | 0.6667% | 1.0000% | 1.3333% | 1.6667% | 2.0000% |
| 0.750% | 3.00% | 0.00% | 0.5000% | 1.0000% | 1.5000% | 2.0000% | 2.5000% | 3.0000% |
| 1.000% | 4.00% | 0.00% | 0.6667% | 1.3333% | 2.0000% | 2.6667% | 3.3333% | 4.0000% |
| 1.250% | 5.00% | 0.00% | 0.8333% | 1.6667% | 2.5000% | 3.3333% | 4.1667% | 5.0000% |
| 1.500% | 6.00% | 0.00% | 1.0000% | 2.0000% | 3.0000% | 4.0000% | 5.0000% | 6.0000% |
| 1.750% | 7.00% | 0.00% | 1.1667% | 2.3333% | 3.5000% | 4.6667% | 5.8333% | 7.0000% |
| 2.000% | 8.00% | 0.00% | 1.3333% | 2.6667% | 4.0000% | 5.3333% | 6.6667% | 8.0000% |
| 2.250% | 9.00% | 0.00% | 1.5000% | 3.0000% | 4.5000% | 6.0000% | 7.5000% | 9.0000% |
| **2.500%** | **10.00%** | **0.00%** | **1.6667%** | **3.3333%** | **5.0000%** | **6.6667%** | **8.3333%** | **10.0000%** |
| 2.750% | 10.00% | 0.00% | 1.6667% | 3.3333% | 5.0000% | 6.6667% | 8.3333% | 10.0000% |
| 3.000% | 10.00% | 0.00% | 1.6667% | 3.3333% | 5.0000% | 6.6667% | 8.3333% | 10.0000% |
| 3.250% | 10.00% | 0.00% | 1.6667% | 3.3333% | 5.0000% | 6.6667% | 8.3333% | 10.0000% |
| 3.500% | 10.00% | 0.00% | 1.6667% | 3.3333% | 5.0000% | 6.6667% | 8.3333% | 10.0000% |
| 3.750% | 10.00% | 0.00% | 1.6667% | 3.3333% | 5.0000% | 6.6667% | 8.3333% | 10.0000% |
| 4.000% | 10.00% | 0.00% | 1.6667% | 3.3333% | 5.0000% | 6.6667% | 8.3333% | 10.0000% |

* Subject to the minimum interest rate of 0.00% and the maximum interest rate of 10.00%

If 30CMS is less than or equal to 2CMS on the applicable CMS reference determination date, the floating interest rate will be the minimum interest rate of 0.00% and no interest will accrue on the securities for such interest period regardless of the total number of calendar days in the interest payment period on which the index closing value of the S&P 500® Index is greater than or equal to the index reference level.

7/5/2019    https://www.sec.gov/Archives/edgar/data/895421/000095010314001094/dp44016_fwp-ps1285.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 54 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 1-1    Page 131 of 281

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

## Fixed to Floating Rate Securities due 2034
**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**
Principal at Risk Securities

### How to calculate the payment at maturity (excluding any interest with respect to the final interest period):

The payoff diagram below illustrates the payment at maturity (excluding any interest with respect to the final interest period) on the securities based on the following terms:

| | |
|---|---|
| Stated principal amount: | $1,000 per security |
| Barrier level: | 50% of the initial index value |
| Minimum payment at maturity: | None |

**Payoff Diagram**



### How it works

- **Par Scenario.** If the final index value is greater than the barrier level of 50% of the initial index value, the investor would receive $1,000 stated principal amount.

  - If the index depreciates 30%, the investor would receive the $1,000 stated principal amount.

- **Downside Scenario.** If the final index value is less than the barrier level of 50% of the initial index value, the investor would receive an amount that is significantly less than the $1,000 stated principal amount, based on a 1% loss of principal for each 1% decline in the index. This amount will be less than $500 per security. There is no minimum payment at maturity on the securities. Accordingly, investors may lose up to their entire initial investment in the securities.

  - If the index depreciates 60%, the investor would lose 60% of the investor's principal and receive only $400 per security at maturity, or 40% of the stated principal amount.

7/5/2019 https://www.sec.gov/Archives/edgar/data/895421/000095010314001094/dp44016_fwp-ps1285.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 55 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 1-11    Page 132 of 281

ELECTRONICALLY FILED - 2019 Jul 29 4:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

**Fixed to Floating Rate Securities due 2034**
Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature, Linked to the S&P 500® Index
Principal at Risk Securities

# Historical Information

### The CMS Reference Index

The following graph sets forth the historical difference between the 30-Year Constant Maturity Swap Rate and the 2-Year Constant Maturity Swap Rate for the period from January 1, 1999 to February 11, 2014 (the "historical period"). The historical difference between the 30-Year Constant Maturity Swap Rate and the 2-Year Constant Maturity Swap Rate should not be taken as an indication of the future performance of the CMS reference index. The graph below does not reflect the return the securities would have yielded during the period presented because it does not take into account the index closing values or the leverage factor. We cannot give you any assurance that the level of the CMS reference index will be positive on any CMS reference determination date. We obtained the information in the graph below, without independent verification, from Bloomberg Financial Markets ("USSW"), which closely parallels but is not necessarily exactly the same as the Reuters Page price sources used to determine the level of the CMS reference index.



**\*The bold line in the graph indicates the CMS reference index strike of 0.00%.**

The historical performance shown above is not indicative of future performance. The CMS reference index level may be negative on one or more specific CMS reference determination dates during the floating interest rate period even if the level of the CMS reference index is generally positive and, moreover, the level of the CMS reference index has in the past been, and may in the future be, negative.

**If the level of the CMS reference index is negative on any CMS reference determination date during the floating interest rate period, you will not receive any interest for the related interest payment period. Moreover, even if the level of the CMS reference index is positive on any such CMS reference determination date, if the index closing value is less than the index reference level on any day during the interest payment period, you will not receive any interest with respect to such day, and if the index closing value remains below the index reference level for each day in the applicable interest payment period, you will receive no interest for that interest payment period.**

February 2014                                                                                                   Page 8

Morgan Stanley

## Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**
Principal at Risk Securities

### The S&P 500® Index

The following table sets forth the published high and low index closing values, as well as end-of-quarter index closing values, for each quarter from January 1, 2009 through February 11, 2014. The graph following the table sets forth the daily index closing values during the historical period. The index closing value on February 11, 2014 was 1,819.75. The historical index closing values should not be taken as an indication of future performance, and we cannot give you any assurance that the index closing value will be higher than the index reference level on any index determination date during the floating interest rate period in which you are paid the floating interest rate. The graph below does not reflect the return the securities would have yielded during the period presented because it does not take into account the CMS reference index level or the leverage factor. We obtained the information in the table and graph below from Bloomberg Financial Markets, without independent verification.

| S&P 500® Index | High | Low | Period End |
|---|---|---|---|
| **2009** | | | |
| First Quarter | 934.70 | 676.53 | 797.87 |
| Second Quarter | 946.21 | 811.08 | 919.32 |
| Third Quarter | 1,071.66 | 879.13 | 1,057.08 |
| Fourth Quarter | 1,127.78 | 1,025.21 | 1,115.10 |
| **2010** | | | |
| First Quarter | 1,174.17 | 1,056.74 | 1,169.43 |
| Second Quarter | 1,217.28 | 1,030.71 | 1,030.71 |
| Third Quarter | 1,148.67 | 1,022.58 | 1,141.20 |
| Fourth Quarter | 1,259.78 | 1,137.03 | 1,257.64 |
| **2011** | | | |
| First Quarter | 1,343.01 | 1,256.88 | 1,325.83 |
| Second Quarter | 1,363.61 | 1,265.42 | 1,320.64 |
| Third Quarter | 1,353.22 | 1,119.46 | 1,131.42 |
| Fourth Quarter | 1,285.09 | 1,099.23 | 1,257.60 |
| **2012** | | | |
| First Quarter | 1,416.51 | 1,277.06 | 1,408.47 |
| Second Quarter | 1,419.04 | 1,278.04 | 1,362.16 |
| Third Quarter | 1,465.77 | 1,334.76 | 1,440.67 |
| Fourth Quarter | 1,461.40 | 1,353.33 | 1,426.19 |
| **2013** | | | |
| First Quarter | 1,569.19 | 1,457.15 | 1,569.19 |
| Second Quarter | 1,669.16 | 1,541.61 | 1,606.28 |
| Third Quarter | 1,725.52 | 1,614.08 | 1,681.55 |
| Fourth Quarter | 1,848.36 | 1,655.45 | 1,848.36 |
| **2014** | | | |
| First Quarter (through February 11, 2014) | 1,848.38 | 1,741.89 | 1,819.75 |

February 2014             Page 9

ELECTRONICALLY FILED - 2018 Jul 20 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**

Principal at Risk Securities



**\*The red solid line in the graph indicates both the hypothetical index reference level and the hypothetical barrier level, in each case assuming the index closing value on February 11, 2014 were the initial index value.**

February 2014

Page

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

7/5/2019     https://www.sec.gov/Archives/edgar/data/895421/000095010314001094/dp44016_fwp-ps1285.htm

3:19-cv-02097-MGL     Date Filed 07/26/19     Entry Number 1-1     Page 58 of 93
3:23-cv-04149-MGL     Date Filed 08/18/23     Entry Number 109-4     Page 135 of 281

Morgan Stanley

Fixed to Floating Rate Securities due 2034
Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index
Principal at Risk Securities

# Risk Factors

*The securities involve risks not associated with an investment in ordinary floating rate securities. An investment in the Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index entails significant risks not associated with similar investments in a conventional debt security, including, but not limited to, fluctuations in 30CMS and 2CMS, fluctuations in the index, and other events that are difficult to predict and beyond the issuer's control. This section describes the most significant risks relating to the securities. For a complete list of risk factors, please see the accompanying prospectus supplement, index supplement and prospectus. You should carefully consider whether the securities are suited to your particular circumstances before you decide to purchase them. Accordingly, prospective investors should consult their financial and legal advisers as to the risks entailed by an investment in the securities and the suitability of the securities in light of their particular circumstances.*

- **The Securities Do Not Guarantee The Return Of Any Principal.** The terms of the securities differ from those of ordinary debt securities in that the securities do not guarantee the return of any of the principal amount at maturity. Instead, if the final index value is less than the barrier level, you will be fully exposed to the decline in the index over the term of the securities on a 1 to 1 basis, and you will receive for each security that you hold at maturity an amount of cash that is significantly less than the stated principal amount, in proportion to the decline in the index. Under this scenario, the value of any such payment will be less than 50% of the stated principal amount and could be zero. You may lose up to your entire initial investment in the securities.

- **Investors Will Not Participate In Any Appreciation In The Value Of The Index.** Investors will not participate in any appreciation in the value of the index from the initial index value, and the return on the securities will be limited to the monthly interest payments that are paid with respect to each interest payment period during the fixed interest rate period and the floating interest rate period, if any.

- **If There Are No Accrual Days In Any Interest Payment Period During The Floating Interest Rate Period, We Will Not Pay Any Interest On The Securities For That Interest Payment Period And The Market Value Of The Securities May Decrease Significantly.** It is possible that the level of the CMS reference index will be less than the CMS reference index strike or that the index closing value will be less than the index reference level for so many days during any monthly interest payment period during the floating interest rate period that the interest payment for that monthly interest payment period will be less than the amount that would be paid on an ordinary debt security and may be zero. In addition, to the extent that the level of the CMS reference index is less than the CMS reference index strike on the applicable CMS reference determination date **or** that the index closing value is less than the index reference level on any number of days during the interest rate period, the market value of the securities may decrease and you may receive substantially less than 100% of the issue price if you wish to sell your securities at such time.

- **The Index Closing Value For Any Day From And Including The Third Index Business Day Prior To The Interest Payment Date Of An Interest Payment Period During The Floating Interest Rate Period Will Be The Index Closing Value For Such Third Day.** Because the index closing value for any day from and including the third index business day prior to the interest payment date of an interest payment period during the floating interest rate period will be the index closing value on such third day, if the index closing value for that index business day is less than the index reference level, you will not receive any interest in respect of any days on or after that third index business day to but excluding the interest payment date even if the index closing value as actually calculated on any of those days were to be greater than or equal to the index reference level.

- **The Amount Of Interest Payable On The Securities In Any Month Is Capped.** The interest rate on the securities for each monthly interest payment period during the floating interest rate period is capped for that month at the maximum interest rate of 10.00% per annum, and, due to the leverage factor, you will not get the benefit of any increase in the CMS reference index level above a level of 2.50%. Therefore, the maximum monthly interest payment you can receive during the floating interest rate period will be approximately $8.33 for each $1,000 stated principal amount of securities. Accordingly, you could receive less than 10.00% per annum interest for any given full year even when the CMS reference index level increases substantially in a monthly interest payment period during that year if the CMS reference index level in the other months in that year does not also increase substantially, or if the index closing value is not at or above the index reference level on any day during the

February 2014                                                                                              Page 11

Morgan Stanley

## Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**
Principal at Risk Securities

interest payment period so that you do not accrue interest with respect to such day, as you will not receive the full benefit of the increase in the CMS reference index level in the outperforming month due to the interest rate cap.

- **The Initial Index Value, The Index Reference Level And The Barrier Level Will Not Be Set Until February 25, 2014.** Because the initial index value is the index closing value on Februray 25, 2014, and because the index reference level and the barrier level are each 50% of the initial index value, you will not know the initial index value, the index reference level or the barrier level for a period of time after the pricing date.

- **The Historical Performance Of 30CMS, 2CMS And The Index Are Not An Indication Of Their Future Performance.** The historical performance of 30CMS and 2CMS and the S&P 500® Index should not be taken as indications of their future performance during the term of the securities. Changes in the levels of 30CMS, 2CMS and the S&P 500® Index will affect the trading price of the securities, but it is impossible to predict whether such levels will rise or fall. There can be no assurance that the CMS reference index level will be positive and the index closing value will be equal to or greater than the index reference level on any CMS reference determination date during the floating interest rate period. In addition, there can be no assurance that the level of the S&P 500® Index on the final determination date will be greater than or equal to the barrier level. *Furthermore, the historical performance of each of the CMS reference index and the index does not reflect the return the securities would have yielded, because each does not take into account the other's performance, the leverage factor or the maximum interest rate.*

- **Investors Are Subject To Our Credit Risk, And Any Actual Or Anticipated Changes To Our Credit Ratings And Credit Spreads May Adversely Affect The Market Value Of The Securities.** Investors are dependent on our ability to pay all amounts due on the securities on interest payment dates and at maturity and therefore investors are subject to our credit risk. If we default on our obligations under the securities, your investment would be at risk and you could lose some or all of your investment. As a result, the market value of the securities prior to maturity will be affected by changes in the market's view of our creditworthiness. Any actual or anticipated decline in our credit ratings or increase in the credit spreads charged by the market for taking our credit risk is likely to adversely affect the value of the securities.

- **The Price At Which The Securities May Be Resold Prior To Maturity Will Depend On A Number Of Factors And May Be Substantially Less Than The Amount For Which They Were Originally Purchased.** Some of these factors include, but are not limited to: (i) changes in the level of 30CMS and 2CMS, (ii) changes in the index closing value, (iii) volatility of 30CMS and 2CMS, (iv) volatility of the index, (v) changes in interest and yield rates, (vi) geopolitical conditions and economic, financial, political and regulatory or judicial events that affect the securities underlying the index, or equity markets generally, and that may affect the index, (vii) any actual or anticipated changes in our credit ratings or credit spreads and (viii) time remaining to maturity. Generally, the longer the time remaining to maturity and the more tailored the exposure, the more the market price of the securities will be affected by the other factors described in the preceding sentence. This can lead to significant adverse changes in the market price of securities like the securities. Primarily, if the level of the CMS reference index is less than the CMS reference index strike or the index closing value is less than the index reference level during the floating interest rate period, especially if the index closing value is near the barrier level, the market value of the securities is expected to decrease and you may receive substantially less than 100% of the issue price if you sell your securities at such time.

- **The Rate We Are Willing To Pay For Securities Of This Type, Maturity And Issuance Size Is Likely To Be Lower Than The Rate Implied By Our Secondary Market Credit Spreads And Advantageous To Us. Both The Lower Rate And The Inclusion Of Costs Associated With Issuing, Selling, Structuring And Hedging The Securities In The Original Issue Price Reduce The Economic Terms Of The Securities, Cause The Estimated Value Of The Securities To Be Less Than The Original Issue Price And Will Adversely Affect Secondary Market Prices.** Assuming no change in market conditions or any other relevant factors, the prices, if any, at which dealers, including MS & Co., are willing to purchase the securities in secondary market transactions will likely be significantly lower than the original issue price, because secondary market prices will exclude the issuing, selling, structuring and hedging-related costs that are included in the original issue price and borne by you and because the secondary market prices will reflect our secondary market credit spreads and the bid-offer spread that any dealer would charge in a secondary market transaction of this type, the costs of unwinding the related hedging transactions as well as other factors.

The inclusion of the costs of issuing, selling, structuring and hedging the securities in the original issue price and the lower rate we are willing to pay as issuer make the economic terms of the securities less favorable to you than they otherwise would be.

February 2014                                                                                                    Page 12

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202226

Morgan Stanley

## Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**

Principal at Risk Securities

- **The Estimated Value Of The Securities Is Determined By Reference To Our Pricing And Valuation Models, Which May Differ From Those Of Other Dealers And Is Not A Maximum Or Minimum Secondary Market Price.** These pricing and valuation models are proprietary and rely in part on subjective views of certain market inputs and certain assumptions about future events, which may prove to be incorrect. As a result, because there is no market-standard way to value these types of securities, our models may yield a higher estimated value of the securities than those generated by others, including other dealers in the market, if they attempted to value the securities. In addition, the estimated value on the pricing date does not represent a minimum or maximum price at which dealers, including MS & Co., would be willing to purchase your securities in the secondary market (if any exists) at any time. The value of your securities at any time after the date of this pricing supplement will vary based on many factors that cannot be predicted with accuracy, including our creditworthiness and changes in market conditions.

- **The Price You Pay For The Securities May Be Higher Than The Prices Paid By Other Investors.** The agent proposes to offer the securities from time to time for sale to investors in one or more negotiated transactions, or otherwise, at market prices prevailing at the time of sale, at prices related to then-prevailing prices, at negotiated prices, or otherwise. Accordingly, there is a risk that the price you pay for the securities will be higher than the prices paid by other investors based on the date and time you make your purchase, from whom you purchase the securities (e.g., directly from the agent or through a broker or dealer), any related transaction cost (e.g., any brokerage commission), whether you hold your securities in a brokerage account, a fiduciary or fee-based account or another type of account and other market factors.

- **The Securities Will Not Be Listed On Any Securities Exchange And Secondary Trading May Be Limited.** The securities will not be listed on any securities exchange. Therefore, there may be little or no secondary market for the securities. MS & Co. may, but is not obligated to, make a market in the securities and, if it once chooses to make a market, may cease doing so at any time. When it does make a market, it will generally do so for transactions of routine secondary market size at prices based on its estimate of the current value of the securities, taking into account its bid/offer spread, our credit spreads, market volatility, the notional size of the proposed sale, the cost of unwinding any related hedging positions, the time remaining to maturity and the likelihood that it will be able to resell the securities. Even if there is a secondary market, it may not provide enough liquidity to allow you to trade or sell the securities easily. Since other broker-dealers may not participate significantly in the secondary market for the securities, the price at which you may be able to trade your securities is likely to depend on the price, if any, at which MS & Co. is willing to transact. If, at any time, MS & Co. were to cease making a market in the securities, it is likely that there would be no secondary market for the securities. Accordingly, you should be willing to hold your securities to maturity.

- **Morgan Stanley & Co. LLC, Which Is A Subsidiary Of The Issuer, Has Determined The Estimated Value On The Pricing Date.** MS & Co. has determined the estimated value of the securities on the pricing date.

- **The Issuer, Its Subsidiaries Or Affiliates May Publish Research That Could Affect The Market Value Of The Securities. They Also Expect To Hedge The Issuer's Obligations Under The Securities.** The issuer or one or more of its affiliates may, at present or in the future, publish research reports with respect to movements in interest rates generally or each of the components making up the CMS reference index specifically, or with respect to the index. This research is modified from time to time without notice and may express opinions or provide recommendations that are inconsistent with purchasing or holding the securities. Any of these activities may affect the market value of the securities. In addition, the issuer's subsidiaries expect to hedge the issuer's obligations under the securities and they may realize a profit from that expected hedging activity even if investors do not receive a favorable investment return under the terms of the securities or in any secondary market transaction.

- **The Calculation Agent, Which Is A Subsidiary Of The Issuer, Will Make Determinations With Respect To The Securities.** Any of these determinations made by the calculation agent may adversely affect the payout to investors. Determinations made by the calculation agent, including with respect to the CMS reference index, the index closing value, the occurrence or non-occurrence of market disruption events and the selection of a successor index or calculation of the index closing value in the event of a market disruption event or discontinuance of the index, may adversely affect the payout to you on the securities. See "Annex A—The S&P 500® Index—Market Disruption Event" and "—Discontinuance of the S&P 500® Index; Alteration of Method of Calculation."

February 2014                                                                                                   Page 13

ELECTRONICALLY FILED - 2019 Jan 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

## Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**

Principal at Risk Securities

- **Adjustments To The S&P 500® Index Could Adversely Affect The Value Of The Securities.** The publisher of the S&P 500® Index can add, delete or substitute the stocks underlying the S&P 500® Index, and can make other methodological changes required by certain events relating to the underlying stocks, such as stock dividends, stock splits, spin-offs, rights offerings and extraordinary dividends, that could change the value of the S&P 500® Index. Any of these actions could adversely affect the value of the securities. The publisher of the S&P 500® Index may discontinue or suspend calculation or publication of the S&P 500® Index at any time. In these circumstances, the calculation agent will have the sole discretion to substitute a successor index that is comparable to the discontinued index. The calculation agent could have an economic interest that is different than that of investors in the securities insofar as, for example, the calculation agent is permitted to consider indices that are calculated and published by the calculation agent or any of its affiliates. If the calculation agent determines that there is no appropriate successor index, on any day on which the index closing value is to be determined, the index closing value for such day will be based on the stocks underlying the discontinued index at the time of such discontinuance, without rebalancing or substitution, computed by the calculation agent, in accordance with the formula for calculating the index closing value last in effect prior to discontinuance of the S&P 500® Index.

- **You Have No Shareholder Rights.** As an investor in the securities, you will not have voting rights, rights to receive dividends or other distributions or any other rights with respect to the stocks that underlie the S&P 500® Index.

- **Investing In The Securities Is Not Equivalent To Investing In The S&P 500® Index Or The Stocks Underlying The S&P 500® Index.** Investing in the securities is not equivalent to investing in the S&P 500® Index or its component stocks.

- **Hedging And Trading Activity By Our Subsidiaries Could Potentially Adversely Affect The Value Of The Index.** One or more of our subsidiaries expect to carry out hedging activities related to the securities (and possibly to other instruments linked to the index or its component stocks), including trading in the stocks underlying the index as well as in other instruments related to the index. Some of our subsidiaries also trade in the stocks underlying the index and other financial instruments related to the index on a regular basis as part of their general broker-dealer and other businesses. Any of these hedging or trading activities could potentially decrease the index closing value, thus increasing the risk that the index closing value will be less than the index reference level on any day during the floating interest rate period or less than the barrier level on the final determination date.

- **The U.S. Federal Income Tax Consequences Of An Investment In The Securities Are Uncertain.** There is no direct legal authority as to the proper treatment of the securities for U.S. federal income tax purposes, and, therefore, significant aspects of the tax treatment of the securities are uncertain.

Please read the discussion under "Tax Considerations" in this pricing supplement concerning the U.S. federal income tax consequences of an investment in the securities. We intend to treat a security for U.S. federal income tax purposes as a single financial contract that provides for a monthly coupon that will be treated as gross income to you at the time received or accrued in accordance with your regular method of tax accounting. Under this treatment, the ordinary income treatment of the monthly coupons, in conjunction with the capital loss treatment of any loss recognized upon the sale, exchange or settlement of the securities, could result in adverse tax consequences to holders of the securities because the deductibility of capital losses is subject to limitations. We do not plan to request a ruling from the Internal Revenue Service (the "IRS") regarding the tax treatment of the securities, and the IRS or a court may not agree with the tax treatment described herein. If the IRS were successful in asserting an alternative treatment for the securities, the timing and character of income or loss on the securities might differ significantly from the tax treatment described herein. For example, under one possible treatment, the IRS could seek to recharacterize the securities as debt instruments. In that event, U.S. Holders would be required to accrue into income original issue discount on the securities every year at a "comparable yield" determined at the time of issuance (as adjusted based on the difference, if any, between the actual and the projected amount of any contingent payments on the securities) and recognize all income and gain in respect of the securities as ordinary income. Because a security provides for the return of principal except where the final index value is below the barrier level, the risk that a security would be recharacterized, for U.S. federal income tax purposes, as a debt instrument is higher than with other equity-linked securities that do not contain similar provisions. **Non-U.S. Holders should note that we currently intend to withhold on any monthly coupon paid to Non-U.S. Holders generally at a rate of 30%, or at a reduced rate specified by an applicable income tax treaty under an "other income" or similar provision, and will not be required to pay any additional amounts with respect to amounts withheld.**

Proposed U.S. Treasury Department regulations issued pursuant to Section 871(m) of the Internal Revenue Code of 1986, as amended, if finalized in their current form, would require withholding at a rate of 30% (or lower treaty rate) on certain

7/5/2019    https://www.sec.gov/Archives/edgar/data/895421/000095010314001094/dp44016_fwp-ps1285.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 62 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 1094-1    Page 139 of 281

Morgan Stanley

## Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**

**Principal at Risk Securities**

"dividend equivalent" payments made or deemed made after December 31, 2015 to non-U.S. persons in respect of financial instruments that reference U.S. stocks. Under these rules, withholding may be required even in the absence of any actual dividend-linked payment made pursuant to the instrument. These rules apply only to instruments acquired after March 4, 2014, and therefore they generally should not apply to initial Non-U.S. Holders that acquire their securities in this offering. It is possible, however, that withholding requirements under these rules will apply to securities acquired by an initial Non-U.S. Holder if the Non-U.S. Holder enters into one or more other transactions with respect to the S&P 500® Index or its constituents after March 4, 2014. Moreover, it is possible that a withholding agent may withhold on payments made to initial Non-U.S. Holders that purchase the securities in this offering if the withholding agent cannot determine the date on which the Non-U.S. Holder acquired the securities. Additionally, a purchaser of the securities after March 4, 2014 that is a non-U.S. person might be subject to withholding under these rules, depending on the facts as of the date of the acquisition. As a result, an initial holder's ability to transfer the securities on a secondary market, if any, may be further limited because, depending on the facts on the date of transfer, a potential purchaser that is a non-U.S. person may be subject to withholding under these rules. If withholding applies, we will not be required to pay any additional amounts with respect to amounts withheld. **These proposed regulations are extremely complex. Non-U.S. Holders should consult their tax advisers regarding the U.S. federal income tax consequences to them of these proposed regulations.**

In 2007, the U.S. Treasury Department and the IRS released a notice requesting comments on the U.S. federal income tax treatment of "prepaid forward contracts" and similar instruments. While it is not clear whether the securities would be viewed as similar to the prepaid forward contracts described in the notice, it is possible that any Treasury regulations or other guidance issued after consideration of these issues could materially and adversely affect the tax consequences of an investment in the securities, possibly with retroactive effect. The notice focuses on a number of issues, the most relevant of which for holders of the securities are the character and timing of income or loss and the degree, if any, to which income realized by non-U.S. investors  should be subject to withholding tax. Both U.S. and Non-U.S. Holders (as defined below) should consult their tax advisers regarding the U.S. federal income tax consequences of an investment in the securities, including possible alternative treatments, the issues presented by this notice and any tax consequences arising under the laws of any state, local or foreign taxing jurisdiction.

February 2014                                                                                                          Page 7

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

Fixed to Floating Rate Securities due 2034
**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**
Principal at Risk Securities

## Use of Proceeds and Hedging

The proceeds we receive from the sale of the securities will be used for general corporate purposes. We will receive, in aggregate, $1,000 per security issued, because, when we enter into hedging transactions in order to meet our obligations under the securities, our hedging counterparty will reimburse the cost of the Agent's commissions. The costs of the securities borne by you and described on page 3 above comprise the Agent's commissions and the cost of issuing, structuring and hedging the securities.

## Supplemental Information Concerning Plan of Distribution; Conflicts of Interest

We expect to deliver the securities against payment therefor in New York, New York on February 28, 2014, which will be the            scheduled business day following the date of the pricing of the securities. Under Rule 15c6-1 of the Exchange Act, trades in the secondary market generally are required to settle in three business days, unless the parties to any such trade expressly agree otherwise. Accordingly, purchasers who wish to trade securities on the date of pricing or on or prior to the third business day prior to the original issue date will be required to specify alternative settlement arrangements to prevent a failed settlement.

The securities will be offered from time to time in one or more negotiated transactions at varying prices to be determined at the time of each sale, which may be at market prices prevailing, at prices related to such prevailing prices or at negotiated prices; *provided*, however, that such price will not be less than $970 per security and will not be more than $1,000 per security.

Morgan Stanley or one of our affiliates will pay varying discounts and commissions to dealers, including Morgan Stanley Smith Barney LLC ("Morgan Stanley Wealth Management") and their financial advisors, of up to $      per security depending on market conditions. The agent may distribute the securities through Morgan Stanley Wealth Management, as selected dealer, or other dealers, which may include Morgan Stanley & Co. International plc ("MSIP") and Bank Morgan Stanley AG. Morgan Stanley Wealth Management, MSIP and Bank Morgan Stanley AG are affiliates of Morgan Stanley.

MS & Co. is our wholly-owned subsidiary and it and other subsidiaries of ours expect to make a profit by selling, structuring and, when applicable, hedging the securities. When MS & Co. prices this offering of securities, it will determine the economic terms of the securities such that for each security the estimated value on the pricing date will be no lower than the minimum level described in "The Securities" on page 3.

MS & Co. will conduct this offering in compliance with the requirements of FINRA Rule 5121 of the Financial Industry Regulatory Authority, Inc., which is commonly referred to as FINRA, regarding a FINRA member firm's distribution of the securities of an affiliate and related conflicts of interest. MS & Co. or any of our other affiliates may not make sales in this offering to any discretionary account.

February 2014                                                                                                                    Page

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**

Principal at Risk Securities

# Acceleration Amount in Case of an Event of Default

If an event of default with respect to the securities shall have occurred and be continuing, the amount declared due and payable upon any acceleration of the securities (the "Acceleration Amount") will be an amount, determined by the calculation agent in its sole discretion, that is equal to the cost of having a qualified financial institution, of the kind and selected as described below, expressly assume all our payment and other obligations with respect to the securities as of that day and as if no default or acceleration had occurred, or to undertake other obligations providing substantially equivalent economic value to you with respect to the securities. That cost will equal:

- the lowest amount that a qualified financial institution would charge to effect this assumption or undertaking, plus

- the reasonable expenses, including reasonable attorneys' fees, incurred by the holders of the securities in preparing any documentation necessary for this assumption or undertaking.

During the default quotation period for the securities, which we describe below, the holders of the securities and/or we may request a qualified financial institution to provide a quotation of the amount it would charge to effect this assumption or undertaking. If either party obtains a quotation, it must notify the other party in writing of the quotation. The amount referred to in the first bullet point above will equal the lowest—or, if there is only one, the only—quotation obtained, and as to which notice is so given, during the default quotation period. With respect to any quotation, however, the party not obtaining the quotation may object, on reasonable and significant grounds, to the assumption or undertaking by the qualified financial institution providing the quotation and notify the other party in writing of those grounds within two business days after the last day of the default quotation period, in which case that quotation will be disregarded in determining the Acceleration Amount.

Notwithstanding the foregoing, if a voluntary or involuntary liquidation, bankruptcy or insolvency of, or any analogous proceeding is filed with respect to Morgan Stanley, then depending on applicable bankruptcy law, your claim may be limited to an amount that could be less than the Acceleration Amount.

If the maturity of the securities is accelerated because of an event of default as described above, we shall, or shall cause the calculation agent to, provide written notice to the trustee at its New York office, on which notice the trustee may conclusively rely, and to the depositary of the Acceleration Amount and the aggregate cash amount due with respect to the securities as promptly as possible and in no event later than two business days after the date of such acceleration.

*Default quotation period*

The default quotation period is the period beginning on the day the Acceleration Amount first becomes due and ending on the third business day after that day, unless:

- no quotation of the kind referred to above is obtained, or

- every quotation of that kind obtained is objected to within five business days after the due date as described above.

If either of these two events occurs, the default quotation period will continue until the third business day after the first business day on which prompt notice of a quotation is given as described above. If that quotation is objected to as described above within five business days after that first business day, however, the default quotation period will continue as described in the prior sentence and this sentence.

In any event, if the default quotation period and the subsequent two business day objection period have not ended before the final determination date, then the Acceleration Amount will equal the principal amount of the securities.

*Qualified financial institutions*

For the purpose of determining the Acceleration Amount at any time, a qualified financial institution must be a financial institution organized under the laws of any jurisdiction in the United States or Europe, which at that time has outstanding debt obligations with a stated maturity of one year or less from the date of issue and rated either:

- A-2 or higher by Standard & Poor's Ratings Services or any successor, or any other comparable rating then used by that rating agency, or

- P-2 or higher by Moody's Investors Service or any successor, or any other comparable rating then used by that rating agency.

ELECTRONICALLY FILED - 2019 Jun 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 65 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 1-1    Page 142 of 281

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

Fixed to Floating Rate Securities due 2034
Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index
Principal at Risk Securities

## Tax Considerations

**Prospective investors should note that the discussion under the section called "United States Federal Taxation" in the accompanying prospectus supplement does not apply to the securities issued under this pricing supplement and is superseded by the following discussion.**

The following is a general discussion of the material U.S. federal income tax consequences and certain estate tax consequences of ownership and disposition of the securities. This discussion applies only to initial investors in the securities who:

- purchase the securities at their "issue price," which will equal the first price at which a substantial amount of the securities is sold to the public (not including bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers); and
- will hold the securities as capital assets within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code").

This discussion does not describe all of the tax consequences that may be relevant to a holder in light of the holder's particular circumstances or to holders subject to special rules, such as:

- certain financial institutions;
- insurance companies;
- certain dealers and traders in securities, commodities or foreign currencies;
- investors holding the securities as part of a "straddle," wash sale, conversion transaction, integrated transaction or constructive sale transaction;
- U.S. Holders (as defined below) whose functional currency is not the U.S. dollar;
- partnerships or other entities classified as partnerships for U.S. federal income tax purposes;
- regulated investment companies;
- real estate investment trusts;
- tax-exempt entities, including "individual retirement accounts" or "Roth IRAs" as defined in Section 408 or 408A of the Code, respectively; or
- persons subject to the alternative minimum tax.

As the law applicable to the U.S. federal income taxation of instruments such as the securities is technical and complex, the discussion below necessarily represents only a general summary. Moreover, the effect of any applicable state, local or foreign tax laws is not discussed, nor are any consequences resulting from the Medicare tax on investment income.

This discussion is based on the Code, administrative pronouncements, judicial decisions and final, temporary and proposed Treasury regulations, all as of the date hereof, changes to any of which subsequent to the date of this pricing supplement may affect the tax consequences described herein. Persons considering the purchase of the securities should consult their tax advisers with regard to the application of the U.S. federal income tax laws to their particular situations as well as any tax consequences arising under the laws of any state, local or foreign taxing jurisdiction.

**General**

Due to the absence of statutory, judicial or administrative authorities that directly address the treatment of the securities or instruments that are similar to the securities for U.S. federal income tax purposes, no assurance can be given that the IRS or a court will agree with the tax treatment described herein. We intend to treat a security for U.S. federal income tax purposes as a single financial contract that provides for a monthly coupon that will be treated as gross income to you at the time received or accrued in accordance with your regular method of tax accounting. In the opinion of our counsel, Davis Polk & Wardwell LLP, this treatment of the securities is reasonable under current law; however, our counsel has advised us that it is unable to conclude affirmatively that this treatment is more likely than not to be upheld, and that alternative treatments are possible.

**You should consult your tax advisers regarding all aspects of the U.S. federal tax consequences of an investment in the securities (including possible alternative treatments of the securities) and with respect to any tax consequences arising under the laws of any state, local or foreign taxing jurisdiction. Unless otherwise stated, the following discussion is based on the treatment of each security as described in the previous paragraph.**

7/5/2019 https://www.sec.gov/Archives/edgar/data/895421/000095010314001094/dp44016_fwp-ps1285.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 67 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 1-1    Page 144 of 281

**Tax Consequences to U.S. Holders**

This section applies to you only if you are a U.S. Holder. As used herein, the term "U.S. Holder" means a beneficial owner of a security that is
for U.S. federal income tax purposes:

February 2014                                                                                    Page 9

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

## Fixed to Floating Rate Securities due 2034

Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index

Principal at Risk Securities

- a citizen or individual resident of the United States;
- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; or
- an estate or trust the income of which is subject to U.S. federal income taxation regardless of its source.

The term "U.S. Holder" also includes certain former citizens and residents of the United States.

### Tax Treatment of the Securities

Assuming the treatment of the securities as set forth above is respected, the following U.S. federal income tax consequences should result.

*Tax Basis.* A U.S. Holder's tax basis in the securities should equal the amount paid by the U.S. Holder to acquire the securities.

*Tax Treatment of Monthly Coupon.* Any monthly coupon on the securities should be taxable as ordinary income to a U.S. Holder at the time received or accrued in accordance with the U.S. Holder's regular method of accounting for U.S. federal income tax purposes.

*Sale, Exchange or Settlement of the Securities.* Upon a sale, exchange or settlement of the securities, a U.S. Holder should recognize gain or loss equal to the difference between the amount realized on the sale, exchange or settlement and the U.S. Holder's tax basis in the securities sold, exchanged or settled. For this purpose, the amount realized does not include any monthly coupon paid at settlement and may not include sale proceeds attributable to an accrued coupon, which may be treated as a coupon payment. Any such gain or loss recognized should be long-term capital gain or loss if the U.S. Holder has held the securities for more than one year at the time of the sale, exchange or settlement, and should be short-term capital gain or loss otherwise. The ordinary income treatment of the monthly coupons, in conjunction with the capital loss treatment of any loss recognized upon the sale, exchange or settlement of the securities, could result in adverse tax consequences to holders of the securities because the deductibility of capital losses is subject to limitations.

### Possible Alternative Tax Treatments of an Investment in the Securities

Due to the absence of authorities that directly address the proper tax treatment of the securities, no assurance can be given that the IRS will accept, or that a court will uphold, the tax treatment described above. In particular, the IRS could seek to analyze the U.S. federal income tax consequences of owning the securities under Treasury regulations governing contingent payment debt instruments (the "Contingent Debt Regulations"). If the IRS were successful in asserting that the Contingent Debt Regulations applied to the securities, the timing and character of income thereon would be significantly affected. Among other things, a U.S. Holder would be required to accrue into income original issue discount on the securities every year at a "comparable yield" determined at the time of their issuance, adjusted upward or downward to reflect the difference, if any, between the actual and the projected amount of any contingent payments on the securities. Furthermore, any gain realized by a U.S. Holder at maturity or upon a sale, exchange or other disposition of the securities would be treated as ordinary income, and any loss realized at maturity would be treated as ordinary loss to the extent of the U.S. Holder's prior accruals of original issue discount and as capital loss thereafter. Because a security provides for the return of principal except where the final index value is below the barrier level, the risk that a security would be recharacterized, for U.S. federal income tax purposes, as a debt instrument is higher than with other equity-linked securities that do not contain similar provisions.

Other alternative federal income tax treatments of the securities are possible, which, if applied, could significantly affect the timing and character of the income or loss with respect to the securities. In 2007, the U.S. Treasury Department and the IRS released a notice requesting comments on the U.S. federal income tax treatment of "prepaid forward contracts" and similar instruments. The notice focuses on whether to require holders of "prepaid forward contracts" and similar instruments to accrue income over the term of their investment. It also asks for comments on a number of related topics, including the character of income or loss with respect to these instruments; whether short-term instruments should be subject to any such accrual regime; the relevance of factors such as the exchange–traded status of the instruments and the nature of the underlying property to which the instruments are linked; whether these instruments are or should be subject to the "constructive ownership" rule, which very generally can operate to recharacterize certain long-term capital gain as ordinary income and impose an interest charge; and appropriate transition rules and effective dates. While it is not clear whether instruments such as the securities would be viewed as similar to the prepaid forward contracts described in the notice, any Treasury regulations or other guidance promulgated after consideration of these issues could materially and adversely affect the tax consequences of an investment in the securities, possibly with retroactive effect. U.S. Holders should consult their tax advisers regarding the U.S. federal income tax consequences of an investment in the securities, including possible alternative treatments and the issues presented by this notice.

### Backup Withholding and Information Reporting

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**
Principal at Risk Securities

Backup withholding may apply in respect of payments on the securities and the payment of proceeds from a sale, exchange or other disposition of the securities, unless a U.S. Holder provides proof of an applicable exemption or a correct taxpayer identification number and otherwise complies with applicable requirements of the backup withholding rules. The amounts withheld under the backup withholding rules are not an additional tax and may be refunded, or credited against the U.S. Holder's U.S. federal income tax liability, provided that the required information is furnished to the IRS. In addition, information returns will be filed with the IRS in connection with payments on the securities and the payment of proceeds from a sale, exchange or other disposition of the securities, unless the U.S. Holder provides proof of an applicable exemption from the information reporting rules.

**Tax Consequences to Non-U.S. Holders**

This section applies to you only if you are a Non-U.S. Holder. As used herein, the term "Non-U.S. Holder" means a beneficial owner of a security that is for U.S. federal income tax purposes:

- an individual who is classified as a nonresident alien;
- a foreign corporation; or
- a foreign estate or trust.

The term "Non-U.S. Holder" does not include any of the following holders:

- a holder who is an individual present in the United States for 183 days or more in the taxable year of disposition and who is not otherwise a resident of the United States for U.S. federal income tax purposes;
- certain former citizens or residents of the United States; or
- a holder for whom income or gain in respect of the securities is effectively connected with the conduct of a trade or business in the United States.

Such holders should consult their tax advisers regarding the U.S. federal income tax consequences of an investment in the securities.

Although significant aspects of the tax treatment of each security are uncertain, we intend to withhold on any monthly coupon paid to a Non-U.S. Holder generally at a rate of 30% or at a reduced rate specified by an applicable income tax treaty under an "other income" or similar provision. We will not be required to pay any additional amounts with respect to amounts withheld. In order to claim an exemption from, or a reduction in, the 30% withholding tax, a Non-U.S. Holder of the securities must comply with certification requirements to establish that it is not a U.S. person and is eligible for such an exemption or reduction under an applicable tax treaty. If you are a Non-U.S. Holder, you should consult your tax advisers regarding the tax treatment of the securities, including the possibility of obtaining a refund of any withholding tax and the certification requirement described above.

*Possible Application of Section 871(m) of the Code*

Proposed U.S. Treasury Department regulations issued pursuant to Section 871(m) of the Code, if finalized in their current form, would require withholding at a rate of 30% (or lower treaty rate) on certain "dividend equivalent" payments made or deemed made after December 31, 2015 to non-U.S. persons in respect of financial instruments that reference U.S. stocks. Under these rules, withholding may be required even in the absence of any actual dividend-linked payment made pursuant to the instrument. These rules apply only to instruments acquired after March 4, 2014, and therefore they generally should not apply to initial Non-U.S. Holders that acquire their securities in this offering. It is possible, however, that withholding requirements under these rules will apply to securities acquired by an initial Non-U.S. Holder if the Non-U.S. Holder enters into one or more other transactions with respect to the S&P 500® Index or its constituents after March 4, 2014. Moreover, it is possible that a withholding agent may withhold on payments made to initial Non-U.S. Holders that purchase the securities in this offering if the withholding agent cannot determine the date on which the Non-U.S. Holder acquired the securities. Additionally, a purchaser of the securities after March 4, 2014 that is a non-U.S. person might be subject to withholding under these rules, depending on the facts as of the date of the acquisition. As a result, an initial holder's ability to transfer the securities on a secondary market, if any, may be further limited because, depending on the facts on the date of transfer, a potential purchaser that is a non-U.S. person may be subject to withholding under these rules. If withholding applies, we will not be required to pay any additional amounts with respect to amounts withheld. These proposed regulations are extremely complex. Non-U.S. Holders should consult their tax advisers regarding the U.S. federal income tax consequences to them of these proposed regulations.

*U.S. Federal Estate Tax*

Individual Non-U.S. Holders and entities the property of which is potentially includible in such an individual's gross estate for U.S. federal estate tax purposes (for example, a trust funded by such an individual and with respect to which the individual has

7/5/2019 https://www.sec.gov/Archives/edgar/data/895421/000095010314001094/dp44016_fwp-ps1285.htm

3:19-cv-02097-MGL   Date Filed 07/26/19   Entry Number 1-1   Page 71 of 93
3:23-cv-04149-MGL   Date Filed 08/18/23   Entry Number 1-4   Page 148 of 281

February 2014   Page 26

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

7/5/2019 https://www.sec.gov/Archives/edgar/data/895421/000095010314001094/dp44016_fwp-ps1285.htm

3:19-cv-02097-MGL    Date Filed 07/26/19    Entry Number 1-1    Page 72 of 93
3:23-cv-04149-MGL    Date Filed 08/18/23    Entry Number 1-1    Page 149 of 281

Morgan Stanley

Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**
**Principal at Risk Securities**

retained certain interests or powers), should note that, absent an applicable treaty exemption, the securities may be treated as U.S. situs property subject to U.S. federal estate tax. Prospective investors that are non-U.S. individuals, or are entities of the type described above, should consult their tax advisers regarding the U.S. federal estate tax consequences of an investment in the securities.

*Backup Withholding and Information Reporting*

Information returns will be filed with the IRS in connection with any monthly coupon and may be filed with the IRS in connection with the payment at maturity on the securities and the payment of proceeds from a sale, exchange or other disposition. A Non-U.S. Holder may be subject to backup withholding in respect of amounts paid to the Non-U.S. Holder, unless such Non-U.S. Holder complies with certification procedures to establish that it is not a U.S. person for U.S. federal income tax purposes or otherwise establishes an exemption. The amount of any backup withholding from a payment to a Non-U.S. Holder will be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the required information is furnished to the IRS.

**The discussion in the preceding paragraphs, insofar as it purports to describe provisions of U.S. federal income tax laws or legal conclusions with respect thereto, constitutes the full opinion of Davis Polk & Wardwell LLP regarding the material U.S. federal tax consequences of an investment in the securities.**

February 2014                                                                                                       Page 2

ELECTRONICALLY FILED - 2019 Jul 29 12:46 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

Fixed to Floating Rate Securities due 2034
**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**
Principal at Risk Securities

# Annex A—The S&P 500® Index

The S&P 500® Index, which is calculated, maintained and published by Standard & Poor's Financial Services LLC ("S&P"), consists of 500 component stocks selected to provide a performance benchmark for the U.S. equity markets. The calculation of the S&P 500® Index is based on the relative value of the float adjusted aggregate market capitalization of the 500 component companies as of a particular time as compared to the aggregate average market capitalization of 500 similar companies during the base period of the years 1941 through 1943.

For additional information about the S&P 500® Index, see the information set forth under "S&P 500® Index" in the accompanying index supplement.

**License Agreement between S&P and Morgan Stanley.** "Standard & Poor's®," "S&P®," "S&P 500®," "Standard & Poor's 500" and "500" are trademarks of S&P and have been licensed for use by Morgan Stanley. For more information, see "S&P 500® Index—License Agreement between S&P and Morgan Stanley" in the accompanying index supplement.

**Market Disruption Event**

Market disruption event means:

(i)  the occurrence or existence of a suspension, absence or material limitation of trading of securities then constituting 20 percent or more of the value of the index (or the successor index) on the relevant exchange(s) for such securities for more than two hours of trading or during the one-half hour period preceding the close of the principal trading session on such relevant exchange(s); or a breakdown or failure in the price and trade reporting systems of any relevant exchange as a result of which the reported trading prices for securities then constituting 20 percent or more of the value of the index (or the successor index) during the last one-half hour preceding the close of the principal trading session on such relevant exchange(s) are materially inaccurate; or the suspension, material limitation or absence of trading on any major U.S. securities market for trading in futures or options contracts or exchange-traded funds related to the index (or the successor index) for more than two hours of trading or during the one-half hour period preceding the close of the principal trading session on such market, in each case as determined by the calculation agent in its sole discretion; and

(ii)  a determination by the calculation agent in its sole discretion that any event described in clause (i) above materially interfered with our ability or the ability of any of our affiliates to unwind or adjust all or a material portion of the hedge position with respect to the securities.

For the purpose of determining whether a market disruption event exists at any time, if trading in a security included in the index is materially suspended or materially limited at that time, then the relevant percentage contribution of that security to the value of the index shall be based on a comparison of (x) the portion of the value of the index attributable to that security relative to (y) the overall value of the index, in each case immediately before that suspension or limitation.

For the purpose of determining whether a market disruption event exists at any time: (1) a limitation on the hours or number of days of trading will not constitute a market disruption event if it results from an announced change in the regular business hours of the relevant exchange or market, (2) a decision to permanently discontinue trading in the relevant futures or options contract or exchange-traded fund will not constitute a market disruption event, (3) a suspension of trading in futures or options contracts or exchange-traded funds on the index by the primary securities market trading in such contracts or funds by reason of (a) a price change exceeding limits set by such securities exchange or market, (b) an imbalance of orders relating to such contracts or funds or (c) a disparity in bid and ask quotes relating to such contracts or funds will constitute a suspension, absence or material limitation of trading in futures or options contracts or exchange-traded funds related to the index and (4) a "suspension, absence or material limitation of trading" on any relevant exchange or on the primary market on which futures or options contracts or exchange-traded funds related to the index are traded will not include any time when such securities market is itself closed for trading under ordinary circumstances.

February 2014                                                                                                                                            Page 22

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

7/5/2019                                                    https://www.sec.gov/Archives/edgar/data/895421/000095010314001094/dp44016_fwp-ps1285.htm

3:19-cv-02097-MGL     Date Filed 07/26/19     Entry Number 1-1     Page 74 of 93
3:23-cv-04149-MGL     Date Filed 08/18/23     Entry Number 1094-2     Page 151 of 281

Morgan Stanley

Fixed to Floating Rate Securities due 2034

**Leveraged CMS Curve and S&P 500® Index Linked Securities With the Payment at Maturity Subject to the Barrier Level Feature Linked to the S&P 500® Index**
Principal at Risk Securities

**Discontinuance of the S&P 500® Index; Alteration of Method of Calculation**

If the underlying index publisher discontinues publication of the index and the underlying index publisher or another entity (including MS & Co.) publishes a successor or substitute index that the calculation agent determines, in its sole discretion, to be comparable to the discontinued index (such index being referred to herein as the "successor index"), then any subsequent index closing value will be determined by reference to the published value of such successor index at the regular weekday close of trading on any index business day that the index closing value is to be determined.

Upon any selection by the calculation agent of the successor index, the calculation agent will cause written notice thereof to be furnished to the trustee, to us and to the depositary, as holder of the securities, within three business days of such selection. We expect that such notice will be made available to you, as a beneficial owner of the securities, in accordance with the standard rules and procedures of the depositary and its direct and indirect participants.

If the underlying index publisher discontinues publication of the index or the successor index prior to, and such discontinuance is continuing on, any date on which the index closing value is to be determined and the calculation agent determines, in its sole discretion, that no successor index is available at such time, then the calculation agent will determine the index closing value for such date. The index closing value of the index or the successor index will be computed by the calculation agent in accordance with the formula for and method of calculating such index last in effect prior to such discontinuance, using the closing price (or, if trading in the relevant securities has been materially suspended or materially limited, its good faith estimate of the closing price that would have prevailed but for such suspension or limitation) at the close of the principal trading session of the relevant exchange on such date of each security most recently constituting such index without any rebalancing or substitution of such securities following such discontinuance. Notwithstanding these alternative arrangements, discontinuance of the publication of the index may adversely affect the value of the securities.

If at any time, the method of calculating the index or the successor index, or the value thereof, is changed in a material respect, or if the index or the successor index is in any other way modified so that such index does not, in the opinion of the calculation agent, fairly represent the value of such index had such changes or modifications not been made, then, from and after such time, the calculation agent will, at the close of business in New York City on each date on which the index closing value is to be determined, make such calculations and adjustments as, in the good faith judgment of the calculation agent, may be necessary in order to arrive at a value of a stock index comparable to the index or the successor index, as the case may be, as if such changes or modifications had not been made, and the calculation agent will calculate the index closing value with reference to the index or the successor index, as adjusted. Accordingly, if the method of calculating the index or the successor index is modified so that the value of such index is a fraction of what it would have been if it had not been modified (e.g., due to a split in the index), then the calculation agent will adjust such index in order to arrive at a value of the index or the successor index as if it had not been modified (e.g., as if such split had not occurred).

February 2014                                                                                                    Page 25

ELECTRONICALLY FILED - 2019 Jul 29 12:41 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202036

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

# EXHIBIT 4

424B2 1 dp44645_424b2-ps1322.htm FORM 424B2

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities Offered | Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|
| Fixed to Floating Rate Notes due 2034 | $5,000,000 | $644.00 |

## Morgan Stanley

March 2014
Pricing Supplement No. 1,322
Registration Statement No. 333-178081
Dated March 5, 2014
Filed pursuant to Rule 424(b)(2)

### INTEREST RATE STRUCTURED PRODUCTS

## Fixed to Floating Rate Notes due 2034

### Leveraged CMS Curve and Russell 2000® Index Linked Notes

As further described below, interest will accrue on the notes (i) in Years 1 to 3: at a rate of 8.00% per annum and (ii) in Years 4 to maturity: for each day that the closing value of the Russell 2000® Index is greater than or equal to 65% of the initial value (which we refer to as the index reference level), at a variable rate per annum equal to 4 times the difference, if any, between the 30-Year Constant Maturity Swap Rate ("30CMS") and the 2-Year Constant Maturity Swap Rate ("2CMS"), as determined on the CMS reference determination date at the start of the related quarterly interest payment period; subject to the maximum interest rate of 10.00% per annum for each interest payment period during the floating interest rate period and the minimum interest rate of 0.00% per annum. The notes provide an above-market interest in Years 1 to 3; however, for each interest payment period in Years 4 to maturity, the notes will not pay any interest with respect to the interest payment period if the CMS reference index level is equal to or less than 0.00% on the related quarterly CMS reference determination date. In addition, if, on any calendar day, the index closing value is less than the index reference level, interest will accrue at a rate of 0.00% per annum for that day.

**All payments are subject to the credit risk of Morgan Stanley. If Morgan Stanley defaults on its obligations, you could lose some or all of your investment. These securities are not secured obligations and you will not have any security interest in, or otherwise have any access to, any underlying reference asset or assets.**

FINAL TERMS

| | |
|---|---|
| Issuer: | Morgan Stanley |
| Aggregate principal amount: | $5,000,000. May be increased prior to the original issue date but we are not required to do so. |
| Issue price: | At variable prices |
| Stated principal amount: | $1,000 per note |
| Pricing date: | March 5, 2014 |
| Original issue date: | March 31, 2014 (18 business days after the pricing date) |
| Maturity date: | March 31, 2034 |
| Interest accrual date: | March 31, 2014 |
| Payment at maturity: | The payment at maturity per note will be the stated principal amount plus accrued and unpaid interest, if any. |
| Interest: | From and including March 31, 2014 to but excluding March 31, 2017 (the "fixed interest rate period"): 8.00% per annum |
| | From and including March 31, 2017 to but excluding the maturity date (the "floating interest rate period"): |
| | For each interest payment period, a variable rate per annum equal to the product of: |
| | (a) leverage factor *times* the CMS reference index; *subject to the minimum interest rate and the maximum interest rate; and* |
| | (b) N/ACT; *where,* |
| | "N" = the total number of calendar days in the applicable interest payment period on which the index closing value is greater than or equal to the index reference level (each such day, an "accrual day"); and |
| | "ACT" = the total number of calendar days in the applicable interest payment period. |
| | The CMS reference index level applicable to an interest payment period will be determined on the related CMS reference determination date. *Beginning March 31, 2017, it is possible that you could receive little or no interest on the notes. If, on the related CMS reference determination date, the CMS reference index level is equal to or less than the CMS reference index strike, interest will accrue at a rate of 0.00% for that interest payment period. In addition, if on any day, the index closing value is determined to be less than the index reference level, interest will accrue at a rate of 0.00% per annum for that day. The determination of the index closing value will be subject to certain market disruption events. Please see Annex A—The Russell 2000® Index—Market Disruption Event" below.* |
| Leverage factor: | 4 |
| Interest payment period: | Quarterly |
| Interest payment period end dates: | Unadjusted |
| Interest payment dates: | Each March 31, June 30, September 30 and December 31, beginning June 30, 2014; *provided* that if any such day is not a business day, that interest payment will be made on the next succeeding business day and no adjustment will be made to any interest payment made on that succeeding business day. |
| Interest reset dates: | Each March 31, June 30, September 30 and December 31, beginning March 31, 2017 |
| CMS reference determination dates: | Two (2) U.S. government securities business days prior to the related interest reset date at the start of the applicable interest payment period. |
| Maximum interest rate: | 10.00% per annum in any quarterly interest payment period during the floating interest rate period |
| Minimum interest rate: | 0.00% per annum |
| CMS reference index: | 30-Year Constant Maturity Swap Rate minus 2-Year Constant Maturity Swap Rate, expressed as a percentage. *Please see "Additional Provisions—CMS Reference Index" below.* |
| CMS reference index strike: | 0.00% |
| Index: | The Russell 2000® Index |
| Underlying index publisher: | Russell Investments |
| Index reference level: | , which is 65% of the initial index value |
| Initial index value: | , which is the index closing value on March 26, 2014 |
| Agent: | Morgan Stanley & Co. LLC ("MS & Co."), a wholly owned subsidiary of Morgan Stanley. See "Supplemental Information Concerning Plan of Distribution; Conflicts of Interest." |

*Terms continued on the following page*

| | |
|---|---|
| Estimated value on the pricing date: | $894.70 per note. The estimated value on any subsequent pricing date may be lower than this estimate, but will in no case be less than $854.70 per note. See "The Notes" on page 3. |

| Commissions and issue price: | Price to public[1][2] | Agent's commissions[2] | Proceeds to issuer[3] |
|---|---|---|---|
| Per note | At variable prices | $40 | $960 |

| **Total** | At variable prices | $200,000 | $4,800,000 |
|---|---|---|---|

(1)   *The notes will be offered from time to time in one or more negotiated transactions at varying prices to be determined at the time of each sale, which may be at market prices prevailing, at prices related to such prevailing prices or at negotiated prices; provided, however, that such price will not be less than $970 per note and will not be more than $1,000 per note. See "Risk Factors—The Price You Pay For The Notes May Be Higher Than The Prices Paid By Other Investors."*

(2)   *Morgan Stanley or one of our affiliates will pay varying discounts and commissions to dealers, including Morgan Stanley Wealth Management (an affiliate of the agent) and their financial advisors, of up to $40 per note depending on market conditions. See "Supplemental Information Concerning Plan of Distribution; Conflicts of Interest. For additional information, see "Plan of Distribution (Conflicts of Interest)" in the accompanying prospectus supplement.*

(3)   *See "Use of Proceeds and Hedging" on page 13.*

**The notes involve risks not associated with an investment in ordinary debt securities. See "Risk Factors" beginning on page 9.**

**The Securities and Exchange Commission and state securities regulators have not approved or disapproved these notes, or determined if this pricing supplement or the accompanying prospectus supplement, index supplement and prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

You should read this document together with the related prospectus supplement, index supplement and prospectus, each of which can be accessed via the hyperlinks below.

**Prospectus Supplement dated November 21, 2011**

**Index Supplement dated November 21, 2011    Prospectus dated November 21, 2011**

**The notes are not bank deposits and are not insured by the Federal Deposit Insurance Corporation or any other governmental agency, nor are they obligations of, or guaranteed by, a bank.**

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

## Fixed to Floating Rate Notes due 2034
**Leveraged CMS Curve and Russell 2000® Index Linked Notes**

*Terms continued from previous page:*

| | |
|---|---|
| **Index closing value:** | The closing value of the index. *Please see "Additional Provisions—The Russell 2000® Index" below.* |
| **Index cutoff:** | The index closing value for any day from and including the fifth index business day prior to the related interest payment date for any interest payment period shall be the index closing value on such fifth index business day prior to such interest payment date. |
| **Redemption:** | None |
| **Day-count convention:** | Actual/Actual |
| **Specified currency:** | U.S. dollars |
| **CUSIP / ISIN:** | 61760QEC4 / US61760QEC42 |
| **Book-entry or certificated note:** | Book-entry |
| **Business day:** | New York |
| **Calculation agent:** | Morgan Stanley Capital Services LLC.<br>All determinations made by the calculation agent will be at the sole discretion of the calculation agent and will, in the absence of manifest error, be conclusive for all purposes and binding on you, the trustee and us.<br>All values used in the interest rate formula for the notes and all percentages resulting from any calculation of interest will be rounded to the nearest one hundred-thousandth of a percentage point, with .000005% rounded up to .00001%. All dollar amounts used in or resulting from such calculation on the notes will be rounded to the nearest cent, with one-half cent rounded upward.<br>Because the calculation agent is our affiliate, the economic interests of the calculation agent and its affiliates may be adverse to your interests as an investor in the notes, including with respect to certain determinations and judgments that the calculation agent must make in determining the payment that you will receive on each interest payment date and at maturity or whether a market disruption event has occurred. Please see Annex A—The Russell 2000® Index—Market Disruption Event" and "—Discontinuance of the Russell 2000® Index; Alteration of Method of Calculation" below. The calculation agent is obligated to carry out its duties and functions as calculation agent in good faith and using its reasonable judgment. |
| **Trustee:** | The Bank of New York Mellon |
| **Contact information:** | Morgan Stanley Wealth Management clients may contact their local Morgan Stanley branch office or our principal executive offices at 1585 Broadway, New York, New York 10036 (telephone number (866) 477-4776). All other clients may contact their local brokerage representative. Third-party distributors may contact Morgan Stanley Structured Investment Sales at (800) 233-1087. |

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

---

Fixed to Floating Rate Notes due 2034
**Leveraged CMS Curve and Russell 2000® Index Linked Notes**

---

# The Notes

The notes are debt securities of Morgan Stanley.  In years 1 to 3, the notes pay interest at a rate of 8.00% per annum.  Beginning March 31, 2017, interest will accrue on the notes for each day that the closing value of the Russell 2000® Index is greater than or equal to 65% of the initial index value (which we refer to as the index reference level), at a variable rate per annum equal to 4 times the CMS reference index for the related quarterly interest payment period; subject to the maximum interest rate of 10.00% per annum per interest payment period and the minimum interest rate of 0.00% per annum.  The floating interest rate is based on the CMS reference index **and** the level of the Russell 2000 Index.  If 30CMS is less than or equal to 2CMS on the applicable CMS reference determination date, the floating interest rate will be 0.00% and no interest will accrue on the notes for the related interest period.  In addition, if, on any calendar day during the interest payment period, the index closing value is less than the index reference level, interest will accrue at a rate of 0.00% per annum for that day.  We describe the basic features of these notes in the sections of the accompanying prospectus called "Description of Debt Securities—Floating Rate Debt Securities" and prospectus supplement called "Description of Notes," subject to and as modified by the provisions described below.  All payments on the notes are subject to the credit risk of Morgan Stanley.

The stated principal amount of each note is $1,000, and the issue price is variable.  This price includes costs associated with issuing, selling, structuring and hedging the notes, which are borne by you, and, consequently, the estimated value of the notes on the pricing date is less than the issue price.  We estimate that the value of each note on the pricing date is $894.70 per note.  The estimated value on any subsequent pricing date may be lower than this estimate, but will in no case be less than $854.70 per note.

*What goes into the estimated value on the pricing date?*

In valuing the notes on the pricing date, we take into account that the notes comprise both a debt component and a performance-based component linked to the CMS reference index and the Russell 2000® Index (the "index").  The estimated value of the notes is determined using our own pricing and valuation models, market inputs and assumptions relating to the CMS reference index and the index, instruments based on the CMS reference index and the index, volatility and other factors including current and expected interest rates, as well as an interest rate related to our secondary market credit spread, which is the implied interest rate at which our conventional fixed rate debt trades in the secondary market.

*What determines the economic terms of the notes?*

In determining the economic terms of the notes, including the interest rate, the leverage factor, the maximum interest rate, the CMS reference index strike and the index reference level, we use an internal funding rate, which is likely to be lower than our secondary market credit spread and therefore advantageous to us.  If the issuing, selling, structuring and hedging costs borne by you were lower or if the internal funding rate were higher, one or more of the economic terms of the securities would be more favorable to you.

*What is the relationship between the estimated value on the pricing date and the secondary market price of the notes?*

The price at which MS & Co. purchases the notes in the secondary market, absent changes in market conditions, including those related to interest rates and the CMS reference index and the index, may vary from, and be lower than, the estimated value on the pricing date, because the secondary market price takes into account our secondary market credit spread as well as the bid-offer spread that MS & Co. would charge in a secondary market transaction of this type, the costs of unwinding the related hedging transactions and other factors.

MS & Co. may, but is not obligated to, make a market in the notes and, if it once chooses to make a market, may cease doing so at any time.

Morgan Stanley

Fixed to Floating Rate Notes due 2034
**Leveraged CMS Curve and Russell 2000® Index Linked Notes**

# Additional Provisions

<u>**CMS Reference Index**</u>

**What are the 30-Year and 2-Year Constant Maturity Swap Rates?**

The 30-Year Constant Maturity Swap Rate (which we refer to as "30CMS") is, on any U.S. government securities business day, the fixed rate of interest payable on an interest rate swap with a 30-year maturity as reported on Reuters Page ISDAFIX1 or any successor page thereto at 11:00 a.m. New York City time on that day.  This rate is one of the market-accepted indicators of longer-term interest rates.

The 2-Year Constant Maturity Swap Rate (which we refer to as "2CMS") is, on any U.S. government securities business day, the fixed rate of interest payable on an interest rate swap with a 2-year maturity as reported on Reuters Page ISDAFIX1 or any successor page thereto at 11:00 a.m. New York City time on that day.

An interest rate swap rate, at any given time, generally indicates the fixed rate of interest (paid semi-annually) that a counterparty in the swaps market would have to pay for a given maturity, in order to receive a floating rate (paid quarterly) equal to 3-month LIBOR for that same maturity.

**U.S. Government Securities Business Day**

U.S. government securities business day means any day except for a Saturday, Sunday or a day on which The Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. government securities.

**CMS Rate Fallback Provisions**

If 30CMS or 2CMS is not displayed by 11:00 a.m. New York City time on the Reuters Screen ISDAFIX1 Page on any day on which the level of the CMS reference index must be determined, such affected rate for such day will be determined on the basis of the mid-market semi-annual swap rate quotations to the calculation agent provided by five leading swap dealers in the New York City interbank market (the "Reference Banks") at approximately 11:00 a.m., New York City time, on such day, and, for this purpose, the mid-market semi-annual swap rate means the mean of the bid and offered rates for the semi-annual fixed leg, calculated on a 30/360 day count basis, of a fixed-for-floating U.S. Dollar interest rate swap transaction with a term equal to the applicable 30 year or 2 year maturity commencing on such day and in a representative amount with an acknowledged dealer of good credit in the swap market, where the floating leg, calculated on an actual/360 day count basis, is equivalent to USD-LIBOR-BBA with a designated maturity of three months.  The calculation agent will request the principal New York City office of each of the Reference Banks to provide a quotation of its rate.  If at least three quotations are provided, the rate for that day will be the arithmetic mean of the quotations, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest).  If fewer than three quotations are provided as requested, the rate will be determined by the calculation agent in good faith and in a commercially reasonable manner.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

Fixed to Floating Rate Notes due 2034
Leveraged CMS Curve and Russell 2000® Index Linked Notes

**The Russell 2000® Index**

The Russell 2000® Index is an index calculated, published and disseminated by Russell Investments, and measures the composite price performance of stocks of 2,000 companies incorporated in the U.S. and its territories. All 2,000 stocks are traded on a major U.S. exchange and are the 2,000 smallest securities that form the Russell 3000® Index. The Russell 3000® Index is composed of the 3,000 largest U.S. companies as determined by market capitalization and represents approximately 98% of the U.S. equity market. The Russell 2000® Index consists of the smallest 2,000 companies included in the Russell 3000® Index and represents a small portion of the total market capitalization of the Russell 3000® Index. The Russell 2000® Index is designed to track the performance of the small capitalization segment of the U.S. equity market. For additional information about the Russell 2000® Index, see the information set forth under "Annex A—The Russell 2000® Index" in this document and "Russell 2000® Index" in the accompanying index supplement.

**Index Closing Value Fallback Provisions**

The index closing value on any calendar day during the term of the notes on which the index level is to be determined (each, an "index determination date") will equal the official closing value of the index as published by the underlying index publisher or its successor, or in the case of any successor index, the official closing value for such successor index as published by the publisher of such successor index or its successor, at the regular weekday close of trading on that calendar day, as determined by the calculation agent; provided that the index closing value for any day from and including the fifth index business day prior to the related interest payment date for any interest payment period shall be the index closing value in effect on such fifth index business day prior to such interest payment date; provided further that if a market disruption event with respect to the index occurs on any index determination date or if any such index determination date is not an index business day, the closing value of the index for such index determination date will be the closing value of the index on the immediately preceding index business day on which no market disruption event has occurred. In certain circumstances, the index closing value shall be based on the alternate calculation of the index described under "Annex A—The Russell 2000® Index—Discontinuance of the Russell 2000® Index; Alteration of Method of Calculation."

"Index business day" means a day, as determined by the calculation agent, on which trading is generally conducted on each of the relevant exchange(s) for the index, other than a day on which trading on such exchange(s) is scheduled to close prior to the time of the posting of its regular final weekday closing price.

"Relevant exchange" means the primary exchange(s) or market(s) of trading for (i) any security then included in the index, or any successor index, and (ii) any futures or options contracts related to the index or to any security then included in the index.

For more information regarding market disruption events with respect to the index, discontinuance of the index and alteration of the method of calculation, see "Annex A—The Russell 2000® Index—Market Disruption Event" and "—Discontinuance of the Russell 2000® Index; Alteration of Method of Calculation" herein.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE #2019CP3202636

Morgan Stanley

**Fixed to Floating Rate Notes due 2034**
**Leveraged CMS Curve and Russell 2000® Index Linked Notes**

# Hypothetical Examples

The table below presents examples of hypothetical interest that would accrue on the notes during any quarter in the floating interest rate period . The examples below are for purposes of illustration only.  The examples of the hypothetical floating interest rate that would accrue on the notes are based on both the level of the CMS reference index level on the applicable CMS reference determination date and the total number of calendar days in a quarterly interest payment period on which the index closing value is greater than or equal to the index reference level.

The actual interest payment amounts during the floating interest rate period will depend on the actual level of the CMS reference index on each CMS reference determination date and the index closing value of the Russell 2000® Index on each day during the floating interest payment period.  The applicable interest rate for each quarterly interest payment period will be determined on a per-annum basis but will apply only to that interest payment period.  The table assumes that the interest payment period contains 90 calendar days.  The examples below are for purposes of illustration only and would provide different results if different assumptions were made.

| CMS Reference Index | 4 *times* CMS Reference Index* | Annualized rate of interest paid | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Number of days on which the index closing value is greater than or equal to the index reference level | | | | | | |
| | | 0 | 10 | 20 | 30 | 50 | 75 | 90 |
| -3.250% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -3.000% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -2.750% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -2.500% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -2.250% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -2.000% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -1.750% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -1.500% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -1.250% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -1.000% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -0.750% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -0.500% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| -0.250% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| 0.000% | 0.00% | 0.00% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% |
| 0.250% | 1.00% | 0.00% | 0.1111% | 0.2222% | 0.3333% | 0.5556% | 0.8333% | 1.0000% |
| 0.500% | 2.00% | 0.00% | 0.2222% | 0.4444% | 0.6667% | 1.1111% | 1.6667% | 2.0000% |
| 0.750% | 3.00% | 0.00% | 0.3333% | 0.6667% | 1.0000% | 1.6667% | 2.5000% | 3.0000% |
| 1.000% | 4.00% | 0.00% | 0.4444% | 0.8889% | 1.3333% | 2.2222% | 3.3333% | 4.0000% |
| 1.250% | 5.00% | 0.00% | 0.5556% | 1.1111% | 1.6667% | 2.7778% | 4.1667% | 5.0000% |
| 1.500% | 6.00% | 0.00% | 0.6667% | 1.3333% | 2.0000% | 3.3333% | 5.0000% | 6.0000% |
| 1.750% | 7.00% | 0.00% | 0.7778% | 1.5556% | 2.3333% | 3.8889% | 5.8333% | 7.0000% |
| 2.000% | 8.00% | 0.00% | 0.8889% | 1.7778% | 2.6667% | 4.4444% | 6.6667% | 8.0000% |
| 2.250% | 9.00% | 0.00% | 1.0000% | 2.0000% | 3.0000% | 5.0000% | 7.5000% | 9.0000% |
| *2.500%* | *10.00%* | *0.00%* | *1.1111%* | *2.2222%* | *3.3333%* | *5.5556%* | *8.3333%* | *10.0000%* |
| 2.750% | 10.00% | 0.00% | 1.1111% | 2.2222% | 3.3333% | 5.5556% | 8.3333% | 10.0000% |
| 3.000% | 10.00% | 0.00% | 1.1111% | 2.2222% | 3.3333% | 5.5556% | 8.3333% | 10.0000% |
| 3.250% | 10.00% | 0.00% | 1.1111% | 2.2222% | 3.3333% | 5.5556% | 8.3333% | 10.0000% |
| 3.500% | 10.00% | 0.00% | 1.1111% | 2.2222% | 3.3333% | 5.5556% | 8.3333% | 10.0000% |
| 3.750% | 10.00% | 0.00% | 1.1111% | 2.2222% | 3.3333% | 5.5556% | 8.3333% | 10.0000% |
| 4.000% | 10.00% | 0.00% | 1.1111% | 2.2222% | 3.3333% | 5.5556% | 8.3333% | 10.0000% |

* Subject to the minimum interest rate of 0.00% and the maximum interest rate of 10.00%

If 30CMS is less than or equal to 2CMS on the applicable CMS reference determination date, the floating interest rate will be the minimum interest rate of 0.00% and no interest will accrue on the notes for such interest period regardless of the total number of calendar days in the interest payment period on which the index closing value of the Russell 2000® Index is greater than or equal to the index reference level.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

**Fixed to Floating Rate Notes due 2034**
**Leveraged CMS Curve and Russell 2000® Index Linked Notes**

# Historical Information

**The CMS Reference Index**

The following graph sets forth the historical difference between the 30-Year Constant Maturity Swap Rate and the 2-Year Constant Maturity Swap Rate for the period from January 1, 1999 to March 5, 2014 (the "historical period"). The historical difference between the 30-Year Constant Maturity Swap Rate and the 2-Year Constant Maturity Swap Rate should not be taken as an indication of the future performance of the CMS reference index. The graph below does not reflect the return the notes would have yielded during the period presented because it does not take into account the index closing values or the leverage factor. We cannot give you any assurance that the level of the CMS reference index will be positive on any CMS reference determination date. We obtained the information in the graph below, without independent verification, from Bloomberg Financial Markets ("USSW"), which closely parallels but is not necessarily exactly the same as the Reuters Page price sources used to determine the level of the CMS reference index.



**\*The bold line in the graph indicates the CMS reference index strike of 0.00%.**

The historical performance shown above is not indicative of future performance. The CMS reference index level may be negative on one or more specific CMS reference determination dates during the floating interest rate period even if the level of the CMS reference index is generally positive and, moreover, the level of the CMS reference index has in the past been, and may in the future be, negative.

**If the level of the CMS reference index is negative on any CMS reference determination date during the floating interest rate period, you will not receive any interest for the related interest payment period. Moreover, even if the level of the CMS reference index is positive on any such CMS reference determination date, if the index closing value is less than the index reference level on any day during the interest payment period, you will not receive any interest with respect to such day, and if the index closing value remains below the index reference level for each day in the applicable interest payment period, you will receive no interest for that interest payment period.**

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

ELECTRONICALLY FILED - 2019 Jun 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

**Fixed to Floating Rate Notes due 2034**
Leveraged CMS Curve and Russell 2000® Index Linked Notes

**The Russell 2000® Index**

The following table sets forth the published high and low index closing values, as well as end-of-quarter index closing values, for each quarter from January 1, 2009 through March 5, 2014. The graph following the table sets forth the daily index closing values during the historical period. The index closing value on March 5, 2014 was 1,205.91. The historical index closing values should not be taken as an indication of future performance, and we cannot give you any assurance that the index closing value will be higher than the index reference level on any index determination date during the floating interest rate period in which you are paid the floating interest rate. The graph below does not reflect the return the notes would have yielded during the period presented because it does not take into account the CMS reference index level or the leverage factor. We obtained the information in the table and graph below from Bloomberg Financial Markets, without independent verification.

| Russell 2000® Index | High | Low | Period End |
|---|---|---|---|
| **2009** | | | |
| First Quarter | 514.71 | 343.26 | 422.75 |
| Second Quarter | 531.68 | 429.16 | 508.28 |
| Third Quarter | 620.69 | 479.27 | 604.28 |
| Fourth Quarter | 634.07 | 562.40 | 625.39 |
| **2010** | | | |
| First Quarter | 690.30 | 586.49 | 678.64 |
| Second Quarter | 741.92 | 609.49 | 609.49 |
| Third Quarter | 677.64 | 590.03 | 676.14 |
| Fourth Quarter | 792.35 | 669.45 | 783.65 |
| **2011** | | | |
| First Quarter | 843.55 | 773.18 | 843.55 |
| Second Quarter | 865.29 | 777.20 | 827.43 |
| Third Quarter | 858.11 | 643.42 | 644.16 |
| Fourth Quarter | 765.43 | 609.49 | 740.92 |
| **2012** | | | |
| First Quarter | 846.13 | 747.28 | 830.30 |
| Second Quarter | 840.63 | 737.24 | 798.49 |
| Third Quarter | 864.70 | 767.75 | 837.45 |
| Fourth Quarter | 852.49 | 769.48 | 849.35 |
| **2013** | | | |
| First Quarter | 953.07 | 872.60 | 951.54 |
| Second Quarter | 999.99 | 901.51 | 977.48 |
| Third Quarter | 1,078.41 | 989.47 | 1,073.79 |
| Fourth Quarter | 1,163.64 | 1,043.46 | 1,163.64 |
| **2014** | | | |
| First Quarter (through March 5, 2014) | 1,208.65 | 1,187.94 | 1,205.91 |



*The red solid line in the graph indicates the hypothetical index reference level, assuming the index closing value on March 5, 2014 were the initial index value.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

### Fixed to Floating Rate Notes due 2034
**Leveraged CMS Curve and Russell 2000® Index Linked Notes**

## Risk Factors

*The notes involve risks not associated with an investment in ordinary floating rate notes. An investment in the Leveraged CMS Curve and Russell 2000® Index Linked Notes entails significant risks not associated with similar investments in a conventional debt security, including, but not limited to, fluctuations in 30CMS and 2CMS, fluctuations in the index, and other events that are difficult to predict and beyond the issuer's control. This section describes the most significant risks relating to the notes. For a complete list of risk factors, please see the accompanying prospectus supplement, index supplement and prospectus. Investors should consult their financial and legal advisers as to the risks entailed by an investment in the notes and the suitability of the notes in light of their particular circumstances.*

▪ **If There Are No Accrual Days In Any Interest Payment Period During The Floating Interest Rate Period, We Will Not Pay Any Interest On The Notes For That Interest Payment Period And The Market Value Of The Notes May Decrease Significantly.** It is possible that the level of the CMS reference index will be less than the CMS reference index strike or that the index closing value will be less than the index reference level for so many days during any quarterly interest payment period during the floating interest rate period that the interest payment for that quarterly interest payment period will be less than the amount that would be paid on an ordinary debt security and may be zero. In addition, to the extent that the level of the CMS reference index is less than the CMS reference index strike on the applicable CMS reference determination date **or** that the index closing value is less than the index reference level on any number of days during the interest rate period, the market value of the notes may decrease and you may receive substantially less than 100% of the issue price if you wish to sell your notes at such time.

▪ **The Index Closing Value For Any Day From And Including The Fifth Index Business Day Prior To The Interest Payment Date Of An Interest Payment Period During The Floating Interest Rate Period Will Be The Index Closing Value For Such Fifth Day.** Because the index closing value for any day from and including the fifth index business day prior to the interest payment date of an interest payment period during the floating interest rate period will be the index closing value on such fifth day, if the index closing value for that index business day is less than the index reference level, you will not receive any interest in respect of any days on or after that fifth index business day to but excluding the interest payment date even if the index closing value as actually calculated on any of those days were to be greater than or equal to the index reference level.

▪ **The Amount Of Interest Payable On The Notes In Any Quarter Is Capped.** The interest rate on the notes for each quarterly interest payment period during the floating interest rate period is capped for that quarter at the maximum interest rate of 10.00% per annum, and, due to the leverage factor, you will not get the benefit of any increase in the CMS reference index level above a level of 2.50%. Therefore, the maximum quarterly interest payment you can receive during the floating interest rate period will be $25.00 for each $1,000 stated principal amount of notes. Accordingly, you could receive less than 10.00% per annum interest for any given full year even when the CMS reference index level increases substantially in a quarterly interest payment period during that year if the CMS reference index level in the other quarters in that year does not also increase substantially, or if the index closing value is not at or above the index reference level on any day during the interest payment period so that you do not accrue interest with respect to such day, as you will not receive the full benefit of the increase in the CMS reference index level in the outperforming quarter due to the interest rate cap.

▪ **The Initial Index Value And The Index Reference Level Will Not Be Set Until March 26, 2014.** Because the initial index value is the index closing value on March 26, 2014, and because the index reference level is 65% of the initial index value, you will not know the initial index value or the index reference level for a period of time after the pricing date.

▪ **The Notes Are Linked To The Russell 2000® Index And Are Subject To Risks Associated With Small-Capitalization Companies.** The Russell 2000® Index consists of stocks issued by companies with relatively small market capitalization, and so the notes are linked to the value of small-capitalization companies. These companies often have greater stock price volatility, lower trading volume and less liquidity than large-capitalization companies and therefore the underlying index may be more volatile than that of indices that consist of stocks issued by large-capitalization companies. Stock prices of small-capitalization companies are also more vulnerable than those of large-capitalization companies to adverse business and economic developments, and the stocks of small-capitalization companies may be thinly traded. In addition, small capitalization companies are typically less well-established and less stable financially than large-capitalization companies and may depend on a small number of key personnel, making them more vulnerable to loss of personnel. Such companies tend to have smaller revenues, less diverse product lines, smaller shares of their product or service markets, fewer financial

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3203036

Morgan Stanley

**Fixed to Floating Rate Notes due 2034**
Leveraged CMS Curve and Russell 2000® Index Linked Notes

resources and less competitive strengths than large-capitalization companies and are more susceptible to adverse developments related to their products.

- **The Historical Performance Of 30CMS, 2CMS And The Index Are Not An Indication Of Their Future Performance.** The historical performance of 30CMS, 2CMS and the Russell 2000® Index should not be taken as indications of their future performance during the term of the notes. Changes in the levels of 30CMS, 2CMS and the Russell 2000® Index will affect the trading price of the notes, but it is impossible to predict whether such levels will rise or fall. There can be no assurance that the CMS reference index level will be positive and the index closing value will be equal to or greater than the index reference level on any CMS reference determination date during the floating interest rate period. *Furthermore, the historical performance of each of the CMS reference index and the index does not reflect the return the notes would have yielded, because each does not take into account the other's performance, the leverage factor or the maximum interest rate.*

- **Investors Are Subject To Our Credit Risk, And Any Actual Or Anticipated Changes To Our Credit Ratings And Credit Spreads May Adversely Affect The Market Value Of The Notes.** Investors are dependent on our ability to pay all amounts due on the notes on the interest payment dates and at maturity and therefore investors are subject to our credit risk. If we default on our obligations under the notes, your investment would be at risk and you could lose some or all of your investment. As a result, the market value of the notes prior to maturity will be affected by changes in the market's view of our creditworthiness. Any actual or anticipated decline in our credit ratings or increase in the credit spreads charged by the market for taking our credit risk is likely to adversely affect the value of the notes.

- **The Price At Which The Notes May Be Resold Prior To Maturity Will Depend On A Number Of Factors And May Be Substantially Less Than The Amount For Which They Were Originally Purchased.** Some of these factors include, but are not limited to: (i) changes in the level of 30CMS and 2CMS, (ii) changes in the index closing value, (iii) volatility of 30CMS and 2CMS, (iv) volatility of the index, (v) changes in interest and yield rates, (vi) geopolitical conditions and economic, financial, political and regulatory or judicial events that affect the securities underlying the index, or equity markets generally, and that may affect the index, (vii) any actual or anticipated changes in our credit ratings or credit spreads and (viii) time remaining to maturity. Generally, the longer the time remaining to maturity and the more tailored the exposure, the more the market price of the notes will be affected by the other factors described in the preceding sentence. This can lead to significant adverse changes in the market price of securities like the notes. Primarily, if the level of the CMS reference index is less than the CMS reference index strike or the index closing value is less than the index reference level, during the floating interest rate period, the market value of the notes is expected to decrease and you may receive substantially less than 100% of the issue price if you sell your notes at such time.

- **The Rate We Are Willing To Pay For Securities Of This Type, Maturity And Issuance Size Is Likely To Be Lower Than The Rate Implied By Our Secondary Market Credit Spreads And Advantageous To Us. Both The Lower Rate And The Inclusion Of Costs Associated With Issuing, Selling, Structuring And Hedging The Notes In The Original Issue Price Reduce The Economic Terms Of The Notes, Cause The Estimated Value Of The Notes To Be Less Than The Original Issue Price And Will Adversely Affect Secondary Market Prices.** Assuming no change in market conditions or any other relevant factors, the prices, if any, at which dealers, including MS & Co., are willing to purchase the notes in secondary market transactions will likely be significantly lower than the original issue price, because secondary market prices will exclude the issuing, selling, structuring and hedging-related costs that are included in the original issue price and borne by you and because the secondary market prices will reflect our secondary market credit spreads and the bid-offer spread that any dealer would charge in a secondary market transaction of this type, the costs of unwinding the related hedging transactions as well as other factors.

  The inclusion of the costs of issuing, selling, structuring and hedging the notes in the original issue price and the lower rate we are willing to pay as issuer make the economic terms of the notes less favorable to you than they otherwise would be.

- **The Estimated Value Of The Notes Is Determined By Reference To Our Pricing And Valuation Models, Which May Differ From Those Of Other Dealers And Is Not A Maximum Or Minimum Secondary Market Price.** These pricing and valuation models are proprietary and rely in part on subjective views of certain market inputs and certain assumptions about future events, which may prove to be incorrect. As a result, because there is no market-standard way to value these types of securities, our models may yield a higher estimated value of the notes than those generated by others, including other dealers in the market, if they attempted to value the notes. In addition, the estimated value on the pricing date does not

Morgan Stanley

Fixed to Floating Rate Notes due 2034
**Leveraged CMS Curve and Russell 2000® Index Linked Notes**

represent a minimum or maximum price at which dealers, including MS & Co., would be willing to purchase your notes in the secondary market (if any exists) at any time. The value of your notes at any time after the date of this pricing supplement will vary based on many factors that cannot be predicted with accuracy, including our creditworthiness and changes in market conditions.

▪ **The Price You Pay For The Notes May Be Higher Than The Prices Paid By Other Investors.** The agent proposes to offer the notes from time to time for sale to investors in one or more negotiated transactions, or otherwise, at market prices prevailing at the time of sale, at prices related to then-prevailing prices, at negotiated prices, or otherwise. Accordingly, there is a risk that the price you pay for the notes will be higher than the prices paid by other investors based on the date and time you make your purchase, from whom you purchase the notes (e.g., directly from the agent or through a broker or dealer), any related transaction cost (e.g., any brokerage commission), whether you hold your notes in a brokerage account, a fiduciary or fee-based account or another type of account and other market factors.

▪ **The Notes Will Not Be Listed On Any Securities Exchange And Secondary Trading May Be Limited.** The notes will not be listed on any securities exchange. Therefore, there may be little or no secondary market for the notes. MS & Co. may, but is not obligated to, make a market in the notes and, if it once chooses to make a market, may cease doing so at any time. When it does make a market, it will generally do so for transactions of routine secondary market size at prices based on its estimate of the current value of the notes, taking into account its bid/offer spread, our credit spreads, market volatility, the notional size of the proposed sale, the cost of unwinding any related hedging positions, the time remaining to maturity and the likelihood that it will be able to resell the notes. Even if there is a secondary market, it may not provide enough liquidity to allow you to trade or sell the notes easily. Since other broker-dealers may not participate significantly in the secondary market for the notes, the price at which you may be able to trade your notes is likely to depend on the price, if any, at which MS & Co. is willing to transact. If, at any time, MS & Co. were to cease making a market in the notes, it is likely that there would be no secondary market for the notes. Accordingly, you should be willing to hold your notes to maturity.

▪ **Morgan Stanley & Co. LLC, Which Is A Subsidiary Of The Issuer, Has Determined The Estimated Value On The Pricing Date.** MS & Co. has determined the estimated value of the notes on the pricing date.

▪ **The Issuer, Its Subsidiaries Or Affiliates May Publish Research That Could Affect The Market Value Of The Notes. They Also Expect To Hedge The Issuer's Obligations Under The Notes.** The issuer or one or more of its affiliates may, at present or in the future, publish research reports with respect to movements in interest rates generally or each of the components making up the CMS reference index specifically, or with respect to the index. This research is modified from time to time without notice and may express opinions or provide recommendations that are inconsistent with purchasing or holding the notes. Any of these activities may affect the market value of the notes. In addition, the issuer's subsidiaries expect to hedge the issuer's obligations under the notes and they may realize a profit from that expected hedging activity even if investors do not receive a favorable investment return under the terms of the notes or in any secondary market transaction.

▪ **The Calculation Agent, Which Is A Subsidiary Of The Issuer, Will Make Determinations With Respect To The Notes.** Any of these determinations made by the calculation agent may adversely affect the payout to investors. Determinations made by the calculation agent, including with respect to the CMS reference index, the index closing value, the occurrence or non-occurrence of market disruption events and the selection of a successor index or calculation of the index closing value in the event of a market disruption event or discontinuance of the index, may adversely affect the payout to you on the notes. See "Annex A—The Russell 2000® Index—Market Disruption Event" and "—Discontinuance of the Russell 2000® Index; Alteration of Method of Calculation."

▪ **Adjustments To The Russell 2000® Index Could Adversely Affect The Value Of The Notes.** The publisher of the Russell 2000® Index can add, delete or substitute the stocks underlying the Russell 2000® Index, and can make other methodological changes required by certain events relating to the underlying stocks, such as stock dividends, stock splits, spin-offs, rights offerings and extraordinary dividends, that could change the value of the Russell 2000® Index. Any of these actions could adversely affect the value of the notes. The publisher of the Russell 2000® Index may discontinue or suspend calculation or publication of the Russell 2000® Index at any time. In these circumstances, the calculation agent will have the sole discretion to substitute a successor index that is comparable to the discontinued index. The calculation agent could

Morgan Stanley

Fixed to Floating Rate Notes due 2034
**Leveraged CMS Curve and Russell 2000® Index Linked Notes**

have an economic interest that is different than that of investors in the notes insofar as, for example, the calculation agent is permitted to consider indices that are calculated and published by the calculation agent or any of its affiliates.  If the calculation agent determines that there is no appropriate successor index, on any day on which the index closing value is to be determined, the index closing value for such day will be based on the stocks underlying the discontinued index at the time of such discontinuance, without rebalancing or substitution, computed by the calculation agent, in accordance with the formula for calculating the index closing value last in effect prior to discontinuance of the Russell 2000® Index.

▪    **You Have No Shareholder Rights.** As an investor in the notes, you will not have voting rights, rights to receive dividends or other distributions or any other rights with respect to the stocks that underlie the Russell 2000® Index.

▪    **Investing In The Notes Is Not Equivalent To Investing In The Russell 2000® Index Or The Stocks Underlying The Russell 2000® Index.**  Investing in the notes is not equivalent to investing in the Russell 2000® Index or its component stocks.

▪    **Hedging And Trading Activity By Our Subsidiaries Could Potentially Adversely Affect The Value Of The Index.**  One or more of our subsidiaries expect to carry out hedging activities related to the notes (and possibly to other instruments linked to the index or its component stocks), including trading in the stocks underlying the index as well as in other instruments related to the index.  Some of our subsidiaries also trade in the stocks underlying the index and other financial instruments related to the index on a regular basis as part of their general broker-dealer and other businesses.  Any of these hedging or trading activities could potentially decrease the index closing value, thus increasing the risk that the index closing value will be less than the index reference level on any day during the floating interest rate period.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

Fixed to Floating Rate Notes due 2034
**Leveraged CMS Curve and Russell 2000® Index Linked Notes**

# Use of Proceeds and Hedging

The proceeds we receive from the sale of the notes will be used for general corporate purposes.  We will receive, in aggregate, $1,000 per note issued, because, when we enter into hedging transactions in order to meet our obligations under the notes, our hedging counterparty will reimburse the cost of the Agent's commissions.  The costs of the notes borne by you and described on page 3 above comprise the Agent's commissions and the cost of issuing, structuring and hedging the notes.

# Supplemental Information Concerning Plan of Distribution; Conflicts of Interest

We expect to deliver the notes against payment therefor in New York, New York on March 31, 2014, which will be the eighteenth scheduled business day following the date of the pricing of the notes.  Under Rule 15c6-1 of the Exchange Act, trades in the secondary market generally are required to settle in three business days, unless the parties to any such trade expressly agree otherwise.  Accordingly, purchasers who wish to trade notes on the date of pricing or on or prior to the third business day prior to the original issue date will be required to specify alternative settlement arrangements to prevent a failed settlement.

The notes will be offered from time to time in one or more negotiated transactions at varying prices to be determined at the time of each sale, which may be at market prices prevailing, at prices related to such prevailing prices or at negotiated prices; *provided*, however, that such price will not be less than $970 per note and will not be more than $1,000 per note.

Morgan Stanley or one of our affiliates will pay varying discounts and commissions to dealers, including Morgan Stanley Smith Barney LLC ("Morgan Stanley Wealth Management") and their financial advisors, of up to $40 per note depending on market conditions.  The agent may distribute the notes through Morgan Stanley Wealth Management, as selected dealer, or other dealers, which may include Morgan Stanley & Co. International plc ("MSIP") and Bank Morgan Stanley AG.  Morgan Stanley Wealth Management, MSIP and Bank Morgan Stanley AG are affiliates of Morgan Stanley.

MS & Co. is our wholly-owned subsidiary and it and other subsidiaries of ours expect to make a profit by selling, structuring and, when applicable, hedging the notes.

MS & Co. will conduct this offering in compliance with the requirements of FINRA Rule 5121 of the Financial Industry Regulatory Authority, Inc., which is commonly referred to as FINRA, regarding a FINRA member firm's distribution of the securities of an affiliate and related conflicts of interest. MS & Co. or any of our other affiliates may not make sales in this offering to any discretionary account.

# Acceleration Amount in Case of an Event of Default

In case an event of default with respect to the notes shall have occurred and be continuing, the amount declared due and payable per note upon any acceleration of the notes shall be an amount in cash equal to the stated principal amount plus accrued and unpaid interest.

# Validity of the Notes

In the opinion of Davis Polk & Wardwell LLP, as special counsel to Morgan Stanley, when the notes offered by this pricing supplement have been executed and issued by Morgan Stanley, authenticated by the trustee pursuant to the Senior Debt Indenture and delivered against payment as contemplated herein, such notes will be valid and binding obligations of Morgan Stanley, enforceable in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, concepts of reasonableness and equitable principles of general applicability (including, without limitation, concepts of good faith, fair dealing and the lack of bad faith), *provided* that such counsel expresses no opinion as to the effect of fraudulent conveyance, fraudulent transfer or similar provision of applicable law on the conclusions expressed above.  This opinion is given as of the date hereof and is limited to the laws of the State of New York and the General Corporation Law of the State of Delaware.  In addition, this opinion is subject to customary assumptions about the trustee's authorization, execution and delivery of the Senior Debt Indenture and its authentication of the notes and the validity, binding nature and enforceability of the Senior Debt Indenture with respect to the trustee, all as stated in the letter of such counsel dated November 21, 2011, which is Exhibit 5-a to the Registration Statement on Form S-3 filed by Morgan Stanley on November 21, 2011.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

Fixed to Floating Rate Notes due 2034
**Leveraged CMS Curve and Russell 2000® Index Linked Notes**

## Tax Considerations

In the opinion of our counsel, Davis Polk & Wardwell LLP, the notes will be treated as "contingent payment debt instruments" for U.S. federal income tax purposes, as described in the section of the accompanying prospectus supplement called "United States Federal Taxation—Tax Consequences to U.S. Holders—Notes—Optionally Exchangeable Notes."  Under this treatment, U.S. taxable investors generally will be subject to annual income tax based on the "comparable yield" (as defined in the accompanying prospectus supplement) of the notes, adjusted upward or downward to reflect the difference, if any, between the actual and the projected amount of any contingent payments on the notes.  In addition, any gain recognized by U.S. taxable investors on the sale or exchange, or at maturity, of the notes generally will be treated as ordinary income. For the comparable yield and the projected payment schedule with respect to a note, please contact Morgan Stanley at 212-761-4000.

For U.S. federal income tax purposes, a U.S. Holder is required to use the comparable yield and the projected payment schedule established by us in determining interest accruals and adjustments in respect of a note, unless such U.S. Holder timely discloses and justifies the use of a different comparable yield and projected payment schedule to the Internal Revenue Service (the "IRS").

The comparable yield and the projected payment schedule are not used for any purpose other than to determine a U.S. Holder's interest accruals and adjustments thereto in respect of a note for U.S. federal income tax purposes.  **They do not constitute a projection or representation by us regarding the actual amounts that will be paid on a note.**

If you are a non-U.S. investor, please read the section of the accompanying prospectus supplement called  "United States Federal Taxation—Tax Consequences to Non-U.S. Holders."

**You should consult your tax adviser regarding all aspects of the U.S. federal tax consequences of an investment in the notes, as well as any tax consequences arising under the laws of any state, local or foreign taxing jurisdiction.  Additionally, any consequences resulting from the Medicare tax on investment income are not discussed in this document or the accompanying prospectus supplement.**

**The discussion in the preceding paragraphs under "Tax Considerations," and the discussion contained in the section entitled "United States Federal Taxation" in the accompanying prospectus supplement, insofar as they purport to describe provisions of U.S. federal income tax laws or legal conclusions with respect thereto, constitute the full opinion of Davis Polk & Wardwell LLP regarding the material U.S. federal tax consequences of an investment in the notes.**

## Where You Can Find More Information

Morgan Stanley has filed a registration statement (including a prospectus, as supplemented by a prospectus supplement and an index supplement) with the Securities and Exchange Commission, or SEC, for the offering to which this pricing supplement relates.  You should read the prospectus in that registration statement, the prospectus supplement, the index supplement and any other documents relating to this offering that Morgan Stanley has filed with the SEC for more complete information about Morgan Stanley and this offering.  You may get these documents without cost by visiting EDGAR on the SEC web site at www.sec.gov.  Alternatively, Morgan Stanley will arrange to send you the prospectus and the prospectus supplement if you so request by calling toll-free 800-584-6837.

You may access these documents on the SEC web site at www.sec.gov as follows:

Prospectus Supplement dated November 21, 2011
Index Supplement dated November 21, 2011
Prospectus dated November 21, 2011

Terms used in this pricing supplement are defined in the prospectus supplement, in the index supplement or in the prospectus.  As used in this pricing supplement, the "Company," "we," "us" and "our" refer to Morgan Stanley.

March 2014                                                                                                        Page 14

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Morgan Stanley

Fixed to Floating Rate Notes due 2034
**Leveraged CMS Curve and Russell 2000® Index Linked Notes**

# Annex A—The Russell 2000® Index

The Russell 2000® Index is an index calculated, published and disseminated by Russell Investments, and measures the composite price performance of stocks of 2,000 companies incorporated in the U.S. and its territories. All 2,000 stocks are traded on a major U.S. exchange and are the 2,000 smallest securities that form the Russell 3000® Index. The Russell 3000® Index is composed of the 3,000 largest U.S. companies as determined by market capitalization and represents approximately 98% of the U.S. equity market. The Russell 2000® Index consists of the smallest 2,000 companies included in the Russell 3000® Index and represents a small portion of the total market capitalization of the Russell 3000® Index. The Russell 2000® Index is designed to track the performance of the small capitalization segment of the U.S. equity market. For additional information about the Russell 2000® Index, see the information set forth under "Russell 2000® Index" in the accompanying index supplement.

**License Agreement between Russell Investments and Morgan Stanley**

The "Russell 2000® Index" is a trademark of Russell Investments and has been licensed for use by Morgan Stanley. For more information, see "Russell 2000® Index—License Agreement between Russell Investments and Morgan Stanley" in the accompanying index supplement.

**Market Disruption Event**

Market disruption event means:

(i) the occurrence or existence of a suspension, absence or material limitation of trading of securities then constituting 20 percent or more of the value of the index (or the successor index) on the relevant exchange(s) for such securities for more than two hours of trading or during the one-half hour period preceding the close of the principal trading session on such relevant exchange(s); or a breakdown or failure in the price and trade reporting systems of any relevant exchange as a result of which the reported trading prices for securities then constituting 20 percent or more of the value of the index (or the successor index) during the last one-half hour preceding the close of the principal trading session on such relevant exchange(s) are materially inaccurate; or the suspension, material limitation or absence of trading on any major U.S. securities market for trading in futures or options contracts or exchange-traded funds related to the index (or the successor index) for more than two hours of trading or during the one-half hour period preceding the close of the principal trading session on such market, in each case as determined by the calculation agent in its sole discretion; and

(ii) a determination by the calculation agent in its sole discretion that any event described in clause (i) above materially interfered with our ability or the ability of any of our affiliates to unwind or adjust all or a material portion of the hedge position with respect to the notes.

For the purpose of determining whether a market disruption event exists at any time, if trading in a security included in the index is materially suspended or materially limited at that time, then the relevant percentage contribution of that security to the value of the index shall be based on a comparison of (x) the portion of the value of the index attributable to that security relative to (y) the overall value of the index, in each case immediately before that suspension or limitation.

For the purpose of determining whether a market disruption event exists at any time: (1) a limitation on the hours or number of days of trading will not constitute a market disruption event if it results from an announced change in the regular business hours of the relevant exchange or market, (2) a decision to permanently discontinue trading in the relevant futures or options contract or exchange-traded fund will not constitute a market disruption event, (3) a suspension of trading in futures or options contracts or exchange-traded funds on the index by the primary securities market trading in such contracts or funds by reason of (a) a price change exceeding limits set by such securities exchange or market, (b) an imbalance of orders relating to such contracts or funds or (c) a disparity in bid and ask quotes relating to such contracts or funds will constitute a suspension, absence or material limitation of trading in futures or options contracts or exchange-traded funds related to the index and (4) a "suspension, absence or material limitation of trading" on any relevant exchange or on the primary market on which futures or options contracts or exchange-traded funds related to the index are traded will not include any time when such securities market is itself closed for trading under ordinary circumstances.

Morgan Stanley

Fixed to Floating Rate Notes due 2034
**Leveraged CMS Curve and Russell 2000® Index Linked Notes**

**Discontinuance of the Russell 2000® Index; Alteration of Method of Calculation**

If the underlying index publisher discontinues publication of the index and the underlying index publisher or another entity (including MS & Co.) publishes a successor or substitute index that the calculation agent determines, in its sole discretion, to be comparable to the discontinued index (such index being referred to herein as the "successor index"), then any subsequent index closing value will be determined by reference to the published value of such successor index at the regular weekday close of trading on any index business day that the index closing value is to be determined.

Upon any selection by the calculation agent of the successor index, the calculation agent will cause written notice thereof to be furnished to the trustee, to us and to the depositary, as holder of the notes, within three business days of such selection.  We expect that such notice will be made available to you, as a beneficial owner of the notes, in accordance with the standard rules and procedures of the depositary and its direct and indirect participants.

If the underlying index publisher discontinues publication of the index or the successor index prior to, and such discontinuance is continuing on, any date on which the index closing value is to be determined and the calculation agent determines, in its sole discretion, that no successor index is available at such time, then the calculation agent will determine the index closing value for such date.  The index closing value of the index or the successor index will be computed by the calculation agent in accordance with the formula for and method of calculating such index last in effect prior to such discontinuance, using the closing price (or, if trading in the relevant securities has been materially suspended or materially limited, its good faith estimate of the closing price that would have prevailed but for such suspension or limitation) at the close of the principal trading session of the relevant exchange on such date of each security most recently constituting such index without any rebalancing or substitution of such securities following such discontinuance.  Notwithstanding these alternative arrangements, discontinuance of the publication of the index may adversely affect the value of the notes.

If at any time, the method of calculating the index or the successor index, or the value thereof, is changed in a material respect, or if the index or the successor index is in any other way modified so that such index does not, in the opinion of the calculation agent, fairly represent the value of such index had such changes or modifications not been made, then, from and after such time, the calculation agent will, at the close of business in New York City on each date on which the index closing value is to be determined, make such calculations and adjustments as, in the good faith judgment of the calculation agent, may be necessary in order to arrive at a value of a stock index comparable to the index or the successor index, as the case may be, as if such changes or modifications had not been made, and the calculation agent will calculate the index closing value with reference to the index or the successor index, as adjusted.  Accordingly, if the method of calculating the index or the successor index is modified so that the value of such index is a fraction of what it would have been if it had not been modified (e.g., due to a split in the index), then the calculation agent will adjust such index in order to arrive at a value of the index or the successor index as if it had not been modified (e.g., as if such split had not occurred).

March 2014                                                                                                    Page

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

# Exhibit B

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF LEXINGTON | ) | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| | ) | |
| Donald Black, Marcia Black, Larry | ) | C/A NO. 2019-CP-32-_____ |
| Martin, Rebecca Martin, Barbara | ) | |
| Thompson, and James Thompson, | ) | |
| | ) | |
| For themselves and a Class of Similarly | ) | **SUMMONS** |
| Situated Plaintiffs, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Mantei & Associates, Ltd., Ricky Alan | ) | |
| Mantei, Cindy Chiellini, Centaurus | ) | |
| Financial, Inc., and J.P. Turner & | ) | |
| Company, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

TO THE DEFENDANTS ABOVE-NAMED:

**YOU ARE HEREBY SUMMONED** and required to answer the complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to this complaint upon the subscriber, at the address shown below, within thirty (30) days after service hereof, exclusive of the day of such service, and if you fail to answer the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,


s/Mitchell Willoughby

Mitchell Willoughby, Esquire, SC Bar No. 6161
Elizabeth Zeck, Esquire, SC Bar No. 9006
R. Walker Humphrey, II, Esquire, SC Bar No. 79426
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street (29201)
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com
whumphrey@willoughbyhoefer.com

*Attorneys for Named Plaintiffs*

June 28, 2019
Columbia, South Carolina

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF LEXINGTON | ) | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| | ) | |
| Donald Black, Marcia Black, Larry | ) | C/A NO. 2019-CP-32-_____ |
| Martin, Rebecca Martin, Barbara | ) | |
| Thompson, and James Thompson, | ) | |
| | ) | |
| For themselves and a Class of Similarly | ) | **ORIGINAL COMPLAINT** |
| Situated Plaintiffs, | ) | **(Jury Trial Demanded)** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Mantei & Associates, Ltd., Ricky Alan | ) | |
| Mantei, Cindy Chiellini, Centaurus | ) | |
| Financial, Inc., and J.P. Turner & | ) | |
| Company, L.L.C, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Named Plaintiffs Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson, for themselves and, pursuant to Rule 23 of the South Carolina Rules of Civil Procedure, on behalf of a class of similarly situated Plaintiffs, complain of the above-named defendants, Mantei & Associates, Ltd. ("Mantei & Associates"), Ricky Alan Mantei, Cindy Chiellini, J.P. Turner & Company, LLC ("J.P. Turner"), and Centaurus Financial, Inc. ("Centaurus") (collectively "Defendants"), and respectfully allege as follows:

## INTRODUCTION

1.    This is a South Carolina class action brought to vindicate the rights of Named Plaintiffs Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson and James Thompson (collectively, "Named Plaintiffs"), and all similarly situated South Carolina investors (the "Class Members"), who were sold illiquid and ripoff products by Defendants.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

2.      Mantei and Chiellini at all relevant times were employed by and/or affiliated with Mantei & Associates, Ltd. All brokers associated with Defendant Mantei & Associates, Ltd. worked as a team.  Defendant Mantei was instrumental in managing and reviewing investments for each and every client with each and every individual broker employed by and/or affiliated with Mantei & Associates, Ltd., and in personally reviewing each client's monthly statements.  Because of her long tenure and experience with Mantei & Associates, Ltd., Defendant Chiellini was named as the "financial representative" on client account statements.  Defendants Mantei, Chiellini, and Mantei & Associates are collectively referred to as the "Mantei Defendants."  At all times relevant to this action, the Mantei Defendants operated out of offices in Lexington County, South Carolina.

3.      Between approximately March 2010 and approximately June 15, 2015, Mantei and Chiellini were registered representatives of J.P. Turner.  Since approximately May 19, 2015, Mantei and Chiellini have been registered representatives with Centaurus.  J.P. Turner and Centaurus are referred to collectively herein as the "Broker-Dealer Defendants."

4.      Defendants advertised and sold illiquid debt instruments to unsophisticated investors over the age of 50, including Named Plaintiffs and the other Class Members, with false promises of high returns and guaranteed return of their principal investment within a short time following initial purchases.  These products included structured certificates of deposit ("Structured CDs"), principal protected notes ("PPNs"), and "medium term" corporate bonds (collectively, the "Ripoff Products"), all of which shared the same characteristics that Defendants willfully misrepresented and/or concealed from Named Plaintiffs and other Class Members:

- that the publicly advertised high initial interest rate would be recalculated after an introductory period based on complex and obscure metrics which resulted in the reduction to zero or near zero of the interest rates payable for the remaining length of the investments,

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

which maturities were measured in decades and in many cases were longer than the Named

Plaintiffs' and other Class Members' life expectancies;

- that the Ripoff Products did not perform like traditional bank certificates of deposit;

- that the market value would decrease during the life of the investments; and

- that the Ripoff Products were illiquid.

These "features" meant that Named Plaintiffs and the other Class Members could not access their funds in the interim without substantial losses, if a secondary market even existed for such investments.

     5.     All of the Ripoff Products were debt securities exempt from registration pursuant to rules issued by the Securities and Exchange Commission under the Securities Act of 1933, were not issued by investment companies registered under or which have filed registration statements under the Investment Company Act of 1940, and/or otherwise did not qualify as "covered securities" for purposes of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").

     6.     Defendants advanced their own interests in the sale of the Ripoff Products without regard and contrary to the interests of the investors, as these products paid high fees and commissions to the detriment of the interests of Named Plaintiffs and other Class Members.

     7.     Defendants sold the Ripoff Products as part of a willful and malicious scheme designed to enrich themselves in reckless disregard of the rights and interests of, and any resulting damage to, Named Plaintiffs and the other Class Members.

     8.     Named Plaintiffs bring this action on behalf of a class consisting of all South Carolina investors over the age of 50 years who were sold the Ripoff Products by Defendants, and on behalf of themselves and other Class Members seek actual damages, punitive damages, court costs, attorneys' fees, litigation expenses, prejudgment interest at the highest legal rate and/or

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

another factor compensating for the time value of money, and equitable relief as may be appropriate, including but not limited to rescission and the disgorgement of commissions or other fees by which Defendants have been unjustly enriched.

<div align="center">**PARTIES**</div>

9.    Named Plaintiffs Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson are each citizens and residents of the State of South Carolina.

10.    Defendant Mantei & Associates, Ltd. is a South Carolina corporation and has as its principal place of business 4580 Sunset Boulevard, Lexington, South Carolina 29072. Mantei & Associates is registered to do business in this State and is in good standing with the South Carolina Secretary of State. Defendants Ricky Alan Mantei and Cindy Chiellini each have their principal place of business at 4580 Sunset Boulevard, Lexington, South Carolina 29072.

11.    Defendants Ricky Alan Mantei and Cindy Chiellini are each citizens and residents of the State of South Carolina.  Defendant Cindy Chiellini is a resident of Lexington County, South Carolina. At all times relevant to this claim, Mantei and Chiellini were registered representatives, and Mantei was also a registered investment advisor, with either J.P. Turner or Centaurus.  All of the actions, inactions, omissions, and wrongdoing of both Mantei and Chiellini were performed for and on behalf of J.P. Turner and Centaurus in the course and scope of their employment. Therefore, Mantei and Chiellini are directly liable and Centaurus and J.P. Turner, and their control persons, are jointly, severally, and fully accountable and totally liable for the misconduct and fraudulent wrongdoing of Mantei and Chiellini under agency law, common law principles of *respondeat superior*, and state securities laws.

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

12.     Defendant Centaurus Financial, Inc. is a California corporation and has as its principal place of business 2300 E Katella Avenue, Suite 200, Anaheim, California 92806. Centaurus is registered to do business in this State and is in good standing with the South Carolina Secretary of State.

13.     Defendant J.P. Turner & Company, LLC is a Georgia limited liability company and has as its principal place of business 200 North Pacific Coast Highway, Suite 1200, El Segundo, California 90245.  J.P. Turner terminated its registration to do business in this State on or about May 16, 2016, but remains an active Georgia limited liability company.

### JURISDICTION AND VENUE

14.     The incidents giving rise to this Complaint took place in the State of South Carolina.

15.     Defendants at all relevant times conducted and performed business and acts that are the subject of this Complaint in Lexington County, South Carolina and have sufficient contacts and business within Lexington County, South Carolina so as to render them subject to the *in personam* jurisdiction and venue of this Court pursuant to the Code of Laws of South Carolina.

16.     All claims contained herein are governed by the laws of the State of South Carolina.

17.     Venue is proper before this Court under, *inter alia*, S.C. Code Ann. § 15-7-30.

### GENERAL ALLEGATIONS

18.     The Mantei Defendants have been financial advisors and brokers in the Lexington area of South Carolina since 1995, often associated with firms having a lengthy record of gross regulatory violations.  From approximately 1995 to 2000, Mantei and Chiellini were registered representatives with D.E. Frey & Company ("D.E. Frey").  D.E. Frey's securities registration was terminated in early 2001 following repeated regulatory violations and sanctions.  From approximately 2008 to 2010, Mantei and Chiellini were registered representatives of GunnAllen

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Financial, Inc. ("GunnAllen").  The Financial Industry Regulatory Authority ("FINRA") shut

down GunnAllen in 2010 after repeated lawsuits, investigations, and fines for regulatory violations

plagued the firm.  Mantei and Chiellini then became registered representatives of J.P. Turner from

approximately 2010 to 2015.  J.P. Turner suffered a fate similar to that of D.E. Frey and GunnAllen

when its parent company, Cetera Financial Group ("Cetera"), shuttered J.P. Turner's operations in

2015 due to J.P. Turner's own pervasive regulatory violations.

19.     In approximately May 2015, the Mantei brokers all registered with Centaurus, and

Centaurus, despite an opportunity and obligation to conduct appropriate due diligence and with

the knowledge and understanding of the illiquidity and other characteristics of the Ripoff Products,

adopted the same faithless wrongful conduct and strategy used at J.P. Turner and sanctioned the

Mantei Defendants to carry on just as they had when affiliated with J.P. Turner—with the same

book of business, the same products, and the same practices.

20.     Centaurus was aware of Mantei and Chiellini's prior employment history, the

products they sold their clients, the products they would continue to sell their clients, and their

business practices.  Centaurus, upon accepting the transfer of the Class Members' accounts, failed

to advise or inform the Class Members of the illiquid and imprudent nature of the Ripoff Products

held in those accounts.  Instead, by accepting the investments without comment to their clients,

the Class Members, Centaurus ratified the recommendations of the Mantei Defendants and their

associates while associated with J.P. Turner.  Upon information and belief, Centaurus imposed no

restrictions on Mantei and Chiellini with respect to the products they could sell, including the

Ripoff Products, or the manner in which they sold them.  Indeed, upon information and belief,

Centaurus expressly sanctioned, allowed, permitted, and encouraged Mantei and Chiellini to keep

selling Ripoff Products just as they had been.

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

21.     Since May 2015, the Mantei Defendants and other registered representatives associated with Mantei & Associates have been the sole/primary representatives of Centaurus in the Aiken/Lexington areas of South Carolina and on information and belief, other parts of South Carolina as well.

22.     This case seeks damages and equitable remedies for the actions of the Mantei Defendants both during their tenure with J.P. Turner and continuing unabated with Centaurus.

23.     The Mantei Defendants, for themselves and on behalf of the Broker-Dealer Defendants, used outdoor signage outside their offices on Highway 378 in Lexington County, among other means of messaging, to advertise the Ripoff Products to the public.  These advertisements claimed the Ripoff Products were "FDIC insured" and provided very attractive interest rates up to 10%, in contrast to low rates then available from depository banks for traditional certificates of deposit and other similar investments, as a ruse to lure in elderly investors.

24.     Defendants' outdoor signage did not provide any explanation of any of the following characteristics of the Ripoff Products:

    a.   that the advertised Ripoff Products were different from traditional certificates of deposit and other similar investments offered by depository banks;

    b.   that the advertised Ripoff Products had no guaranteed rate of return over the life of the investment;

    c.   that the high rate of return advertised was a "teaser" rate that would be paid for only a short period and that thereafter interest would be determined by a calculation based on obscure market metrics;

    d.   that, due to the calculations embedded in the Ripoff Products, the rate of return following the initial teaser period would drop as low as 0% well before maturity;

ELECTRONICALLY FILED - 2019 Jun 28 12:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

e.   that the advertised FDIC insurance did not protect their investments against fluctuations in value prior to maturity as a result of decreased interest rates based on various financial indices;

f.   that there were high commissions and fees to be paid to Defendants or otherwise charged and that the advertised FDIC insurance only protected the amount of investment net of Defendants' fees;

g.   that the value of the Ripoff Products at maturity would effectively be worth less in purchasing power than the amount invested originally;

h.   that the value of the advertised Ripoff Products could and in fact did decrease substantially prior to maturity;

i.   that the Ripoff Products had lengthy maturity periods, often as long as decades, that could equal or exceed the investors' life expectancy, and

j.   that the Ripoff Products were highly illiquid and that any early sale, if available at all, would result in substantial loss of principal.

25.     Once elderly Named Plaintiffs and Class Members were lured into Defendants' local offices by the misleading advertising of the Ripoff Products, Defendants represented and assured them that Defendants had the knowledge and experience necessary to safely and prudently handle their investments. As a result of these affirmative representations, Named Plaintiffs and Class Members placed the utmost faith, trust, and confidence in Defendants to provide sound, prudent and honest financial advice in the management of their retirement assets entrusted to Defendants.

26.     Defendants assured Named Plaintiffs and other Class Members that the outdoor signage accurately described the Ripoff Products they were purchasing. But the misleading and

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

incomplete outdoor signage was just one part of Defendants' scheme of misrepresentation and concealment about the Ripoff Products.

27.     Defendants recommended the Ripoff Products to Named Plaintiffs and other Class Members as safe, secure, and liquid investments.

28.     Defendants also told Named Plaintiffs and other Class Members that the Ripoff Products were FDIC insured for the full value of the investment.

29.     Defendants failed to provide Named Plaintiffs and other Class Members with prospectuses for the Ripoff Products prior to their sale in direct violation of, *inter alia*, S.C. Code Ann. Regs. 13-501(A)(10).

30.     Defendants failed to provide Named Plaintiffs and other Class Members with full, complete, and accurate disclosures regarding the nature and terms of the Ripoff Products, but instead deliberately concealed the material facts set forth in ¶ 24, *supra*.

31.     Defendants failed to inform Named Plaintiffs and other Class Members that the Ripoff Products had stated maturities of longer than ten years and that the principal of their investment in the Ripoff Products could be tied up until the stated maturity dates.

32.     Defendants knew or should have known that the interest calculations embedded in the Ripoff Products were based on metrics that made it extremely unlikely for the Ripoff Products to return the promised "good" rate of interest after the initial guaranteed period.

33.     Defendants failed to inform Named Plaintiffs and other Class Members that the embedded calculations made it extremely unlikely that the Ripoff Products would return the promised "good" rate of interest after the initial guaranteed period.

34.     The Ripoff Products sold to Named Plaintiffs and other Class Members had lengthy maturity periods.  Defendants knew or should have known these periods were longer than the

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

investment time horizons and even the life expectancies of many elderly Named Plaintiffs and other Class Members to whom the Defendants sold these products.

35.     Defendants failed to inform Named Plaintiffs and other Class Members that the maturity periods were longer than their investment time horizons and even the life expectancies of many elderly investors to whom the Defendants sold these products.

36.     The market value of the Ripoff Products prior to maturity fell dramatically below their cost bases as a result of the falling interest rates, which dropped to zero pursuant to the embedded calculations based on various financial metrics.

37.     Defendants knew or should have known that the market value of the Ripoff Products would drop well below their cost bases as a result of their lengthy terms and the decreased and/or zero interest rates resulting from the embedded rate calculations.

38.     Defendants failed to inform Named Plaintiffs and other Class Members that the market value of the Ripoff Products would drop well below their cost bases as a result of their lengthy terms and the decreased and/or zero interest rates resulting from the embedded rate calculations.

39.     Defendants knew or should have known that the issuers were unlikely to exercise their "call" options as a result of the decreased and/or zero interest rates resulting from the embedded interest rate calculations.

40.     Defendants knew or should have known that the Ripoff Products would effectively be worth less in purchasing power at maturity than the amount originally invested.

41.     Defendants failed to inform Named Plaintiffs and other Class Members that the Ripoff Products would effectively be worth less in purchasing power at maturity than the amount originally invested.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

42.    Defendants failed to inform Named Plaintiffs and other Class Members that their representations that the Ripoff Products would be called well before their maturity dates were untrue, deceitful, and wrongful.

43.    Because of the decreased value of the Ripoff Products prior to maturity and because the Ripoff Products did not generate the income stream promised by Defendants, Named Plaintiffs and other Class Members are unable to make withdrawals without invading principal and locking in substantial losses, in direct contradiction of Defendants' representations that the Named Plaintiffs and other Class Members' investments in the Ripoff Products were protected, insured, and liquid.

44.    The Ripoff Products are grossly illiquid, meaning that Named Plaintiffs and other Class Members cannot access the assets invested in the Ripoff Products without suffering substantial losses as the market value of the Ripoff Products are now far below their cost bases.

45.    Defendants engaged in a scheme of concealment, failing to reveal to Named Plaintiffs and other Class Members that the Ripoff Products generated large commissions and fees payable to Defendants, which amounts were deducted from the amount available for investment. Defendants further concealed that these commissions and fees were the primary motivating factor in their promotion and sale of these illiquid products to elderly Named Plaintiffs and other Class Members—not the needs of the investors themselves, but rather the bad faith and self-interests of Defendants.

46.    When Named Plaintiffs and other Class Members raised questions to Defendants about the diminished current values of the Ripoff Products, Defendants repeatedly told Named Plaintiffs and other Class Members that the Ripoff Products were and had been proper investments, that any reduction in the account balance was merely temporary and the result of factors beyond

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Defendants' control, that making changes in the investment strategy designed by Defendants would be foolish and wrong, and that the best course of action would be to continue to hold the Ripoff Products until they were called. Defendants supported their recommendation of Named Plaintiffs and other Class Members' continued holding of the Ripoff Products by repeating their assurances that the Ripoff Products would soon be called, well in advance of their maturity date. Defendants knew this to be false and made these representations only to convince Named Plaintiffs and other Class Members to continue holding the Ripoff Products and to take no other actions to protect their interests.

47.    Reassured by these continuing false and misleading promises and representations from financial "advisors" whom they believed were trustworthy and reputable and had their best interests in mind, the Named Plaintiffs and other Class Members followed Defendants' advice to leave their irreplaceable assets under Defendants' control and to continue to hold the Ripoff Products recommended and sold by Defendants. Defendants' false and misleading promises and representations concealed the true nature of the Ripoff Products and the harm they were causing, thereby keeping Named Plaintiffs and other Class Members misinformed, in the dark and waiting patiently as advised by Defendants.

48.    Unbeknownst to the Named Plaintiffs and other Class Members, the Ripoff Products were too risky and illiquid for elderly investors with a need for guaranteed income for living expenses, health care costs or to meet required minimum distributions in their IRAs and for flexibility and liquidity in their accounts. However, because of the faith, trust, and confidence that Defendants purposefully, deliberately and misleadingly engendered in these elderly Named Plaintiffs and other Class Members, they remained unaware that their trust was misplaced, that

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

they had been lied to and defrauded, and that their accounts continued to be exposed to enormous risk, imprudent investment, and general mismanagement.

49.     As a result of Defendants' continuing failures, the Named Plaintiffs and other Class Members have lost substantial value in their irreplaceable assets, have been denied immediate access to their funds, and have suffered enormous loss and damage.

## ALLEGATIONS OF NAMED PLAINTIFFS

### A.    Donald and Marcia Black

50.     Donald Black was born in 1943 and served for 27 years as a mess sergeant in the South Carolina Army National Guard.  He also owned and operated a lawn and garden store in South Carolina for over thirty years, until his retirement in 2013.

51.     Marcia Black was born in 1945 and was employed as hairdresser prior to her retirement in 2011.

52.     Mr. Black has served on the Board of Directors of the Nazareth United Methodist Church in Leesville, South Carolina since the mid-1980s.  In mid-2013, while he was also serving as Treasurer, a church member approached him about an investment she had just been sold by Defendants and which she believed (based on information received from Defendants) would also be a good investment opportunity for the church.  Mr. Black traveled to the Mantei Defendants' local office and observed a sign advertising "FDIC Insured" CDs at 10% interest for a minimum investment of $25,000.  He met with a representative of Defendants who described the advertised investments as FDIC insured and offering a 10% return during the first year, while the interest rate could decline thereafter, it would still be at a "good" rate, which amount would be readjusted to "not less than 3-4%" thereafter.  Defendants' representative explained that the investment would

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

be called by the issuer in 3-5 years and all principal would be returned to the investor at that time, in addition to the substantial interest that would be earned on the investment.

53.    After Mr. Black explained that the potential investor was the church, Defendants' representative agreed to come to a church board meeting to explain the recommended investments. At that meeting, which Mr. Black attended, Defendants' representative repeated the presentation made to Mr. Black in Defendants' local office.

54.    At no time either during Mr. Black's initial meeting in Defendants' office or during the church board meeting did Defendants' representative explain that the interest on the recommended investments could go to zero or that principal losses were likely to occur if the investment was not held until maturity.  Nor did Defendants' representative ever explain that the recommended investments would not mature until around 2030 and that the guaranteed return of principal would be available only if the investment was held until maturity.

55.    Thereafter, the church board voted to entrust two types of irreplaceable assets to Defendants for investment in the recommended products:  its cemetery fund, which represented monies held in trust and from which perpetual care expenses must be paid for the upkeep of burials in the church's graveyard, and a portion of its general fund.  Defendants comingled the two types of assets in the same account and sold the church two structured CDs for the aggregate amount.

56.    In fact and unbeknownst to Mr. Black and other church members, the stated maturities of the Ripoff Products sold to the church by Defendants were between 2028 and 2033.

57.    In his role as church Treasurer, Mr. Black observed the deposit of interest payments during the initial introductory period resulting from the investments recommended by Defendants into the church's bank account(s).  He and Mrs. Black decided to consult Defendants about whether they should make a similar investment with their own funds.  At the time, the Blacks were both

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

retired and in their late 60s. Defendants' representative recommended that the Blacks purchase similar products in their individual capacities and repeated the same representations about the expected income and liquidity of the recommended investments.

58.     In reliance on the representations of Defendants' representative, the Blacks decided to entrust Defendants with $60,000. These funds were the proceeds of the family's "change jar" savings. Over the years, the Blacks had saved their daily pocket change in a designated jar. Each time the jar filled up, they rolled the coins and took them to their bank. The Blacks did not deposit the money generated from their change jar in the bank or otherwise invest it. Instead, they converted the coins into cash in bills and kept those bills at their home.

59.     After Defendants recommended that they purchase one of the advertised products, the Blacks brought the cash representing their "change jar" savings to Defendants' local office. Defendants refused to accept cash and required that the Blacks obtain a cashier's check from their bank in order to purchase the products recommended by Defendants.

60.     Defendants sold Mr. and Mrs. Black a single structured CD product with a cost basis of $60,000, representing the entire amount of their years of "change jar" savings. They did not provide the Blacks with a prospectus on this product prior to its sale.

61.     Mrs. Black received an inheritance from her brother and sought Defendants' advice regarding the investment of a portion of it. Defendants' representative recommended the purchase of another structured CD, again assuring her that it would be a wise investment as it would provide income and repeating the same representations about the expected income and liquidity of the recommended investment.

62.     Defendants sold Mrs. Black another structured CD product with a cost basis of $50,000, representing the entire amount of the inheritance entrusted to Defendants for investment.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

63.     In fact and unbeknownst to Mr. and Mrs. Black, the stated maturity of the Ripoff Products sold to them by Defendants were between 2034 and 2035.  These maturities exceed the life expectancies of either of the Blacks.

64.     Several years later, Mr. Black noticed that the church was no longer receiving interest payments on the Ripoff Products that Defendants had sold and that the market value shown on Defendants' account statements for these assets was less than the amount the church had originally paid.  Mr. Black met with Defendants to ask for an explanation.

65.     Defendants gave a long, complicated, and confusing account of how the interest rates were calculated on such Ripoff Products, which Mr. Black did not understand.  They further provided reassurances that they would look into and rectify this situation.   Believing that Defendants were looking out for their best interests, Mr. Black was reassured that Defendants would look after and protect his interests.

66.     The Blacks had a similar communication with Defendants after they noticed similar problems in their personal accounts.  Again, Defendants' representatives reassured them that their money was safe that Defendants would "look into" other options for them to earn money from these investments.

67.     In 2018, the Blacks received by mail a written communication from Defendants purporting to list their investment objectives and other information about themselves and their account.  Much of this information was untrue.  The Blacks went to meet with Defendants who took back the erroneous customer information paperwork and promised to make corrections to accurately reflect the Blacks' objectives, risk tolerance and other information.  The Blacks have never received a corrected customer information printout from Defendants, despite Defendants' promises to share such paperwork.

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

68.    As a result of Defendants' recommendations that much of their retirement savings and of Mrs. Black's inheritance be tied up in Ripoff Products, the Blacks have been forced to finance purchases they otherwise would have been able to buy outright. Unless they accept a sizeable loss, their money will be tied up and unavailable for their use and enjoyment during their lifetimes.

### B.    Larry and Rebecca Martin

69.    Larry Martin was born in 1949 and was employed as a machinist at Michelin for 33 years prior to his retirement in 2013.

70.    Rebecca Martin was born in 1952 and was employed as an administrative assistant for about 30 years, first for a local textile company and later for a law firm.

71.    In 2013, the Martins sought a meeting with the Mantei Defendants after seeing the sign outside their office advertising a 10% return on investments. At that time, the Martins were both in their mid-60s. Mr. Martin had recently retired from Michelin and Mrs. Martin planned to retire within a year.

72.    Mr. Martin required advice on the investment of his 401K and a lump sum retirement fund he had received from Michelin. These funds, which totaled approximately $730,000, were held in a roll-over IRA. Mrs. Martin would also be receiving retirement assets of approximately $130,000. These funds represented a substantial portion of the Martins' retirement savings.

73.    Defendant Chiellini asked the Martins if they would like to earn the 10% return advertised on the office sign. She also told them that the recommended investments were guaranteed to never lose their principal and that the investments would be called by their issuers within 3-5 years at which time the full principal would be returned.

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

74.     The Martins were not told that the 10% interest rate was only for the first year of investment nor that thereafter the interest rate was variable and could drop to zero.  Nor did Defendants disclose that the recommended investments would not mature for twenty (20) years.

75.     Defendants sold Mr. Martin four structured CDs in the aggregate amount of $500,000, as well as a $100,000 "medium term" corporate bond.  These Ripoff Products were all purchased with assets in Mr. Martin's IRA.

76.     When Mrs. Martin retired in mid-2014, Defendants also sold her another two structured CDs in the aggregate amount of $80,000 and a $50,000 corporate note.   These Ripoff Products were all purchased with assets in Mrs. Martin's IRA.

77.     When discussing the investment strategy recommended for the Martins, Defendants did not distinguish between different types of investments they eventually sold to the Martins but treated them as having the same high return and likelihood of being called within a short period. Defendants knew or should have known these representations were false.

78.     Defendants did not provide the Martins with prospectuses on the recommended products prior to its sale.

79.     In fact and unbeknownst to Mr. and Mrs. Martin at the time of their purchases, the stated maturity of the Ripoff Products sold to them by Defendants were between 2033 and 2034. These maturities exceed the life expectancies of either of the Martins.

80.     Several years later, the Martins noticed that the monthly statements reported declining fair market values for their supposedly "guaranteed" investments.   Defendants' representatives initially provided reassurances that the Martins should not worry because they would actually receive all of their principal back.

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

81.     The Martins made numerous attempts to discuss these investments with Defendant Chiellini, who failed to return calls or set up a meeting for about a year.  Several meetings finally occurred in March and April 2018, at which time Defendants admitted that the Ripoff Products had long maturities.  When the Martins complained that their money was tied up for twenty years, Defendant Chiellini, on behalf of all Defendants, continued to maintain that the issuers would call these investments within 6 years of their issuance and that the Martins should be patient and would soon have access to all their money.

82.     The Martins were not satisfied with the answers and explanations provided during the in-person meetings and raised additional questions in writing.  However, Defendants failed to respond to these inquiries.  Upset and disillusioned at their mistreatment by their trusted advisors, the Martins transferred their accounts away from Defendants' control in May 2018.

### C.     James and Barbara Thompson

83.     James Thompson was born in 1942 and was employed as a sheet metal fabricator and welder and in construction prior to his retirement.

84.     Barbara Thompson was born in 1941 and was employed as an auditor in the South Carolina Comptroller General's Office prior to her retirement.

85.     In late 2013 or early 2014, the Thompsons sought a meeting with the Mantei Defendants after seeing the sign outside their office advertising a 10% return on investments.

86.     The Thompsons sought advice on the investment of essentially all of their liquid assets, which were collectively worth approximately $126,000.  At this time, they were both over 70.5 years old and their IRAs were subject to the minimum distribution requirements imposed by law.   Prior to their engagement of Defendants as their financial advisors, the Thompsons' assets were held in bank accounts.   They told Defendants that they were "low risk" investors.

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

87.     Defendants assured the Thompsons that the recommended investment products would not lose principal and that the issuers would call these products within 3-5 years, so that their funds would be readily available to them.

88.     Defendants also assured the Thompsons that although the interest rates on these products were subject to change, the return would remain "good."  The Thompsons were never told that the interest could go to zero.

89.     Defendants sold Mr. Thompson a $33,000 structured CD, tying up 100% of his IRA funds in a Ripoff Product.

90.     Defendants sold Mrs. Thompson a $26,000 principal protected note, tying up 100% of her IRA funds in a Ripoff Product.

91.     Defendants also sold the Thompsons another $33,000 structured CD and another $34,000 principal protected note in the couple's joint tenancy brokerage account.  These Ripoff Products were identical to those sold to the Thompsons in their IRAs.

92.     The Thompsons were not provided with a prospectus for any of the Ripoff Products prior to the Defendants selling such products to them.

93.     In fact, and unbeknownst to the Thompsons, the Ripoff Products sold to them by Defendants had maturities between 2033 and 2034.  These maturities exceed the life expectancies of either of the Thompsons.

94.     In late 2016, the Thompsons complained to Defendants that the Ripoff Products recommended by Defendants had lost value and were no longer paying any interest.  At Defendants' recommendation, the structured CD was sold at a loss from both Mr. Thompson's IRA and their joint brokerage account.

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## CLASS ALLEGATIONS

95.     Named Plaintiffs bring this class action on behalf of themselves and all persons similarly situated under Rule 23, SCRCP.  Named Plaintiffs seek to represent the following class:

> South Carolina citizens and the estates of deceased South Carolina citizens, who, at the age of 50 years or older, were sold by representatives affiliated with the Mantei Defendants while registered with the Broker-Dealer Defendants a debt instrument (including, but not limited to structured certificates of deposit, principal protected notes, and corporate medium-term notes) with an interest rate that was subject to fluctuation prior to maturity, which could decrease to zero based on market variables, and which has or had a maturity period greater than 10 years.

96.     Named Plaintiffs' claims may be maintained under Rule 23(a), SCRCP on behalf of the Class Members because the class is so numerous that joinder of all members is impracticable, there are questions of law or fact in common to the class, the claims of the representative parties are typical of the claims of the class, the representative parties will fairly and adequately protect the interests of the class and the amount in controversy exceeds one hundred dollars ($100.00) for each class member.

97.     The number of Class Members is currently unknown but is expected to exceed the number beyond which joinder of all Class Members is impractical.  Upon information and belief, the size of the class does not exceed 100 members.

98.     The questions of law that are common to the claims of Named Plaintiffs and of each Class Member include, *inter alia*:

a.  the liability of Defendants;

b.  the method of calculation of damages;

c.  the anticipated justifications and defenses raised by the Defendants;

d.  the availability of equitable relief, such as disgorgement and/or rescission of the Ripoff Products; and

e.  remedies available under South Carolina law.

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

99.     The questions of fact that are common to the claims of Named Plaintiffs and of

each Class Member include, *inter alia:*

    a.  the business practices and conduct of Defendants to promote the Ripoff
        Products to Named Plaintiffs and the Class Members to advance their own
        interests in collecting fees and commissions;

    b.  the true characteristics of the Ripoff Products;

    c.  the knowledge of the Defendants regarding the true characteristics of the
        Ripoff Products;

    d.  the lack of notice from Defendants to inform the Named Plaintiffs and Class
        Members of the true characteristics of the Ripoff Products;

    e.  the knowledge of the Defendants as to the illiquidity of the Ripoff Products
        for any Plaintiff in the class;

    f.  the lack of notice from Defendants to inform the Named Plaintiffs and Class
        Members of the illiquidity of the Ripoff Products;

    g.  the failure of Defendants to provide Named Plaintiffs and Class Members
        with prospectuses prior to confirmation of the purchase of the Ripoff
        Products;

    h.  the extent and source of the Defendants' unjust enrichment, including fees,
        commissions, incentives, and any other form of benefit or compensation
        received by Defendants;

    i.  the lack of notice from Defendants to inform the Named Plaintiffs and Class
        Members of the fees, commissions, incentives, and any other form of
        benefit or compensation to be received by Defendants for recommending
        and selling the Ripoff Products to the Named Plaintiffs and Class Members;
        and

    j.  all factual issues regarding equitable relief.

100.     The claims advanced by Named Plaintiffs are typical of those of each Class

Member in that the nature of the claims is the same for each Class Member; the Named Plaintiffs

were subjected to the same general course of business practices and conduct as each Class

Member; the cause of damage for the class is a single course of conduct which is the same for each

Class Member; each Class Member is an affected investor; the Ripoff Products sold are substantially the same in all relevant respects for this action; the types of damages incurred are essentially the same for each Class Member; and the anticipated defenses of Defendants are the same for each Class Member.

101.    Named Plaintiffs were sold Ripoff Products that were substantially similar in all material respects to the products sold to other Class Members. Named Plaintiffs possess sufficient knowledge and involvement in the matter to fairly and adequately protect the interests of each member of the class.

102.    Each Class Member has incurred damages and requires relief as set forth herein due to the Defendants' actions.

## FOR A FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

103.    Each allegation of the foregoing paragraphs is incorporated herein by reference as fully as if set forth verbatim.

104.    Upon the opening of Named Plaintiffs' and the Class Members' accounts with Defendants, and then as Defendants began to manage and control the accounts, Defendants entered into both express agreements and implied agreements with the Named Plaintiffs and other Class Members.  These agreements constituted contracts between the Named Plaintiffs and other Class Members and the Broker-Dealer Defendants (hereinafter "the Agreements").

105.    Defendants, via the Agreements, and pursuant to statutes and regulations, agreed to abide by the rules and regulations of the Securities and Exchange Commission ("SEC"), the Financial Industry Regulatory Authority ("FINRA"), and all other self-regulatory organizations ("SRO") of which they were members.  Named Plaintiffs and the Class Members are third party

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

beneficiaries of these Agreements and have been damaged by Defendants' failure to abide by these Agreements and the SRO rules and regulations.[1]

106.    In addition, South Carolina law implies a duty of good faith and fair dealing into every contract, including the Agreements between Defendants and Named Plaintiffs and the Class Members.

107.    Defendants' (i) failure to fulfill their common law and statutory duties to handle and manage the investors' accounts with due care, diligence, and undivided faithfulness and loyalty; (ii) self-serving actions, inactions, and omissions; and (iii) bad faith and fraudulent wrongdoing as described herein, constitute a failure to abide by the terms of the Agreements and the third-party agreements referenced above, and constitute a breach of these contracts.  Named Plaintiffs and the Class Members have been directly and proximately damaged as a result of Defendants' breaches.

108.    Named Plaintiffs and other Class Members are therefore informed and believe that they are entitled to (1) actual damages, including but not limited to loss opportunity costs and/or market damages; (2) consequential damages; (3) disgorgement of wrongfully obtained fees and commissions; (4) costs, (5) prejudgment interest, (6) attorneys' fees, and (7) and such other relief as is just, proper, and equitable.

---

[1] By citing to federal securities rules and regulations, Named Plaintiffs are not making any claims under federal law; instead, Named Plaintiffs simply are using the violation of federal standards as potential proof of liability on their state-law theories.  Incorporating these standards into Plaintiffs' state law cause of action does not give rise to federal question jurisdiction.  *See Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 817 (1986).  Any removal on this basis will be met with an immediate motion for remand and for sanctions.

ELECTRONICALLY FILED - 2019 Jun 28 03:13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## FOR A SECOND CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY)

109.    Each allegation of the foregoing paragraphs is incorporated herein by reference as fully as if set forth verbatim.

110.    Defendants, as Named Plaintiffs' and the Class Members' registered securities brokers, acted as Named Plaintiffs' and the Class Members' agents and, under the common law of South Carolina, any agent by virtue of the relationship with the principal is considered a fiduciary with respect to all matters within the scope of the agency.

111.    By the nature of the transactions in question, the Named Plaintiffs' and the Class Members' relationship with Defendants, Defendants' employees, and Defendants' agents involved a relationship of the utmost trust and confidence.  This relationship was, by its essential nature, intrinsically fiduciary, calling for Defendants, and their employees and agents, to act with perfect good faith, absolute faithfulness, and undivided loyalty to the interests of Named Plaintiffs and the Class Members.

112.    With this fiduciary relationship also came the duties and obligations to keep Named Plaintiffs and the Class Members fully informed of all information pertinent to all transactions in which Defendants were representing Named Plaintiffs and the Class Members, to make full disclosure of all information that materially affected the account, to disclose any actual or potential conflict of interest, to exercise reasonable care, diligence, and prudence in the performance of their duties and to place the interests of their principals above their own.

113.    At the urging of Defendants, Named Plaintiffs and the Class Members reposed a special confidence in Defendants by entrusting their assets to Defendants, who agreed to accept them and to act as Named Plaintiffs' and the Class Members' fiduciaries in providing expert guidance and investment advice.

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

114.    Defendants breached their fiduciary duties in one or more of the following particulars:

a.  Defendants placed their own interests ahead of Named Plaintiffs and the Class Members by recommending and purchasing the Ripoff Products;

b.  Defendants placed their own interests ahead of Named Plaintiffs' and the Class Members' interests by treating them as a profit center instead of as their fiduciary principals;

c.  Defendants sold Ripoff Products that were harmful and damaging to Plaintiffs and provided false, misleading, and incomplete information to Named Plaintiffs and the Class Members regarding the Ripoff Products in an effort to induce Named Plaintiffs and the Class Members to purchase them;

d.  Despite knowing that the Ripoff Products were speculative and illiquid, Defendants nonetheless sold them to Named Plaintiffs and the Class Members;

e.  Defendants knew of, but failed to disclose to Named Plaintiffs and the Class Members, their own financial interests in recommending Ripoff Products, including a complete advance disclosure of all fees and costs associated with the Ripoff Products; and

f.  Defendants either knew of or failed to ascertain and understand the nature of the Ripoff Products purchased for Named Plaintiffs and the Class Members.

115.    Because of the imprudence, recklessness, willful and wanton misconduct, failures to disclose, bad faith, and fraudulent acts and misrepresentations, as set forth herein, Defendants, and their employees and agents, breached the fiduciary duties owed to Named Plaintiffs and the Class Members.  These breaches were a direct and proximate cause of damages to the Named Plaintiffs and the Class Members.

116.    Named Plaintiffs and the Class Members are therefore informed and believe that they are entitled to (1) actual damages, including but not limited to loss of opportunity costs and/or market damages, (2) consequential damages, (3) disgorgement of wrongfully obtained fees and

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

commissions, (4) punitive damages in an amount to be determined by the finder of fact, (5) costs, (6) prejudgment interest, and (7) and such other relief as is just, proper, and equitable.

## FOR A THIRD CAUSE OF ACTION
### (UNJUST ENRICHMENT)

117.     Each allegation of the other paragraphs set forth herein is incorporated by reference as fully as if set forth verbatim.

118.     As a result of the misconduct and omissions described above, Defendants received benefits in the form of commissions and fees on the sale of each Ripoff Product.  These commissions and fees were paid out of the gross amount Named Plaintiffs and other Class Member invested in the Ripoff Products, to the detriment of Named Plaintiffs and other Class Members and the benefit of Defendants.

119.     For the reasons set forth in this Complaint, Defendants received and retained those commissions under unequitable circumstances.  Defendants' foisting of the Ripoff Products upon Named Plaintiffs and other Class Members through their willful concealment of material information regarding the Ripoff Products' nature, structure, and characteristics unjustly conferred a benefit upon Defendants to the great detriment of Named Plaintiffs and the Class Members.

120.     Named Plaintiffs and the Class Members are therefore informed and believe that they are entitled to (1) disgorgement of wrongfully obtained fees and commissions, (2) prejudgment interest, (3) all losses or harms suffered as a result of and occasioned by the Defendants wrongfully obtaining fees and commissions from Plaintiffs, and (4) and such other relief as is just, proper, and equitable.

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## FOR A FOURTH CAUSE OF ACTION
## (BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT)

121.    Each allegation of the other paragraphs set forth herein is incorporated by reference as fully as if set forth verbatim.

122.    Defendants' fraudulent misconduct, actions, and inactions, as described above in the Fifth Cause of Action, constitutes a failure to abide by the terms of the Agreements, and constitute a breach of the Agreements entered into with Named Plaintiffs and other Class Members.  Named Plaintiffs and the Class Members have been directly and proximately damaged as a result of these breaches by Defendants.

123.    Moreover, in breaching the Agreements with Named Plaintiffs and the Class Members, Defendants exhibited a fraudulent intent relating to those breaches as set forth above.

124.    Defendants' breaches of the Agreements were accompanied by fraudulent acts on the part of Defendants as set forth above.

125.    As a direct and proximate result of Defendants' breach of contract accompanied by fraudulent act, Named Plaintiffs and the Class Members have suffered injury all in direct violation of the laws of the state of South Carolina.

126.    Named Plaintiffs are therefore informed and believe that they are entitled to (1) actual damages including but not limited to loss of opportunity cost and/or market damages, (2) consequential damages, (3) punitive damages, (4) costs, (5) prejudgment interest, (6) attorneys' fees, and (7) and such other relief as is just, equitable, and proper.

## FOR A FIFTH CAUSE OF ACTION
## (STATE SECURITIES ACT VIOLATIONS, S.C. CODE ANN. §§ 35-1-101, *ET SEQ.*)

127.    Each allegation of the foregoing paragraphs is incorporated herein by reference as fully as if set forth verbatim.

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

128.    The Ripoff Products, while not "covered securities" for purposes of SLUSA, are nonetheless "securities" as that term is defined in the South Carolina Uniform Securities Act of 2005.  S.C. Code Ann. § 35-1-102(29); *see also id.* § 35-1-102(7) (separately defining "Federal covered security" under the South Carolina Uniform Securities Act of 2005).

129.    In the course of their fiduciary duties to Named Plaintiffs and the Class Members, Defendants recommended and advised Named Plaintiffs and the Class Members to purchase the Ripoff Products, and in so doing, made untrue statements of material facts or omitted to state material facts necessary to make other statements not misleading, in light of the circumstances, thereby violating the South Carolina Securities Act, S.C. Code Ann. § 35-1-501, -502, & 509(b) and S.C. Code of Regulations 13-501(14)—(17) as set forth in this Complaint.

130.    The actions, inactions, untrue statements, and omissions of Defendants were made (or not omitted) to Named Plaintiffs and the Class Members, either directly or indirectly, in connection with the offer, sale, or purchase of securities under South Carolina law, namely the Ripoff Products.

131.    On information and belief Defendants were compensated, either directly or indirectly, for the sale of the Ripoff Products, which was accomplished by means of untrue statements and/or omissions that rewarded Defendants, but damaged Named Plaintiffs and the Class Members as alleged herein.

132.    On information and belief, Defendants failed to provide Named Plaintiffs and the Class Members with copies of the prospectuses for each Ripoff Product prior to sale, in violation of S.C. Code Ann. Regs 13-501(A)(10).

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

133.    Defendants' acts and/or omissions violated FINRA Rule 2111 and other applicable FINRA rules governing broker conduct relative to honesty, ethics, obligations to customers, and the like, in violation of S.C. Code Ann. Regs 13-501(A)(21).

134.    The actions of Defendants were wrongful, fraudulent, and in violation of S.C. Code Ann. §§ 35-1-501, -502, and -509 (Supp. 2010) and the regulations regulating broker conduct established thereunder.

135.    As a direct and proximate result of the fraud of Defendants, Named Plaintiffs and the Class Members suffered substantial damages.

136.    Named Plaintiffs and the Class Members are therefore informed and believe that they are entitled to (1) actual damages including but not limited to loss of opportunity cost and/or market damages and/or rescission, (2) disgorgement of fees and commissions paid to Defendants; (3) costs, (4) attorneys' fees, (5) statutory interest pursuant to S.C. Code Ann. § 35-1-509(b), and (6) such other relief as is just, proper and equitable.

## DEMAND FOR RELIEF

WHEREFORE, Named Plaintiffs pray for judgment against Defendants Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, jointly and severally, as follows:

a.    For actual damages suffered by Named Plaintiffs and the Class Members including but not limited to the market losses to their accounts that would not have occurred in the absence of the sale of the Ripoff Products;

b.    For consequential damages and/or market or lost opportunity damages and/or market damages suffered by Named Plaintiffs and the Class Members;

c.    For disgorgement of fees and commissions received by Defendants as a result of the sale of the Ripoff Products;

d.    For rescission of the Ripoff Products;

e.      For punitive damages in an amount to be determined by the trier of fact;

f.      For statutory and/or prejudgment interest at the highest legal rate;

g.      For the costs of this action;

h.      For reasonable attorneys' fees; and

i.      For such other and further relief as is just, equitable and proper.

Respectfully submitted,

s/Mitchell Willoughby
Mitchell Willoughby, Esquire, SC Bar No. 6161
Elizabeth Zeck, Esquire, SC Bar No. 9006
R. Walker Humphrey, II, Esquire, SC Bar No. 79426
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street (29201)
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com
whumphrey@willoughbyhoefer.com

*Attorneys for Named Plaintiffs*

June 28, 2019
Columbia, South Carolina

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF LEXINGTON | ) | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| | ) | |
| Donald Black, Marcia Black, Larry | ) | C/A NO. 2019-CP-32-_____ |
| Martin, Rebecca Martin, Barbara | ) | |
| Thompson, and James Thompson, | ) | |
| | ) | |
| For themselves and a Class of Similarly | ) | **NOTICE OF MOTION AND MOTION FOR** |
| Situated Plaintiffs, | ) | **PROTECTIVE ORDER PURSUANT TO** |
| | ) | **RULES 23(d)(2) and 26(c), SCRCP** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Mantei & Associates, Ltd., Ricky Alan | ) | |
| Mantei, Cindy Chiellini, Centaurus | ) | |
| Financial, Inc., and J.P. Turner & | ) | |
| Company, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**TO:  DEFENDANTS MANTEI & ASSOCIATES, LTD, RICKY ALAN MANTEI, CINDY
CHIELLINI, CENTAURUS FINANCIAL, INC., and J.P. TURNER & COMPANY,
LLC**

**YOU WILL PLEASE TAKE NOTICE** that Plaintiffs, Donald Black, Marcia Black,

Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson, for themselves and on

behalf of a class of similarly situated investors, will move this Court at the Lexington County

Courthouse, Lexington, South Carolina, ten (10) days from the date of this motion or as soon

thereafter as a hearing is scheduled by the Court for an Order pursuant to Rules 23(d)(2) and 26(c)

of the South Carolina Rules of Civil Procedure restricting *pendente lite*, the above-named

defendants, Centaurus Financial, Inc. ("Centaurus"), J.P. Turner & Company, LLC ("J.P. Turner"),

Mantei & Associates, Ltd. ("Mantei & Associates"), Ricky Alan Mantei, and Cindy Chiellini

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

(collectively "Defendants"), and their counsel from communicating with any potential class members regarding this litigation,

Counsel for the Plaintiffs affirms, pursuant to Rule 11, SCRCP, that he believes consultation with the Defendants on the matters stated herein would serve no useful purpose.

In support of this motion, Plaintiffs would respectfully show as follows:

## INTRODUCTION

In this proposed class action, Plaintiffs believe Defendants and their counsel may attempt to communicate with potential members of the class ("Class Members")—for whom Defendants act as financial advisors in a fiduciary relationship--about the subject matter of this lawsuit in order to shape the Class Members' beliefs and obtain an advantage in this litigation. Any communication with the Class Members regarding this lawsuit instituted by the Defendants likely will misrepresent the status, purpose, and effect of the action and will create impressions tending to reflect adversely on the named Plaintiffs, their counsel, and Plaintiffs' causes of action. This type of one-sided communication would interfere with Plaintiffs' right to bring their claims as a class action under Rule 23, SCRCP. An order prohibiting Defendants and their counsel from communicating with potential class members about the subject matter of this lawsuit without prior court approval would be a narrowly-tailored limitation of commercial speech consistent with the rights of the parties under the circumstances.

## FACTUAL BACKGROUND

This lawsuit arises out of the Defendants' foisting of illiquid debt instruments upon the Plaintiffs and the Class Members via false promises and misleading information. The current proposed definition of the Class Members is:

South Carolina citizens and the estates of deceased South Carolina citizens, who, at the age of 50 years or older, were sold by representatives affiliated with the

Mantei Defendants[1] while registered with the Broker-Dealer Defendants a debt instrument (including, but not limited to structured certificates of deposit, principal protected notes, and corporate medium-term notes) with an interest rate that was subject to fluctuation prior to maturity, which could decrease to zero based on market variables, and which has or had a maturity period greater than 10 years.

Plaintiffs brought the following causes of action to vindicate their rights and the rights of the Class Members as a result of the Defendants' conduct: (1) breach of contract; (2) breach of fiduciary duty; (3) unjust enrichment; (4) breach of contract accompanied by a fraudulent act; and (5) violations of the Uniform Securities Act, S.C. Code Ann. §§ 35-1-101, *et seq.*

Plaintiffs and the Class Members placed the utmost trust, care, and confidence in the Defendants.  Plaintiffs believe the Defendants may leverage and attempt to misuse their fiduciary relationship and communicate with the Class Members about this litigation in an attempt to either to solicit affidavit testimony in opposition to class certification, encourage class members to "opt out" of the class after it is certified, or otherwise obtain an advantage in this case to the detriment of Plaintiffs' and the other Class Members' rights.  Indeed, Defendants have already attempted to use surreptitious techniques to alter clients' investment objectives after losses occurred in the accounts.  Due to the very real nature of this potentially irreparable harm as a result of the confidential relationship between Defendants and the Class Members, Plaintiffs file this motion for an order preemptively prohibiting such communications and thereby prevent further injury and harm from occurring to Class Members at the hands of Defendants who have already misused their fiduciary relationship to enrich themselves at the expense of Named Plaintiffs and other Class Members.

---

[1] The "Mantei Defendants" are Defendants Mantei & Associates, Ricky Alan Mantei, and Cindy Chiellini.  At all relevant times, Mantei and Chiellini were registered representatives of either Defendants J.P. Turner or Centaurus.

ELECTRONICALLY FILED - 2019 Jul 26 1:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jun 28 3:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## LAW/ANALYSIS

Rule 23(d)(2), SCRCP gives this Court the broad power to "impose such terms as shall fairly and adequately protect the interest of the persons on whose behalf the action is brought or defended." Under certain circumstances, it may be necessary to limit communication between the parties and potential members of the class. *See Eldridge v. City of Greenwood*, 308 S.C. 125, 127-28, 417 S.E.2d 532, 534 (1992). One reason that courts enter such orders is to protect against "[u]napproved communications to class members that misrepresent the status or effect of the pending action [which] have an obvious potential for confusion and/or adversely affecting the administration of justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 n.12 (1981) (quoting *Waldo v. Lakeshore Estates, Inc.*, 433 F. Supp. 782, 790-91 (E.D. La. 1977)). Orders restricting these communications are permissible when they "reflect a weighing of the need for a limitation and the potential interference with the rights of the parties" and are carefully drawn to "limit[] speech as little as possible." *Id.* at 101-02; *see also Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985) (holding the four criteria for good cause to restrict communications between a class and class opponents are "the severity and the likelihood of the perceived harm; the precision with which the order is drawn; the availability of a less onerous alternative; and the duration of the order").

Case law is replete with examples where such orders are entered to protect the rights of the parties. Courts in particular recognize that where defendants have business relationships with the absent and unsophisticated class members, they are in a position to use their economic leverage to coercive effect. To prevent such harms and to avoid inherent potential for abuse, defendants in class-action lawsuits may be prohibited from unrestricted communications with potential class members.

ELECTRONICALLY FILED - 2019 Jun 28 12:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

For example, such restrictions were placed upon the defendant in *Kleiner*. In that case, the plaintiffs sought class-based relief against a bank for its failure to properly calculate interest rates charged to its customers. *Kleiner*, 751 F.2d at 1196. Because many members of the class would be concerned about their credit rating and their ability to borrow from the bank in the future, the bank had economic leverage over these potential class members. *See id.* at 1202. The Eleventh Circuit recognized that a "unilateral communications scheme" by a class action defendant is "rife with potential for coercion. '[I]f the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive.'" *Id.* (quoting Note, *Developments in the Law – Class Actions*, 89 Harv. L. Rev. 1318, 1600 (1976)). Unilateral "opt out" communications are particularly troublesome, as they "sabotage the goal of informed consent by urging exclusion on the basis of a one-side presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable." *Id.* at 1203. The court therefore affirmed the district court's order imposing communication restrictions. *Id.*; *see also id.* at 1207 (finding the order was not an unconstitutional restriction of commercial speech).

Similarly, in *Rankin v. Board of Education of Wichita Public Schools*, 174 F.R.D. 695 (D. Kan. 1977), plaintiffs sought certification of a class of speech-language impaired students. Defendant school board wrote to parents of the student class members addressing the underlying issues raised by the litigation, without mentioning the litigation. *Id.* at 697. Even though the letter was not itself abusive, it nonetheless raised real concerns about future communications. As the court noted: "There is no legitimate purpose for defendant to communicate with prospective members of the class concerning the lawsuit; such communications could invite abuse." *Id*. While the court allowed communications "made in the ordinary course of providing educational services

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

to the students, even though such communications may necessarily implicate the subject matter of the litigation," the court issued an order prohibiting defendants and their counsel from making any contact or communication with prospective class members which expressly referred to the litigation in order to avoid this blatant potential for abuse. *Id.* at 697-98.

Other courts have imposed contact bans on defendants after they demonstrated their inability to avoid potentially inappropriate contacts. In *Hampton Hardware, Inc. v. Cotter & Company, Inc.*, 156 F.R.D. 630 (N.D. Tex. 1994), a hardware retailer brought a class action against a wholesale cooperative. The defendant wholesaler sent three different letters to potential class members, urging them not to participate in the lawsuit. *Id.* at 631-32. Although the court found that little actual harm was caused by the letters, they nonetheless demonstrated the clear potential for abuse and accordingly justified the imposition of a bar on litigation-related contacts. In so holding, the court pointed to the on-going business relationship between class members and the defendant which "underscore[d] the potential for future coercion." *Id.* at 633. Because class members "must necessarily rely upon the defendant for dissemination of factual information about hardware goods and for lower prices in purchasing those goods," they were particularly susceptible to believing defendant's negative comments about the class action litigation. *Id.* In addition, defendant had a clear conflict of interest in advising class members about the merits of participating in the lawsuit "due to its direct pecuniary benefit in the outcome." *Id.* The court noted that "[a]ctual harm need not be proven to justify an order limiting class contacts. Rather, an order limiting contacts is justified upon a finding of 'a likelihood of serious abuses.'" *Id.* (quoting *In re School Asbestos Litigation*, 842 F.2d 671, 683 (3d Cir. 1988)).

Here, there is no legitimate reason for the Defendants to communicate with class members about the subject-matter of the lawsuit prior to certification. Many class members have an on-

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

going business relationship with the Defendants, with the Defendants acting in a fiduciary capacity as their financial advisors. All of the class members are elderly and many are very unsophisticated. These are relationships highly susceptible to misinformation and subtle coercion relating to their rights to pursue claims against the Defendants, just like the debtor-class in *Kleiner* and even more so than the parents in *Rankin* or the hardware retailers in *Hampton Hardware*. Any communication with potential class members about the subject-matter of this case creates a likelihood of serious abuse. Moreover, these Defendants have already attempted to alter the investment objectives of accounts of Class Members under the guise of "updating" account information. Plaintiffs therefore request that this Court prohibit Defendants from engaging in the following communications with the Class Members during the pendency of this litigation: (1) any express or implied reference to the instant lawsuit; (2) any express or implied request that Class Members "opt out" of the class if it is certified; and (3) any solicitation of support for Defendants' opposition to a motion to certify the class, opposition to this motion, or opposition to other issues in this case that may arise during the course of this litigation.

Class Members include both current and former clients of Defendants. Plaintiffs do not intend to restrict Defendants' communications with Class Members in the ordinary course of any still existing relationship. But those communications cannot pertain to the subject matter of this lawsuit. The Class Members' decision to participate or opt out of the class or support or oppose this motion or any other issue in this litigation under Rule 23 should be based on proper notice approved by the Court, and not on a one-sided presentation of the merits of the case by the Defendants or their counsel or other representatives.

ELECTRONICALLY FILED - 2019 Jun 28 13:37 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court enter an order prohibiting the Defendants and their counsel from communicating with potential class members about the subject-matter of this lawsuit prior to trial as described above, or in the alternative, to prohibit such communication without prior court approval, and for such other and further relief as may be just and proper.

Respectfully submitted,

s/Mitchell Willoughby
Mitchell Willoughby, Esquire, SC Bar No. 6161
Elizabeth Zeck, Esquire, SC Bar No. 9006
R. Walker Humphrey, II, Esquire, SC Bar No. 79426
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street (29201)
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com
whumphrey@willoughbyhoefer.com

*Attorneys for Named Plaintiffs*

June 28, 2019
Columbia, South Carolina

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636
ELECTRONICALLY FILED - 2019 Jul 11 4:01 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF LEXINGTON | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson, | C/A NO. 2019-CP-32-02636 |
| For themselves and a Class of Similarly Situated Plaintiffs, | **NOTICE OF HEARING** |
| Plaintiffs, | |
| vs. | |
| Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, L.L.C, | |
| Defendants. | |

**TO:    THE DEFENDANTS ABOVE-NAMED:**

**YOU WILL PLEASE TAKE NOTICE** that Plaintiffs' Motion for Protective Order Pursuant to Rules 23(d)(2) and 26(c), SCRCP filed on June 28, 2019 in the above-captioned case is scheduled for a hearing before The Honorable William P. Keesley on Wednesday, July 31, 2019 at 11:30am at the Lexington County Courthouse located at 205 East Main Street in Lexington, South Carolina, 29072. A copy of the Court's electronic notice of hearing is attached hereto as Exhibit 1.

Respectfully submitted,

s/Mitchell Willoughby
Mitchell Willoughby, Esquire, SC Bar No. 6161
Elizabeth Zeck, Esquire, SC Bar No. 9006
R. Walker Humphrey, II, Esquire, SC Bar No. 79426
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street (29201)

1

Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com
whumphrey@willoughbyhoefer.com

*Attorneys for Plaintiffs*

July 11, 2019
Columbia, South Carolina

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636
ELECTRONICALLY FILED - 2019 Jul 11 4:01 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

# EXHIBIT 1

ELECTRONICALLY FILED - 2019 July 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202686

| | |
|---|---|
| **From:** | Courtmail32_DoNotReply@sccourts.org |
| **To:** | Mitchell Willoughby |
| **Cc:** | jparker@lex-co.com |
| **Subject:** | Motion "MOFREE-Motion for Protective Order" for Case "2019CP3202636-Donald Black , plaintiff, et al VS Mantei & Associates Ltd , defendant, et al" was added to a Motions Roster for 7/31/2019 at 11:30 AM |
| **Date:** | Monday, July 1, 2019 2:45:08 PM |

The Common Pleas motion roster for the week of July 29th, 2019 has been published to the web.  All requests for continuances must be filed by Wednesday July 24th 2019 @ 5pm.

If this motion is resolved before the scheduled date and time, please notify the following:  Jenny Parker at jparker@lex-co.com.

~~~ CONFIDENTIALITY NOTICE ~~~ This message is intended only for the addressee and may contain information that is confidential. If you are not the intended recipient, do not read, copy, retain, or disseminate this message or any attachment. If you have received this message in error, please contact the sender immediately and delete all copies of the message and any attachments.

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

# Exhibit C

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** )<br><br>**COUNTY OF LEXINGTON** )<br><br>Donald Black, Marcia Black, Larry Martin,<br>Rebecca Martin, Barbara Thompson, and<br>James Thompson.<br><br>For themselves and a Class of Similarly<br>Situated Plaintiffs,<br><br>Plaintiffs,<br><br>v.<br><br>Mantei & Associates, Ltd., Ricky Alan<br>Mantei, Cindy Chiellini, Centaurus<br>Financial, Inc., and J.P. Turner &<br>Company, L.L.C.,<br><br>Defendants. | **IN THE COURT OF COMMON PLEAS<br>FOR THE ELEVENTH JUDICIAL CIRCUIT**<br><br><br>Civil Action No.: 2019CP3202636<br><br><br><br><br>**NOTICE OF FILING<br>NOTICE OF REMOVAL** |

        **PLEASE TAKE NOTICE** that on the July 26, 2019, pursuant to 15 U.S.C. § 78bb and 28

U.S.C. § 1446, Defendants Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini,

Centaurus Financial, Inc., and J.P. Turner & Company, L.L.C. (collectively, "Defendants") filed

a Notice of Removal of this action with the Clerk of the United States District Court for the District

of South Carolina, Columbia Division (*see* Exhibit A). By filing this Notice, Defendants have

removed this action to the United States District Court for the District of South Carolina, Columbia

Division.

        Pursuant to 28 U.S.C. § 1446(d), this Court shall proceed no further unless and until this

action is remanded.

        To preserve its rights and so as not to have a default judgment entered against it, Defendants

hereby notify this Court that Defendants will not file responsive pleading(s) to Plaintiffs'

ELECTRONICALLY FILED - 2019 Jul 29 12:47 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Complaint with this Court. Defendants' responsive pleading(s) will be timely filed with the United States District Court.

Dated: July 26, 2019                    Respectfully submitted,


/s/ Michael H. Montgomery               /s/ Joel H. Smith
Michael H. Montgomery                   Joel H. Smith
Montgomery Willard, LLC                 Kevin J. Malloy
1002 Calhoun Street (29201)             Bowman and Brooke LLP
Post Office Box 11886                   1441 Main Street, Suite 1200
Columbia, South Carolina 29211          Columbia, SC  29201-2897
(803) 779-3500                          (803) 726-7422
mhm@montgomerywillard.com               Joel.Smith@bowmanandbrooke.com
                                        Kevin.Malloy@bowmanandbrooke.com

*Attorney for Mantei & Associates, Ltd.,*
*Ricky Alan Mantei, and Cindy Chiellini*   *Attorneys for Centaurus Financial, Inc.*


                        /s/ Cory Manning
                        Cory Manning
                        Nelson Mullins Riley & Scarborough LLP
                        1320 Main Street, 17th Floor
                        Columbia, SC 29201
                        (803) 255-5524
                        Cory.Manning@nelsonmullins.com

                        *Attorney for J.P. Turner & Company,L.L.C.*

**STATE OF SOUTH CAROLINA** )    **IN THE COURT OF COMMON PLEAS**
)    **FOR THE ELEVENTH JUDICIAL CIRCUIT**
**COUNTY OF LEXINGTON** )
)
Donald Black, Marcia Black, Larry Martin, )
Rebecca Martin, Barbara Thompson, and )    Civil Action No.: 2019-CP-32-02636
James Thompson. )
)
For themselves and a Class of Similarly )
Situated Plaintiffs, )
)
Plaintiffs, )    **ACKNOWLEDGMENT OF**
)    **RECEIPT OF FILED COPY OF**
)    **NOTICE OF REMOVAL**
v. )
)
Mantei & Associates, Ltd., Ricky Alan )
Mantei, Cindy Chiellini, Centaurus )
Financial, Inc., and J.P. Turner & )
Company, L.L.C., )
)
Defendants. )

Receipt of a copy of the Notice of Removal filed by the Defendants, by and through their

attorneys, in the above-titled action is hereby acknowledged on this ___ day of _____,

2019.

_____
The Honorable Lisa M. Comer
Lexington County Clerk of Court

ELECTRONICALLY FILED - 2019 Jul 29 12:49 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2019 Jul 29 12:49 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636



Common Pleas

**Case Caption:**     Donald  Black  , plaintiff, et al VS   Mantei & Associates Ltd  ,
                      defendant, et al

**Case Number:**     2019CP3202636

**Type:**            Acknowledgement of Filing of Removal

s/Lisa M. Comer

Lexington County Clerk of Court

Electronically signed on 2019-07-31 13:27:35     page 2 of 2

ELECTRONICALLY FILED - 2020 Aug 05 8:28 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| DONALD BLACK, MARCIA BLACK, LARRY MARTIN, REBECCA MARTIN, BARBARA THOMPSON, and JAMES THOMPSON, *for themselves and a class of similarly situated plaintiffs*, Plaintiffs, | § § § § § § § | |
| vs. | § § | Civil Action No.: 3:19-02097-MGL |
| MANTEI & ASSOCIATES, LTD., RICKEY ALAN MANTEI, CINDY CHIELLINI, CENTAURUS FINANCIAL, INC., and J.P. TURNER & CO., LLC, Defendants. | § § § § § § | |

---

**MEMORANDUM OPINION AND ORDER
GRANTING PLAINTIFFS' MOTION TO REMAND**

---

## I.     INTRODUCTION

Plaintiffs Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson, for themselves and a class of similarly situated plaintiffs, (collectively, Plaintiffs) brought this action for various South Carolina state law claims in the Lexington County Court of Common Pleas.  Defendants Mantei & Associates, Rickey Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, LLC (collectively, Defendants) removed the action to federal court under 15 U.S.C. § 78bb(f)(2).

ELECTRONICALLY FILED - 2020 Aug 05 8:28 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Pending before the Court is Plaintiffs' motion to remand. Having carefully considered Plaintiffs' motion, the response, the reply, the record, and the applicable law, it is the judgment of the Court Plaintiffs' motion will be granted.

## II.     PROCEDURAL HISTORY

Plaintiff brought this action in the Lexington County Court of Common Pleas. Plaintiffs originally alleged Defendants "advertised and sold illiquid debt instruments to unsophisticated investors." Complaint ¶ 4. More specifically, Plaintiffs alleged the suit involves "products includ[ing] structured certificates of deposit . . ., principal protected notes . . . , and 'medium term' corporate bonds, all of which shared the same characteristics Defendants willfully misrepresented and/or concealed from Named Plaintiffs and other Class Members." *Id.* Plaintiffs further asserted in paragraph five of the complaint:

> All of the [products included in the suit] were debt securities exempt from registration pursuant to rules issued by the Securities and Exchange Commission under the Securities Act of 1933, [which] were not issued by investment companies registered under or which have filed registration statements under the Investment Company Act of 1940, and/or [which] otherwise did not qualify as "covered securities" for purposes of the Securities Litigation Uniform Standards Act of 1998 [(SLUSA)].

*Id.* ¶ 5. Importantly, neither the definition, nor any other portion of the complaint, identified specific products subject to the suit. Instead they provided merely a description of the products potentially applicable under the suit, without identifying specific products.

As the Court noted, Defendants removed the action to federal court based on 15 U.S.C. § 78bb(f)(2). According to that statute, "[a]ny covered class action brought in any State court involving a covered security . . . shall be removable to the Federal district court for the district in which the action is pending." *Id.*

ELECTRONICALLY FILED - 2020 Aug 05 8:28 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Thereafter, Plaintiffs filed a motion to remand the action to state court, which the Court denied because the original complaint implicated SLUSA and thus presented a federal question.

Subsequently, Plaintiffs filed a motion to amend their complaint, which the Court granted. The First Amended Complaint (FAC) makes two relevant changes from the original complaint. First, it modifies paragraph five, adding: "The Named Plaintiffs hereby expressly exclude any . . . [p]roducts that otherwise meet the definition of a covered security from this action." FAC ¶ 5.

Second, Plaintiffs likewise limit the class definition to individuals sold "a debt instrument . . . that is not a 'covered security' under SLUSA." *Id.* ¶ 95. Stated differently, these changes exclude from the suit any product determined by a court during the course of the litigation to be a covered security, rather than declaring from the start the products meeting the other parameters of the suit fail to meet the requirements of a covered security.

Plaintiffs filed their amended complaint and filed a new motion for remand. Defendants responded and Plaintiffs replied. The Court is now ready to rule on the pending motion.

## III.    STANDARD OF REVIEW

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction may be removed by the defendant." 28 U.S.C. § 1441(a). "Because removal jurisdiction raises significant federalism concerns, [a court] must strictly construe removal jurisdiction." *Mulcahey v. Columbia Organic Chem. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). "If federal jurisdiction is doubtful, a remand is necessary." *Id.*

Federal courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States. 28 U.S.C. § 1331. Under federal question jurisdiction, the well-plead compliant rule applies. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). This requires

ELECTRONICALLY FILED - 2020 Aug 05 8:28 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

"a federal question [be] presented on the face of the plaintiff's properly pleaded complaint." *Id.* This means a plaintiff "may avoid federal jurisdiction by exclusive reliance on state law." *Id.*

## IV.    DISCUSSION AND ANALYSIS

Plaintiffs move to remand the case, arguing the FAC eliminates any SLUSA applicability and presents only state-law claims. They present two distinct arguments. First, they assert the changes made in the FAC mean the case no longer presents any federal questions, making SLUSA inapplicable and requiring remand. Second, they argue even if remand is not required, the Court should decline to exercise supplemental jurisdiction over the FAC, since all federal claims have been removed.

The Court identifies three analytical steps to address Plaintiffs motion. First, it must determine whether the FAC still implicates SLUSA.

### A.    *Whether the FAC still implicates SLUSA*

Plaintiffs assert the FAC removes any SLUSA implication, thus removing any federal questions. As discussed in the Court's October 10, 2019 order, Congress, through SLUSA, manifested complete preemption over state law class actions claims regarding covered securities. 15 U.S.C. § 78bb(f)(2). When federal law creates a strong enough federal interest in the area of law, complete preemption has the effect of transforming a state-law "claim [in that area] into one arising under federal law." *In re Blackwater Sec. Consulting, Inc.*, 460 F.3d 576, 584 (4th Cir. 2006).

SLUSA preempts a state claim if four elements are met:  1) "the action is a covered class action," 2) "the action purports to be based on state law," 3) "the defendant is alleged to have misrepresented or omitted a material fact (or to have used or employed any manipulative or

ELECTRONICALLY FILED - 2020 Aug 05 8:28 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

deceptive device or contrivance)," and 4) the conduct described in element three is done "in connection with the purchase or sale of a covered security." *Green v. Ameritrade, Inc.*, 279 F.3d 590, 596 (8th Cir. 2002).

A covered security is any security meeting certain requirements under "the Securities Act of 1933," but excluding "any debt security that is exempt from registration under the Securities Act of 1933." 15 U.S.C. § 78bb(f)(5)(E).  A covered class action is a single lawsuit seeking damages "on behalf of 50 or more persons" in which questions of law or fact common to all plaintiffs predominate over questions related to individual plaintiffs, or in which a named party seeks to recover damages on a representative basis." *Id.* § 75bb(f)(5)(B).

The Court now turns to the new language in the FAC, excluding from the suit any product deemed a covered security under SLUSA.  The two relevant language changes affect only the fourth element.  Because the Court determined in its October 10, 2019 order the first three elements were satisfied, it need not repeat that discussion here.

As noted above, the FAC changed the complaint to, "expressly exclude any . . . [p]roducts [from the suit] that otherwise meet the definition of a covered security from this action."  FAC ¶ 5.

The new language makes key changes, addressing the Court's concern from its previous order.  First, the new language explicitly excludes all covered securities, unlike in the original complaint, which relied on Plaintiff's assertion that included securities were not covered securities. Now, it is clear from the plain language of the complaint, if a product is a covered security, it is automatically excluded from the lawsuit completely.

Second, and relatedly, it removes any potential federal implication from the FAC.  Under the original complaint, a product meeting the requirements of Paragraph four of that complaint would be a part of the suit, even if it met the requirements for a covered security, despite Plaintiff's

ELECTRONICALLY FILED - 2020 Aug 05 8:28 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

assurances no products were covered securities. This is because the exclusion of covered securities was an assertion, rather than a definitional requirement for a product to be relevant. Any such products would be subject to dismissal, but the complaint would, at this stage, include such products. By contrast, the FAC fails to implicate any federal questions, as the sued-upon products are definitionally not covered securities.

Stated differently, even at this stage of the litigation, the FAC eliminates the possibility the suit will ever implicate a covered security, rather than requiring claims related to covered securities later be dismissed from the suit. This nuanced distinction from the original complaint is determinative. All purportedly fraudulent acts sued upon and their associated products, under the FAC, fail the fourth criteria of SLUSA preemption inasmuch as they have no "connection with the purchase or sale of a covered security," *Green*, 279 F.3d at 596, and therefore no federal question remains.

Importantly, a state court is "an equally competent body . . . to make the preclusion determination" under SLUSA. *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 645 (2006). Thus, the fact a court might need to make later preclusion determinations on individual products associated with the purportedly fraudulent acts is insufficient to create a federal question. Plaintiffs, thus, are correct; SLUSA no longer applies to the case.

### B. Whether the Court is required to remand the case

Having determined no federal questions remain in the FAC, the Court must examine whether it has subject matter jurisdiction to hear the case moving forward. A court's subject matter jurisdiction is determined by the original complaint. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 640 (2009) (stating a district court is vested with subject matter jurisdiction over a case based on the original complaint). Importantly, "subject matter jurisdiction is not divested from the district court when the federal claims are dismissed from the complaint." *Harless v. CSX*

6

ELECTRONICALLY FILED - 2020 Aug 05 8:28 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

*Hotels, Inc.*, 389 F.3d 444, 448 (4th Cir. 2004)    Thus, because the Court previously determined the original complaint implicated federal questions, it retains subject matter jurisdiction over this complaint.

> **C.  Whether the Court should exercise supplemental jurisdiction over the remaining state law claims**

Although the Court retains jurisdiction based on the original complaint, it must decide whether to decline to exercise its supplemental jurisdiction once it has decided the federal claims. *See id.* at 447-51 (declining to exercise supplemental jurisdiction and granting a motion to remand after an amendment to the complaint removed any federal claims).  Because the case can be remanded, the Court must now perform a supplemental jurisdiction analysis.

Essentially, once the complaint is amended to remove all federal questions, the Court is left with a discretionary decision whether to exercise supplemental jurisdiction. *See id.* (upholding a district court's discretionary declination of supplemental jurisdiction after an amendment to the complaint removed all outstanding federal questions). A district court "enjoy[s] wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995).  "Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Id.*

The factors for supplemental jurisdiction weigh against the Court exercising supplemental jurisdiction in this case.  Because this case still is in its infancy, there are no arguments for convenience or judicial economy present.  Further, there is nothing inherently unfair to the parties in remanding a case at such an early stage of litigation.  Finally, as addressed above, the mere fact

ELECTRONICALLY FILED - 2020 Aug 05 8:28 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

a state court will make determinations of preclusion, fails to implicate a federal policy requiring this Court to retain jurisdiction.

Accordingly, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims.

## VI.    CONCLUSION

For the reasons stated above, it is the judgment of the Court Plaintiffs' motion for remand is **GRANTED**.


   **IT IS SO ORDERED.**

Signed this 31st day of July 2020 in Columbia, South Carolina.

s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE

A TRUE COPY
ATTEST: ROBIN L. BLUME, CLERK

BY:

DEPUTY CLERK

ELECTRONICALLY FILED - 2020 Aug 05 8:33 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

**U.S. District Court**

**District of South Carolina**

## Notice of Electronic Filing

The following transaction was entered on 7/31/2020 at 4:43 PM EDT and filed on 7/31/2020
**Case Name:** Black et al v. Mantei & Associates, Ltd. et al
**Case Number:** 3:19-cv-02097-MGL
**Filer:**
**WARNING: CASE CLOSED on 07/31/2020**
**Document Number:** 76

Docket Text:
**MEMORANDUM OPINION AND ORDER granting [67] Motion to Remand to State Court. Signed by Honorable Mary Geiger Lewis on 7/31/2020. Clerk's Notice: Attorneys are responsible for supplementing the State Record with all documents filed in Federal Court. (cbru, )**

**3:19-cv-02097-MGL Notice has been electronically mailed to:**

Joel Haywood Smith   joel.smith@bowmanandbrooke.com, brianna.arnone@bowmanandbrooke.com, sara.rothell@bowmanandbrooke.com, tina.beard@bowmanandbrooke.com

Michael Hart Montgomery   mhm@montgomerywillard.com, cbradley@montgomerywillard.com

Mitchell Myron Willoughby   mwilloughby@willoughbyhoefer.com, landrews@willoughbyhoefer.com, moshields@willoughbyhoefer.com

Elizabeth Zeck   ezeck@willoughbyhoefer.com

Cory E Manning   cory.manning@nelsonmullins.com, ann.boney@nelsonmullins.com, caroline.stone@nelsonmullins.com

Kevin Joseph Malloy   kevin.malloy@bowmanandbrooke.com, brianna.arnone@bowmanandbrooke.com, ceanne.sullivan@bowmanandbrooke.com, sara.rothell@bowmanandbrooke.com

Robert Walker Humphrey, II   whumphrey@willoughbyhoefer.com, bkarns@willoughbyhoefer.com

Joanna Christina Boardman   cboardman@bressler.com

Joshua Daniel Jones   jdjones@bressler.com

Armistead Inge Selden, III   iselden@bressler.com

**3:19-cv-02097-MGL Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091130295 [Date=7/31/2020] [FileNumber=9740977-0
] [20a4058eadfa38c503fb5198d1ee620208b622905e0fa2aee4e03808386f0dc9382
a384c72d99786a3f8f2dd00c4606727584326f600ac1f1c8d2a632f23f288]]

ELECTRONICALLY FILED - 2020 Aug 05 8:33 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ELECTRONICALLY FILED - 2020 Aug 10 4:13 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF LEXINGTON | ) | ELEVENTH JUDICIAL CIRCUIT |
| | ) | |
| Donald Black, Marcia Black, Larry Martin, | ) | C.A. No. 2019-CP-32-02636 |
| Rebecca Martin, Barbara Thompson, and | ) | |
| James Thompson, | ) | |
| | ) | |
| For Themselves and a Class of Similarly | ) | |
| Situated Plaintiffs, | ) | |
| | ) | |
| Plaintiffs, | ) | **DEFENDANTS'** |
| | ) | **MOTION TO DISMISS** |
| | ) | |
| vs. | ) | |
| | ) | |
| Mantei & Associates, Ltd., Ricky Alan | ) | |
| Mantei, Cindy Chiellini, Centaurus Financial, | ) | |
| Inc., and J.P. Turner & Company, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Defendants Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini (collectively, the "Mantei Defendants"), Centaurus Financial, Inc. ("Centaurus"), and J.P. Turner & Company, L.L.C. ("J.P. Turner" and, together with the Mantei Defendants and Centaurus, "Defendants"), by and through their undersigned attorneys, hereby move for an order dismissing the First Amended Complaint of Plaintiffs Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson (collectively "Plaintiffs") pursuant to Rules 8(a), 9(b), and 12(b)(6) of the South Carolina Rules of Civil Procedure.

This motion is based on the following grounds:

## I.     Rule 9(b) of the South Carolina Rules of Civil Procedure

Under Rule 9(b) of the South Carolina Rules of Civil Procedure, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b), SCRCP.  "[T]he 'circumstances' required to be pled with particularity under Rule 9(b)

ELECTRONICALLY FILED - 2020 Aug 10 4:13 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

are 'the time, place and contents of the false representations, as well as the identity of the person making the representation and what he obtained thereby.'" *Cot v. Univ. of S.C.*, No. 2016-CP-10-50822017, S.C. C.P. LEXIS 345, at \*25 (S.C.C.P. June 26, 2017) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

Because Plaintiffs directly cite fraudulent acts or omissions as the basis for each of their separate causes of action, all of their claims are based on alleged fraudulent acts or omissions and, therefore, are subject to Rule 9(b)'s heightened pleading standard. *See* Amended Compl. at ¶¶ 107, 114, 115, 119, 122-25, 129, 134. Nonetheless, Plaintiffs do not meet the minimum requirements of Rule 9(b). *See* Rule 9(b), SCRCP. Among other Rule 9(b) deficiencies, Plaintiffs do not identify the person who committed allegedly fraudulent acts, the alleged fraudulent statements or representations made by this unidentified person, or even what specific investments were purchased by each Plaintiff that are allegedly at issue in this case. *See generally* Amended Complaint. As such, all of Plaintiffs' claims should be dismissed for failure to meet Rule 9(b)'s heightened pleading requirements. *See* Rule 9(b), SCRCP; *Ardis v. Cox*, 314 S.C. 512, 515-16, 431 S.E.2d 267, 269 (S.C. App. 1993) (finding that a complaint alleging fraud was "fatally defective" as the plaintiff did not specifically allege fraud and noting that "[w]here the complaint omits allegations on any element of fraud, the trial court should grant the defendant's motion to dismiss the claim").

## II.     Rules 8(a) and 12(b)(6) of the South Carolina Rules of Civil Procedure

Not only do the allegations in Plaintiffs' First Amended Complaint fail to meet Rule 9(b)'s pleading standard, but several of their claims also fail as a matter of law under Rule 8(a)(2) and Rule 12(b)(6)'s pleading requirements. *See* Rule 8(a)(2), SCRCP; Rule 12(b)(6), SCRCP. Rule 8(a)(2) provides that a plaintiff is required to plead a "a short and plain statement of the facts

ELECTRONICALLY FILED - 2020 Aug 10 4:13 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

showing that the [plaintiffs] is entitled to relief." Rule 8(a)(2), SCRCP.  "Under Rule 12(b)(6), SCRCP, a defendant may move to dismiss based on a failure to state facts sufficient to constitute a cause of action."  *Flateau v. Harrelson*, 355 S.C. 197, 201, 584 S.E.2d 413, 415 (S.C. Ct. App. 2003).  As explained below, Plaintiffs' claims based on Centaurus's alleged ratification, alleged violations of rules and regulations under which no private right of action exists, and alleged violations of the South Carolina Uniform Securities Act should all be dismissed pursuant to Rule 12(b)(6).

### a.    Centaurus's Alleged Ratification Does Not Create a Legally Cognizable Claim.

Under South Carolina law, a claim for ratification requires proof of the following three elements: "(1) acceptance by the principal of the benefits of the agent's acts, (2) full knowledge of the facts, and (3) circumstances or an affirmative election indicating an intention to adopt the unauthorized arrangements."  *Lincoln v. Aetna Casualty & Surety Co.*, 300 S.C. 188, 191, 386 S.E.2d 801, 803 (S.C. Ct. App. 1989).  Although Plaintiffs assert that Centaurus "ratified the recommendations of the Mantei Defendants and their associates while associated with J.P. Turner," see Amended Compl. at ¶ 20, Plaintiffs make no allegation of agency between Centaurus and J.P. Turner, or between Centaurus and the Mantei Defendants during the time the Mantei Defendants were employed by J.P. Turner.  Accordingly, Plaintiffs fail to plead the prerequisite elements to establish ratification and this claim should be dismissed pursuant to Rule 12(b)(6), SCRCP.

### b.    Plaintiffs' Claims Based on Rules and Regulations that Offer No Private Causes of Action Fail as a Matter of Law.

Plaintiffs attempt to bring causes of action based on rules and provisions that offer them no private rights of action, thereby bringing legally invalid claims upon which no relief can be granted.  *See, e.g.*, *Hambrick v. GMAC Mortg. Corp.*, 370 S.C. 118, 125, 634 S.E.2d 5, 9 (S.C. Ct.

ELECTRONICALLY FILED - 2020 Aug 10 4:13 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

App. 2006) (affirming dismissal of claim because "no private right of action exists" for that claim). Despite this accepted rule of law, Plaintiffs rely on rules and regulations in their first (breach of contract), fourth (breach of contract accompanied by fraudulent act) and fifth (state securities act violations) causes of action. *See* Amended Compl. at ¶¶ 105, 122, 129-34. Because these alleged violations do not create a private right of action for any plaintiff, any claim based upon such must be dismissed as a matter of law.

        **c.**     ***Plaintiffs' South Carolina Uniform Securities Act Claims Fail as a Matter of Law.***

Plaintiffs bring claims pursuant to the South Carolina Uniform Securities Act, §§ 35-1-101, *et seq*. (fifth cause of action) that are outside of the enumerated civil relief provided by this Act. For instance, alleged violations of the South Carolina Uniform Securities Act are governed by the limitations period prescribed in § 35-1-509(j)(2), yet Plaintiffs bring claims that are outside of this applicable limitations period. *See generally* Amended Complaint. Because Plaintiffs bring claims pursuant to this Act that fail to state facts sufficient to constitute a cause of action, these claims should be dismissed pursuant to Rule 12(b)(6), SCRCP.

<u>**Conclusion**</u>

For the foregoing reasons, this case should be dismissed. This motion is based on the pleadings, South Carolina Rules of Civil Procedure, any forthcoming memoranda in support of the motion, and the common and statutory law of the State of South Carolina.

[SIGNATURE PAGE FOLLOWS]

ELECTRONICALLY FILED - 2020 Aug 10 4:13 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Respectfully submitted,

/s/ Joel H. Smith
Joel H. Smith, SC Bar No. 5266
Kevin J. Malloy, SC Bar No. 100170
Bowman and Brooke LLP
1441 Main Street, Suite 1200
Columbia, SC  29201-2897
(803) 726-7422
Joel.Smith@bowmanandbrooke.com
Kevin.Malloy@bowmanandbrooke.com

J. Christina Boardman, SC Bar No. 104395
Bressler, Amery & Ross, P.C.
2001 Park Place, Suite 15000
Birmingham, AL 35203
(205) 820-7422
 cboardman@bressler.com

*Attorneys for Centaurus Financial, Inc.*

/s/ Michael H. Montgomery
Michael H. Montgomery, SC Bar No. 4034
Montgomery Willard, LLC
1002 Calhoun Street (29201)
Post Office Box 11886
Columbia, South Carolina 29211
(803) 779-3500
mhm@montgomerywillard.com

*Attorney for Mantei & Associates, Ltd.,
Ricky Alan Mantei, and Cindy Chiellini*

/s/ Cory Manning
Cory Manning, SC Bar No. 14702
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
(803) 255-5524
Cory.Manning@nelsonmullins.com

*Attorney for J.P. Turner & Company, L.L.C.*

August 10, 2020
Columbia, South Carolina

ELECTRONICALLY FILED - 2020 Aug 10 4:20 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| COUNTY OF LEXINGTON | ) | |
| | ) | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| | ) | |
| Donald Black, Marcia Black, Larry Martin, | ) | CIVIL ACTION NO: 2019-CP-32-02636 |
| Rebecca Martin, Barbara Thompson, and | ) | |
| James Thompson, | ) | |
| | ) | |
| For themselves and a Class of Similarly | ) | |
| Situated Plaintiffs, | ) | **DEFENDANTS' MOTION TO STRIKE** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Mantei & Associates, Ltd., Ricky Alan | ) | |
| Mantei, Cindy Chiellini, Centaurus Financial, | ) | |
| Inc., and J.P. Turner & Company, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Defendants Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus

Financial, Inc., and J.P. Turner & Company, LLC (collectively, "Defendants"), by and through

undersigned counsel, and pursuant to Rule 12(f) of the South Carolina Rules of Civil Procedure,

file this Memorandum of Law in support of their Motion to Strike Donald Black, Marcia Black,

Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson's (collectively,

"Plaintiffs") First Amended Complaint ("Amended Complaint").

     1.     Because Plaintiffs' Amended Complaint is fashioned with redundant, immaterial,

impertinent, scandalous, argumentative, and prejudicial allegations, Defendants' Motion to

Strike should be granted in its entirety.

     2.     This matter arises out of Plaintiffs' purchase of, structured certificates of deposit,

principal-protected notes, and corporate bonds.  A central gravamen of Plaintiff's grievance is

that J.P. Turner and Centaurus Financial, Inc., the "Broker-Dealer Defendants"  failed to conduct

ELECTRONICALLY FILED - 2020 Aug 10 4:20 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

adequate due diligence and supervision as Defendants Ricky Alan Mantei ("Mr. Mantei"), Cindy Chiellini ("Ms. Chiellini"), and Mantei & Associates, Ltd., advertised and sold "illiquid debt instruments to unsophisticated investors."  (Amended Compl. ¶ 4.)

3.     Plaintiffs allege they were somehow tricked into believing they were set to receive substantial returns with no downside-risk instead of recommended safe and steady investments.  While the facts of the case are straight-forward, Plaintiffs' Amended Complaint is anything but.

4.     Plaintiffs' Amended Complaint is not a short or plain statement of facts, it is 31 pages of long and drawn out allegations, that even when material, are more evidentiary than notice pleading.  The majority of the 136 paragraphs are redundant, immaterial, impertinent, scandalous, argumentative, and prejudicial.  More than that, they are contrary to the South Carolina Rules of Civil Procedure.

5.     While Defendants can look past many of these allegations; two specific claims compel Defendants to move that the verbiage pled be stricken: i) Plaintiffs' use of the word "Ripoff Products" over 100 times to describe the investments at issue; and ii) Plaintiffs' inclusion of unrelated and irrelevant regulatory history of both non-parties and J.P. Turner.

6.     South Carolina Rule of Civil Procedure 12(f) allows the court to strike either on its own or on motion properly made by a party any redundant, immaterial, impertinent, or scandalous matter as should be done here. S.C. R. Civ. P. 12(f)("Upon motion pointing out the defects complained of, and made by a party before responding to a pleading... [a] court may order stricken from any pleading any... redundant, immaterial, impertinent or scandalous matter."). The decision whether to strike matter from a pleading is a decision to be made by the trial judge, in the exercise of his discretion. *Gambrell v. Cox*, 250 S.C. 228 (1967). The court's

ELECTRONICALLY FILED - 2020 Aug 10 4:20 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

ruling does not affect the trial judge's discretion regarding admissibility of evidence at the trial of the matter. *Id*. at 230; *Spears v. D. M. Dew & Sons Inc.*, 230 S.C. 507 (1957).

7.     The allegations identified in Defendants' motion should be striken as they are both immaterial and are prejudicial.

8.     Plaintiffs' use of the phrase "Ripoff Products" to define and refer to the investments at issue should be stricken as scandalous, argumentative, immaterial, and prejudicial to Defendants.

9.     For example, in paragraph 4 of the Amended Complaint, Plaintiffs define the structured certificates of deposit, principal-protected notes, and corporate bonds as the "Ripoff Products." (Amended Compl. ¶ 4.) The United States District Court District of South Carolina has stricken similar language when confronted with this issue in the past. *See, e.g. Hughes v. Kaiser Jeep Corp.*, 40 F.R.D. 89 (D.S.C. 1966) (holding that a reference to the vehicle in which the plaintiff's decedent was killed as a "death trap" was unnecessary, argumentative, prejudicial, and was stricken.).

10.     Here, Plaintiffs use the term "Ripoff Products" over 100 times throughout the Amended Complaint. This term is unwarranted as it is merely intended by Plaintiffs to cast the Defendants and the investments at issue in a derogatory light from the outset by forcing the Court and the Parties to refer to the products at issue as "ripoffs" in hopes that "if you say it enough, it just might stick."

11.     This language is scandalous and has no place in the pleadings. The language is also irrelevant to the allegations made in the Amended Complaint. Here, the gravamen of the Amended Complaint is not that the investments at issue are inherently bad; rather, Plaintiffs

ELECTRONICALLY FILED - 2020 Aug 10 4:20 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

allege that Defendants made misrepresentations concerning the products and/or the products were unsuitable for them based on their lack of financial sophistication.

12.     Finally, the language used by Plaintiffs is prejudicial just like the language used in the cases cited above. *See Kaiser Jeep Corp.*, 40 F.R.D. 89 (striking reference to the vehicle in which the plaintiff's decedent was killed as a "death trap" was unnecessary, argumentative, and ***prejudicial***) (emphasis added).

13.     In addition, the term "Ripoff Products" is prejudicial on its face. Because this is a putative class action, the Amended Complaint could potentially be submitted to non-parties to provide notice of the claims and ask them to join in litigation against Defendants (to not opt-out of the class). Plaintiffs estimated that the class size would "not exceed 100 members." (Amended Compl. ¶ 97.) It seems that the only basis for including the term is to inflame potential class members. Striking this material promotes the very purpose of Rule 12(f).

14.     Plaintiffs' allegations of prior regulatory history should be stricken as immaterial, impertinent, and scandalous. (*See* Amended Compl. ¶ 18.) Notably, Plaintiffs make no allegation that any of the supposed regulatory matters are related to or even similar to the conduct alleged by Plaintiffs.

15.     Allegations related to prior, unrelated actions may be stricken as scandalous, immaterial, and prejudicial.

16.     Here, Plaintiffs' inclusion of unrelated regulatory history is immaterial, impertinent, and scandalous and should be stricken. Whether D.E. Frey & Company, GunnAllen Financial, Inc., or J.P. Turner have been the subject of unrelated, prior regulatory investigations is not relevant to any issue or claim raised by Plaintiffs.

ELECTRONICALLY FILED - 2020 Aug 10 4:20 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

17.     While Defendants dispute that this evidence will be admissible, if Plaintiffs wish to argue otherwise they may try to do so at the correct procedural stage, but such claims are plainly improper at the pleading stage.

## **CONCLUSION**

WHEREFORE, Defendants pray as follows:

a.  All references to regulatory history be stricken from the Amended Complaint;

b.  All reference to the term "Ripoff Products" be stricken from the Amended Complaint; and

c.  For such other and further relief as the Court deems proper.

Respectfully submitted,

*/s/ Joel H. Smith*
Joel H. Smith, SC Bar No. 5266
Kevin J. Malloy, SC Bar No. 100170
Bowman and Brooke LLP
1441 Main Street, Suite 1200
Columbia, SC  29201-2897
(803) 726-7422
Joel.Smith@bowmanandbrooke.com
Kevin.Malloy@bowmanandbrooke.com

J. Christina Boardman, SC Bar No. 104395
Bressler, Amery & Ross, P.C.
2001 Park Place, Suite 15000
Birmingham, AL 35203
(205) 820-7422
 cboardman@bressler.com

*Attorneys for Centaurus Financial, Inc.*

ELECTRONICALLY FILED - 2020 Aug 10 4:20 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

_/s/ Michael H. Montgomery_
Michael H. Montgomery, SC Bar No. 4034
Montgomery Willard, LLC
1002 Calhoun Street (29201)
Post Office Box 11886
Columbia, South Carolina 29211
(803) 779-3500
mhm@montgomerywillard.com

_Attorney for Mantei & Associates, Ltd.,_
_Ricky Alan Mantei, and Cindy Chiellini_


_/s/ Cory Manning_
Cory Manning, SC Bar No. 14702
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
(803) 255-5524
Cory.Manning@nelsonmullins.com

_Attorney for J.P. Turner & Company, L.L.C._

August 10, 2020
Columbia, South Carolina

ELECTRONICALLY FILED - 2020 Aug 10 4:26 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636



| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| COUNTY OF LEXINGTON | ) | |
| | ) | FOR THE ELEVENTH JUDICIAL CIRCUIT |
| | ) | |
| Donald Black, Marcia Black, Larry Martin, | ) | CIVIL ACTION NO: 2019-CP-32-02636 |
| Rebecca Martin, Barbara Thompson, and | ) | |
| James Thompson, | ) | |
| | ) | |
| For themselves and a Class of Similarly | ) | NOTICE OF MOTION AND MOTION FOR |
| Situated Plaintiffs, | ) | SCHEDULING ORDER THROUGH RULING |
| | ) | ON MOTION FOR CERTIFICATION OF |
| Plaintiffs, | ) | PUTATIVE CLASS |
| | ) | Rule 23(d), S.C.R.C.P. |
| vs. | ) | Rule 26(d), S.C.R.C.P. |
| | ) | |
| | ) | |
| Mantei & Associates, Ltd., Ricky Alan Mantei, | ) | |
| Cindy Chiellini, Centaurus Financial, Inc., and | ) | |
| J.P. Turner & Company, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**TO: THIS HONORABLE COURT AND PLAINTIFFS DONALD BLACK, MARCIA BLACK, LARRY MARTIN, REBECCA MARTIN, BARBARA THOMPSON, AND JAMES THOMPSON AND THEIR ATTORNEYS MITCHELL WILLOUGHBY, ELIZABETH ZECK, AND R. WALKER HUMPHREY, II:**

YOU WILL PLEASE TAKE NOTICE that Defendants Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini (collectively, the "Mantei Defendants"), Centaurus Financial, Inc. ("Centaurus"), and J.P. Turner & Company, L.L.C. ("J.P. Turner" and, together with the Mantei Defendants and Centaurus, collectively "Defendants"), by and through their undersigned attorneys, hereby move, pursuant to Rules 23(d) and 26(d), *S.C.R.C.P.*, for a Scheduling Order dealing with all matters involving this case up to and including the Court ruling on Plaintiffs' anticipated Motion for Certification of a Putative Class in this matter. Defendants make this Motion reserving fully their rights to move to dismiss this matter pursuant to Rules 8, 9 and 12 of the South Carolina Rules of Civil Procedure. This motion is based on the following grounds:

1

ELECTRONICALLY FILED - 2020 Aug 10 4:26 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

1.      This case arises out of Plaintiffs' claims of fraud, breach of fiduciary duty, breach of contract, breach of contract accompanied by a fraudulent act, unjust enrichment, and violation of the South Carolina Securities Acts in their purchase of certain unspecified debt investments through some or all Defendants.

2.      Because Plaintiffs are required to arbitrate any individual claims against Defendants pursuant to written agreements containing binding, pre-dispute arbitration provisions, this case will terminate entirely should the Court deny class certification.  Thus, the bifurcation of discovery is warranted here to ensure both fairness to the parties and judicial economy in the administration of this case.

3.      The bifurcation of discovery in this matter is also necessary because class discovery and merits discovery will involve different inquiries.  Specifically, while class discovery will focus on whether Plaintiffs meet the standards set forth in Rule 23, *S.C.R.C.P.*, merits discovery will center on individualized inquiries regarding the alleged fraud in connection with the unspecified investments at issue in the First Amended Complaint.  Allowing these two separate stages of discovery to overlap would confuse the issues central to each stage of this case.

4.      Furthermore, if class certification is denied, merits discovery will be pursued in individual arbitrations.  As such, the additional burden of Defendants having to respond to merits discovery (and potentially doing so based on different procedural discovery rules) before class certification is decided would be unduly burdensome and costly for Defendants.

5.      Additionally, Defendants are filing Motions to Dismiss and Strike concurrently with this motion.  Should the Court grant Defendants' Motion to Dismiss, the class discovery provided for in the Scheduling Order will be unnecessary.  Therefore, Defendants also move that the Court's Order not allow any discovery to commence until the Court has ruled upon Defendants'

ELECTRONICALLY FILED - 2020 Aug 10 4:26 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Motions to Dismiss and Strike as well as any such motions that may be filed in response to any amended complaint.

6.     Based on the foregoing, it is vital for the Court to set guidelines for discovery in this matter up to the point of the Court issuing a ruling on the Class Certification question in order to ensure the convenience of the parties and witnesses, the interests of justice, the judicial economy of this case, and the avoidance of unnecessary discovery.  Defendants have attached a proposed Order on this motion as Exhibit A hereto.  Defendants respectfully request that the Court enter this proposed Order to promote an efficient and just administration of this case.

This motion is based upon the pleadings in this matter, all applicable authority together with any memoranda, argument, and affidavits as might be submitted hereafter as permitted by the Court and as authorized by the South Carolina Rules of Civil Procedure.

Pursuant to Rule 11, South Carolina Rules of Civil Procedure, I certify that I attempted to communicate with opposing counsel prior to filing this motion.  The communication could not be timely held.  Moreover, I do not believe that consultation would serve any useful purpose.

*s/ Michael H. Montgomery*
Michael H. Montgomery, SC Bar No. 4034
Montgomery Willard, LLC
1002 Calhoun Street (29201)
Post Office Box 11886
Columbia, South Carolina 29211
(803) 779-3500
mhm@montgomerywillard.com

ELECTRONICALLY FILED - 2020 Aug 10 4:26 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Respectfully submitted,

/s/ Joel H. Smith
Joel H. Smith, SC Bar No. 5266
Kevin J. Malloy, SC Bar No. 100170
Bowman and Brooke LLP
1441 Main Street, Suite 1200
Columbia, SC  29201-2897
(803) 726-7422
Joel.Smith@bowmanandbrooke.com
Kevin.Malloy@bowmanandbrooke.com

J. Christina Boardman, SC Bar No. 104395
Bressler, Amery & Ross, P.C.
2001 Park Place, Suite 15000
Birmingham, AL 35203
(205) 820-7422
 cboardman@bressler.com

*Attorneys for Centaurus Financial, Inc.*

/s/ Michael H. Montgomery
Michael H. Montgomery, SC Bar No. 4034
Montgomery Willard, LLC
1002 Calhoun Street (29201)
Post Office Box 11886
Columbia, South Carolina 29211
(803) 779-3500
mhm@montgomerywillard.com

*Attorney for Mantei & Associates, Ltd.,*
*Ricky Alan Mantei, and Cindy Chiellini*

/s/ Cory Manning
Cory Manning, SC Bar No. 14702
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
(803) 255-5524
Cory.Manning@nelsonmullins.com

*Attorney for J.P. Turner & Company, L.L.C.*

August 10, 2020
Columbia, South Carolina

EXHIBIT A TO MOTION FOR SCHEDULING ORDER

ELECTRONICALLY FILED - 2020 Aug 10 4:26 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | |
|---|---|
| STATE OF SOUTH CAROLINA | ) IN THE COURT OF COMMON PLEAS |
| COUNTY OF LEXINGTON | ) |
| | ) FOR THE ELEVENTH JUDICIAL CIRCUIT |
| | ) |
| Donald Black, Marcia Black, Larry Martin, | ) CIVIL ACTION NO: 2019-CP-32-02636 |
| Rebecca Martin, Barbara Thompson, and | ) |
| James Thompson, | ) |
| | ) |
| For themselves and a Class of Similarly | ) |
| Situated Plaintiffs, | ) SCHEDULING ORDER THROUGH RULING |
| | ) ON MOTION FOR CERTIFICATION OF |
| Plaintiffs, | ) PUTATIVE CLASS |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| Mantei & Associates, Ltd., Ricky Alan Mantei, | ) |
| Cindy Chiellini, Centaurus Financial, Inc., and | ) |
| J.P. Turner & Company, L.L.C., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## <u>SCHEDULING ORDER THROUGH RULING ON MOTION FOR CERTIFICATION OF PUTATIVE CLASS</u>

This matter is before the Court on Defendants' motion for a Scheduling Order. Defendants have asked the Court to limit the initial discovery in this matter to those issues necessary for the Court to determine whether to grant or to deny Plaintiffs' forthcoming request to certify the putative class. Defendants' request is based on the fact that the Court's denial of class certification would terminate the case in its entirety because Plaintiffs are required to arbitrate any individual claims against Defendants pursuant to written agreements containing binding, pre-dispute arbitration provisions. Defendants also request that any class discovery not commence until the Court has ruled upon Defendants' Motions to Dismiss and Strike, as well as any such motions that may be filed in response to any amended Complaint. Defendants aver that if the Court dismisses

EXHIBIT A TO MOTION FOR SCHEDULING ORDER

ELECTRONICALLY FILED - 2020 Aug 10 4:26 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

the action, no discovery will be necessary.  The Court finds this request appropriate and that issuing this Order will ensure both fairness to the parties and judicial economy in the administration of this case.

The Court provides the following schedule for discovery relating to class certification issues and briefing of Plaintiffs' forthcoming request to certify the putative class. The discovery provided for herein shall be moot if the Court dismisses Plaintiffs' claims.

1.     The Parties shall file Motions to join other parties and amend the pleadings no later than thirty days following the issuance of an Order from the Court on Defendants' Motions to Dismiss.  If Defendants move to dismiss any Amended Complaint filed by Plaintiffs, the deadline set forth below shall run from the issuance of an Order from the Court on those Motions to Dismiss.

2.     The Parties shall commence discovery limited to those issues necessary for the Court to determine whether to grant or to deny Plaintiffs' forthcoming request to certify the putative class; namely, those set forth in S.C.R.C.P. Rule 23(b)(1) and Plaintiffs' standing to pursue the asserted claims (hereinafter "Class Action Discovery") thirty days following the issuance of an Order from the Court on Defendants' Motions to Dismiss.

3.     Once commenced, Class Action Discovery shall last for 120 days.

4.     Plaintiffs shall file and serve a document identifying by full name, address, and telephone number each person whom Plaintiffs expect to call as an expert at the class certification

EXHIBIT A TO MOTION FOR SCHEDULING ORDER

ELECTRONICALLY FILED - 2020 Aug 10 4:26 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

stage, if any, within thirty days of the commencement of Class Action Discovery.

5.     Defendants shall file and serve a document identifying by full name, address, and telephone number each person whom Defendants expect to call as an expert at the class certification stage, if any, within thirty days after receipt of Plaintiffs' identification of any such expert.

6.     Class certification discovery shall close One Hundred Fifty (150) days following the issuance of an order on the Motions to Dismiss.  No motions relating to discovery shall be filed until counsel have conferred and attempted to resolve the matter.

7.     Plaintiffs shall file their Motion for Class Certification on or before thirty (30) days after the closing of class certification discovery.

8.     Defendants shall file any Opposition to Plaintiffs' Motion for Class Certification on or before thirty (30) days after the filing of Plaintiffs' Motion for Class Certification.

9.     Plaintiffs shall file any Reply in Support of Plaintiffs' Motion for Class Certification fourteen (14) days after the filing of Defendants' Opposition to Plaintiffs' Motion for Class Certification.

10.     The parties shall confer on remaining scheduling matters within ten (10) days of the Court's ruling on Plaintiffs' Motion for Class Certification.

EXHIBIT A TO MOTION FOR SCHEDULING ORDER

SO ORDERED, this _____ day of August 2020.

                                              _____

                                              Hon. Waltion J. McLeod, IV
                                              Chief Administrative Judge
                                              Court of Common Pleas
                                              For the 11th Judicial Circuit

Lexington, South Carolina

ELECTRONICALLY FILED - 2020 Aug 10 4:26 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636



ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

| | |
|---|---|
| STATE OF SOUTH CAROLINA | ) IN THE COURT OF COMMON PLEAS |
| | ) |
| COUNTY OF LEXINGTON | ) FOR THE ELEVENTH JUDICIAL CIRCUIT |
| | ) |
| Donald Black, Marcia Black, Larry | ) C/A NO. 2019-CP-32-02636 |
| Martin, Rebecca Martin, Barbara | ) |
| Thompson, and James Thompson, | ) |
| | ) |
| For themselves and a Class of Similarly | ) |
| Situated Plaintiffs, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) **PLAINTIFFS' FIRST AMENDED** |
| vs. | ) **COMPLAINT** |
| | ) **(Jury Trial Demanded)** |
| Mantei & Associates, Ltd., Ricky Alan | ) |
| Mantei, Cindy Chiellini, Centaurus | ) |
| Financial, Inc., and J.P. Turner & | ) |
| Company, L.L.C., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

Named Plaintiffs Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson, for themselves and, pursuant to Rule 23 of the South Carolina Rules of Civil Procedure, on behalf of a class of similarly situated Plaintiffs, complain of the above-named defendants, Mantei & Associates, Ltd. ("Mantei & Associates"), Ricky Alan Mantei, Cindy Chiellini, J.P. Turner & Company, LLC ("J.P. Turner"), and Centaurus Financial, Inc. ("Centaurus") (collectively "Defendants"), and respectfully allege as follows:

## INTRODUCTION

1.     This is a South Carolina class action brought to vindicate the rights of Named Plaintiffs Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson and James Thompson (collectively, "Named Plaintiffs"), and all similarly situated South Carolina investors (the "Class Members"), who were sold illiquid and ripoff products by Defendants.

1

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

2.      Mantei and Chiellini at all relevant times were employed by and/or affiliated with Mantei & Associates, Ltd. All brokers associated with Defendant Mantei & Associates, Ltd. worked as a team.  Defendant Mantei was instrumental in managing and reviewing investments for each and every client with each and every individual broker employed by and/or affiliated with Mantei & Associates, Ltd., and in personally reviewing each client's monthly statements.  Because of her long tenure and experience with Mantei & Associates, Ltd., Defendant Chiellini was named as the "financial representative" on client account statements.  Defendants Mantei, Chiellini, and Mantei & Associates are collectively referred to as the "Mantei Defendants."  At all times relevant to this action, the Mantei Defendants operated out of offices in Lexington County, South Carolina.

3.      Between approximately March 2010 and approximately June 15, 2015, Mantei and Chiellini were registered representatives of J.P. Turner.  Since approximately May 19, 2015, Mantei and Chiellini have been registered representatives with Centaurus.  J.P. Turner and Centaurus are referred to collectively herein as the "Broker-Dealer Defendants."

4.      Defendants advertised and sold illiquid debt instruments to unsophisticated investors over the age of 50, including Named Plaintiffs and the other Class Members, with false promises of high returns and guaranteed return of their principal investment within a short time following initial purchases.  These products included structured certificates of deposit ("Structured CDs"), principal protected notes ("PPNs"), and "medium term" corporate bonds (collectively, the "Ripoff Products"), all of which shared the same characteristics that Defendants willfully misrepresented and/or concealed from Named Plaintiffs and other Class Members:

- that the publicly advertised high initial interest rate would be recalculated after an introductory period based on complex and obscure metrics which resulted in the reduction to zero or near zero of the interest rates payable for the remaining length of the investments,

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

which maturities were measured in decades and in many cases were longer than the Named

Plaintiffs' and other Class Members' life expectancies;

- that the Ripoff Products did not perform like traditional bank certificates of deposit;

- that the market value would decrease during the life of the investments; and

- that the Ripoff Products were illiquid.

These "features" meant that Named Plaintiffs and the other Class Members could not access their

funds in the interim without substantial losses, if a secondary market even existed for such

investments.

5.      Through this class action, the Named Plaintiffs only seek recovery for themselves

and the Class Members for damages caused by products that do not qualify as "covered securities"

for purposes of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").  The Named

Plaintiffs hereby expressly exclude any Ripoff Products that otherwise meet the definition of a

covered security from this action, and they reserve the right to seek recovery of damages related

to any covered securities through other action(s) in another forum.

6.      Defendants advanced their own interests in the sale of the Ripoff Products without

regard and contrary to the interests of the investors, as these products paid high fees and

commissions to the detriment of the interests of Named Plaintiffs and other Class Members.

7.      Defendants sold the Ripoff Products as part of a willful and malicious scheme

designed to enrich themselves in reckless disregard of the rights and interests of, and any resulting

damage to, Named Plaintiffs and the other Class Members.

8.      Named Plaintiffs bring this action on behalf of a class consisting of all South

Carolina investors over the age of 50 years who were sold the Ripoff Products by Defendants, and

on behalf of themselves and other Class Members seek actual damages, punitive damages, court

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

costs, attorneys' fees, litigation expenses, prejudgment interest at the highest legal rate and/or another factor compensating for the time value of money, and equitable relief as may be appropriate, including but not limited to rescission and the disgorgement of commissions or other fees by which Defendants have been unjustly enriched.

## PARTIES

9.     Named Plaintiffs Donald Black, Marcia Black, Larry Martin, Rebecca Martin, Barbara Thompson, and James Thompson are each citizens and residents of the State of South Carolina.

10.     Defendant Mantei & Associates, Ltd. is a South Carolina corporation and has as its principal place of business 4580 Sunset Boulevard, Lexington, South Carolina 29072. Mantei & Associates is registered to do business in this State and is in good standing with the South Carolina Secretary of State. Defendants Ricky Alan Mantei and Cindy Chiellini each have their principal place of business at 4580 Sunset Boulevard, Lexington, South Carolina 29072.

11.     Defendants Ricky Alan Mantei and Cindy Chiellini are each citizens and residents of the State of South Carolina.  Defendant Cindy Chiellini is a resident of Lexington County, South Carolina. At all times relevant to this claim, Mantei and Chiellini were registered representatives, and Mantei was also a registered investment advisor, with either J.P. Turner or Centaurus.  All of the actions, inactions, omissions, and wrongdoing of both Mantei and Chiellini were performed for and on behalf of J.P. Turner and Centaurus in the course and scope of their employment. Therefore, Mantei and Chiellini are directly liable and Centaurus and J.P. Turner, and their control persons, are jointly, severally, and fully accountable and totally liable for the misconduct and fraudulent wrongdoing of Mantei and Chiellini under agency law, common law principles of *respondeat superior*, and state securities laws.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

12.     Defendant Centaurus Financial, Inc. is a California corporation and has as its principal place of business 2300 E Katella Avenue, Suite 200, Anaheim, California 92806. Centaurus is registered to do business in this State and is in good standing with the South Carolina Secretary of State.

13.     Defendant J.P. Turner & Company, LLC is a Georgia limited liability company and has as its principal place of business 200 North Pacific Coast Highway, Suite 1200, El Segundo, California 90245.  J.P. Turner terminated its registration to do business in this State on or about May 16, 2016, but remains an active Georgia limited liability company.

## JURISDICTION AND VENUE

14.     The incidents giving rise to this Complaint took place in the State of South Carolina.

15.     Defendants at all relevant times conducted and performed business and acts that are the subject of this Complaint in Lexington County, South Carolina and have sufficient contacts and business within Lexington County, South Carolina so as to render them subject to the *in personam* jurisdiction and venue of this Court pursuant to the Code of Laws of South Carolina.

16.     All claims contained herein are governed by the laws of the State of South Carolina.

17.     Venue is proper before this Court under, *inter alia*, S.C. Code Ann. § 15-7-30.

## GENERAL ALLEGATIONS

18.     The Mantei Defendants have been financial advisors and brokers in the Lexington area of South Carolina since 1995, often associated with firms having a lengthy record of gross regulatory violations.  From approximately 1995 to 2000, Mantei and Chiellini were registered representatives with D.E. Frey & Company ("D.E. Frey").  D.E. Frey's securities registration was terminated in early 2001 following repeated regulatory violations and sanctions.  From approximately 2008 to 2010, Mantei and Chiellini were registered representatives of GunnAllen

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Financial, Inc. ("GunnAllen"). The Financial Industry Regulatory Authority ("FINRA") shut down GunnAllen in 2010 after repeated lawsuits, investigations, and fines for regulatory violations plagued the firm. Mantei and Chiellini then became registered representatives of J.P. Turner from approximately 2010 to 2015. J.P. Turner suffered a fate similar to that of D.E. Frey and GunnAllen when its parent company, Cetera Financial Group ("Cetera"), shuttered J.P. Turner's operations in 2015 due to J.P. Turner's own pervasive regulatory violations.

19.    In approximately May 2015, the Mantei brokers all registered with Centaurus, and Centaurus, despite an opportunity and obligation to conduct appropriate due diligence and with the knowledge and understanding of the illiquidity and other characteristics of the Ripoff Products, adopted the same faithless wrongful conduct and strategy used at J.P. Turner and sanctioned the Mantei Defendants to carry on just as they had when affiliated with J.P. Turner—with the same book of business, the same products, and the same practices.

20.    Centaurus was aware of Mantei and Chiellini's prior employment history, the products they sold their clients, the products they would continue to sell their clients, and their business practices. Centaurus, upon accepting the transfer of the Class Members' accounts, failed to advise or inform the Class Members of the illiquid and imprudent nature of the Ripoff Products held in those accounts. Instead, by accepting the investments without comment to their clients, the Class Members, Centaurus ratified the recommendations of the Mantei Defendants and their associates while associated with J.P. Turner. Upon information and belief, Centaurus imposed no restrictions on Mantei and Chiellini with respect to the products they could sell, including the Ripoff Products, or the manner in which they sold them. Indeed, upon information and belief, Centaurus expressly sanctioned, allowed, permitted, and encouraged Mantei and Chiellini to keep selling Ripoff Products just as they had been.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

21.    Since May 2015, the Mantei Defendants and other registered representatives associated with Mantei & Associates have been the sole/primary representatives of Centaurus in the Aiken/Lexington areas of South Carolina and on information and belief, other parts of South Carolina as well.

22.    This case seeks damages and equitable remedies for the actions of the Mantei Defendants both during their tenure with J.P. Turner and continuing unabated with Centaurus.

23.    The Mantei Defendants, for themselves and on behalf of the Broker-Dealer Defendants, used outdoor signage outside their offices on Highway 378 in Lexington County, among other means of messaging, to advertise the Ripoff Products to the public.  These advertisements claimed the Ripoff Products were "FDIC insured" and provided very attractive interest rates up to 10%, in contrast to low rates then available from depository banks for traditional certificates of deposit and other similar investments, as a ruse to lure in elderly investors.

24.    Defendants' outdoor signage did not provide any explanation of any of the following characteristics of the Ripoff Products:

    a.    that the advertised Ripoff Products were different from traditional certificates of deposit and other similar investments offered by depository banks;

    b.    that the advertised Ripoff Products had no guaranteed rate of return over the life of the investment;

    c.    that the high rate of return advertised was a "teaser" rate that would be paid for only a short period and that thereafter interest would be determined by a calculation based on obscure market metrics;

    d.    that, due to the calculations embedded in the Ripoff Products, the rate of return following the initial teaser period would drop as low as 0% well before maturity;

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

e.  that the advertised FDIC insurance did not protect their investments against fluctuations in value prior to maturity as a result of decreased interest rates based on various financial indices;

f.  that there were high commissions and fees to be paid to Defendants or otherwise charged and that the advertised FDIC insurance only protected the amount of investment net of Defendants' fees;

g.  that the value of the Ripoff Products at maturity would effectively be worth less in purchasing power than the amount invested originally;

h.  that the value of the advertised Ripoff Products could and in fact did decrease substantially prior to maturity;

i.  that the Ripoff Products had lengthy maturity periods, often as long as decades, that could equal or exceed the investors' life expectancy, and

j.  that the Ripoff Products were highly illiquid and that any early sale, if available at all, would result in substantial loss of principal.

25.  Once elderly Named Plaintiffs and Class Members were lured into Defendants' local offices by the misleading advertising of the Ripoff Products, Defendants represented and assured them that Defendants had the knowledge and experience necessary to safely and prudently handle their investments.  As a result of these affirmative representations, Named Plaintiffs and Class Members placed the utmost faith, trust, and confidence in Defendants to provide sound, prudent and honest financial advice in the management of their retirement assets entrusted to Defendants.

26.  Defendants assured Named Plaintiffs and other Class Members that the outdoor signage accurately described the Ripoff Products they were purchasing.  But the misleading and

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

incomplete outdoor signage was just one part of Defendants' scheme of misrepresentation and concealment about the Ripoff Products.

27.     Defendants recommended the Ripoff Products to Named Plaintiffs and other Class Members as safe, secure, and liquid investments.

28.     Defendants also told Named Plaintiffs and other Class Members that the Ripoff Products were FDIC insured for the full value of the investment.

29.     Defendants failed to provide Named Plaintiffs and other Class Members with prospectuses for the Ripoff Products prior to their sale in direct violation of, *inter alia*, S.C. Code Ann. Regs. 13-501(A)(10).

30.     Defendants failed to provide Named Plaintiffs and other Class Members with full, complete, and accurate disclosures regarding the nature and terms of the Ripoff Products, but instead deliberately concealed the material facts set forth in ¶ 24, *supra*.

31.     Defendants failed to inform Named Plaintiffs and other Class Members that the Ripoff Products had stated maturities of longer than ten years and that the principal of their investment in the Ripoff Products could be tied up until the stated maturity dates.

32.     Defendants knew or should have known that the interest calculations embedded in the Ripoff Products were based on metrics that made it extremely unlikely for the Ripoff Products to return the promised "good" rate of interest after the initial guaranteed period.

33.     Defendants failed to inform Named Plaintiffs and other Class Members that the embedded calculations made it extremely unlikely that the Ripoff Products would return the promised "good" rate of interest after the initial guaranteed period.

34.     The Ripoff Products sold to Named Plaintiffs and other Class Members had lengthy maturity periods.  Defendants knew or should have known these periods were longer than the

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

investment time horizons and even the life expectancies of many elderly Named Plaintiffs and other Class Members to whom the Defendants sold these products.

35.     Defendants failed to inform Named Plaintiffs and other Class Members that the maturity periods were longer than their investment time horizons and even the life expectancies of many elderly investors to whom the Defendants sold these products.

36.     The market value of the Ripoff Products prior to maturity fell dramatically below their cost bases as a result of the falling interest rates, which dropped to zero pursuant to the embedded calculations based on various financial metrics.

37.     Defendants knew or should have known that the market value of the Ripoff Products would drop well below their cost bases as a result of their lengthy terms and the decreased and/or zero interest rates resulting from the embedded rate calculations.

38.     Defendants failed to inform Named Plaintiffs and other Class Members that the market value of the Ripoff Products would drop well below their cost bases as a result of their lengthy terms and the decreased and/or zero interest rates resulting from the embedded rate calculations.

39.     Defendants knew or should have known that the issuers were unlikely to exercise their "call" options as a result of the decreased and/or zero interest rates resulting from the embedded interest rate calculations.

40.     Defendants knew or should have known that the Ripoff Products would effectively be worth less in purchasing power at maturity than the amount originally invested.

41.     Defendants failed to inform Named Plaintiffs and other Class Members that the Ripoff Products would effectively be worth less in purchasing power at maturity than the amount originally invested.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

42. Defendants failed to inform Named Plaintiffs and other Class Members that their representations that the Ripoff Products would be called well before their maturity dates were untrue, deceitful, and wrongful.

43. Because of the decreased value of the Ripoff Products prior to maturity and because the Ripoff Products did not generate the income stream promised by Defendants, Named Plaintiffs and other Class Members are unable to make withdrawals without invading principal and locking in substantial losses, in direct contradiction of Defendants' representations that the Named Plaintiffs and other Class Members' investments in the Ripoff Products were protected, insured, and liquid.

44. The Ripoff Products are grossly illiquid, meaning that Named Plaintiffs and other Class Members cannot access the assets invested in the Ripoff Products without suffering substantial losses as the market value of the Ripoff Products are now far below their cost bases.

45. Defendants engaged in a scheme of concealment, failing to reveal to Named Plaintiffs and other Class Members that the Ripoff Products generated large commissions and fees payable to Defendants, which amounts were deducted from the amount available for investment. Defendants further concealed that these commissions and fees were the primary motivating factor in their promotion and sale of these illiquid products to elderly Named Plaintiffs and other Class Members—not the needs of the investors themselves, but rather the bad faith and self-interests of Defendants.

46. When Named Plaintiffs and other Class Members raised questions to Defendants about the diminished current values of the Ripoff Products, Defendants repeatedly told Named Plaintiffs and other Class Members that the Ripoff Products were and had been proper investments, that any reduction in the account balance was merely temporary and the result of factors beyond

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Defendants' control, that making changes in the investment strategy designed by Defendants would be foolish and wrong, and that the best course of action would be to continue to hold the Ripoff Products until they were called. Defendants supported their recommendation of Named Plaintiffs and other Class Members' continued holding of the Ripoff Products by repeating their assurances that the Ripoff Products would soon be called, well in advance of their maturity date. Defendants knew this to be false and made these representations only to convince Named Plaintiffs and other Class Members to continue holding the Ripoff Products and to take no other actions to protect their interests.

47.     Reassured by these continuing false and misleading promises and representations from financial "advisors" whom they believed were trustworthy and reputable and had their best interests in mind, the Named Plaintiffs and other Class Members followed Defendants' advice to leave their irreplaceable assets under Defendants' control and to continue to hold the Ripoff Products recommended and sold by Defendants. Defendants' false and misleading promises and representations concealed the true nature of the Ripoff Products and the harm they were causing, thereby keeping Named Plaintiffs and other Class Members misinformed, in the dark and waiting patiently as advised by Defendants.

48.     Unbeknownst to the Named Plaintiffs and other Class Members, the Ripoff Products were too risky and illiquid for elderly investors with a need for guaranteed income for living expenses, health care costs or to meet required minimum distributions in their IRAs and for flexibility and liquidity in their accounts. However, because of the faith, trust, and confidence that Defendants purposefully, deliberately and misleadingly engendered in these elderly Named Plaintiffs and other Class Members, they remained unaware that their trust was misplaced, that

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

they had been lied to and defrauded, and that their accounts continued to be exposed to enormous risk, imprudent investment, and general mismanagement.

49.     As a result of Defendants' continuing failures, the Named Plaintiffs and other Class Members have lost substantial value in their irreplaceable assets, have been denied immediate access to their funds, and have suffered enormous loss and damage.

## ALLEGATIONS OF NAMED PLAINTIFFS

### A.     Donald and Marcia Black

50.     Donald Black was born in 1943 and served for 27 years as a mess sergeant in the South Carolina Army National Guard.  He also owned and operated a lawn and garden store in South Carolina for over thirty years, until his retirement in 2013.

51.     Marcia Black was born in 1945 and was employed as hairdresser prior to her retirement in 2011.

52.     Mr. Black has served on the Board of Directors of the Nazareth United Methodist Church in Leesville, South Carolina since the mid-1980s.  In mid-2013, while he was also serving as Treasurer, a church member approached him about an investment she had just been sold by Defendants and which she believed (based on information received from Defendants) would also be a good investment opportunity for the church.  Mr. Black traveled to the Mantei Defendants' local office and observed a sign advertising "FDIC Insured" CDs at 10% interest for a minimum investment of $25,000.  He met with a representative of Defendants who described the advertised investments as FDIC insured and offering a 10% return during the first year, while the interest rate could decline thereafter, it would still be at a "good" rate, which amount would be readjusted to "not less than 3-4%" thereafter.  Defendants' representative explained that the investment would

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

be called by the issuer in 3-5 years and all principal would be returned to the investor at that time, in addition to the substantial interest that would be earned on the investment.

53.     After Mr. Black explained that the potential investor was the church, Defendants' representative agreed to come to a church board meeting to explain the recommended investments. At that meeting, which Mr. Black attended, Defendants' representative repeated the presentation made to Mr. Black in Defendants' local office.

54.     At no time either during Mr. Black's initial meeting in Defendants' office or during the church board meeting did Defendants' representative explain that the interest on the recommended investments could go to zero or that principal losses were likely to occur if the investment was not held until maturity.  Nor did Defendants' representative ever explain that the recommended investments would not mature until around 2030 and that the guaranteed return of principal would be available only if the investment was held until maturity.

55.     Thereafter, the church board voted to entrust two types of irreplaceable assets to Defendants for investment in the recommended products:  its cemetery fund, which represented monies held in trust and from which perpetual care expenses must be paid for the upkeep of burials in the church's graveyard, and a portion of its general fund.  Defendants comingled the two types of assets in the same account and sold the church two structured CDs for the aggregate amount.

56.     In fact and unbeknownst to Mr. Black and other church members, the stated maturities of the Ripoff Products sold to the church by Defendants were between 2028 and 2033.

57.     In his role as church Treasurer, Mr. Black observed the deposit of interest payments during the initial introductory period resulting from the investments recommended by Defendants into the church's bank account(s).  He and Mrs. Black decided to consult Defendants about whether they should make a similar investment with their own funds.  At the time, the Blacks were both

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

retired and in their late 60s. Defendants' representative recommended that the Blacks purchase similar products in their individual capacities and repeated the same representations about the expected income and liquidity of the recommended investments.

58.     In reliance on the representations of Defendants' representative, the Blacks decided to entrust Defendants with $60,000. These funds were the proceeds of the family's "change jar" savings. Over the years, the Blacks had saved their daily pocket change in a designated jar. Each time the jar filled up, they rolled the coins and took them to their bank. The Blacks did not deposit the money generated from their change jar in the bank or otherwise invest it. Instead, they converted the coins into cash in bills and kept those bills at their home.

59.     After Defendants recommended that they purchase one of the advertised products, the Blacks brought the cash representing their "change jar" savings to Defendants' local office. Defendants refused to accept cash and required that the Blacks obtain a cashier's check from their bank in order to purchase the products recommended by Defendants.

60.     Defendants sold Mr. and Mrs. Black a single structured CD product with a cost basis of $60,000, representing the entire amount of their years of "change jar" savings. They did not provide the Blacks with a prospectus on this product prior to its sale.

61.     Mrs. Black received an inheritance from her brother and sought Defendants' advice regarding the investment of a portion of it. Defendants' representative recommended the purchase of another structured CD, again assuring her that it would be a wise investment as it would provide income and repeating the same representations about the expected income and liquidity of the recommended investment.

62.     Defendants sold Mrs. Black another structured CD product with a cost basis of $50,000, representing the entire amount of the inheritance entrusted to Defendants for investment.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

63.     In fact and unbeknownst to Mr. and Mrs. Black, the stated maturity of the Ripoff Products sold to them by Defendants were between 2034 and 2035.  These maturities exceed the life expectancies of either of the Blacks.

64.     Several years later, Mr. Black noticed that the church was no longer receiving interest payments on the Ripoff Products that Defendants had sold and that the market value shown on Defendants' account statements for these assets was less than the amount the church had originally paid.  Mr. Black met with Defendants to ask for an explanation.

65.     Defendants gave a long, complicated, and confusing account of how the interest rates were calculated on such Ripoff Products, which Mr. Black did not understand.  They further provided reassurances that they would look into and rectify this situation.   Believing that Defendants were looking out for their best interests, Mr. Black was reassured that Defendants would look after and protect his interests.

66.     The Blacks had a similar communication with Defendants after they noticed similar problems in their personal accounts.  Again, Defendants' representatives reassured them that their money was safe that Defendants would "look into" other options for them to earn money from these investments.

67.     In 2018, the Blacks received by mail a written communication from Defendants purporting to list their investment objectives and other information about themselves and their account.  Much of this information was untrue.  The Blacks went to meet with Defendants who took back the erroneous customer information paperwork and promised to make corrections to accurately reflect the Blacks' objectives, risk tolerance and other information.  The Blacks have never received a corrected customer information printout from Defendants, despite Defendants' promises to share such paperwork.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

68.     As a result of Defendants' recommendations that much of their retirement savings and of Mrs. Black's inheritance be tied up in Ripoff Products, the Blacks have been forced to finance purchases they otherwise would have been able to buy outright.  Unless they accept a sizeable loss, their money will be tied up and unavailable for their use and enjoyment during their lifetimes.

**B.     Larry and Rebecca Martin**

69.     Larry Martin was born in 1949 and was employed as a machinist at Michelin for 33 years prior to his retirement in 2013.

70.     Rebecca Martin was born in 1952 and was employed as an administrative assistant for about 30 years, first for a local textile company and later for a law firm.

71.     In 2013, the Martins sought a meeting with the Mantei Defendants after seeing the sign outside their office advertising a 10% return on investments.  At that time, the Martins were both in their mid-60s.  Mr. Martin had recently retired from Michelin and Mrs. Martin planned to retire within a year.

72.     Mr. Martin required advice on the investment of his 401K and a lump sum retirement fund he had received from Michelin.  These funds, which totaled approximately $730,000, were held in a roll-over IRA.  Mrs. Martin would also be receiving retirement assets of approximately $130,000.  These funds represented a substantial portion of the Martins' retirement savings.

73.     Defendant Chiellini asked the Martins if they would like to earn the 10% return advertised on the office sign.  She also told them that the recommended investments were guaranteed to never lose their principal and that the investments would be called by their issuers within 3-5 years at which time the full principal would be returned.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

74.     The Martins were not told that the 10% interest rate was only for the first year of investment nor that thereafter the interest rate was variable and could drop to zero.  Nor did Defendants disclose that the recommended investments would not mature for twenty (20) years.

75.     Defendants sold Mr. Martin four structured CDs in the aggregate amount of $500,000, as well as a $100,000 "medium term" corporate bond.  These Ripoff Products were all purchased with assets in Mr. Martin's IRA.

76.     When Mrs. Martin retired in mid-2014, Defendants also sold her another two structured CDs in the aggregate amount of $80,000 and a $50,000 corporate note.   These Ripoff Products were all purchased with assets in Mrs. Martin's IRA.

77.     When discussing the investment strategy recommended for the Martins, Defendants did not distinguish between different types of investments they eventually sold to the Martins but treated them as having the same high return and likelihood of being called within a short period.  Defendants knew or should have known these representations were false.

78.     Defendants did not provide the Martins with prospectuses on the recommended products prior to its sale.

79.     In fact and unbeknownst to Mr. and Mrs. Martin at the time of their purchases, the stated maturity of the Ripoff Products sold to them by Defendants were between 2033 and 2034.  These maturities exceed the life expectancies of either of the Martins.

80.     Several years later, the Martins noticed that the monthly statements reported declining fair market values for their supposedly "guaranteed" investments.   Defendants' representatives initially provided reassurances that the Martins should not worry because they would actually receive all of their principal back.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

81.     The Martins made numerous attempts to discuss these investments with Defendant Chiellini, who failed to return calls or set up a meeting for about a year.  Several meetings finally occurred in March and April 2018, at which time Defendants admitted that the Ripoff Products had long maturities.  When the Martins complained that their money was tied up for twenty years, Defendant Chiellini, on behalf of all Defendants, continued to maintain that the issuers would call these investments within 6 years of their issuance and that the Martins should be patient and would soon have access to all their money.

82.     The Martins were not satisfied with the answers and explanations provided during the in-person meetings and raised additional questions in writing.  However, Defendants failed to respond to these inquiries.  Upset and disillusioned at their mistreatment by their trusted advisors, the Martins transferred their accounts away from Defendants' control in May 2018.

### C.     James and Barbara Thompson

83.     James Thompson was born in 1942 and was employed as a sheet metal fabricator and welder and in construction prior to his retirement.

84.     Barbara Thompson was born in 1941 and was employed as an auditor in the South Carolina Comptroller General's Office prior to her retirement.

85.     In late 2013 or early 2014, the Thompsons sought a meeting with the Mantei Defendants after seeing the sign outside their office advertising a 10% return on investments.

86.     The Thompsons sought advice on the investment of essentially all of their liquid assets, which were collectively worth approximately $126,000.  At this time, they were both over 70.5 years old and their IRAs were subject to the minimum distribution requirements imposed by law.   Prior to their engagement of Defendants as their financial advisors, the Thompsons' assets were held in bank accounts.   They told Defendants that they were "low risk" investors.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

87.     Defendants assured the Thompsons that the recommended investment products would not lose principal and that the issuers would call these products within 3-5 years, so that their funds would be readily available to them.

88.     Defendants also assured the Thompsons that although the interest rates on these products were subject to change, the return would remain "good."  The Thompsons were never told that the interest could go to zero.

89.     Defendants sold Mr. Thompson a $33,000 structured CD, tying up 100% of his IRA funds in a Ripoff Product.

90.     Defendants sold Mrs. Thompson a $26,000 principal protected note, tying up 100% of her IRA funds in a Ripoff Product.

91.     Defendants also sold the Thompsons another $33,000 structured CD and another $34,000 principal protected note in the couple's joint tenancy brokerage account.  These Ripoff Products were identical to those sold to the Thompsons in their IRAs.

92.     The Thompsons were not provided with a prospectus for any of the Ripoff Products prior to the Defendants selling such products to them.

93.     In fact, and unbeknownst to the Thompsons, the Ripoff Products sold to them by Defendants had maturities between 2033 and 2034.  These maturities exceed the life expectancies of either of the Thompsons.

94.     In late 2016, the Thompsons complained to Defendants that the Ripoff Products recommended by Defendants had lost value and were no longer paying any interest.   At Defendants' recommendation, the structured CD was sold at a loss from both Mr. Thompson's IRA and their joint brokerage account.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## CLASS ALLEGATIONS

95.     Named Plaintiffs bring this class action on behalf of themselves and all persons similarly situated under Rule 23, SCRCP.  Named Plaintiffs seek to represent the following class:

> South Carolina citizens and the estates of deceased South Carolina citizens, who, at the age of 50 years or older, were sold by representatives affiliated with the Mantei Defendants while registered with the Broker-Dealer Defendants a debt instrument (including, but not limited to structured certificates of deposit, principal protected notes, and corporate medium-term notes) that is not a "covered security" under SLUSA, with an interest rate that was subject to fluctuation prior to maturity, which could decrease to zero based on market variables, and which has or had a maturity period greater than 10 years.

96.     Named Plaintiffs' claims may be maintained under Rule 23(a), SCRCP on behalf of the Class Members because the class is so numerous that joinder of all members is impracticable, there are questions of law or fact in common to the class, the claims of the representative parties are typical of the claims of the class, the representative parties will fairly and adequately protect the interests of the class and the amount in controversy exceeds one hundred dollars ($100.00) for each class member.

97.     The number of Class Members is currently unknown but is expected to exceed the number beyond which joinder of all Class Members is impractical.  Upon information and belief, the size of the class does not exceed 100 members.

98.     The questions of law that are common to the claims of Named Plaintiffs and of each Class Member include, *inter alia*:

    a.  the liability of Defendants;

    b.  the method of calculation of damages;

    c.  the anticipated justifications and defenses raised by the Defendants;

    d.  the availability of equitable relief, such as disgorgement and/or rescission of the Ripoff Products; and

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

    e.   remedies available under South Carolina law.

99.   The questions of fact that are common to the claims of Named Plaintiffs and of each Class Member include, *inter alia:*

    a.   the business practices and conduct of Defendants to promote the Ripoff Products to Named Plaintiffs and the Class Members to advance their own interests in collecting fees and commissions;

    b.   the true characteristics of the Ripoff Products;

    c.   the knowledge of the Defendants regarding the true characteristics of the Ripoff Products;

    d.   the lack of notice from Defendants to inform the Named Plaintiffs and Class Members of the true characteristics of the Ripoff Products;

    e.   the knowledge of the Defendants as to the illiquidity of the Ripoff Products for any Plaintiff in the class;

    f.   the lack of notice from Defendants to inform the Named Plaintiffs and Class Members of the illiquidity of the Ripoff Products;

    g.   the failure of Defendants to provide Named Plaintiffs and Class Members with prospectuses prior to confirmation of the purchase of the Ripoff Products;

    h.   the extent and source of the Defendants' unjust enrichment, including fees, commissions, incentives, and any other form of benefit or compensation received by Defendants;

    i.   the lack of notice from Defendants to inform the Named Plaintiffs and Class Members of the fees, commissions, incentives, and any other form of benefit or compensation to be received by Defendants for recommending and selling the Ripoff Products to the Named Plaintiffs and Class Members; and

    j.   all factual issues regarding equitable relief.

100.   The claims advanced by Named Plaintiffs are typical of those of each Class Member in that the nature of the claims is the same for each Class Member; the Named Plaintiffs were subjected to the same general course of business practices and conduct as each Class Member; the cause of damage for the class is a single course of conduct which is the same for each

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

Class Member; each Class Member is an affected investor; the Ripoff Products sold are substantially the same in all relevant respects for this action; the types of damages incurred are essentially the same for each Class Member; and the anticipated defenses of Defendants are the same for each Class Member.

101.    Named Plaintiffs were sold Ripoff Products that were substantially similar in all material respects to the products sold to other Class Members. Named Plaintiffs possess sufficient knowledge and involvement in the matter to fairly and adequately protect the interests of each member of the class.

102.    Each Class Member has incurred damages and requires relief as set forth herein due to the Defendants' actions.

### FOR A FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

103.    Each allegation of the foregoing paragraphs is incorporated herein by reference as fully as if set forth verbatim.

104.    Upon the opening of Named Plaintiffs' and the Class Members' accounts with Defendants, and then as Defendants began to manage and control the accounts, Defendants entered into both express agreements and implied agreements with the Named Plaintiffs and other Class Members.  These agreements constituted contracts between the Named Plaintiffs and other Class Members and the Broker-Dealer Defendants (hereinafter "the Agreements").

105.    Defendants, via the Agreements, and pursuant to statutes and regulations, agreed to abide by the rules and regulations of the Securities and Exchange Commission ("SEC"), the Financial Industry Regulatory Authority ("FINRA"), and all other self-regulatory organizations ("SRO") of which they were members.  Named Plaintiffs and the Class Members are third party

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

beneficiaries of these Agreements and have been damaged by Defendants' failure to abide by these Agreements and the SRO rules and regulations.[1]

106.    In addition, South Carolina law implies a duty of good faith and fair dealing into every contract, including the Agreements between Defendants and Named Plaintiffs and the Class Members.

107.    Defendants' (i) failure to fulfill their common law and statutory duties to handle and manage the investors' accounts with due care, diligence, and undivided faithfulness and loyalty; (ii) self-serving actions, inactions, and omissions; and (iii) bad faith and fraudulent wrongdoing as described herein, constitute a failure to abide by the terms of the Agreements and the third-party agreements referenced above, and constitute a breach of these contracts.  Named Plaintiffs and the Class Members have been directly and proximately damaged as a result of Defendants' breaches.

108.    Named Plaintiffs and other Class Members are therefore informed and believe that they are entitled to (1) actual damages, including but not limited to loss opportunity costs and/or market damages; (2) consequential damages; (3) disgorgement of wrongfully obtained fees and commissions; (4) costs, (5) prejudgment interest, (6) attorneys' fees, and (7) and such other relief as is just, proper, and equitable.

---

[1]By citing to federal securities rules and regulations, Named Plaintiffs are not making any claims under federal law; instead, Named Plaintiffs simply are using the violation of federal standards as potential proof of liability on their state-law theories.  Incorporating these standards into Plaintiffs' state law cause of action does not give rise to federal question jurisdiction.  *See Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 817 (1986).  Any removal on this basis will be met with an immediate motion for remand and for sanctions.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## FOR A SECOND CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY)

109.    Each allegation of the foregoing paragraphs is incorporated herein by reference as fully as if set forth verbatim.

110.    Defendants, as Named Plaintiffs' and the Class Members' registered securities brokers, acted as Named Plaintiffs' and the Class Members' agents and, under the common law of South Carolina, any agent by virtue of the relationship with the principal is considered a fiduciary with respect to all matters within the scope of the agency.

111.    By the nature of the transactions in question, the Named Plaintiffs' and the Class Members' relationship with Defendants, Defendants' employees, and Defendants' agents involved a relationship of the utmost trust and confidence.  This relationship was, by its essential nature, intrinsically fiduciary, calling for Defendants, and their employees and agents, to act with perfect good faith, absolute faithfulness, and undivided loyalty to the interests of Named Plaintiffs and the Class Members.

112.    With this fiduciary relationship also came the duties and obligations to keep Named Plaintiffs and the Class Members fully informed of all information pertinent to all transactions in which Defendants were representing Named Plaintiffs and the Class Members, to make full disclosure of all information that materially affected the account, to disclose any actual or potential conflict of interest, to exercise reasonable care, diligence, and prudence in the performance of their duties and to place the interests of their principals above their own.

113.    At the urging of Defendants, Named Plaintiffs and the Class Members reposed a special confidence in Defendants by entrusting their assets to Defendants, who agreed to accept them and to act as Named Plaintiffs' and the Class Members' fiduciaries in providing expert guidance and investment advice.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

114.    Defendants breached their fiduciary duties in one or more of the following particulars:

    a.    Defendants placed their own interests ahead of Named Plaintiffs and the Class Members by recommending and purchasing the Ripoff Products;

    b.    Defendants placed their own interests ahead of Named Plaintiffs' and the Class Members' interests by treating them as a profit center instead of as their fiduciary principals;

    c.    Defendants sold Ripoff Products that were harmful and damaging to Plaintiffs and provided false, misleading, and incomplete information to Named Plaintiffs and the Class Members regarding the Ripoff Products in an effort to induce Named Plaintiffs and the Class Members to purchase them;

    d.    Despite knowing that the Ripoff Products were speculative and illiquid, Defendants nonetheless sold them to Named Plaintiffs and the Class Members;

    e.    Defendants knew of, but failed to disclose to Named Plaintiffs and the Class Members, their own financial interests in recommending Ripoff Products, including a complete advance disclosure of all fees and costs associated with the Ripoff Products; and

    f.    Defendants either knew of or failed to ascertain and understand the nature of the Ripoff Products purchased for Named Plaintiffs and the Class Members.

115.    Because of the imprudence, recklessness, willful and wanton misconduct, failures to disclose, bad faith, and fraudulent acts and misrepresentations, as set forth herein, Defendants, and their employees and agents, breached the fiduciary duties owed to Named Plaintiffs and the Class Members. These breaches were a direct and proximate cause of damages to the Named Plaintiffs and the Class Members.

116.    Named Plaintiffs and the Class Members are therefore informed and believe that they are entitled to (1) actual damages, including but not limited to loss of opportunity costs and/or market damages, (2) consequential damages, (3) disgorgement of wrongfully obtained fees and

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

commissions, (4) punitive damages in an amount to be determined by the finder of fact, (5) costs, (6) prejudgment interest, and (7) and such other relief as is just, proper, and equitable.

### FOR A THIRD CAUSE OF ACTION
### (UNJUST ENRICHMENT)

117.    Each allegation of the other paragraphs set forth herein is incorporated by reference as fully as if set forth verbatim.

118.    As a result of the misconduct and omissions described above, Defendants received benefits in the form of commissions and fees on the sale of each Ripoff Product.  These commissions and fees were paid out of the gross amount Named Plaintiffs and other Class Member invested in the Ripoff Products, to the detriment of Named Plaintiffs and other Class Members and the benefit of Defendants.

119.    For the reasons set forth in this Complaint, Defendants received and retained those commissions under unequitable circumstances.  Defendants' foisting of the Ripoff Products upon Named Plaintiffs and other Class Members through their willful concealment of material information regarding the Ripoff Products' nature, structure, and characteristics unjustly conferred a benefit upon Defendants to the great detriment of Named Plaintiffs and the Class Members.

120.    Named Plaintiffs and the Class Members are therefore informed and believe that they are entitled to (1) disgorgement of wrongfully obtained fees and commissions, (2) prejudgment interest, (3) all losses or harms suffered as a result of and occasioned by the Defendants wrongfully obtaining fees and commissions from Plaintiffs, and (4) and such other relief as is just, proper, and equitable.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

## FOR A FOURTH CAUSE OF ACTION
## (BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT)

121.    Each allegation of the other paragraphs set forth herein is incorporated by reference as fully as if set forth verbatim.

122.    Defendants' fraudulent misconduct, actions, and inactions, as described above in the Fifth Cause of Action, constitutes a failure to abide by the terms of the Agreements, and constitute a breach of the Agreements entered into with Named Plaintiffs and other Class Members.  Named Plaintiffs and the Class Members have been directly and proximately damaged as a result of these breaches by Defendants.

123.    Moreover, in breaching the Agreements with Named Plaintiffs and the Class Members, Defendants exhibited a fraudulent intent relating to those breaches as set forth above.

124.    Defendants' breaches of the Agreements were accompanied by fraudulent acts on the part of Defendants as set forth above.

125.    As a direct and proximate result of Defendants' breach of contract accompanied by fraudulent act, Named Plaintiffs and the Class Members have suffered injury all in direct violation of the laws of the state of South Carolina.

126.    Named Plaintiffs are therefore informed and believe that they are entitled to (1) actual damages including but not limited to loss of opportunity cost and/or market damages, (2) consequential damages, (3) punitive damages, (4) costs, (5) prejudgment interest, (6) attorneys' fees, and (7) and such other relief as is just, equitable, and proper.

## FOR A FIFTH CAUSE OF ACTION
## (STATE SECURITIES ACT VIOLATIONS, S.C. CODE ANN. §§ 35-1-101, *ET SEQ.*)

127.    Each allegation of the foregoing paragraphs is incorporated herein by reference as fully as if set forth verbatim.

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

128.   The Ripoff Products, while not "covered securities" for purposes of SLUSA, are nonetheless "securities" as that term is defined in the South Carolina Uniform Securities Act of 2005.  S.C. Code Ann. § 35-1-102(29); *see also id.* § 35-1-102(7) (separately defining "Federal covered security" under the South Carolina Uniform Securities Act of 2005).

129.   In the course of their fiduciary duties to Named Plaintiffs and the Class Members, Defendants recommended and advised Named Plaintiffs and the Class Members to purchase the Ripoff Products, and in so doing, made untrue statements of material facts or omitted to state material facts necessary to make other statements not misleading, in light of the circumstances, thereby violating the South Carolina Securities Act, S.C. Code Ann. § 35-1-501, -502, & 509(b) and S.C. Code of Regulations 13-501(14)—(17) as set forth in this Complaint.

130.   The actions, inactions, untrue statements, and omissions of Defendants were made (or not omitted) to Named Plaintiffs and the Class Members, either directly or indirectly, in connection with the offer, sale, or purchase of securities under South Carolina law, namely the Ripoff Products.

131.   On information and belief Defendants were compensated, either directly or indirectly, for the sale of the Ripoff Products, which was accomplished by means of untrue statements and/or omissions that rewarded Defendants, but damaged Named Plaintiffs and the Class Members as alleged herein.

132.   On information and belief, Defendants failed to provide Named Plaintiffs and the Class Members with copies of the prospectuses for each Ripoff Product prior to sale, in violation of S.C. Code Ann. Regs 13-501(A)(10).

133.    Defendants' acts and/or omissions violated FINRA Rule 2111 and other applicable FINRA rules governing broker conduct relative to honesty, ethics, obligations to customers, and the like, in violation of S.C. Code Ann. Regs 13-501(A)(21).

134.    The actions of Defendants were wrongful, fraudulent, and in violation of S.C. Code Ann. §§ 35-1-501, -502, and -509 (Supp. 2010) and the regulations regulating broker conduct established thereunder.

135.    As a direct and proximate result of the fraud of Defendants, Named Plaintiffs and the Class Members suffered substantial damages.

136.    Named Plaintiffs and the Class Members are therefore informed and believe that they are entitled to (1) actual damages including but not limited to loss of opportunity cost and/or market damages and/or rescission, (2) disgorgement of fees and commissions paid to Defendants; (3) costs, (4) attorneys' fees, (5) statutory interest pursuant to S.C. Code Ann. § 35-1-509(b), and (6) such other relief as is just, proper and equitable.

## DEMAND FOR RELIEF

WHEREFORE, Named Plaintiffs pray for judgment against Defendants Mantei & Associates, Ltd., Ricky Alan Mantei, Cindy Chiellini, Centaurus Financial, Inc., and J.P. Turner & Company, jointly and severally, as follows:

a.    For actual damages suffered by Named Plaintiffs and the Class Members including but not limited to the market losses to their accounts that would not have occurred in the absence of the sale of the Ripoff Products;

b.    For consequential damages and/or market or lost opportunity damages and/or market damages suffered by Named Plaintiffs and the Class Members;

c.    For disgorgement of fees and commissions received by Defendants as a result of the sale of the Ripoff Products;

d.    For rescission of the Ripoff Products;

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636

e.    For punitive damages in an amount to be determined by the trier of fact;

f.    For statutory and/or prejudgment interest at the highest legal rate;

g.    For the costs of this action;

h.    For reasonable attorneys' fees; and

i.    For such other and further relief as is just, equitable and proper.

Respectfully submitted,

**WILLOUGHBY & HOEFER, P.A.**

s/Mitchell Willoughby
Mitchell Willoughby, S.C. Bar No. 6161
Elizabeth Zeck, S.C. Bar No. 9006
930 Richland Street (29201)
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com

R. Walker Humphrey, II, S.C. Bar No. 79426
133 River Landing Drive, Suite 200
Charleston, SC 29492
(843) 619-4426
whumphrey@willoughbyhoefer.com

*Attorneys for Named Plaintiffs*

August 10, 2020
Columbia, South Carolina

ELECTRONICALLY FILED - 2020 Aug 10 4:43 PM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202636